IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JULIE KEASCHALL, Personal Representative of the Estate of Kurtis Keaschall, deceased and DAWSON PUBLIC POWER DISTRICT, | ) CIVIL ACTION NO.: 4:14-CV-03070 ) ) ) ) AFFIDAVIT OF STEPHEN L. AHL |
| Plaintiffs, | ) IN SUPPORT OF DEFENDANTS' ) MOTION FOR SUMMARY JUDGMENT ) |
| vs. | ) ) |
| ALTEC INDUSTRIES, INC. and OSBORNE INDUSTRIES, INC., | ) ) ) |
| Defendants. | ) ) |

STATE OF NEBRASKA      )
                       )ss.
COUNTY OF LANCASTER    )

Stephen L. Ahl, being first duly sworn upon oath, deposes and states as follows:

1.  I am the attorney for Defendant Osborne Industries, Inc., in the above-captioned action.

2.  I offer this Affidavit in support of Defendants' Motion for Summary Judgment.

3.  I have personal knowledge of the facts contained herein.

4.  During the course of discovery, Plaintiff has disclosed only two expert witnesses on liability issues, John A. Eihusen, P.E. and William R. Coleman, M.S., P.E.

5.  Attached hereto as Exhibit A is a true and correct copy of the September 26, 2015 Report of John A. Eihusen, P.E, which Plaintiff provided during discovery in this matter.

6.  Attached hereto as Exhibit B is a true and correct copy of the October 24, 2016 and November 29, 2016 Deposition of John A. Eihusen, P.E., taking during

**EXHIBIT**
**1**

discovery in this matter.

7. Attached hereto as Exhibit C is a true and correct copy of the transcript of the deposition of Plaintiff's designated expert William R. Coleman, taken during discovery in this matter.

8. Attached hereto as Exhibit D is a true and correct copy of the September 30, 2015 Report of William R. Coleman, which Plaintiff provided during discovery in this matter.

9. Attached hereto as Exhibit E is a true and correct copy of the August 29, 2016 Supplemental Report of William R. Coleman, P.E., M.S.

10. Attached hereto as Exhibit F is the August 1, 2016 Rebuttal Report of John A. Eihusen, P.E., which Plaintiff produced during discovery in this matter.

11. Attached hereto as Exhibit G is a true and correct copy of the June 23, 2016 Knott Laboratory Engineering Report prepared by Osborne's designated expert Ben T. Railsback, M.S., P.E, which was produced during discovery in this matter.

12. Attached hereto as Exhibit H is the Report of Osborne's designated expert Joseph F. Rakow, PhD, P.E., which was produced during discovery in this matter.

13. Attached here to as Exhibit I is the June 27, 2016 Report of Defendant Altec Industries, Inc.'s designated expert, Anand R. Shah, M.S., M.B.A., P.E., which Altec produced during discovery in this matter.

14. Attached hereto as Exhibit J is the Altec Industries, Inc. Operator's Manual for AA755L. This document is subject to a protective order and is filed under seal.

15. On May 10, 2017, Defendants filed motions seeking to exclude the testimony of John A. Eihusen and William R. Coleman.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Stephen L. Ahl

SUBSCRIBED AND SWORN to before me, this <u>10th</u> day of May 2017.

_____
Notary Public

GENERAL NOTARY - State of Nebraska
JENNIFER D. SANER
My Comm. Exp. October 8, 2020

3

## EiCon Services

3310 Manassas PL
Lincoln, NE, 68516
E-Mail: EiCon@neb.rr.com

# Keaschall Failure Investigation

## Summary Findings

September 26, 2015

John A. Eihusen, PE



## 1.  Scope of Work for Expert Analysis

The scope of work (SOW) was to review the evidence provided, research and investigate as necessary to determine the cause and all contributing factors for the failure of the aerial lift bucket involved in the Keachall accident.  The work scope includes responding directly and specifically to the questions of interest provided below:

1) Did defendants use reasonable care in the manufacture of the bucket?
2) Did defendants use reasonable care in the design of the bucket?
3) Did defendants adequately warn of the dangers of the use of the bucket and the need for periodic inspection?
4) Was the bucket defective and unreasonably dangerous for its intended use (or for any use defendants could reasonably foresee)?
5) Were items 1-4 a cause of the collapse of the bucket?

This summary report details the investigation and findings for the failed composite man-lift bucket assembly and provides answers to the key questions of interest.

## 2. Standard Reference Datums and Identification

For consistency in this report a standardized reference datum is defined as an observer would view the assembly standing at the point of connection with the lift boom; facing outward and bucket open upwards.



**Figure 1 Reference View**

The bucket is identified with the following attached label shown in Figure 2.



**Figure 2 Identification Label**

2

## 3. Statement of Expert Opinion

It is my expert opinion as an engineer in the field of composites that:

1) A delamination flaw (or structural defect) was created at the time of manufacture at the "A" Location (see Figure 6).
2) The defect was near or adjacent to the top of the pre-formed insert used to form the right side vertical rib of section 2.
3) Secondary machining operations transforming the raw molded part described in ALTEC drawing 704-00065 to the external profile on drawing 704-00350 caused external edge defects or in-plane delamination at the 18 inch rib to rib cut opening. The defects could have been facilitated by physical damage of the cutting tool or by exposing existing internal defects to the environment.
4) The internal delaminations and external machining damage was facilitated by dry fiber from incomplete resin flow and wet out of the reinforcement mat at the time of molding.
5) The incomplete resin flow resulted from improper reinforcement layup and mold closure as identified by Osborne on the units Aerial Platform Inspection Report.
6) The external flaws caused by the machining operation grew in service extending the delamination surface between plies and reducing the structural capacity of the laminate as it was used in-service until it reached the failure load condition.
7) At time of the failure the compromised composite resolving Mr. Keaschall's body weight into vertical rib failed in shear at or near the vertical rib insert which triggered the catastrophic failure of the bucket.
8) Mr. Keaschall would not have had any visual warning of the impending failure.
9) None of the inspection methods used for safety assessment "as described" in the user operating instructions would have indicated this failure mode to Mr. Keaschall.
10) The primary structure was not resistant to a single point failure mode and as such failed totally and completely in a manner inconsistent with life-critical applications.
11) The primary reinforcement used in the design and identified as short fiber, random mat has little capacity to resist flaw propagation and was improperly applied in the design without suitable long fiber reinforcement to provide fracture toughness and control of cycling tensile strains in the laminate.

# 4. Responses to Questions of Interest

The following sections respond to the questions of interest with a summary rational.

## 4.1.   Question of Interest 1

Did defendants {Altec / Osborne} use reasonable care in the manufacture of the bucket?

RESPONSE: Based on the disclosures provided, No.

RATIONALE: My determination is based on lack of disclosures that indicate that the requirements of ISO 9000 were not being followed and best practices for risk management were not being applied.  Minimum requirements of ISO 9000 order specific actions with respect to vendor management and certification to conformance to the purchase order. This may be implemented in numerous schemes but documentation that the lift bucket was shipped / received meeting the purchase specification was not provided.  This implies that no inspection of the manufactured assembly was performed.  In the ISO 9000 quality system vendor surveys and process documentation should have been in the record for the manufacture of the bucket.

Standard best practice process would be to develop PFMEAs and active CONTROL PLANS to which the manufacturing process could be audited for compliance.  The CONTROL PLAN would also point to tool validation and inspection verification for all key steps.  For a life critical structure not supported by comprehensive process planning (PFMEA, CONTROL PLANS, TOOL VALIDATION) with concurrent traceability of key material content is not providing "reasonable" care by any recent standard of merit.

## 4.2.   Question of Interest 2

Did defendants {Altec / Osborne} use reasonable care in the design of the bucket

RESPONSE: Based on the disclosures provided, No.

RATIONALE:  The design documentation did not provide or apparently consider a material evaluation plan to develop acceptable allowable stresses for the bucket over the design lifetime.  There apparently was no comprehensive specification for the operational requirements for the lift bucket with a concurrent design analysis to verify the design intent.  Some "work product" of the design authority should have evidenced design intent that a responsible individual with an understanding of the "use" and "success" in service exercised critical judgment.  The preparation of an advanced analysis such as Finite Element Analysis (FEA) with a material suitable fracture assessment would have been within normal expectations for life critical structure.  Altec claims the ability to perform such analysis in multiple patent disclosures for composite structures.  They also clearly identify the performance improvement of long fiber, woven or knitted fabrics.  The lack of those known techniques in this life critical structure would not be considered either reasonable or best practice.

In the testing of the product there is no indication of the revision level of the bucket tested or any indication how any specific test of record related to the release status and of current builds.  Revision changes were issued without providing rational for changes or detailing the effect to the design verification documents.  Bucket validation testing beyond the date of manufacture or revision level of the bucket supplied are not relevant to the engineering evaluation of the design and are not proof that reasonable care was applied in the design process.

As part of a design process for a life critical structure it is reasonable to expect that a DFMEA would be developed.  A DFMEA would have indicated the single point failure and lack of a failure tolerant design.  In this case a design was developed with out redundant load paths so that when the bucket flange was compromised the structure failed catastrophically.

4

## 4.3.    Question of Interest 3

Did defendants {Altec / Osborne} adequately warn of the dangers of the use of the bucket and the need for periodic inspection?

RESPONSE: Based on the disclosures provided and the manner of this failure, No.

RATIONALE: An extensive review of the documents provided by Altec never disclosed the potential for catastrophic structural failure of the composite parts.  Inspection criteria centered on the dielectric response of the composite to resist high voltage current leakage.  Inspection criteria specific to the identification of unsafe use or (pass / fail) criteria for the load carrying ability of the structure was not identified.  This is clearly shown in the vehicle's inspection record that several third-party inspections to published recommendations and did not find any defects in the bucket structure.

## 4.4.    Question of Interest 4

Was the bucket defective and unreasonably dangerous for its intended use (or for any use defendants {Altec / Osborne} could reasonably foresee)?

RESPONSE: From the information disclosed, YES.

RATIONALE: By Osborne manufacturing records the bucket was subjected to known folds and visual indications at the time of manufacture.  These were judged to be superficial and passed on without further inspection.  The responsible review and evaluation of acceptable or repairable defects is not provided in the documentation.  No evidence of evaluation of the depth or extent of the defect is recorded or part of the manufacturing record.  At no point was a concurrence of the "design authority" documented to allow the observed defect to remain in the laminate.  Altec as the "design authority" has a implied responsibility to ensure that proper guidance of the manufacturing process is provided.  This would include continuing inspection and control of received hardware to ensure it fully meets the intended specification.  There is no documentation that supports that critical and reasonable effort.

The evaluation of the defect (or an anomaly) should have been validated by systematic D/P FMEA evaluations as part of an operational Control Plan.  The Control Plan would have required the validation of visual inspection indication, which in this case was the preceding "first cause" of the chaining sequence of the failure event.

## 4.5.    Question of Interest 5

Were items 1-4 a cause of the collapse of the bucket?

RESPONSE: YES.

RATIONALE: As detailed above.

## 5. Evidence Reviewed

My expert opinion is based on the following:

1) Personal inspection of the failed components
2) All Documents and specifications as disclosed by Altec
    a. This includes all operations, parts and service instructions
    b. This includes all test documentation and video
3) All Documents and specifications as disclosed by Osborne
4) All Documents and inspection records as disclosed by Dawson Public Power
5) All Documents and reports as provided by Sherman County Sheriff
6) All Depositions as provided by the client (Dawson Public Power)
7) Personal research in specific application
8) Review of Altec patents and claims
9) Detail review of the photographic evidence by:
    a. Altec
    b. Dawson Public Power
    c. Sherman County Sheriff
10) Body of personal experience in advanced composite design (see Section 9)
11) MIL-HDBK-17, Composite Materials Handbook

## 6. Visual Findings in the Primary Structure

The failure resulted in the molded assembly failing into three major sections. For consistency and uniformity of reference they are identified as follows:

- Failed Section 1 : Body Shell, see Figure 3
- Failed Section 2 : Attachment Structure, see Figure 4
- Failed Section 3 : Corner Segment, see Figure 5

The visual inspection of the failed structure indicates 3 prominent points of interest as shown in Figure 6. These points of interest are connected by a fracture network (yellow dashed lines) that traverse the assembly separating the structure into the three (3) sections noted above. For each point of interest a summary of visible indications are provided in the following figures.



**Figure 3 Section 1, Bucket Body (with liner)**

7



Figure 4 Section 2, Attachment Structure (View looking outward from boom)



**Figure 5 Section 3, Corner Segment**



**Figure 6 Locations of Interest**

## 6.1.   Summary of Visual Indications at Location A

The visual evidence at location "A" shows numerous composite ply delaminations that cut across the failure interface separating Sections 1 and 2.  The common failure surfaces are clearly indicted in  Figure 7 and Figure 9.   There are several of these structural defects whose span reaches from the free edge of the flange to deep into the primary load carrying structure as shown in Figure 8.  The exact locations and extent of many delaminations (structural defects) can be traced by the contamination that has collected between adjacent composite plies.  This is positive evidence that the individual composite lamina were not bonded together in those locations.  A likely source of the contamination (black color) would be migration of surface oils and dirt, which leeched into the laminate following and marking the extent of the unbonded surfaces.  The yellow color on surfaces marking internal delaminations can be attributed to several factors such as oxidation of the resin from atmospheric exposure, migration of contaminants from the environment or evidence of under-catalyzed (improperly mixed) resin.  But in all cases discoloration within the laminate bears witness to a pre-existing internal structural defect that prevented the individual laminate plies from contributing to the strength of the structure.



**Figure 7 Location A, Section 1 (View looking right)**

11



**Figure 8 Location A, Section 1, (View looking up)**



**Figure 9 Location A, Section 2, (View looking down)**

There are several exposed surfaces at location A on both sections 1 and 2, that by their clean and smooth texture show no positive indication of adhesion within the laminate from the time of manufacture. In several locations the delamination surfaces have no evidence of exposure to external contaminants, which is a strong indication that they were sealed into the assembly at the time of manufacture. Without full and complete disclosure of the exact lamination schedule and manufacturing process it is difficult to estimate the effect of each specific defect to the strength of the primary structure but it can be clearly stated that the ability of the structure to resolve loads through that location was significantly, if not severely compromised.

6.2.    Summary of Visual Indications at Location B

The visual inspection at location B does not show the multitude of internal flaws that presented at location A. The laminate displays a uniform color and material composition within the laminate thickness as shown by Figure 10, Figure 11 and Figure 12. The failed sections at location B present surfaces typical of a composite laminate failing in a condition of overload with reinforcement fibers pulled out normal to the exposed surfaces. The exposed surfaces suggest a shear failure caused by an applied moment and tensile traction in the plane of the flange causing the separation of sections 1 and 2.



Figure 10 Location B, Section 1 (View looking right and forward)



**Figure 11 Location B, Section 1 (View looking left)**



**Figure 12 Location B, Section 2 (View looking inward and up)**

6.3.    Summary of Visual Indications at Location C

The visual inspection of the fractured surfaces at location C shows that the rate of energy dissipation was changing as the fracture crossed through location C (see Figure 13).  The abrupt turn and separation into multiple paths along with a change of orientation of the separation plane within the laminate thickness indicate that the structure was likely shifting under the applied load and changing how the load was being transmitted between the bucket shell and the mounting point at the boom.

16



**Figure 13 Location C, Section 1 (View looking downward)**

## 7. Failure Event Narrative

Inspection of the photographs (see Figure 15) taken at the worksite indicates that it was highly likely that Mr. Keaschall was standing at the far outboard right edge of the bucket. This would have placed the maximum load (bending moment and tensile force) at location A. The top flange of the bucket assembly, which crosses over location A, provides a significant share of the stiffness holding the bucket orientation to the boom. Inspection of the failed sections 1 and 2 at location A also indicates that a mold insert (not disclosed by Altec) is keyed into the bucket flange at the time of manufacture similar to a tongue and groove connection (see Figure 16).

When the triggering load caused the numerous defects at location A to coalesce, the remaining structure was overloaded initiating the final failure sequence. The failure event likely started with a crack or muffled bang as the composite reached critical strength and started to fail. During the failure initiation the laminate in section 1 that engaged the raised lip of the mold insert of section 2, failed in shear (part of the coalescing of delaminations). In addition, the material in the flange adjacent to the raised feature of the mold insert failed. This resulted in tearing of the reinforcement in the bucket flange, allowing it to rotate over and become uncoupled from the mold insert inside mounting ribs in section 2 at location A (see Figure 16).

As the flange rolled over the top of the mold insert, the bucket started to peel away from the boom. A crack opening started to propagate down from location A. As this crack lengthened, a torsional moment was generated in the bucket flange as the bucket (section 1) started to peel away from the boom (section 2). This is witnessed at location C where the running fracture was briefly blunted by the added stiffness provided by the local curvature in the corner and the bucket flange resisted the developing moment. This resulted in a short pause in the failure sequence ranging anywhere from a heartbeat to a deep breath. As the propagating of the crack slowed coming into location C the composite flange at location B failed in torsion. This failure likely had an acoustic emission similar to the first one characterized as a louder crack or bang as it failed at a higher load than the composite at location A. When the flange composite at location B failed it separated sections 1 and 2, running fractures linked together parting the bucket assembly into sections 1, 2 and 3.

18

# 8. Commentary

The failure sequence indicates that separation of the bucket generally occurred from the flange downward. This would have resulted in a top-heavy center of mass for the load (Mr. Keaschall) on the far, right outboard corner of the bucket. This condition would have resulted in an arrested turning or rotation of the bucket as it rolled over responding to the top loaded center of gravity and the propagation of the fracture in the laminate. In effect Mr. Keaschall was dumped head first out of the bucket. The mechanics of the separation would have also imparted an angular momentum on the bucket as it fell free from the boom. This would have caused it to travel backward under the boom into the truck box resulting in the bent frame railing.

Also, providing for the nature of the defects recorded at location A, Mr. Keaschall would not have had any visual indication of the impending failure. The stiffness of the bucket under load would have been visually "normal" as the laminate would have retained its strength until a critical point was reached. The triggering event could have been as simple as strong upward heave (multiplying the load in the bucket) of a hand wrench to break a threaded connection.

A key comment on the general overall structure is that the primary composite reinforcement appears to be short fiber, chopped strand mat. This material even when properly applied is highly dependent on resin properties to resolve the applied load between the short fibers. This dependence on resin properties means the material even in the best conditions has very little ability to blunt or stop a propagating fracture. This can be demonstrated in the Altec testing for the bucket in as presented in Figure 14. This snap shot from Altec video DSCF5571.avi shows the creation and extension of a laminate flaw under load. This mechanism demonstrates how the laminate flaws grew, linking and coalescing together until the laminate reached its failure condition.



**Figure 14 Location A, Crack formation and extension during testing.**

19

This material selection coupled with a lack of redundant load paths in the bucket shell is atypical for a life critical structure. The simple inclusion of a relatively trivial amount of continuous fiber reinforcement in the bucket shell would have arrested the propagation of the fracture and given Mr. Keaschall the time to land the bucket safely even with the accumulation of failures at location A.

In this specific case the design did not demonstrate a "soft" failure mode that is typical for life-critical structures.



**Figure 15 Orientation of Boom and Pole at Work Site**

20



Figure 16 Location A Detail, Section 2 (View looking inboard)

# 9. Qualifications and Experience

| | |
|---|---|
| **Education** | Dec 1998, University of Nebraska, Lincoln Nebraska, **MSME** |
| | May 1981, University of Nebraska, Lincoln Nebraska, **BSME** |

**Professional Experience**

**1994-Present**

**Senior Design Engineer** – Hexagon Composites/General Dynamics/Lincoln Composites

Research and Development Engineer providing support for global normative and pre-normative standards development.

Technical Lead for the Hexagon Global Hydrogen Team providing leadership in product development and overall global market approach in the hydrogen fuel market

Senior Designer/Analyst for advanced composite structures for automotive and commercial applications.

Supervising engineer for very high performance pressure vessels in safety critical applications.

Program lead as a Tier 1 supplier to produce a gaseous fuel storage container, completing all requirements of the APQP (Advanced Product Quality Planning) process for a major automotive OEM (Original Equipment Manufacturer).

Responsible individual compiling detailed homologation reports for national and international regulatory compliance.

Lead system designer for vehicle fuel systems with expertise in the thermodynamic response of complex gaseous control systems.

Wide project experience from customer conflict resolution to vendor quality control.

Represents company on national policy issues with regard to pressure vessel and relief valve technology.

**1991 – 1994**

**Research and Development Engineer** – Coleman Powermate

Research and Development Engineer in support of generator and pressure washer product lines.

Supervised research and development of advanced electrical generators.

Developed new analytical design methods for validation of product performance

Performed extensive laboratory testing of prototype products.

**1990 - 1991**

**Senior Design Engineer** – Baldwin Filters

Responsible for product design and support for filters in both air and liquid automotive applications.

Developed new product specifications for new applications and development of test schedules for verification of performance.

Support of design to unit cost and manufacturing implementation of new products.

Provided service and technical support in response to customer issues.

1988 - 1990    **Program Manager** – Addax, Inc

Responsible for all program phases of funded research and product design efforts.

Programs included development of rocket motor cases, drive shafts, pressure vessels, and various advanced composite structural components for both the commercial and government markets.

1983 - 1988    **Design Engineer** – Brunswick Defense

Responsible for product design and stress analysis of advanced composite structures, including pressure vessels for aerospace and defense applications, tactical and ballistic rocket motor cases, finite element and closed form solutions for anisotropic and isotropic materials.

Served as principal design engineer for valves, plumbing, and electrical components on a 480 gallon fuel tank for the F-18 fighter aircraft.

Program experience included defining customer requirements and giving formal written and oral presentations.

1981 - 1983    **Design Engineer** – Phillips Petroleum Co.

Responsible for the design of all types of heat and fluid transfer equipment, using classical and computer analysis to predict performance.

Performed stress analysis for the design and repair of fired and unfired steel pressure vessels to ASME code.

Developed specifications and standards for high temperature and corrosive services.

Performed cost estimates for large chemical projects and design coordinator for a two-million dollar capital project.

**Patents**

**Patent 5,180,490** : Lubricant Filter Assembly with Internal Bypass Lock-out

**Patent 5,205,427** : Modular Fuel Tank System

**Patent 5,529,460** : Pressure Washer with Flow Control Switch

**Patent 5,848,604** : Thermally Responsive Pressure Relief System

**Patent 6,986,490** : Method and apparatus for mounting a fluid containment cylinder

**Patent 8,820,069** : Shape memory alloy trigger for pressure relief valve

23

**Publications**   *Application of Plastic-Lined Composite Pressure Vessels For Hydrogen Storage,* John A. Eihusen, General Dynamics, 15th World Hydrogen Energy Conference, June 2004, Yokohama, Japan

*New Developments in Gaseous Fuel Storage for Heavy-Duty Vehicles* by William E. Dick and John A. Eihusen, General Dynamics, Lincoln Operations, World NGV2002, Oct 2002, Washington, D.C. USA

*Development and Certification of a CNG Fuel Tank for a Non-Step Bus,* Tiller, Newhouse, Eihusen, Lincoln Composites, NGV2000 A-O15

*Development of a CNG Fuel System for the ENVIRO 2000 TAXI,* Tiller, Newhouse, Eihusen, Lincoln Composites, SAMPE Automotive, Sept 1999 Detroit, Michigan

*Characterization of the Transverse Thermal Conductivity of Intraply Hybrid Composites Laminates,* Eihusen and Peters, SAMPE Tech Conf, Oct 1999, 31T-07

*Evolution of CNG Bus Fuel Systems,* Tiller and Eihusen, Lincoln Composites, NGV'98 May 1998 Cologne Germany

*Development of Compressed Natural Gas Storage Systems for Transit Bus Applications,* Tiller and Eihusen, Lincoln Composites, APTA May 1997, Miami, Florida

**Professional Activities**   Registered Professional Engineer, State of Nebraska, E-6202

Full voting member of the Compressed Gas Association,

Cylinder Specification Committee

Associate member, Compressed Gas Association

Cylinder Valve Committee
TSA Security Guideline Task Group
Hydrogen Technology Committee

Full voting member of the CSA America,

NGV 6.1 CNG Vehicle Subsystems

HGV 3.1 / NGV 3.1 Technical Advisory Group on Development of Standards for Fuel System Components of Compressed Natural Gas and Hydrogen Powered Vehicles

PRD1 / HPRD 1 Pressure Relief Devices for Natural Gas Vehicles and Hydrogen Vehicle Fuel Containers TAG

HPIT 1 Technical Advisory Group on Compressed Hydrogen Powered Industrial Truck On-board Fuel Storage and Handling Components

NGV / HGV Series Technical Advisory Group, Common Issues Working Group

International Organization for Standardization (ISO), Technical Committee TC58 Gas Cylinders:

Subcommittee SC 3 Cylinder Design, US Representative and voting expert

ISO TC58/SC 3/WG 17, Compressed natural gas cylinders for road vehicles
ISO TC58/SC 3/WG 27, Composite cylinders
ISO TC58/SC 3/WG 32, Refillable composite reinforced tubes of water capacity between 150 liters and 3000 liters, design, construction, and testing

Subcommittee SC 4 Operational requirements for gas cylinders, US Representative and voting expert

ISO TC58/SC 4/WG 3, Methods for inspection and requalification of NGV fuel gas

containers

**Awards**

CSA America Divisional Medal award for leadership and commitment to the development of standards for hydrogen components, resulting in one of the first hydrogen component standards for pressure relief devices; a primary safety component for compressed hydrogen vehicle fueling systems that have unique fire safety and durability requirements

CSA America Corporate Award of Merit providing outstanding expertise to the PRD/ HRPD1, NGV/HGV2, NGV/HGV 3.1 Technical Committees.   Lincoln's Composites representatives have been extremely active and diligent members of the TCs, compiling and examining the texts of draft standards, and providing data to validate propose testing methods.

## 10.    Previous Cases as an Expert Witness

None

## 11.   Statement of Compensation

### 11.1.   Travel Expense

Travel is billed in categories relating to distance:

> Time between points within the city limits of Lincoln NE is not billed
> For travel less than 60 miles from Lincoln, NE time is billed at actual time at a rate of $85/hour
> For travel more than 60 miles from Lincoln, NE time is billed in 4 hour blocks at $85/hour
>
> Mileage is billed at current IRS rate
> Domestic airfare is billed at coach fare
> International flight time greater than 9 hours is billed at Business fare
>
> Expenses are billed actual plus 5%

### 11.2.   Engineering Research and Analysis

The current rate for standard research and analysis is $325 per in hour, billable in 1/10 hour blocks

### 11.3.   Third Party Services

Third party services contracted in behalf of the client charged at vendor invoice plus 15%.  Vendor payment terms minus 10 business days apply unless other arrangements made.

### 11.4.   Billing and Invoicing

Billing terms and conditions negotiated at time of engagement of services

28

## 12. Drawing Revision Data

| Item Description | Doc No. | Doc. Rev. | Doc Title | Issue Date | Revision Description | Drawn By | ECO# | Comments |
|---|---|---|---|---|---|---|---|---|
| Bucket Assy | 704-0065 | A | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 16Aug86 | Initial Release?? | JSK/R LD | ?? | Note 1, Resin not called out in BoM. Laminate Stacking Sequece not on drawing. Rib inserts (from failed part) not on drawing BoM. |
| Bucket Assy | 704-0065 | B | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 26Aug92 | 1" WAS .75", ADDED .12" & 1.25" DIM, REDRAWN ON CAD | EJV | 92-1033 | Item 1 on Drawing 704-00350 BoM Item 1 on Drawing 704-00541 BoM (Weststar) |
| Bucket Assy | 704-0065 | C | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 01Sep93 | .250 WAS .188, 1.13 WAS 1.00, ADD VIEW A, R2.75 WAS R 3.00, ADD NOTE 3 | TWW | 93-1290 | Made Walls and Bottom Thicker Made Flange Thicker Note 3: GELCOAT OUTSIDE FACES ONLY, INSIDE TO BE WHITE PIGMENT W/UV INHIBITORS. |
| Bucket Assy | 704-0065 | D | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 06Oct93 | R .38 IN SECTION A-A WAS 2X, ADD "RADIUS FINISH, NO SHARP EDGE" | SCH | 93-1398 | |
| Bucket Assy | 704-0065 | E | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 19Nov93 | DIM 21.50 WAS 21.12, 23.00 WAS 22.63, 1.69 WAS 1.50 | Matt H. | 93-1515 | |
| Bucket Assy | 704-0065 | F | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 18Oct03 | REDRAWN IN AUTOCAD | DLP | 03-1073 | |

29

**Bucket Assy**

| Part No. | Rev | Description | Date | Change Description | By | Doc # | Note |
|---|---|---|---|---|---|---|---|
| 704-0065 | G | PLATFORM, MOLD, RIBBED, 24 X 48 X 42 | 29sep06 | REDRAWN IN SOLIDWORKS, MODEL WAS MODIFIED TO MEET THE PART PROVIDED BY SUPPLIER, DIMENSIONS OVER 20 INCHES WERE CONVERTED TO SINGLE DECIMAL PLACE DIMENSIONS (23.1 WAS 23.00, 21.3 WAS 21.50, 47.1 WAS 46.88, 45.5 WAS 45.44 & 41.3 WAS 41.25), PUT DRAFT NOTE ON RIBS TO COMPLY WITH SUPPLIER'S PROCESSES, SCUFF PAD SIZE NOT ALTERED, DISTANCE TO PLATFORM FRONT & BACK DID (1.59 WAS 1.69). | RLD | 93-16913 | Note 1: GLUE ITEMS 2 & 3 TO PLATFORM & ALLOW 24 HOURS FOR CURE. Adhesive Not called out in BoM |
| 704-00350 | | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 03Aug93 | Initial Release?? | KAW | | |
| 704-00350 | A | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 17Oct94 | 4.08 WAS 3.83 | Matt H. | 94-1091 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 704-00350 | B | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 03Jan01 | ADDED DIM. 1.00 | DIW | 01-0503 | |
| 704-00350 | C | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 22May02 | ADDED NOTE 2. | JLL | 02-0905 | Note 2: PLATFORM CONSTRUCTION TO COMPLY WITH EN-241. |
| 704-00350 | D | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 16Sep03 | 1.13 WAS 1.63. | JLL | 03-0855 | Increased depth of flange cut-out 0.50 inches / Flange width is 1.13" |
| 704-00350 | E | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 27Jun08 | ITEM 2 P/N 970058583 WAS P/N 704-00043, ADDED NOTES "CENTER STEP ON SIDE OF PLATFORM" AND "STEP OPEN FOR ACCESS ON INSIDE" | TOI | 093-20904 | |
| 704-00350 | F | PLATFORM, FIBERGLASS, RETANGULAR, 46.00 IN L, 22.00 IN W, 41.00 IN H | 19Nov08 | REVISED HOLE DRILLING ON RIGHT HAND RIB | J. Name | 093-22124 | |
| Component | 704-10232 | BOLT PLATE, CONTROL VALVE | | | | | Item 3 on Drawing 704-00350 BoM |
| Component | 970058583 | STEP, FIBERGLASS, 6 IN H, 12 IN W | | | | | Item 2 on Drawing 704-00350 BoM / Item 2 on Drawing 704-00541 BoM (Weststar) |

| | Part No. | Rev | Description | Date | Change | BPD | ?? | Notes |
|---|---|---|---|---|---|---|---|---|
| Comparison Final Assy (Weststar) | 704-00541 | | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 4/8/97 | Initial Release?? | | | Weststar Drawing No instructions to install step. Cut-out Flange is 0.37" wider than drawing 704-00675  Flange width is 1.50" |
| Comparison Final Assy (Weststar) | 704-00541 | A | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 8/19/97 | ADD MOUNTING HOLES AND LOCATING DIMENSIONS | RLD | 97-1053 | |
| Comparison Final Assy (Weststar) | 704-00541 | B | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 3/27/98 | ADDED .91, .86 & .75 DIMS, (1.13) WAS 1.21 | JSK | 98-0687 | Unable to locate 1.13" dimension |
| Comparison Final Assy (Weststar) | 704-00541 | C | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 11/17/01 | REVISED TO SOLIDWORKS FROM AUTOCAD, ADDED (2) .56 DIA HOLES | HCW | 01-1279 | |
| Comparison Final Assy (Weststar) | 704-00541 | D | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 10/21/02 | ADDED 2 X Ø .422 | DLB | 02-1374 | |
| Comparison Final Assy (Weststar) | **704-00541** | **E** | **PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS** | **9/25/03** | **ADD ANOTHER SET OF LANYARD MOUNTING HOLES IN "RIGHT" RIB (SEE DETAIL)** | **RLD** | **03-858** | |
| Comparison Final Assy (Weststar) | 704-00541 | F | PLATFORM, 24 X 48 X 41, SIDE MOUNT, A CLASS | 6/27/08 | ITEM 2 P/N 970058583 WAS P/N 704-00043, ADDED NOTES CENTER STEP ON SIDE OF PLATFORM AND "STEP OPEN FOR ACCESS ON INSIDE." | TOI | 093-20904 | |

32

| MFG Spec | EN-241 | | FIBERGLASS PLATFORM CONSTRUCTION | 5/22/86 | Initial Release?? | | | |
| MFG Spec | EN-241 | A | FIBERGLASS PLATFORM CONSTRUCTION | | ? | | | No revision data |
| MFG Spec | EN-241 | B | FIBERGLASS PLATFORM CONSTRUCTION | | ? | | | No revision data |
| MFG Spec | EN-241 | C | FIBERGLASS PLATFORM CONSTRUCTION | 12/13/96 | Item 9, testing strength changed from 2000 to 1150- initial calculation was incorrect. | Mike Ande rson | | |
| MFG Spec | EN-241 | D | FIBERGLASS PLATFORM CONSTRUCTION | 9/17/99 | Added additional valve plates to cover all platforms being made in Item 11. Format changed to conform to current standard.  See revision request #0482. | JS 09- 21-99 | #0482 | |
| MFG Spec | EN-241 | E | FIBERGLASS PLATFORM CONSTRUCTION | 1/19/00 | added option for additional construction methods approved by Engineering to 1.1. See revision request #0586. | JS 01- 24-00 | #0586 | |

33

| MFG Spec | EN-241 | F | FIBERGLASS PLATFORM CONSTRUCTION | 3/9/00 | Added platform performance testing. Added plywood thickness requirements to 2.2.1. Added hold time for the 12X test. See revision request #0599. | JS 05-03-00 | #0599 | |
|----------|--------|---|----------------------------------|--------|------|---------|--------|---|

| MFG Spec | EN-241 | G | FIBERGLASS PLATFORM CONSTRUCTION | 5/28/02 | Added 2.12. See revision request # 1217 | DM 06-03-02 | #1217 | |
|----------|--------|---|----------------------------------|---------|------|---------|--------|---|
| MFG Spec | EN-241 | H | FIBERGLASS PLATFORM CONSTRUCTION | 8/9/02 | Added requirements for platforms with doors in section 2.12. See Revision request #1262. | DM 08-23-02 | #1262 | |
| MFG Spec | EN-241 | J | **FIBERGLASS PLATFORM CONSTRUCTION** | **9/9/03** | **Added requirement for impact test in section 2.2.3. See revision request #1355** | **DM 09-16-03** | **#1355** | |
| MFG Spec | EN-241 | K | FIBERGLASS PLATFORM CONSTRUCTION | 1/4/06 | Added exemption for side push test on platforms with egress doors in section 2.2.1. See revision request #1657 | DM 01-31-06 | #1657 | |

34

| MFG Spec | EN-241 | L | FIBERGLASS PLATFORM CONSTRUCTION | 6/27/07 | Revised 2.10 to specify strap vice fixture. See revision request #2040. | SB 06-28-07 | #2040 |
| MFG Spec | EN-241 | M | FIBERGLASS PLATFORM CONSTRUCTION | 10/26/09 | Increased testing detail, added field testing requirements. See revision request #2663. | Ryan McKinney 10-26-09 | #2663 |

| MFG Spec | EN-241 | N | FIBERGLASS PLATFORM CONSTRUCTION | 1/11/10 | Added section 2.2.7. Section 2.3.4 150 lbs. was 60 lbs. See revision request #2763 | Ryan McKinney 01-11-10 | #2763 |
| MFG Spec | EN-241 | P | FIBERGLASS PLATFORM CONSTRUCTION | 1/28/14 | Added part number for fastener, nut and washer to section 2.3.5. Added section 2.2.8. See revision request #2974 | Ryan McKinney 01-28-14 | #2974 |

1

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA
 2
   JULIE KEASCHALL, Personal    )  Case No. 4:14-CV-03070
 3 Representative of the Estate  )
   of Kurtis Keaschall, deceased,)
 4 and DAWSON PUBLIC POWER       )  DEPOSITION OF
   DISTRICT,                     )  JOHN EIHUSEN, P.E.
 5                               )  TAKEN ON BEHALF OF
            Plaintiffs,          )  DEFENDANTS
 6                               )
        vs.                      )
 7                               )
   ALTEC INDUSTRIES, INC., and   )
 8 OSBORNE INDUSTRIES, INC.,     )
                                 )
 9           Defendants.         )
10
11
12
13 Taken at the law offices of Johnson, Flodman, Guenzel &
      Widger, 1227 Lincoln Mall, Lincoln, Nebraska, on
14        October 14, 2016, and November 29, 2016.
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                     I N D E X
 2       APPEARANCES . . . . . . . . . . . . .     2
 3       STIPULATIONS . . . . . . . . . . . .      4
 4       REPORTER'S CERTIFICATE . . . . . . .    190
 5       AMENDMENT TO DEPOSITION PAGE . . . .    191
 6
 7   WITNESS:
 8       John Eihusen, P.E.
 9       Direct Examination by Mr. Ahl . . . .     5
10       Cross-Examination by Mr. Shively . . .  146
11       Cross-Examination by Mr. Beucke . . .   174
12       Cross-Examination by Mr. Guenzel . . .  177
13       Redirect Examination by Mr. Ahl . . .   179
14
15   EXHIBITS:                          Marked  Found
16   100. File of John Eihusen . . . . .     5   Binder
17   101. Figure 6 Locations of Interest    33   Binder
18   102. Thumb drive . . . . . . . . .     42   Binder
19   103. E-mail, 5/12/15 . . . . . . .     53   Binder
20   104. Figures 6 and 7 . . . . . . .     56   Binder
21   105. Aerial Platform Inspection Report  87  Binder
22   106. Figure 152 . . . . . . . . . .    87   Binder
23   107. Figures 14 and 15 . . . . . .    137   Binder
24   108. Photograph . . . . . . . . .     179   Binder
25                         *****
```

2

```
               A P P E A R A N C E S
 1
 2 For Plaintiff        MR. LARRY W. BEUCKE
   Keaschall:          PARKER GROSSART BAHENSKY BEUCKE
 3                        BOWMAN & SYMINGTON, LLC
                        1516 1st Avenue
 4                      Kearney, NE  68848
 5 For Plaintiff Dawson MR. STEVEN E. GUENZEL
   Public Power:       JOHNSON, FLODMAN, GUENZEL &
 6                        WIDGER
                        1227 Lincoln Mall
 7                      Lincoln, NE  68508
 8 For Defendant Altec: MR. ROBERT W. SHIVELY
                       SHIVELY & LANNIN, PC, LLO
 9                      4400 South 86th Street
                        Suite 100
10                      Lincoln, NE  68526
11 For Defendant        MR. STEPHEN L. AHL
12 Osborne:            WOLFE, SNOWDEN, HURD, LUERS &
                          AHL
13                      1248 O Street
                        Suite 800
14                      Lincoln, NE  68508
15
16
17
18
19
20
21
22
23
24
25
```

4

```
               S T I P U L A T I O N S
 1
 2       It is stipulated and agreed by and between the
 3 parties hereto:
 4       1.  That the deposition of John Eihusen, P.E.,
 5 may be taken before Marcy Benge, RMR, General Notary
 6 Public, at the time and place set forth on the title
 7 page hereof.
 8       2.  That the deposition is taken pursuant to
 9 notice.
10       3.  That the requirements of Neb. Ct. R.
11 Disc. Section 6-330 (B) (A) and (C) are waived.
12       4.  That the original deposition will be
13 delivered to Mr. Stephen L. Ahl, Attorney for Defendant
14 Osborne.
15       5.  That all objections except as to form and
16 foundation are reserved until time of trial.
17       6.  That the testimony of the witness may be
18 transcribed outside the presence of the witness.
19       7.  That the signature of the witness to the
20 transcribed copy of the deposition is not waived.
21
22
23
24
25
```



EXHIBIT
B

5

EIHUSEN - Direct

1      (Exhibit No. 100 was marked for
2      identification.)
3      (At 9:04 a.m. on October 14, 2016, with Mr. Larry
4   Beucke appearing as counsel for Plaintiff Keaschall,
5   Mr. Steven Guenzel appearing as counsel for Plaintiff
6   Dawson Public Power, Mr. Robert Shively appearing as
7   counsel for Defendant Altec and Mr. Stephen Ahl
8   appearing as counsel for Defendant Osborne, the
9   deposition commenced as follows:)
10           **JOHN EIHUSEN, P.E.,**
11      of lawful age, being first duly
          cautioned and solemnly sworn as
12      hereinafter certified, was examined
          and testified as follows:
13

14   (Witness's response to oath:  "Yes, I do, ma'am.")
15           DIRECT EXAMINATION
16   BY MR. AHL:
17      Q.   Would you state your full name for the
18   record, please?
19      A.   John A. Eihusen.
20      Q.   Mr. Eihusen, my name is Steve Ahl, and
21   we've just been introduced.  I'm going to take your
22   deposition this morning, asking you some questions
23   about yourself and your background and about an
24   investigation that you did involving a component that
25   had been manufactured by Osborne Industries in part

6

EIHUSEN - Direct

1   of a boom lift system.  Do you understand that?
2      A.   Yes.
3      Q.   Okay.  And as we go along this morning,
4   if I ask you a question that you don't understand for
5   any reason, just seems awkward to you or doesn't make
6   any sense, if you would just stop me and let me know
7   that.  I'll probably ask a bad question.  I do it all
8   the time.  So if you'll stop me and let me know I've
9   done it again, I'll be happy to ask it in a different
10   fashion and make sure you understand it before you
11   give me an answer.  Will you do that?
12      A.   Yes, sir.  Thank you.
13      Q.   Also, if as we're going along this
14   morning you think an answer you've given me to a
15   previous question is either inaccurate or incomplete,
16   stop me and let me know that as well.  I'll be happy
17   to give you a chance to go back and either correct
18   your answer or complete it, as the case may be.  Will
19   you do that as well?
20      A.   Yes, sir.  Thank you.
21      Q.   Mm-hmm.  And if you don't do any of those
22   things, I'm going to assume you understood the
23   question, you've answered it truthfully and to the
24   best of your ability.  And can I rely on that as we
25   move forward this morning?

7

EIHUSEN - Direct

1      A.   Yes, sir.  That's the purpose of being
2   here.
3      Q.   Okay.  That's what I think, too.  So I
4   just want to make sure we're on the same page.  Would
5   you state your business address for the record,
6   please?
7      A.   In this case the business address is my
8   home address, 3310 Manassas.
9      Q.   And what business is operated out of that
10   location?
11      A.   EiCon Services, which is my LLC for
12   consulting services.
13      Q.   That business, how long has it been in
14   business?
15      A.   I would have to actually look at the
16   incorporation paper, but it's been, I believe, two
17   years.
18      Q.   Are there any other employees other than
19   yourself?
20      A.   No.
21      Q.   Has that been true since its inception?
22      A.   Yes, sir.
23      Q.   And you run that business out of your
24   home?
25      A.   Yes, sir.

8

EIHUSEN - Direct

1      Q.   What do the businesses -- business
2   premises include?  I suppose an office space?
3      A.   Yes, sir.
4      Q.   How about a laboratory?
5      A.   No, sir.
6      Q.   Do you have any scientific equipment
7   there by which -- that you utilize to do testing
8   or --
9      A.   No, sir.
10      Q.   -- experiments?  Do you have that
11   material available to you?
12      A.   If required, it can be contracted.
13      Q.   So you need to go out and rent it or
14   secure it from somewhere else if you ultimately need
15   it?
16      A.   Right.  Those services, yes, sir.
17      Q.   And did you find that necessary in this
18   case?
19      A.   No, sir.
20      Q.   What is your age?
21      A.   Fifty-nine.
22      Q.   And your date of birth?
23      A.   9/15/57.
24      Q.   What is your occupation or profession?
25      A.   Mechanical engineer.

9

EIHUSEN – Direct

1      **Q.**    Can you give me your educational
2  background that has qualified you to be a mechanical
3  engineer? Starting -- let's start with high school.
4      **A.**    **Math and science sufficient to enter the**
5  **University of Nebraska system.**
6      **Q.**    I'm assuming you graduated from high
7  school, then?
8      **A.**    **Yes, sir.**
9      **Q.**    Where and when?
10     **A.**    **Minden High School, Minden, Nebraska,**
11 **1975.**
12     **Q.**    Okay.  From there did you go straight to
13 the University of Nebraska?
14     **A.**    **No.**
15     **Q.**    Where did you go?
16     **A.**    **I went to Florida Institute of Technology**
17 **for two years.**
18     **Q.**    What type of a school is that?
19     **A.**    **It's a technology university.  I went**
20 **there for professional pilot training.**
21     **Q.**    Is it a university?
22     **A.**    **It is now.**
23     **Q.**    Was it when you went?
24     **A.**    **No.  It was a -- it's grown in size.**
25 **It's kind of like Kearney State grew in size and**

10

EIHUSEN – Direct

1  **became the University.**
2      **Q.**    Okay.  How long did you attend that
3  institution?
4      **A.**    **Two years.**
5      **Q.**    Did your attendance there result in the
6  awarding of any degrees, diplomas or certificates?
7      **A.**    **No, sir.  But all of the credits were**
8  **transferable to UNL.**
9      **Q.**    Is that what you did?
10     **A.**    **Yes, sir.**
11     **Q.**    What year did you transfer to UNL?
12     **A.**    **'77.  I'd have to look, sir.  You're**
13 **looking back at things I haven't thought about in a**
14 **while.**
15     **Q.**    How long did you attend UNL?
16     **A.**    **I would have to look on the actual course**
17 **list, but I was -- I believe it was, for the**
18 **bachelor's degree, for about three years.**
19     **Q.**    And that would be in the engineering
20 college?
21     **A.**    **Yes, sir.**
22     **Q.**    What year did you graduate?
23     **A.**    **1979.**
24     **Q.**    Okay.  What degree did you graduate with?
25     **A.**    **A B.S. in M.E.**

11

EIHUSEN - Direct

1      **Q.**    Pardon me?
2      **A.**    **A bachelor of science in mechanical**
3  **engineering.**
4      **Q.**    What did you do next, if anything, as far
5  as your formal education?
6      **A.**    **Continued to take classes and received my**
7  **master's of science in mechanical engineering from**
8  **UNL, and the exact date I would have to look up on my**
9  **CV.**
10     **Q.**    And if we're not going by exact dates,
11 but just your best recollection, what would you tell
12 me?
13     **A.**    **There's no reason to go by recollection.**
14 **We can -- it's published.  We can look it up.**
15     **Q.**    But you don't have any idea as we sit
16 here today?
17     **A.**    **Oh, that would be in the mid -- mid --**
18 **toward the end of the '80s and the early '90s.**
19     **Q.**    After graduating with your bachelor's
20 degree, did you go to work somewhere?
21     **A.**    **Oh, yes, sir.**
22     **Q.**    Where'd you go to work?
23     **A.**    **Phillips Petroleum.**
24     **Q.**    Okay.  Where were they located?
25     **A.**    **Sweeny, Texas.**

12

EIHUSEN - Direct

1      **Q.**    What did you do for them?
2      **A.**    **I was a mechanical engineer and assigned**
3  **to special projects dealing with systems and**
4  **materials and stress analysis.**
5      **Q.**    Okay.  Why don't you just tell me what
6  all that involves.  I understand those are the
7  general areas that you worked, but what did it
8  involve?
9      **A.**    **I specified welding parameters.  I**
10 **specified heat exchangers, furnaces; provided**
11 **engineering guidance on repair; provided engineering**
12 **guidance on purchasing of additional parts and**
13 **materials in that -- in that company.**
14     **Q.**    Did your degree in engineering, either
15 your bachelor's or your master's, focus in any
16 specific area?
17     **A.**    **No.  I was split about equally between**
18 **thermodynamics and structures.**
19     **Q.**    Are you a professional engineer?
20     **A.**    **Yes, I am.**
21     **Q.**    When did you get your designation?
22     **A.**    **I believe that was in 1982.  I would have**
23 **to look that up, sir.**
24     **Q.**    How long did you work for Phillips
25 Petroleum?

13

EIHUSEN - Direct

1    A.    As previously stated, approximately two
2    years.
3    Q.    How come you left?
4    A.    It was in southern Texas, and we wanted
5    to get closer to the Midwest.
6    Q.    You say "we"?
7    A.    My wife and I.  I was married at the
8    time.
9    Q.    Is your wife employed outside the home at
10   the present time?
11   A.    Yes, she is.
12   Q.    What does she do?
13   A.    She is an administrator with Lincoln
14   Public Schools.
15   Q.    Upon leaving Phillips Petroleum's
16   employment, what did you do next?
17   A.    I went to Brunswick Composites.
18   Q.    What did you do there?
19   A.    At Brunswick Composites, it was -- we
20   started to -- Brunswick Composites is in advanced
21   materials and at that time was a company that worked
22   in advanced composites and composites technology
23   providing design and design services to the major
24   contractors, defense contractors, at the time.  We
25   were able to get the last 2 to 3 percent performance

14

EIHUSEN - Direct

1    to make mission that no one else in the world could.
2    Q.    Why did you leave Brunswick?
3    A.    Brunswick, we really didn't leave.  We
4    were -- they went through several name changes.
5    There was a -- time when -- and I would have to go
6    to the -- my resume or CV to get the exact dates, but
7    I was offered a position in a start-up company here
8    in Lincoln called Addax, A-d-d-a-x.
9    Q.    Okay.  What kind of a company was that?
10   A.    That was another advanced materials, but
11   it was a spin-off of Advanced Technology & Commercial
12   Products.
13   Q.    Who was the owner of that business?
14   A.    The man was Jack Keester.
15   Q.    When was this?
16   A.    And Brian Spencer.  I would have to look
17   on my CV.
18   Q.    Well, do you have it with you?
19   A.    Yeah.  It's on -- you have it.  It's in
20   what -- all the documents we...
21   Q.    Do you have it?
22   A.    1988 to 1990.
23   Q.    And why did you leave there?
24   A.    It was a start-up company, and it was
25   going through the throes of being sold.  And the

15

EIHUSEN - Direct

1    owners were working those issues out.  And I decided
2    to take a position which was more financially stable
3    for me and a young family.
4    Q.    Where did you go?
5    A.    I went to Baldwin Filters.
6    Q.    Where are they located?
7    A.    Kearney, Nebraska.
8    Q.    What did you do for Baldwin Filters?
9    A.    I was a filtration engineer and specified
10   filter media and the design construction of filters
11   across the general -- across the general product
12   line.
13   Q.    Was that their home company, in Kearney?
14   A.    Baldwin Filters at the time had recently
15   been sold to a much larger company called CLARCOR.
16   So Baldwin Filters as a corporate location, likely,
17   yes.  I'm unsure about the answer, but they were
18   owned by a larger company called CLARCOR.
19   Q.    How long were you there?
20   A.    I was there for two years.
21   Q.    Why did you leave?
22   A.    I was offered a position with Coleman
23   Powermate, which was down the street, in an RV
24   position to look at advanced power generation
25   schemes.

16

EIHUSEN - Direct

1    Q.    And what did that position involve?  What
2    did you do on a day-to-day basis?
3    A.    They had -- at that time they were --
4    they had acquired the rights to the Ballard fuel cell
5    engine, which is Ballard Technologies, which is now
6    owned, I think, by Ford.  But they had acquired the
7    rights for all of the Ballard fuel cell motors
8    under -- I'm going to say five to seven horse, which
9    would be in their product range for portable power.
10   Q.    What did you do, though?
11   A.    I was looking to -- they were looking to
12   generate -- or build and construct a Stirling power
13   generator.
14   Q.    Okay.  But what did you do?
15   A.    I designed, built the prototype, tested
16   it, worked with NASA, brought down as much as the
17   technology could and tried to bring that -- that
18   project to a conclusion.
19   Q.    Were you the only engineer that was
20   involved in the design, or were you designing a
21   component or a portion of it?
22   A.    I was over -- I had overall design
23   responsibility for that project.
24   Q.    How long did you stay there?
25   A.    I was there for three years.

17

EIHUSEN - Direct

1    Q.    Why'd you leave?
2    A.    Coleman Powermate was in the throes of
3  being bought out by Sunbeam.  And, again, it was a
4  position of great instability that I saw coming.  If
5  you notice, Coleman Powermate is no longer in
6  Kearney.  I saw that.  And so I called Lincoln -- in
7  Lincoln, and the organization that I started with was
8  extremely happy to have me back.
9    Q.    And who was that again?
10    A.    At that time that would have been one of
11  the name evolutions of Brunswick Composites,
12  Brunswick Defense, Lincoln Composites.  It would have
13  been all at the 27th and Superior location.
14    Q.    What did you do for them when you came
15  back?
16    A.    Basically, exactly what I did when I
17  left, only I came back as a senior design engineer
18  responsible for building advanced composite parts.
19    Q.    For what?  What -- what was the product
20  ultimately?
21    A.    Lincoln Composites as a defense
22  contractor has -- I worked on a lot of things that
23  were on a need-to-know basis.  I also carried a
24  secret clearance at that time for a period of time.
25  To give you some history, Lincoln Composites

18

EIHUSEN - Direct

1  fabricated the second stage of the MX missile in
2  Lincoln.  They fabricated numerous launch tubes.  The
3  MLRS launch tube was designed -- designed, fabricated
4  for a while in Lincoln, then shipped to Arkansas.
5  The TOW launch tube, the VIPER program.  There was a
6  multitude of programs.  Most of the satellite
7  insertion motors, the primary structure is fabricated
8  in Lincoln.
9           Most people are not aware that Lincoln,
10  Nebraska, is a technology center for advanced
11  composites.  It goes right by them.  There was a
12  tremendous amount of technology at the time, and
13  Brunswick had an excellent working relationship with
14  a group of professors between -- at UNL.  And between
15  that institution of many names in that location,
16  many, many advanced programs were able to proceed
17  because we were able to reach the levels of
18  performance that no one else in the world was able.
19           I will give you an example.  Most of the
20  pressure vessels in the space shuttles were designed
21  and fabricated and validated here in Lincoln.  And
22  the age of those space -- of those pressure tanks on
23  the shuttle was its actual true demise for its
24  reaching out of service.  Because the age and
25  reliability was -- did not reach levels that would

19

EIHUSEN - Direct

1  continue in service, because they had been in service
2  for over 25 years.
3    Q.    How long did you stay there?
4    A.    I'm essentially still there.  They were
5  procured by General Dynamics.  Then General
6  Dynamics -- I was in a commercial division.  General
7  Dynamics spun that commercial division off to Hexagon
8  Composites, which is still in Lincoln.  And I am
9  still working there as a principal engineer in
10  standards and special projects, if you will.
11    Q.    What does your day-to-day job duties
12  include there now?  What do you do?
13    A.    I am responsible for numerous
14  international committees in pressure vessels and
15  pressure vessel safety and standards.  I am currently
16  working on a project that -- most of my projects are
17  over 10,000 psi in structural and pressure
18  containment.
19    Q.    Are you actually developing these
20  projects or --
21    A.    Yes.
22    Q.    -- are you just overseeing them?
23    A.    I have a work scope to complete.  A task
24  to complete, build it, and I do.
25    Q.    You're actually out in the laboratory

20

EIHUSEN - Direct

1  working and doing the experiments and things of that
2  nature?  Testing?
3    A.    Oh, yes, sir.
4    Q.    Okay.
5    A.    I've looked at thousands of failed
6  composite parts.
7    Q.    Who would be your immediate supervisor at
8  the present time?
9    A.    Norm Newhouse.
10    Q.    What's Norm's title?
11    A.    He's VP of R&D engineering, I believe.  I
12  don't know what his exact title is.
13    Q.    When did you get into the consulting
14  business?
15    A.    About two years ago I started the LLC to
16  prepare myself to be thinking about end of career
17  options.
18    Q.    Does your business advertise?
19    A.    No, sir.
20    Q.    How do you secure your -- your business?
21    A.    Word of mouth.
22    Q.    You don't put any ads in any
23  publications?
24    A.    No, sir.
25    Q.    How many cases have you consulted on,

21

EIHUSEN - Direct

1    approximately?
2        A.    This is my first case, sir.
3        Q.    Do you have a fee schedule?
4        A.    Yes, sir.  And you have it released.
5        Q.    I guess I'm just asking you, do you have
6    it?
7        A.    Yeah.
8        Q.    Okay.  What is your charges?  Do you
9    charge by the hour?
10        A.    I bill at -- my standard is $325 per hour
11    billable in one-tenth-of-an-hour blocks.  I charge
12    $85 an hour for travel in four-hour blocks.  Expenses
13    are billed at actual cost plus 5 percent.
14        Q.    Is that true regardless of what you're
15    doing as far as the $325 per hour charge, whether
16    you're testifying, whether you're analyzing, whatever
17    it might be?
18        A.    Yes, sir.
19        Q.    Okay.  Do you have any sense of what you
20    have charged in regard to your work on this case at
21    this point?
22        A.    I have not billed my case out.
23        Q.    Do you have any idea what your charges
24    are at the present time?
25        A.    I would have to go look through my hours

22

EIHUSEN - Direct

1    to get a feel for that, but I'm estimating that we
2    have probably over 100 hours into it.
3        Q.    You didn't bring that material with you
4    here today?
5        A.    No, sir.
6        Q.    Is there anything else that you didn't
7    bring with you today other than your accounting
8    records of your time spent on this case that you've
9    either produced or have been given to you --
10        A.    No.
11        Q.    -- or relate to this case at all?
12        A.    Very specifically, the accounting records
13    were not brought.  That's the only thing I have.  And
14    those were not in the perceived scope of needing
15    them.
16        Q.    They're what?
17        A.    It was not in my perceived scope that it
18    needed to be brought.
19        Q.    You didn't think it related to this case?
20        A.    No.
21        Q.    Okay.  But there's nothing else that you
22    have that relates to this case in any fashion?
23        A.    To the best of my knowledge, this is --
24    everything here is what's on the table.
25        Q.    Okay.  Nothing's been removed from any of

23

EIHUSEN - Direct

1    your files by anybody?
2        A.    No, sir.  I've been in sole charge.
3    That's the LLC.
4        Q.    Okay.  Why don't you tell us what all you
5    brought?
6        A.    I have a hard drive of my e-mails in PDF
7    format.  I have a list of references that I reviewed
8    for the case, which are there.  I also have a list of
9    work product, and I believe on -- I'm not sure if
10    that drive has the PDFs of the reports that were
11    published.  But that's on that drive.
12        Q.    Okay.
13        A.    On these paper copies, I have the paper
14    copies of the reports returned to me from the other
15    expert witnesses.  I have pictures of -- that was
16    taken -- pictures and loose documents of -- that were
17    provided to me or what I took care of in California.
18    I also have the original secrecy -- or the agreement
19    for confidentiality treatment from the court.  I have
20    guidance of -- for federal witnesses.  And I have my
21    paper notes detailing the depositions and the
22    documents that I reviewed going into -- that was part
23    of the different disclosures released by Altec, the
24    sheriff, and Osborne.
25        Q.    Okay.  Anything else?

24

EIHUSEN - Direct

1        A.    To the best of my knowledge, that is all
2    of it.  But I did handle a great volume of data on
3    the -- on the original look-through.  This is the
4    ones that I felt were important.  There is a -- to
5    the best of my knowledge, this is all of it.
6        Q.    Your last answer would lead me to believe
7    that you've brought what you thought was important
8    and not what you thought was not important.  Is that
9    what you're telling us?
10        A.    I brought what was unique in work product
11    to me.  Those common documents, I did not go through
12    exhaustibly to bring them here as copies, because I
13    thought they would be available to all parties
14    already there.
15        Q.    Did you receive a copy of the notice of
16    this deposition and -- telling you what you were
17    supposed to bring today?
18        A.    I was verbally informed of what was
19    required to bring, yes, sir.
20        Q.    And did you understand that you were to
21    bring your entire file --
22        A.    I bring that --
23        Q.    -- and not bring what you thought was
24    important?
25        A.    Yes, sir.

25

EIHUSEN - Direct

1    Q.    But you didn't do that?
2    A.    Yes, sir.  I did not bring copies of data
3  already released to all the experts and already
4  released to everyone else.
5    Q.    Anything else you didn't bring?
6    A.    No, sir.
7    Q.    Besides your -- your accounting notes?
8    A.    And my accounting notes, that's right,
9  sir.
10    Q.    Can you get that material and provide it
11  to your attorney so that we can have it?
12    A.    Oh, yes, sir.  I'll just hand back the
13  CDs that they handed me.
14    Q.    Okay.  If you'd do that, I'd appreciate
15  that.
16    A.    I can, sir.
17    Q.    Anything else?
18    A.    No, sir.
19    Q.    Okay.  As part of your investigation and
20  analysis in this case, did you do any experiments or
21  testing that you would have recorded any of the
22  results, either written format or otherwise?
23    A.    We would have -- in that category, we
24  would have handled the x-rays, which would have been
25  testing or invest- -- or review of the laminate.

26

EIHUSEN - Direct

1    Q.    Let me ask you this:  Did you
2  independently yourself --
3    A.    No, sir.
4    Q.    Well, why don't you let me finish my
5  question.  Did you yourself independently do any
6  testing, any experiments, or any analysis that --
7  where you would have recorded any calculations, test
8  results or findings?
9    A.    Can you break those questions -- I
10  believe there were three questions there.  Can you
11  break them out?  I answered, I believe, the first
12  one.
13    Q.    Okay.  I guess I'm -- I'm not following
14  you.  Did you do any testing?
15    A.    No, sir.
16    Q.    Did you do any experiments?
17    A.    No, sir.
18    Q.    Did you do any sort of scientific
19  analysis that you ultimately arrived at any -- that
20  you did calculations on?
21    A.    No, sir.
22    Q.    Did you do any testing or experiments
23  where you would have recorded the results of those?
24    A.    No, sir.
25    Q.    Do you remember when you were first

27

EIHUSEN - Direct

1  contacted about this case?
2    A.    Yes.
3    Q.    When?
4    A.    I believe that would have been in -- I
5  don't know the exact date, but that would have been
6  in first quarter 2014.  Or not -- excuse me.  Third
7  quarter of -- fourth quarter of 2014.
8    Q.    Do you have any notes or anything that
9  would indicate the date you were contacted?
10    A.    That would be in my billing notes.
11    Q.    Okay.  And that's one of the things you
12  didn't bring today?
13    A.    Yes, sir.
14    Q.    Who contacted you?
15    A.    Mr. Guenzel has a -- we have a common
16  friend, and he made the recommendation, word of
17  mouth, that I might be helpful to this case.
18    Q.    Okay.  Who's that common friend?
19    A.    His name is Bill Glaesemann.
20    Q.    And how do you know Mr. Glaesemann?  Do
21  you work with him?
22    A.    We used to work together.  He's now
23  retired.
24    Q.    Okay.  So Mr. Guenzel contacted you?
25    A.    Yes.

28

EIHUSEN - Direct

1    Q.    Did he call you?
2    A.    Yes.
3    Q.    At your home?
4    A.    Yes.
5    Q.    And when he first contacted you, what did
6  he ask about?
7    A.    He inquired of my experience.  He
8  inquired of my technical abilities and if I would be
9  willing to look at photographs that were -- that I
10  could -- and get an opinion on if I could look at
11  some draw- -- photographs to get an opinion on.
12    Q.    I assume that you agreed to do that?
13    A.    Yes, sir.
14    Q.    Were you given any information about the
15  component that you were going to be looking at, why
16  you'd be looking at it?
17    A.    No.  Just look at the component and
18  proffer -- obviously, he told me -- he says, I have a
19  composite part.  It's failed.  Can you tell me
20  anything about it?
21    Q.    Were you told the circumstances under
22  which it failed or anything?
23    A.    No, sir.  At that time, that would have
24  been under court order.  That would have been
25  information that probably would not have been

29

EIHUSEN - Direct

1    released to me. I was looking at documents -- or
2    photographs that were not pinned to the court order
3    and -- is my understanding.
4         Q.    Okay. So you were just given some
5    photographs, asked to look at them and see if you
6    could come up with any opinions or conclusions about
7    the failure mode?
8         A.    Right. And specific photographs would
9    have been those produced by Coleman.
10        Q.    Were you provided any other information
11   at that time?
12        A.    No, sir.
13        Q.    Were you asked to do anything else at
14   that time?
15        A.    No, sir.
16        Q.    Were you provided the photographs?
17        A.    Yes, sir.
18        Q.    Do you remember specifically what
19   photographs you were -- you were provided?
20        A.    The Coleman portfolio of photographs.
21        Q.    I'm assuming that you did that?
22        A.    Yes, sir.
23        Q.    And were you able to come up with any
24   opinions or conclusions simply by looking at the
25   photographs?

30

EIHUSEN - Direct

1         A.    Absolutely.
2         Q.    Did you ever look at the actual component
3    itself at that time?
4         A.    No.
5         Q.    Okay. Just photographs?
6         A.    Just photographs.
7         Q.    Okay. And why don't you tell me what
8    opinions or conclusions you were able to determine by
9    looking at those photographs?
10        A.    Sticking in the photographic evidence at
11   the time, I was able to immediately determine the
12   location of the failure, the cause of the -- not
13   cause, but the location of the failure, the failure
14   mode, propagation of the failure through the rest of
15   the structure, and come to a reasonable conclusion of
16   how it failed.
17        Q.    You were able to do all of this just by
18   looking at the photographs?
19        A.    Yes, sir.
20        Q.    How long did you spend looking at the
21   photographs and formulating your opinions or
22   conclusions at that time?
23        A.    The original -- the failure location and
24   the failure mode at the primary location jumps out.
25   There was a bit of time to justify the photographs in

31

EIHUSEN - Direct

1    3-D space. Because that's what you do. You lay --
2    you build the part in your mind and -- at least I do.
3    Build the part with the part in space in your mind,
4    then eventually work around it and rotate it in your
5    head and review it. And as I was able to lay it out,
6    then we were able to piece -- I was able to piece
7    that -- the entire narrative together.
8         Q.    Did you ever do any computer modeling or
9    anything of that fashion with the photographs?
10        A.    No.
11        Q.    Do you have the ability to do that at
12   your home business?
13        A.    I have the ability to contract anything I
14   need.
15        Q.    Okay. Do you have the ability to do that
16   at your home?
17        A.    I have the ability. I do not have the
18   equipment.
19        Q.    Okay. Again, that would be something you
20   have to go out and hire somebody else to do?
21        A.    Either access to the machine or just buy
22   the services.
23        Q.    Did you do it?
24        A.    It was not necessary.
25        Q.    Did you do it?

32

EIHUSEN - Direct

1         A.    No, sir.
2         Q.    After looking at the photographs and
3    thinking about this, you arrived at some opinions and
4    conclusions. I assume that you contacted Mr. Guenzel
5    to tell him what those would be?
6         A.    Yes, I did.
7         Q.    And why don't you tell us now what
8    opinions and conclusions you were able to draw simply
9    by looking at the photographs.
10        A.    The part failed in shear on the primary
11   flange, the horizontal flange that goes around the
12   bucket. When it failed in shear and broke loose of
13   its -- of the dovetail lock on the interlock, that
14   flange separated and continued to load. As it
15   continued to load, as -- as a composite continued to
16   load, the fracture propagated away from the initial
17   location, was hesitated briefly at a corner. At that
18   point, the -- location "B" failed and a rotation was
19   under load, as evidenced from the visual indications.
20   And when that separated, the -- a fracture propagated
21   from location "B" to what I call the hinge location
22   in the corner. And the bucket separated.
23        Q.    Do you have any diagrams or photographs
24   that would be indicative of what you're talking
25   about? You're talking about location "A," location

33

EIHUSEN - Direct

1  "B" and a flange?
2      A.    Yes, I do.
3      Q.    Okay.  Why don't we pull that out so we
4  can attach this -- mark it as an exhibit and attach
5  it so that we'll know what we're talking about when
6  we read your transcript.
7      A.    That would be in Figure 2 of my report.
8            MR. SHIVELY:  Which report?
9            THE WITNESS:  That would be on the first
10 one.  Or let me look.  Actually, it's in -- that
11 figure is used several times.
12     A.    I think the better one would be on the --
13 the first report published.  And that would be
14 Figure 6, which is a larger picture of the same view.
15     Q.    (By Mr. Ahl)  Do you have that?
16     A.    Yes, I do.  This is a much better version
17 of that.
18           MR. AHL:  Okay.  We'll just have her mark
19 that.
20           (Exhibit No. 101 was marked for
21           identification.)
22     Q.    (By Mr. Ahl)  Okay.  Looking at Exhibit
23 No. 101 now, I've asked you whether or not you have
24 any diagrams or photographs that would show the
25 various locations that you've just testified about

34

EIHUSEN - Direct

1  and have designated as locations "A," "B" and "C"?
2      A.    That's correct.
3      Q.    Does Exhibit No. 101 show those areas?
4      A.    Yes, sir.
5      Q.    Okay.  And you have marked those areas
6  and designated them as "A," "B" and "C"; is that
7  correct?
8      A.    That is correct.
9      Q.    Okay.  Now, why don't you go ahead again
10 with this exhibit in front of you and tell us what
11 opinion or conclusion or -- or plural, opinions and
12 conclusions, that you were able to draw simply by
13 looking at Mr. Coleman's photographs?
14     A.    On location "A," the top flange failed in
15 shear by inspection of the -- of the -- of the
16 failure surfaces.  At that point, a running
17 unsuppressed fracture propagated -- propagated on its
18 way to "C."  As it was propagating, that flange of
19 the bucket pulled over the top and started to load in
20 torsion.  And it tried to resist the weight.  And
21 that weight was resisted at location "B."  And at
22 location "B," based on the angularity of that surface
23 and how the composite was pulled apart, it indicated
24 to me that that composite was under moment at the
25 time of failure.

35

EIHUSEN - Direct

1      And as it failed, the -- it then released
2  the failure to continue from "B" on around to "C."
3  And at "C," both failures met and -- at a horizontal
4  position at "C," which I recognized since the
5  fractured planes shifted again, and they changed
6  orientation.  The load hesitated there.  And the
7  fracture indicated again a bending mode instead of a
8  propagating shear.  And that indicated to me that
9  that was a hinge location.  And that was the last
10 separation point from the bucket from the boom.
11     Q.    Did you ever actually go down to inspect
12 the bucket physically --
13     A.    Yes.
14     Q.    -- before arriving at this opinion?
15     A.    Yes.
16     Q.    Okay.  When did you do that?
17     A.    The bucket arrived in Lincoln, and I was
18 able to view it after your experts did.
19     Q.    Okay.  I thought you were talking about
20 your preliminary opinions and conclusions that you
21 drew only on the basis of the photographs that were
22 given to you by Mr. Guenzel?
23     A.    You gave me a -- you asked a question
24 without a time.
25     Q.    Okay.  Let's limit it to that.

36

EIHUSEN - Direct

1      A.    All right.
2      Q.    Let's talk about the photographs.
3      A.    In a timeline?
4      Q.    Yeah.  When you came up with the first
5  opinion that you've just expressed to us --
6      A.    That's correct.
7      Q.    -- you did that based solely on the
8  photographs?
9      A.    Yes, sir.
10     Q.    Not by looking at the bucket?
11     A.    No.
12     Q.    Okay.
13     A.    I confirmed my opinion by looking at the
14 bucket.
15     Q.    At some later time?
16     A.    Yes, sir.
17     Q.    Okay.  Other than looking at the
18 photograph which is designated as Exhibit 101, were
19 there any other photographs that you relied on
20 principally for formulating that opinion as to the
21 failure mode?
22     A.    The -- there are numerous close-ups of
23 location "A" and "B" on either side of the failure
24 location, which I spent a great deal of time with.
25     Q.    Any other opinions or conclusions that

37

EIHUSEN - Direct

1   you expressed to Mr. Guenzel based on the
2   photographic evidence that you first examined?
3       A.      At what point in the timeline, sir?
4       Q.      After -- when you first contacted him to
5   tell him you've looked at the photographs, these are
6   your opinions and conclusions.
7       A.      I told him how I believed it failed and
8   how the failure propagated through it.  At that
9   point, that's all the information I had.
10      Q.      What was the next thing that you did?
11      A.      The next thing was Mr. Guenzel requested
12  my services officially.  And at that point we started
13  into a scope of work, generating a scope of work.
14  And then a -- doing the necessary requirements to
15  treat this information in a confidential manner.
16      Q.      Did you ultimately arrive at what the
17  scope of your work was to be?
18      A.      Yes.
19      Q.      Okay.  What was that?
20      A.      As provided in the first published
21  report, I stated the scope of work as paragraph
22  number 1.
23      Q.      Okay.  And that's page number 1,
24  paragraph number 1, of your report dated
25  September 26th of 2015?

38

EIHUSEN - Direct

1       A.      Right.  So what I -- what happened was,
2   this was the scope of work generated by -- and
3   provided to the attorneys that -- what was expected
4   of me.
5       Q.      After you formulated your scope of work
6   that you were going to do in regard to this project,
7   were you provided any additional information about
8   how the -- how the incident occurred with
9   Mr. Keaschall?
10      A.      At that time, I was provided -- after --
11  after officially signing in and executing the proper
12  confidentiality documents for the court, Mr. Guenzel
13  gave me the balance of the information belonging to
14  the case.  Of which those being which I did not bring
15  today.
16      Q.      You didn't bring what Mr. Guenzel
17  provided you to give you the background on this
18  accident?
19      A.      Yes.  That was precisely those other --
20  those other documents.  As in -- that was my
21  justification for they're available to everybody.
22      Q.      Yeah.  But we don't know what he gave
23  you, do we?  I don't know what Mr. Guenzel gave you.
24  Would I?  Have you ever disclosed or -- or provided a
25  list of what you've been given?

39

EIHUSEN - Direct

1       A.      I have no -- I do not know how you -- the
2   attorney communication.  You're asking me to make an
3   opinion on attorney communication.  I can't do that.
4       Q.      Okay.
5       A.      I can only give you what I believed at
6   the time.
7       Q.      And you could have brought your entire
8   file like you were asked to do?
9       A.      Yes, sir.
10      Q.      And you didn't?
11      A.      Yes, sir.
12      Q.      You know, Mr. Eihusen, this is going to
13  be my only chance to visit with you and take your
14  deposition and get your testimony and find out what
15  you say and what you base all of your opinions on and
16  what you've been told and the information that you
17  had when you went into this analysis.  And I guess
18  I'd just as soon maybe reschedule this until you can
19  bring us your entire file so I can see what you were
20  told and what the basis of you going forward was with
21  your investigation at the time.
22      A.      If that's necessary.
23      Q.      I think it is necessary.  I'm going to
24  ask you right now on the record to bring your entire
25  file.  Don't pick what you think is important.  Don't

40

EIHUSEN - Direct

1   pick what you think everybody else has or doesn't
2   have.  You bring your entire file.  Okay?
3       A.      Yes, sir.
4               MR. AHL:  Okay.  And then let's just pick
5   a new date, and we'll do this again.
6               MR. BEUCKE:  Does page 6 there help you
7   out?
8               MR. AHL:  We're going to get his entire
9   file there.
10              MR. BEUCKE:  Does page 6 --
11              THE WITNESS:  Yeah.  It's -- the files
12  were handled by you.  So that's --
13              MR. BEUCKE:  Can you tell him, referring
14  to page 6 of your report, exactly the documents you
15  did not bring?
16              THE WITNESS:  Oh, let me look.
17      A.      Well, the documents by Osborne are a lot.
18  They're on a CD.  Documents by Dawson Public Power,
19  Sheriff Sherman County, additional depositions by
20  the -- we may have those depositions by Public Power.
21  But -- I did not bring Altec patents.  But you have
22  all of my -- you have my references and the
23  MIL-HDBK-17.  And the -- the photographic evidence
24  from -- between Altec and Dawson and the Sherman
25  Sheriff's Office is massive, but we can bring that.

41

EIHUSEN - Direct

1    **Q.**  Okay.  I'd just as soon you do that.

2    **A.**  **Yes, sir.**

3    **Q.**  And bring your billing records.  And

4  bring anything that has anything to do at all with

5  this file since you were first contacted until the

6  day we come -- we re-adjourn.  Okay?

7    **A.**  **No problem, sir.**

8        MR. AHL:  Okay.  Let's do it.

9  (Deposition adjourned at 9:49 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

42

EIHUSEN - Direct

1        (Exhibit No. 102 was marked for

2        identification.)

3    (At 8:57 a.m. on November 29, 2016, with counsel

4  for the parties present, the deposition recommenced

5  as follows:)

6         DIRECT EXAMINATION (Cont'd)

7  BY MR. AHL:

8    **Q.**  Still under oath from last time.

9    **A.**  **Yes, sir.**

10    **Q.**  Ready to go?

11    **A.**  **I am, sir.**

12    **Q.**  Okay.  Last time we were here for your

13  deposition, we were talking about the file materials

14  that you generated since you first became engaged in

15  this investigation.

16    **A.**  **Yes.**

17    **Q.**  Do you remember that?  And we determined

18  that last time you had not brought your complete

19  file, but there were some things that you did not

20  bring with you for whatever reason; correct?

21    **A.**  **For -- and for clarity and for those --**

22  **what the incremental was, the documents that I --**

23  **that were under court seal was what I did not have.**

24  **And my time log is the only thing that was missing**

25  **from yesterday -- or the first time.**

---

43

EIHUSEN - Direct

1    **Q.**  What do you mean under court seal?  Do

2  you mean under the protective order?

3    **A.**  **Yes.**

4    **Q.**  Okay.  That was produced by Altec and

5  Osborne?

6    **A.**  **Yes.  And those documents I treated like**

7  **classified material.  Do not duplicate.  Do not**

8  **disseminate.**

9    **Q.**  Okay.

10    **A.**  **And so I was a bit surprised to see**

11  **that -- to do both.  But they are now incrementally,**

12  **and the time sheet -- time logs are in.  Those two**

13  **incremental increases are now in that sum total.**

14    **Q.**  Okay.  And that now -- you've provided us

15  with a thumb drive this morning, which has been

16  marked as Exhibit 102, is it?  That now contains your

17  entire file with nothing removed?

18    **A.**  **That is, sir.**

19    **Q.**  And let me show you the blue thumb drive

20  that I've been provided by Mr. Guenzel and ask you if

21  you can identify that as being the one that you

22  brought here today that contains your entire file in

23  regard to your work on this matter?

24    **A.**  **No.  This is a copy that Mr. Guenzel**

25  **made.**

---

44

EIHUSEN - Direct

1    **Q.**  Have you seen it?

2    **A.**  **Have I seen this?**

3    **Q.**  The copy?

4    **A.**  **I had heard that he duplicated it.**

5    **Q.**  Okay.  But the materials that you gave

6  him to duplicate contained every document that you

7  have either been provided, generated or otherwise --

8    **A.**  **Yes.**

9    **Q.**  -- during the entire investigation?

10    **A.**  **Yes, sir.**

11    **Q.**  And you've removed nothing?

12    **A.**  **Yes, sir.**

13    **Q.**  Okay.

14        MR. GUENZEL:  And I will state for the

15  record that the Exhibit 102 has -- is an exact copy

16  of the thumb drive he brought me that he just

17  described for you.

18        MR. AHL:  Okay.  Fair enough.

19    **Q.**  (By Mr. Ahl)  Okay.  We were just getting

20  into some of the context of when you were first

21  retained in regard to this --

22    **A.**  **Yes, sir.**

23    **Q.**  -- investigation last time when we

24  stopped.  Do you remember that?

25    **A.**  **I'll let you -- I'll let you jog my**

45

EIHUSEN - Direct

1  memory.
2      Q.    Okay.  Well, I think we were talking
3  about when you were first contacted and by whom and
4  what your discussions may have been.  Does that jog
5  your memory?
6      A.    Yes.
7      Q.    Okay.  Do you remember when you were
8  first contacted?
9      A.    Yes.
10     Q.    And can you tell me that?
11     A.    The -- Steve Guenzel gave me a call and
12  asked me if I would review some -- a set of doc- --
13  of pictures.  And if I had a -- could evaluate how
14  that -- that part failed.  And he said he was having
15  difficulty finding suitable experts in the country
16  that could do that job.
17     Q.    Okay.  Do you remember when that
18  conversation took place?
19     A.    It was in my time log.
20     Q.    Okay.
21     A.    But it's logged.  It's 5/15 or 5/16, over
22  a year ago.
23     Q.    Okay.  At that point in time you were
24  provided with photographs?
25     A.    Yes.  That would be considered the

46

EIHUSEN - Direct

1  Coleman portfolio.
2      Q.    Okay.  Were you provided anything else?
3      A.    No.
4      Q.    When you were first retained, you
5  indicated that you could do what the scope of work
6  Mr. Guenzel was looking for, I assume?
7      A.    Well, the first question is, is did I
8  know how it failed.
9      Q.    Well, but -- but did you tell him you
10  were a suitable expert to look at that?
11     A.    Yes.
12     Q.    Okay.  And the first question that you
13  were asked to determine is, can you determine why or
14  how it failed?
15     A.    Yes.  Or the manner in which it failed,
16  specifically.
17     Q.    And by virtue of you being retained, I'm
18  assuming that your answer to that was, yes, you
19  thought you could?
20     A.    Yes.
21     Q.    When you were provided with the
22  photographs, were you provided any other information
23  to help you in your analysis of why or how this
24  bucket may have failed?
25     A.    Yes.  Later.

47

EIHUSEN - Direct

1      Q.    Okay.  Why don't we go through, and why
2  don't you tell me those things that you were provided
3  by outside sources that you used in formulating your
4  opinions or your conclusions.
5      A.    The -- first of all, we looked at the
6  entire body of the Coleman photos.
7      Q.    Okay.
8      A.    And resolving those into a 3-D space in
9  my mind, looking through the fracture planes and
10  surfaces, and the evidence in the composite was
11  extremely compelling to me on how it failed and the
12  order it failed.  After we were signed in, after I
13  executed the court order, I was then handed the rest
14  of the documents and disclosures, excluding any
15  medical.  Which I specifically asked not to have
16  issued to me.
17     Q.    Okay.
18     A.    So I had all of the depositions at that
19  point.  I also did a bit of research on a little bit
20  of the Altec patents, what they were looking for, and
21  I also did a site review of a truck.  And I went onto
22  and looked at a truck.  And we also did x-ray and
23  performed some other minor NDE techniques.  But the
24  biggest one was being -- looking at the x-rays of
25  the -- of the buckets themselves.

48

EIHUSEN - Direct

1      Q.    Okay.  And when did you do that?
2      A.    Again, I would have to go look at my logs
3  for an exact date.
4      Q.    Okay.  Can you give me just kind of a
5  general timeframe?
6      A.    Middle of -- middle of last year.  It was
7  in the summertime, I think.  That would have been --
8  well, wait a minute.  I can get very close.
9      Q.    Okay.
10     A.    It would have been the date of my
11  appendix report.  So it would have been just prior to
12  March 3rd, 2016.
13     Q.    Okay.  In your consulting work, and in
14  particular in your consulting work on this particular
15  case, do you have a lab available to you?
16     A.    You can contract labs from anywhere in
17  the world if you have -- if you know what you're
18  asking for.
19     Q.    Okay.  Absent going out and hiring
20  someone to do something or contracting with a lab to
21  use their equipment, do you as a consultant have a
22  lab available as part of your consulting business?
23     A.    No.
24     Q.    Okay.  And, again, let's exclude going
25  out and renting, hiring or leasing something.  Do you

49

EIHUSEN - Direct

1    have any equipment available to you in your
2    consulting business that you use or did use in your
3    analysis of this case?
4         A.    No.
5         Q.    Have you consulted with other individuals
6    who have provided you information in regard to your
7    investigation in this case that you have used that
8    information in formulating any opinions, conclusions
9    or impressions?
10        A.    No. My con- -- my opinions were
11   formulated fairly rapidly on the initial
12   investigation of the composite. And they have --
13   what the evidence that the composite itself showed.
14   And that was the basis of my review, was looking at
15   the composite.
16        Q.    Was that looking at the photographs, or
17   was that looking at the actual bucket itself?
18        A.    Both.
19        Q.    Okay.
20        A.    And the trucks that they were mounted on.
21        Q.    So you have not retained or hired any
22   other consultants that have performed any analysis
23   for you of any type where you've used that
24   information in formulating or supporting any of your
25   conclusions, impressions or opinions?

50

EIHUSEN - Direct

1         A.    That was -- if you check my e-mails, that
2    was contemplated to do. We were -- my rec- --
3    initial recommendation was to do a credible FEA. And
4    when I say credible, something that was -- that
5    measured design intent. And that was the looking at
6    the start of the second bucket, to find. When I
7    realized that the second bucket was not built in the
8    same fashion, there was no way I could or anyone
9    could do a credible FEA. And so there was really no
10   need to move further in any analysis.
11        Q.    So your answer is, no, you've not hired
12   or contracted with anybody to perform any type of
13   analytical services that have provided you with
14   information that you've used in your opinions,
15   conclusions or impressions?
16        A.    That's true.
17        Q.    Okay. Have you had anyone do any type of
18   analysis for you of any of the composites or any of
19   the equipment used or involved in this incident?
20        A.    We shared laboratory work with your
21   experts. I consider that part of that effort, yes.
22        Q.    Okay. Other than the experts who have
23   been retained in working on this, anybody that you've
24   used independently?
25        A.    Well, we would have done our own, but

51

EIHUSEN - Direct

1    since we shared the experts, we decided to share the
2    work there. So, yes, that's -- you have full access.
3    We -- that was the idea of the shared laboratory.
4    There was no reason to go further.
5         Q.    Okay. So, again, your answer is, no, you
6    haven't?
7         A.    In the same manner of your people, yes.
8         Q.    When you were provided with the Coleman
9    photographs, you did a review of those photographs.
10   Was that done just basically with the naked eye, or
11   did you use any type of microscopic examination of
12   the photographs?
13        A.    The photographs are very good. And you
14   can digitally work on. But the question is, when you
15   look at those photographs, you're -- you're looking
16   at telltale signs that's taken years and years of
17   working in the composites field to see what's going
18   on. And, like I said, the evidence was quite
19   compelling to me in the composite structure itself,
20   how it failed.
21        Q.    I understand your answer, but that
22   doesn't answer the question I asked. Did you look at
23   it with your naked eye, or did you --
24        A.    I looked at it with my naked eye, sir.
25        Q.    That was the only way?

52

EIHUSEN - Direct

1         A.    Yes.
2         Q.    Okay.
3         A.    Quite adequate.
4         Q.    Okay. After looking at -- when did you
5    look at those Coleman photographs? Was it, like, in
6    the spring of 2015?
7         A.    It would have been probably -- the first
8    report is dated September 26th. So it would have
9    been spring, summer, yeah, somewhere in there, of
10   '15.
11        Q.    And you do have the Coleman photographs
12   with you?
13        A.    I have them on that jump drive, sir.
14        Q.    Okay. Do you have just regular copies
15   with you --
16        A.    No.
17        Q.    -- by any chance?
18        A.    No.
19        Q.    In looking through some of the material
20   that you provided to us last time we were here for
21   your deposition, there was a series of e-mails
22   contained in those materials. And in one you're
23   talking about your review of the Coleman photographs.
24   And that's in an e-mail dated May 12th of 2015.
25        A.    Okay.

53

EIHUSEN - Direct

1    Q.    Let me have the court reporter mark that,
2  and I'll show it to you.
3    A.    May I see it?
4    Q.    Absolutely.  After we get it identified.
5          (Exhibit No. 103 was marked for
6          identification.)
7    Q.    (By Mr. Ahl)  Okay.  Let me show you now
8  what the court reporter has marked as Exhibit 103,
9  and let's make sure that's an e-mail from you.  Is
10  it?
11    A.    Yes.
12    Q.    Okay.  And does that appear to be a true
13  and accurate copy of the e-mail -- an e-mail that you
14  would have generated on or about the date reflected
15  on the exhibit?
16    A.    Yes.
17    Q.    Okay.  And you're talking about the
18  review of the photographs?
19    A.    Yes.
20    Q.    Okay.  And in there you indicate
21  specifically that you found a very large
22  manufacturing flaw in the photographs?
23    A.    Yes.
24    Q.    And that's a game changer, in your --
25  your opinion?

54

EIHUSEN - Direct

1    A.    Yes.
2    Q.    Okay.  Do we have those photographs?
3    A.    You have the x-ray.  This would be the
4  x-rays.
5    Q.    So this -- these are not the photographs?
6    A.    Those are the x-rays.
7    Q.    Okay.  Do we have those?
8    A.    Yes.
9    Q.    Here today?
10    A.    Yes.
11    Q.    Can you find those for me?
12    A.    They're in the jump drive.
13    Q.    Okay.  If we have --
14    A.    But they're in the -- we do have copies
15  in my report.
16    Q.    Okay.  Why don't we get that, those
17  photographs, out in your report.
18          MR. BEUCKE:  May I see it?
19          MR. AHL:  Sure.
20    A.    This is the rib that did not fail.  Do
21  you want this?
22    Q.    (By Mr. Ahl)  Yeah, I do want that.  I'm
23  going to ask you about it.  You've just handed me
24  what is identified as page 7 out of one of your
25  reports; is that correct?

55

EIHUSEN - Direct

1    A.    That's correct.
2    Q.    And that's what you indicate that you're
3  referring to when you're talking about photographs in
4  Exhibit No. 103?
5    A.    Yes.
6          MR. AHL:  I'll mark that.
7          MR. GUENZEL:  If I could interject,
8  Mr. Eihusen, if you'd take a look at -- he's asking
9  you about Exhibit 103, which is an e-mail dated May
10  of 2015.  I thought you told us --
11          MR. AHL:  Well, you know, I don't want
12  you to testify.  If he's got his dates inaccurate, he
13  can figure it out.
14          MR. GUENZEL:  Well, he's been -- he's
15  gotten -- he's jumped off.  And if you want a bunch
16  of inaccurate information, you can keep going.
17  You're asking about an exhibit -- you're going off of
18  Exhibit 103, and I think he ought to take another
19  look at Exhibit 103, because he's jumped about six or
20  eight months.
21          MR. AHL:  I think he has, too, but --
22  because I don't think these existed back then.
23          MR. GUENZEL:  I don't think they did
24  either.
25          MR. AHL:  So I don't know what he's

56

EIHUSEN - Direct

1  talking about, and maybe he can explain that to us.
2          MR. GUENZEL:  I hope so.
3          MR. AHL:  I hope so, too.
4    Q.    (By Mr. Ahl)  Let's mark this first,
5  because this is what you identified.
6          (Exhibit No. 104 was marked for
7          identification.)
8    A.    Yes.
9    Q.    (By Mr. Ahl)  Let me hand you what has
10  been marked as Exhibit No. 104.  Now, that's what you
11  handed me --
12    A.    Yes.
13    Q.    -- as referenced as the photograph
14  referenced in Exhibit No. 103 --
15    A.    Yes.
16    Q.    -- in your e-mail?
17    A.    Right.  And the -- let me clear, is this
18  shows up as deep, dark lines in the -- in the
19  pictures, in the Coleman pictures.  And those deep,
20  dark lines are flaws in or indicating a deep
21  delamination.  That's what this was.  My tying them
22  together is, this picture is so much more indicative
23  of what we were seeing here.  So my apologies on
24  mixing this up.  But these deep, dark, straight
25  striations on the edge, to a trained eye, indicates a

4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 53 of 288 - Page ID # 2521

57

EIHUSEN - Direct

1  laminate in trouble.  So what we were looking at here
2  was this picture removed from the other side from the
3  failure.  So we had a clear picture now of what we
4  were looking for and how this thing was -- was
5  reacting in service.
6      Q.     Okay.
7      A.     So my -- my apologies.  I was -- it's the
8  same defect.  It's how it's looked at.  And this one
9  is much more educational on where it is and how it
10 is.
11     Q.     Well, Exhibit No. 4 is now what you're
12 referring to in Exhibit No. 3; correct?
13            MR. GUENZEL:  Do you mean 104 and 103?
14            MR. AHL:  Yeah.  I thought that's what I
15 just said.
16     A.     And you can see these in the Coleman
17 pictures when you look on edge, and you can see the
18 black -- deep, black layering, which indicates a
19 delamination on that on the far side.  And this is --
20     Q.     (By Mr. Ahl)  But when you wrote this
21 e-mail, the images in Exhibit 104 didn't exist, did
22 they?
23     A.     That's correct.
24     Q.     So that's not what you were referring to
25 in terms of the actual photograph?

58

EIHUSEN - Direct

1      A.     Yeah.  In my mind, it was the same
2  defect, sir.  This one is much more indication -- I
3  did not believe it to be as large and as extensive as
4  the x-ray proved to be.  Because when you're looking
5  at it here, you can see that you have a staining.
6  You can see the edge on effect of the opening of a --
7  of the laminate.  But you can't evaluate it.  You
8  just know it's there.  And so these are much more
9  instructive to me, and so that's why they locked in
10 my head.
11     Q.     Okay.  Can we find the photograph that
12 you were actually referring to?
13     A.     Sure.  If we have a copy of the Coleman,
14 I'm sure we can find -- it shows up on multiples.  I
15 just didn't pick up on it.
16     Q.     What I'd like to have is the actual
17 photograph that you were looking at when you claimed
18 you found a game changer and that you found the
19 manufacturing defect.  That's what I'd like to see.
20     A.     Let's see if we can get something that's
21 close.  I just don't have a close-up on that other
22 side.  We'd be looking on the other side.  We'd be
23 looking for that dark, staining line.  And I do not
24 have a view of it.  But those -- that's an indication
25 of a -- the laminate was in trouble.  And that's on

59

EIHUSEN - Direct

1  the failure location.  And we could see that it was
2  reaching back.  What I didn't catch up was, it was
3  existing on the other side, which means it was going
4  all the way across.  So it's on the Coleman view.  We
5  can provide that.
6      Q.     Maybe when we take a break, you can take
7  a look on a computer and see if you can find the
8  actual photograph.  How does that sound?
9      A.     I think we can do that, sir.
10     Q.     Okay.  Great.
11     A.     I don't think it would take very long at
12 all.
13     Q.     Okay.  And, specifically, what
14 manufacturing defect are you talking about?  What is
15 it?
16     A.     We have a -- the defect is, it --
17 uncompensated resin shrinkage tends to, on a fixed
18 mold, a mold that is fixed on both sides, the resin
19 will pull apart and cause a -- when it shrinks will
20 cause a gap or opening.  And that defect typically
21 finds itself as laminar indications on the midplane
22 or near the midplanes, depending on how much resin
23 shrinkage was there and how uncompensated it was.
24     Q.     That's the manufacturing defect that you
25 saw on the photograph that you looked at?

60

EIHUSEN - Direct

1      A.     Yes.  In fact, that was one of the
2  potential causes that I listed in my first report.
3      Q.     What is the result of that defect, in
4  your opinion?
5      A.     Well, one has to approach the defect in
6  terms of design intent.  What was the intent.  I have
7  not seen anything here on any disclosures, anybody's
8  analysis, that speaks to the design intent.  And that
9  means, how did the designer who put this together,
10 how did he design -- intend for it to function.
11 Without that, it's pretty hard.
12            But I'll give you my best understanding
13 of design intent, is this preformed piece that was
14 set in the rib has a locking dovetail that reaches up
15 and locks into the edge of the bucket, the bucket
16 flange.  And that was provided a lot.  When you have
17 a defect that reduces a shear area on that location,
18 that becomes a very significant manufacturing flaw.
19     Q.     I guess what I'm really asking you is,
20 what's the effect of the flaw, in your opinion?  Is
21 it -- does it weaken the material?  Does it -- what's
22 the result of that flaw, in your opinion?
23     A.     That flaw would probably pass proof load.
24 It might pass DVT load.  The question is, is it
25 cycling.  How many cycles can it take.  How long will

Page 57 to 60 of 191

61

EIHUSEN - Direct

1  it go in service.  It will progressively -- what
2  happens is, these -- a flaw like that will progress,
3  reducing the allowable shear area or the load
4  capability of the joint until it fails.
5       Q.    Did you ever do any testing to determine
6  if, in fact, that area was weakened by this defect?
7  Did you do any testing?
8       A.    No.
9       Q.    Did you do any testing at all to
10 determine what, if any, effect the defect that you
11 are claiming you see had on the design of this
12 bucket?  Did you do any testing?
13      A.    No.
14      Q.    Did you ever visit the Osborne plant to
15 observe the manufacturing process?
16      A.    No.
17      Q.    You indicate that as part of your
18 investigation, you also had the opportunity to see a
19 truck and a boom?
20      A.    Mm-hmm.
21      Q.    Yes?
22      A.    Yes.
23      Q.    Was that the truck and boom involved in
24 this incident?
25      A.    It was a near identical one.  I was

62

EIHUSEN - Direct

1  advised from Dawson that it was identical to the one
2  that had been in service.
3       Q.    Why didn't you look at the one that was
4  in service there?
5       A.    I believe it had been disposed of.  I'm
6  not sure.
7       Q.    Okay.
8       A.    It was not available to me.
9       Q.    Okay.  Would you have liked to have seen
10 the actual one?
11      A.    Not really.
12      Q.    Okay.  Didn't make any difference to you?
13      A.    Well, if they're manufactured the same.
14 I wanted to see use.
15      Q.    It didn't make any difference to you?
16      A.    Evidence was in the composite.
17      Q.    Again, I --
18      A.    That's correct.  It did not make any
19 difference.
20      Q.    Okay.  You've prepared two reports
21 detailing your investigation and your analysis in
22 this case; is that correct?
23      A.    That's correct.
24      Q.    Have you got those in front of you?
25      A.    Yes, I do.  Except for one page marked

63

EIHUSEN - Direct

1  Exhibit 104.
2       Q.    Okay.  Let's take a look at your first
3  report that's dated September 26th of 2015.
4       A.    Okay.  Do you have a page?
5       Q.    Yeah.  Why don't we just go right to
6  page 1, jump right into it.  How does that sound?
7       A.    Okay.
8       Q.    On page 1 you indicate under a bullet
9  point, "Scope of Work for Expert Analysis," and then
10 you list five separate questions that I assume that
11 you are going to attempt to answer throughout your --
12 your investigation; is that correct?
13      A.    That's correct, sir.
14      Q.    And then, if I'm reading your report
15 correctly, on page number 3, essentially you're
16 answering those questions with your expert opinion?
17      A.    Yes.  That's a summary statement.
18 Paragraph 3 becomes a summary statement.
19      Q.    And does page 3 set out all of your
20 opinions and conclusions in regard to your analysis
21 and investigation?
22      A.    Yeah.  Yes.
23      Q.    Okay.  Would you agree with me just on a
24 general basis that what we typically refer to as a
25 scientific method calls for formulating theories and

64

EIHUSEN - Direct

1  hypotheses and then testing them to establish whether
2  or not the conclusions we draw are valid?  Would you
3  agree with that generally?
4       A.    You're asking me two questions there.
5       Q.    Okay.
6       A.    Break it into two.
7       Q.    Do you agree that the scientific method,
8  or what we generally refer to as the scientific
9  method, generally entails formulating opinions -- or
10 formulating hypotheses or theories and then testing
11 them to see if they prove to be correct?  Do you
12 agree with that general statement?
13      A.    Yes.
14      Q.    Okay.  And on page 3 you list 11 separate
15 bullet points as setting out your opinions?
16      A.    Yes.
17      Q.    Why don't we go through those one at a
18 time.  And starting with number 1, why don't you
19 detail for us what experiments, calculations or
20 testing you performed to establish each of those
21 opinions or conclusions?
22      A.    We had a -- if you look at the failure
23 location "A," you can see on the pictures, from the
24 Coleman pictures, and if you look at Figure 8, from
25 7, 8 and 9, you will see the outside indication of a

65

EIHUSEN - Direct

1    defect on the Figure 7.  What was most telling is on
2    Figure 8, the depth of the defect and how far it
3    reached into the laminate.  And when you go to
4    Figure 9, you start looking at different colors,
5    which indicates that some of the defects had access
6    to atmospheric contamination, and some of them -- the
7    delamination, some of them didn't.  Which means the
8    ones that were white and a uniform color were sealed
9    in at the time of manufacture.
10         So that says that the delamination flaw
11   existed -- oh, and the pictures also indicated that,
12   if you look at Figure 9, you will see smooth surfaces
13   and resin bubbles, which indicates that there was no
14   resin contact at that point.  And no bonding.  So
15   that says that they were in -- in there at the time
16   of manufacture, created at the time of manufacture.
17         Q.    Is --
18         A.    And, yes, that was all done by the naked
19   eye.
20         Q.    Okay.  And is it a review of those
21   photographs that you just detailed for us the basis
22   on which you formulate your opinion number 1 in your
23   statement of expert opinion in your report on page 3?
24         A.    That and confirmation visually when I had
25   the part in front of me, yes, sir.

66

EIHUSEN - Direct

1          Q.    And there were no other experiments,
2    calculations or tests that you performed?
3          A.    None needed for those kind of
4    indications, sir.
5          Q.    Okay.  So none done?
6          A.    None done.
7          Q.    Okay.  Let's go to number 2:  "The defect
8    was near or adjacent to the top of the pre-formed
9    insert used to form the right side vertical rib of
10   section 2."  Was that determined, again, totally by
11   viewing the photographs and looking at the pieces
12   when you had the opportunity?
13         A.    Yes, sir.  The evidence is in the
14   composite itself.
15         Q.    Okay.  Any experiments, calculations or
16   tests you performed to establish that -- those
17   opinions?
18         A.    Visual indication, sir.
19         Q.    Okay.  Number 3.  What is the basis of
20   your opinion in number 3?
21         A.    The basis of my opinion there is long
22   experience in the composites industry.  I was giving
23   more credits to the professionalism of the build than
24   the x-rays later showed.  The start of the defects in
25   this case can be started by machine.  That flange is

67

EIHUSEN - Direct

1    very thick and very heavy.  And the tool cutting
2    forces can cause delaminations.  And I was saying at
3    this point in time, before I had the NDE, the x-rays,
4    I did not know how far back and how extensive they --
5    that -- those defects were.  And it was quite
6    possible that these defects can be done when
7    machining, because this part, remember, is formed
8    with one continuous flange, and then the -- the
9    cutouts or relief cutout is machined later.  It's a
10   typical problem in many composite parts.
11         Q.    Just so I understand your answer
12   correctly, the basis for opinion number 3 is your
13   experience in the industry and no other experiments,
14   calculations or tests; correct?
15         A.    And the surface indications, yes.
16         Q.    Okay.  And didn't go down and watch any
17   of the manufacturing process to determine whether or
18   not your observations are correct; true?
19         A.    That's true.
20         Q.    And in your -- your opinion, you say the
21   defects could have been facilitated by physical
22   damage of the cutting tool.  Do you know whether they
23   were or not?
24         A.    In -- it's irrelevant at this point.
25   They could have been facilitated, opened up.  What we

68

EIHUSEN - Direct

1    have is, we have some very large defects that were
2    opened up.  So cutting tools could have started it.
3    I wanted to be sure that that was well understood,
4    that the tools could have started the defects at this
5    time.
6          Q.    But you have no -- no evidence that they
7    did?  Simply that they could?
8          A.    We have evidence of delaminations heavily
9    exposed to the environment.  For a great period of
10   time.  Which would be indication from the time of
11   manufacture.  A good indication is, if a laminate was
12   constructed well, constructed well, you can destroy a
13   laminate in a hurry with bad machining.
14         Q.    Do you --
15         A.    So, yes, it's my opinion.
16         Q.    Do you have any independent evidence at
17   all that you can point us to that the cutting tools
18   facilitated physical damage?  And, if so, tell me
19   what it is.
20         A.    On this part, no.
21         Q.    Okay.
22         A.    But on other parts, yes.  You can find
23   that in the literature.
24         Q.    Number 4:  "The internal delaminations
25   and external machining damage was facilitated by dry

69

EIHUSEN - Direct

1  fiber from incomplete resin flow and wet out of the
2  reinforcement mat at the time of molding."  Were
3  there any experiments, calculations or tests
4  performed that you relied on to establish that
5  opinion?
6       A.     **Visual indication.  A dry fiber is dry**
7  **fiber.**
8       Q.     So, again, you're -- that was determined
9  by simply looking at photographs?
10      A.     **Oh, you can -- you can touch it, sir.**
11      Q.     So you looked at photographs and you
12  touched it?
13      A.     **And you're working with -- yes.**
14      Q.     Anything else that you did that you used
15  as a basis for that opinion?
16      A.     **No, sir.**
17      Q.     Okay.  Number 5:  "The incomplete resin
18  flow resulted from improper reinforcement layup and
19  mold closure as identified by Osborne on the units
20  Aerial Platform Inspection Report."  What's the basis
21  of that opinion?
22      A.     **You had a shop traveler -- I call it a**
23  **shop traveler manufacturing record that indicated a**
24  **flaw.  A flaw that was identified on the edge by the**
25  **manufacturing personnel.**

70

EIHUSEN - Direct

1       Q.     Do you have that record?
2       A.     **That was part of the court documents,**
3  **yes, sir.  You have every one that was part of the**
4  **records turned in.**
5       Q.     But I want to make sure I know which ones
6  you're talking about.
7       A.     **Yeah.**
8       Q.     I don't want to have to go through them
9  all.
10      A.     **It was the one for the bucket, sir.**
11      Q.     Again, when we take our break here maybe
12  in about 15 or 20 minutes, can you find that in your
13  file?
14      A.     **Yeah.  We can do that.**
15      Q.     Okay.  So I will make a note that we'll
16  do that.  Okay?
17      A.     **Yep.**
18      Q.     Anything else other than that record that
19  you're relying on for that opinion?
20      A.     **Well, first of all, there was no -- when**
21  **I looked at that record, that same record seemed to**
22  **be willfully inadequate.  It was deemed okay to**
23  **proceed.  And yet there was no engineering function.**
24  **There was no design review, no intent, no evaluation**
25  **of the defect.  And given that no evaluation of the**

71

EIHUSEN - Direct

1  **defect, if you actually saw a fold, that affects**
2  **resin flow.  Now, when you do molded parts, if you**
3  **have folds and -- folds in the part, you affect the**
4  **resin flow and how it trains.  The idea is, it needs**
5  **to come in every time the same way.**
6       Q.     And I think I understand your answer
7  there, too.  But the question was, was there anything
8  else other than that record that you relied on in
9  formulating that opinion?
10      A.     **That was the basis of formulating that**
11  **opinion, sir.  Yes, sir.**
12      Q.     Okay.  That record?
13      A.     **That record.**
14      Q.     Okay.  Number 6:  "The external flaws
15  caused by the machining operation grew in service
16  extending the delamination surface between plies and
17  reducing the structural capacity of the laminate as
18  it was used in-service until it reached the failure
19  load condition."  What machining process can you
20  point to that caused external flaws?
21      A.     **The machining process for the cutting the**
22  **relief flange, or the relief in the flange.**
23      Q.     And exactly what independent evidence can
24  you point us to that would allow you to tell us that
25  the machining operation caused external flaws in that

72

EIHUSEN - Direct

1  area?
2       A.     **The machining operation never -- when you**
3  **machine, the gap -- there are surface gaps,**
4  **indications, that were opened up.  That were opened**
5  **up at the time of manufacture.  Now, that either --**
6  **either they were likely -- since they were deep in**
7  **cut, since that area was removed, it had to be done**
8  **at the time of manufacture or machining operation.**
9  **Because that part was whole at the time of**
10 **manufacture.  So when that machining tool comes in**
11 **and removes that material, it opens those flaws up.**
12 **The simple fact that you remove the material says**
13 **you -- you created that.**
14      Q.     And it reduced the structural capacity of
15  the laminate.  Are we talking about the strength?
16      A.     **Yes.**
17      Q.     Did you ever test to determine how much
18  reduction there would be in structural capacity as a
19  result of this flaw that you find?
20      A.     **Well, we know what it failed at, don't**
21  **we?**
22      Q.     That wasn't the question I asked you.
23             MR. AHL:  Would you read that back to
24  him?
25      Q.     (By Mr. Ahl)  And listen to the question.

73

EIHUSEN - Direct

1      (The requested portion of the record
2      was repeated.)
3      A.    My apologies, sir.  No.  The grounding
4   assumption is, the experimental and scientific method
5   is, you work with the knowns.  The knowns are, sir,
6   we had one person in the bucket, and it failed.  And
7   my apologies.
8      Q.    (By Mr. Ahl)  So you have not done any
9   experiments, tests or calculations to determine what
10  your opinion would be regarding the reduction in
11  structural capacity for the external flaws that you
12  believe that you see?
13     A.    That's correct.
14     Q.    Is that a fair statement?
15     A.    That's correct, sir.
16     Q.    Okay.  "At the time of" -- number 7: "At
17  time of the failure the compromised composite
18  resolving Mr. Keaschall's body weight into vertical
19  rib failed in shear at or near the vertical rib
20  insert which triggered the catastrophic failure of
21  the bucket."  Why don't you tell me the basis of that
22  opinion.  Everything that you used to formulate and
23  arrive at that opinion or conclusion.
24     A.    You look at the pieces, the physical
25  evidence in the pieces, and how they fit together and

74

EIHUSEN - Direct

1   how the load was applied inside on the -- on the
2   structure.  It becomes apparent on how that's done.
3   So that's how it was done, sir.
4      Q.    Again --
5      A.    Visual inspection with experience.
6      Q.    No other testing or -- analysis or --
7      A.    No.
8      Q.    -- calculations?  No?
9      A.    No.
10     Q.    Number 8:  "Mr. Keaschall would not have
11  had any visual warning of the impending failure."
12     A.    That's correct.
13     Q.    Okay.  How do you know that?
14     A.    Because the way the laminate is
15  structured, the way the laminate is built, it would
16  have been a sudden complete failure.  Composites
17  fail -- composites don't have a yield condition.
18  Composites have a linear -- they have a linear
19  failure.  And so they're either there or they're not.
20  It's that simple.
21     Q.    So based on the -- the condition of the
22  laminate after the failure, that's the basis --
23     A.    No.
24     Q.    -- for your opinion?
25     A.    No.

75

EIHUSEN - Direct

1      Q.    Okay.  What is?  Maybe I misunderstood
2   your answer.
3      A.    What we're looking at is composites as a
4   class of materials do not have a yield like a metal
5   part.  Like you bend an aluminum rod, and it takes a
6   permanent set.  Composites, you bend it, and it
7   breaks.  It's more like a wood rod.  And so he
8   wouldn't have known much -- much different.  His
9   weight, as they were going on, it may have gone down
10  a little bit, maybe perceptually, maybe not, every
11  time he used it.  But every time he got into that
12  bucket, he pushed it one more cycle closer to
13  failure.  And he wouldn't have known it.
14     Q.    So your opinion is that this was a sudden
15  catastrophic failure that there would be no time to
16  determine it was occurring until it had already
17  occurred?
18     A.    I'm saying that the loss of strength was
19  progressive.  Until he reached a point where the --
20  it failed under the load of his load or whatever he
21  was doing at the time.
22     Q.    Do you believe that there would be any
23  audible sound at the time of failure?
24     A.    Yes.  I've thought through this.  I've
25  listened to many, many structural parts, composite

76

EIHUSEN - Direct

1   parts, fail in my time.  I've been around a lot of
2   failing.  And so putting this -- how this particular
3   bucket would have failed, yes, I think he would have
4   had a -- an initial -- there would have been an
5   initial retort.  Report.
6      Q.    And in looking at your -- the materials
7   in your file, at one time you were theorizing there
8   was more than one retort.  Have you ever formulated
9   any opinions or conclusions as to whether or not
10  there would be one or two?
11     A.    Yes.  And I think, again, we go back into
12  the evidence of the composite, or of the -- of the
13  composite itself.  And we can work that through if
14  you want to talk through that failure narrative.
15  That's later in this report.
16     Q.    And we'll get to that.  But just for
17  right now, how many retorts do you believe that there
18  would have been?
19     A.    I think there was an initial large one,
20  and then I think after that, it was -- would have
21  sounded more like a tree branch failing in an ice
22  storm.
23     Q.    And how -- do you have any opinions as to
24  the length of time that would expire between those
25  two events?

77

EIHUSEN - Direct

1    A.    Well, unfortunately --
2    Q.    Just yes or no.  No?
3    A.    I think you're talking in something less
4    than a second between the first and second one.
5    Q.    Okay.
6    A.    And then it happens fairly rapidly.  You
7    have to understand, you're making judgment calls
8    there.  But you can tell that there was a -- the
9    fracture surfaces do indicate timing in events and
10   timing of the events.  But you don't have a -- way
11   to really put absolute numbers on those, sir.  That's
12   more of an engineering judgment call at that point.
13   Q.    Okay.  Number 9, we'll just pass over.
14   How about number 10?  "The primary structure was not
15   resistant to a single point failure mode and as such
16   failed totally and completely in a manner
17   inconsistent with life-critical applications."  Why
18   don't you tell me again what experiments,
19   calculations or tests that you performed to establish
20   that opinion, if any?
21   A.    That's a -- that's a standard of -- let
22   me phrase this carefully.
23   Q.    Okay.
24   A.    The failure -- this particular structure
25   did not fail softly.  It did not fail in a way that

78

EIHUSEN - Direct

1    would have allowed him to be survivable.  In other
2    words, it was -- everything was -- all the eggs in
3    the basket were on the primary structure.  The design
4    intent -- we'll go back to that.  The design intent
5    was to have no redundant structure.  And because of
6    that design intent of no redundant structure --
7    structure, it's not really consistent with
8    life-critical applications.  Typically on those
9    structures, which I -- in similar mission critical
10   applications, you want to make sure that you have
11   redundant pathways, redundant load carrying
12   abilities.
13   Q.    Are you claiming that the design of this
14   bucket somehow is inconsistent with any standards of
15   ANSI or OSHA?  Or is this just your opinion?
16   A.    Well, having read -- this is my -- well,
17   it's my opinion in working with, like I said, in many
18   mission critical applications, life-critical
19   applications, it's very difficult to imagine that you
20   would put everything on a -- without a redundant
21   structure.
22   Q.    Okay.
23   A.    And -- yes.
24   Q.    Are you aware of any standards or
25   regulations that this -- that the design would have

79

EIHUSEN - Direct

1    violated in this regard?
2    A.    Well, I've spent some time with A92.  I'm
3    not -- having spent similar time in the composites
4    industry and similar composite standards, I'm not
5    sure that A92 is completely up to snuff.  And I'm
6    being generous there.
7    Q.    I guess I just want to make sure I
8    understand your -- your testimony.  Are you or are
9    you not indicating that your opinion indicates that
10   the design of the bucket would violate any standard
11   or regulation in regard to these types of products?
12   A.    International or just national standards?
13   Q.    Aren't we talking about a national
14   product?
15   A.    Let's answer the first one.  Inasmuch as
16   ANSI A92 is written, it meets it.
17   Q.    Okay.
18   A.    But the question is, is that sufficient.
19   Q.    Would that be one really good reason for
20   someone like Mr. Keaschall to have been wearing his
21   fall protection gear on the day of this accident?
22        MR. BEUCKE:  Let me object to the form of
23   the question as ambiguous.  I don't know what you
24   mean by would "that" be, by "that."
25        MR. AHL:  By "that," when he's saying on

80

EIHUSEN - Direct

1    his opinion number 10 that there are no redundancies
2    and that this may not adequately be a safe product
3    because it can just fail.  Not in a soft mode.
4    Q.    (By Mr. Ahl)  Do you understand that?
5    A.    I understand that.  Let me give you an
6    engineering judgment and a little self-reflection
7    here, because I have been -- worked in high steel and
8    I have worked in high places.  Not necessarily with
9    the five-point harnesses that are being used.  I'm
10   not sure that I would have taken the straight jump as
11   opposed to being hung on a tether.  Certainly the
12   tether that Altec is recommending, the short,
13   four-foot length.  He had the -- he had a longer one,
14   which was quasi legal at that time.  But he had no
15   fall -- he had no interference for him when he fell.
16   So he could have -- that was OSHA legal for him to be
17   on a long tether.
18        I'm not so sure I would have taken a jump
19   and being swung into or part of that very sharp
20   guillotine that he was hanging by.  I'm not sure that
21   would have been a survivable accident.  I would have
22   taken the jump straight down.
23   Q.    So, in your opinion, it's better off that
24   he was not wearing his fall protection that day.  Is
25   that what you -- is that really what your opinion is?

81

EIHUSEN - Direct

1    A.    I think it becomes very debatable when
2    you look at where the fall protection would have put
3    him. The fall protection -- the fall protection that
4    he was -- that Altec has asked to use, the four-foot,
5    does not predicate that the bucket has failed. There
6    is -- it is predicated that the bucket is in place
7    and the fall protection is keeping you in the general
8    area of the bucket. But there is no -- the simple
9    fact that this bucket failed and created exactly the
10   hazards that keep one from using the six-foot
11   lanyard, or the longer lanyard on a boom truck, from
12   happening -- or around, keep one from specifying the
13   longer lanyard instead of the four-foot, gives me
14   great pause and makes it not necessarily such a very
15   sure thing.
16          And when I look at -- like I said, you
17   take a look at those pictures and you think about
18   hanging -- dangling and hanging out under that very
19   sharp guillotine, because that's what it is, and
20   being drug under that, I'm not so sure that would
21   have been -- that would have been a suitable -- or an
22   alternative that I would have accepted myself. And
23   let me put it that way, since I can only evaluate on
24   how I would have thought at the time.
25          Q.    Okay. And I'm asking for your expert

82

EIHUSEN - Direct

1    opinion, and if -- if you're called up to the witness
2    stand and you're asked the question that based on
3    your opinion number 10 should Mr. Keaschall been
4    wearing his fall protection on the day of this
5    accident, are you telling me that you're going to
6    tell the jury that your answer is either no or you're
7    not sure?
8          A.    I'm saying on number 10, this bucket was
9    designed -- it would have been very easy to put -- to
10   tie the bottom floor of the bucket into the ribs
11   along the top. There were things that could have
12   been done to this design to make this survivable.
13         Q.    And we're not talking about them.
14         MR. AHL: You want to read the question
15   back to him again?
16         A.    Well, you were asking about 10.
17         Q.    (By Mr. Ahl) I said in light of
18   number 10. Let's answer the question about the fall
19   protection, of what you're going to tell the jury if
20   you're asked the question.
21         MR. AHL: And let's have -- have you read
22   that back to him.
23         (The requested portion of the record
24         was repeated.)
25         A.    What lanyard, sir?

83

EIHUSEN - Direct

1          Q.    (By Mr. Ahl) The lanyard that he had
2    with him that day.
3          A.    That, sir, is very much of a judgment
4    call when you believe -- when you look at how this
5    thing failed. I can only answer how I would have
6    done it.
7          Q.    Well, I -- are you --
8          A.    I can only answer for myself.
9          Q.    Well, let me just ask you this, then:
10   Are you telling me that you don't have a professional
11   opinion as to whether or not he should have had his
12   fall protection on on the day of this accident? And
13   that's fine if you don't have an opinion.
14         A.    I would -- yes. I don't have an opinion
15   at this point, sir.
16         Q.    Okay.
17         A.    I think it's -- I think it's -- in my
18   opinion, though, it is not a sure thing.
19         Q.    Does ANSI require fall protection to be
20   worn on --
21         A.    OSHA requires it.
22         Q.    Does OSHA?
23         A.    Yes.
24         Q.    Does ANSI, do you know?
25         A.    I never saw it in the -- in the standard,

84

EIHUSEN - Direct

1    they require lock-off points. Typically the way ANSI
2    standards are written, operational issues are not
3    normally found in design standards.
4          Q.    Did Mr. Keaschall's employer require that
5    he wear fall protection while performing the job he
6    was doing that day?
7          A.    I believe he -- yes, sir.
8          Q.    Would he have been in violation of the
9    OSHA standard that day at the time of this incident
10   for not wearing his fall protection?
11         MR. BEUCKE: Let me object to the form of
12   the question as I think it may exceed this witness's
13   expertise and area of opinions.
14         Q.    (By Mr. Ahl) You know what the OSHA
15   standard is, don't you?
16         A.    I'm aware of the OSHA standard. I didn't
17   read it, but like you said, you want to be -- my
18   charter here is to testify to the composite as much
19   as possible, sir.
20         Q.    So are you telling me you don't have an
21   opinion as to whether or not his lack of wearing his
22   fall protection that day would have violated the OSHA
23   standard? You don't have an opinion or you don't
24   know?
25         A.    Let's say I don't know, sir.

85

EIHUSEN - Direct

1    Q.    Okay. Let's go to number 11. "The
2  primary reinforcement used in the design and
3  identified as short fiber, random mat has little
4  capacity to resist flaw propagation and was
5  improperly applied in the design without suitable
6  long fiber reinforcement to provide fracture
7  toughness and control of cycling tensile strains in
8  the laminate."
9    A.    Yes.
10   Q.    That's your opinion?
11   A.    Yes, sir. That's my opinion.
12   Q.    Okay. And can you tell me what the basis
13 of that opinion is?
14   A.    If you look in design handbooks, if you
15 look in the great body of work in the composites
16 industry, short fiber, random mat is not used in
17 tensile mode. At least in structural. It is filler.
18 It is core material. And, in fact, I had to work
19 really, really hard to find what the allowables were
20 for the material as opposed to interdirectional or
21 cross-ply reinforced cloth fabric.
22        And let me put this in perspective.
23 You're asking the difference between pressed dryer
24 lint and a tea towel as far as strength. Because
25 that's what short fiber, random mat is. Basically,

86

EIHUSEN - Direct

1  pressed dryer lint. And when I talk about long --
2  suitable long fiber, you're talking loading materials
3  like a tea -- like a towel or a tea towel or
4  washcloth, something that has some physical strength
5  and pull. As long fiber can carry load. A bit of
6  long fiber going around the -- the flange of this
7  bucket probably would have saved his life. And
8  that's what I was talking about, is -- on number 10.
9    Q.    Did you do any testing, experiments or
10 calculations to determine what effect the use of
11 random -- of the short fiber, random mat had in
12 regards to the strength of this bucket?
13   A.    You will find -- in my references, you
14 will find reference materials on -- on the different
15 materials and their lack or whatever strength you
16 would call out on them, sir.
17   Q.    Okay. Did you do any testing, though, to
18 determine what effect it had?
19   A.    Not on this bucket.
20   Q.    No? Okay. Did you do any testing or any
21 analysis to determine how much short fiber or random
22 mat was used in the manufacture of this bucket?
23        MR. BEUCKE: You say how much?
24        MR. AHL: Yeah.
25   Q.    (By Mr. Ahl)  What quantity? Let me...

87

EIHUSEN - Direct

1    A.    If you're looking for -- no. Let's
2  answer that no.
3    Q.    Okay.
4    A.    Let's not delay that.
5    Q.    Why don't we take about a ten-minute
6  break or so, and if you could find those photographs
7  for me while we're doing that in your file, I'd sure
8  appreciate it.
9    A.    We need one photograph and one exhibit.
10   Q.    Is that what we're looking for?
11   A.    I believe, sir. Yes, sir.
12        (At this time a brief recess was
13        taken.)
14        (Exhibit Nos. 105 and 106 were marked
15        for identification.)
16   Q.    (By Mr. Ahl)  Okay. We just took a short
17 break, and you have secured a couple items out of
18 your file for me that we had talked about in earlier
19 testimony but didn't have the actual exhibit. We now
20 have an exhibit marked 105 and exhibit marked
21 No. 106. First, let's go to Exhibit No. 105, and why
22 don't you identify what that purports to be?
23   A.    This is an inspection report. It
24 outlines the -- I normally call this a shot traveler,
25 but it gives you the information of -- during the

88

EIHUSEN - Direct

1  build of this particular bucket. By serial number.
2    Q.    And do you know, is this the record that
3  corresponds to the bucket that failed, or do we know?
4    A.    Yes, it is, by serial number, I believe.
5    Q.    Okay. In your prior testimony, you
6  indicated that there was something in this record
7  that gave you concern and that you found significant
8  in regard to the failure of this bucket?
9    A.    Yes.
10   Q.    Why don't you tell me what that is and
11 point out to me where that is reflected in the
12 record?
13   A.    You have, in the middle of the sheet, it
14 says, "Observed Discrepancies." Wrinkle is checked,
15 rib side. That's the one that stands out to me.
16 There's an "Air." It says skid, in flange. I'm
17 assuming that that means it was open. Don't know
18 about that, but I know what a wrinkle is to me, and
19 that's a wrinkle visible from the -- on the outside
20 of the -- on the layup when the mold was closed.
21   Q.    Anything else that was of particular
22 importance to you in the record which is Exhibit
23 No. 105?
24   A.    Well, there's lots of -- I have lots of
25 questions on it, but...

89

EIHUSEN - Direct

1     Q.    And let's set those questions aside for a
2 minute. Is there anything significant to you in that
3 record as it would relate to the -- to the failure of
4 this bucket?
5     A.    **Based on the information disclosed to me,**
6 **nothing discernible.**
7     Q.    Okay.
8     A.    **If there was more information, that may**
9 **change.**
10    Q.    Okay. And you indicated that the one
11 thing of significance to you is the checkmark that
12 says wrinkle, rib side?
13    A.    **Yes.**
14    Q.    What's the significance of that?
15    A.    **When you lay material into a mold,**
16 **especially a closed mold, and on resin transfer**
17 **manufacturing process, consistency is everything.**
18 **Consistency of resin flow, consistency of fill. That**
19 **speaks to the recurring quality of the part.**
20 **Anything that affects resin flow can channel resin**
21 **and cause dry spots and can cause weakness in the --**
22 **in the -- in the part itself.**
23          **What's concerning to me was, when I see**
24 **these known discrepancies, no review by the design**
25 **authority on what was acceptable or not. There's no**

90

EIHUSEN - Direct

1 **guidance here on what is acceptable or not. There is**
2 **no guidance on how much resin content is suitable.**
3 **There's no validation of any of the numbers here in**
4 **the design record. That's part of the many questions**
5 **that I have. And that requires, again, someone who**
6 **knew design intent to make those calls.**
7     Q.    Where you're talking about the folds or
8 the wrinkles and the effect on lamination, is that
9 what we're talking about?
10    A.    **Strength, yes.**
11    Q.    Strength? Okay. Did you ever evaluate
12 the structural significance of the folds or the
13 laminate in the area? Or do you even know what area
14 they're talking about?
15    A.    **Rib side.**
16    Q.    Okay.
17    A.    **That's on the side of the failure.**
18 **Anything that would affect the channeling of that**
19 **flow would affect -- this is on the side of the**
20 **failure. Let's -- let's put it in the worst possible**
21 **location, is right on top of the rib.**
22    Q.    Let me ask you this: Did you evaluate in
23 any fashion, either through testing, analysis or any
24 other method, the structural significance of the
25 wrinkle on the rib side? Did you?

91

EIHUSEN - Direct

1     A.    **No.**
2     Q.    Would that area that they described be in
3 what has been referred to throughout your report as
4 location "A"?
5     A.    **That would be the intent. When you're**
6 **looking at changing the mold or changing how this --**
7 **how the resin is flowing, it could be anywhere in**
8 **between the ribs. Anywhere in that distance is what**
9 **I would be worried about, sir.**
10    Q.    Do you know whether they're referring to
11 what you have called in your report location "A"? In
12 Exhibit No. 105 where they're talking about --
13    A.    **They say rib side.**
14    Q.    Okay. So you don't know exactly?
15    A.    **That's correct.**
16    Q.    Okay. The design of this bucket has
17 features where, from an engineering perspective, the
18 bucket is to carry the weight load; is that correct?
19 Of the occupant.
20    A.    **There's a spec on what it's -- their**
21 **intent for it, yes.**
22    Q.    Would you agree that the platform is
23 designed to carry the load of the weight on its
24 floor?
25    A.    **No. I -- you're talking about an**

92

EIHUSEN - Direct

1 **integrated structure. You're asking me -- I guess**
2 **you're going to have to speak more specifically.**
3     Q.    I guess, when the bucket is in use, you
4 have an individual and tools in it, where, in your
5 opinion, is that bucket designed to carry the main
6 load of that weight?
7     A.    **You stand on the floor.**
8     Q.    Is there a scientific method that you
9 could use to determine through a scientific analysis
10 where the stresses on the platform would normally be
11 when the -- when it's loaded?
12    A.    **If you knew how it was built, yes.**
13    Q.    Could you do that with what -- what do
14 they call it? A final element analysis or something
15 like that?
16    A.    **Yes, you could.**
17    Q.    Okay. And that would determine where the
18 stresses are on the platform when it's being
19 utilized?
20    A.    **It would take -- yes.**
21    Q.    Okay.
22    A.    **A suitable expert could do that job, yes.**
23    Q.    Okay. Did you do that?
24    A.    **No.**
25    Q.    Do you know whether it's been done in

93

EIHUSEN - Direct

1   this case?
2       A.   **I know there was an attempt.**
3       Q.   Do you -- do you know whether it's been
4   done?
5       A.   **Let me be very specific.**
6       Q.   That's what I want.
7       A.   **None was -- none was disclosed by Altec**
8   **for the design or build of the bucket.  The only FEA**
9   **that I am aware of was done after the failure.**
10      Q.   Do you know what the one done after the
11  failure showed as far as where the stresses on the
12  platform were when it was loaded?
13      A.   **Let me be very --**
14      Q.   Well, just yes or no --
15      A.   **-- generous.**
16      Q.   -- first.  Do you know whether there was
17  one done after the failure by anyone?
18      A.   **Yes, there was one done after the**
19  **failure.**
20      Q.   Have you seen the results of that?
21      A.   **I've seen one plot of it.**
22      Q.   Who did that?
23      A.   **That was Mr. Rakow.**
24      Q.   Okay.
25      A.   **Rakow.**

94

EIHUSEN - Direct

1       Q.   Yeah.  Do you know what that analysis
2   showed in terms of where the stresses were on the
3   platform when it was loaded?
4       A.   **I'm going to be very specific again.**
5       Q.   Okay.
6       A.   **The plot that Mr. Rakow put in his report**
7   **would not be acceptable, credible analysis in any**
8   **expert composites that I'm aware of.**
9       Q.   Do you know what it showed?
10      A.   **Yes.**
11      Q.   What did it show?
12      A.   **It showed von Mises stresses located at**
13  **the bottom.**
14      Q.   The floor of the platform?
15      A.   **No.  On the rib -- connection to the rib**
16  **to the side.**
17      Q.   The mounting bolts?
18      A.   **No.**
19      Q.   Where?
20      A.   **His highlighted on the very -- was on the**
21  **bottom of the rib connecting to the side wall.  I'm**
22  **going by memory, sir.**
23      Q.   Okay.
24      A.   **And we -- we have that here if you want**
25  **to.**

95

EIHUSEN - Direct

1       Q.   You want to take a look at it just to
2   make sure you've got it?
3       A.   **No.  I've got it in memory, sir.**
4       Q.   Okay.  Did it show anything about
5   location "A," whether or not there was high stress or
6   low stress in that area?
7       A.   **Well, if it would have been done**
8   **properly, it probably likely would have.**
9       Q.   Again, I know you want to answer whatever
10  question you want to formulate in your own mind.  But
11  that's not the question I asked.
12           MR. AHL:  Read it back to him.
13           (The requested portion of the record
14               was repeated.)
15      A.   **His analysis, no.**
16      Q.   (By Mr. Ahl)  Didn't show anything in
17  that regard?
18      A.   **That's correct, sir.**
19      Q.   You seem to be very critical of the
20  methodology?
21      A.   **Absolutely.**
22      Q.   Why don't you tell me exactly what all
23  your criticisms are so we can address them with
24  Mr. Rakow?
25      A.   **Von mises stress is an inappropriate**

96

EIHUSEN - Direct

1   **failure criteria for composites, period.  He would**
2   **have been -- carried a little bit more credence if he**
3   **would have said von Mises strains.  He would have**
4   **been even a little bit more if he would have talked**
5   **about first principal strains.  But when he said**
6   **that, the question now is -- begs on what was his**
7   **material properties, how did he lay it up, what**
8   **elements did he use, how the material elements laid**
9   **in there.**
10          **Obviously he did not include the**
11  **difference in stiffnesses of the material of the rib**
12  **and the flange.  It looks like the material was**
13  **treated -- the bucket was modeled relatively**
14  **isotropically.  Not modeling the Rakow version.  And**
15  **so if he didn't model the Rakow version, if he didn't**
16  **come back specifically with -- you know, if he came**
17  **in and took a CAD model, a 3-D CAD model, pushed the**
18  **button and said give me tet -- condensed tet**
19  **elements, laid material properties in, he's going to**
20  **get an answer or a result that would not be meritable**
21  **in any -- in any peer review that I'm aware of.**
22          **That was one of the reasons why I was**
23  **going after the second bucket, was to do a credible**
24  **design or credible design FEA.  Suitable for this.**
25  **But when I realized that we had no way to develop the**

EIHUSEN - Direct

97

1  as-built condition of the Keaschall bucket without
2  systematically destroying it, that's when I said, we
3  can't do that.
4      Q.    So you think that Dr. Rakow's tests just
5  show nothing as far as the final element analysis?
6      A.    I think Mr. Rakow has to provide a great
7  deal of his input and of his analysis.  And I'm being
8  kind there, sir.
9      Q.    In your report you come up with, on
10  page 4, your responses to questions of interest.
11  Going back to your original report.
12      A.    Yes, sir.
13      Q.    And question of interest number 1 is, did
14  Altec slash Osborne use reasonable care in the
15  manufacture of the bucket?
16      A.    Yes, sir.
17      Q.    Your response to that was no?
18      A.    Yes, sir.
19      Q.    Can you tell us the basis upon which you
20  formulate that opinion or conclusion?
21      A.    The lack of disclosures.
22      Q.    To whom?
23      A.    To the court.  They were an ISO 9000
24  company.  They have an ISO 9000 certificate hanging
25  on their wall.  It was in effect at the time of

EIHUSEN - Direct

98

1  build.  ISO 9000 requires significant design control
2  and management of risk.  None of those documents were
3  produced for this.  Having none of those documents,
4  that's on the face of it.
5      Q.    Other than not having the what you would
6  feel to be appropriate disclosures, do you have any
7  other basis for your opinion as expressed to question
8  of interest number 1?
9      A.    When they did the manufacturing — let's
10  go look on — let's be very specific and walk through
11  this.
12      Q.    Okay.
13      A.    Who was — the question is, and it still
14  is in my mind, who's the design authority for the
15  bucket?  I'm not — that's not clear in my mind.  Who
16  had — who had final design authority here?  If it
17  was Altec, they should have had shipping and
18  receiving documents that said, we're buying what
19  we're getting.  And we have an e-mail in the record
20  that says, we have no idea where these — these —
21  the tests that were asked.
22          They asked for the tests to the — the
23  specification.  And you look and you say, people
24  weren't — the two institutions weren't effectively
25  doing their jobs.  And when I look very specifically

EIHUSEN - Direct

99

1  to process FMEAs — failure modes and effects
2  analysis — control plans, all the things that would
3  have provided input to this document, I'm not seeing
4  any of those.  If they exist, I would might change my
5  opinion, sir.  But the lack of disclosures, the lack
6  of specific disclosure on those issues, I have to
7  say, based on what I see, no.
8      Q.    And that formulates the entire basis of
9  your opinion as to the lack of disclosures and lack
10  of information that's been provided to you?
11      A.    Yes, sir.
12      Q.    Okay.  Let's go down to question of
13  interest number 2, "Did Defendants Altec slash
14  Osborne use reasonable care in the design of the
15  bucket?"  And, again, your response is no.  Why don't
16  you tell us specifically what you use as the basis of
17  that opinion?
18      A.    Where was the responsible individual?
19  Who's the design authority?  Who is the competent
20  authority that signed off on the drawings?  Who did
21  the validation?  Who did — where's the work product?
22  This is all that was disclosed on this bucket.
23  Where's the work product, other than some drawings?
24  There's nothing here that says this design was
25  suitable.  This design meets my — I have an intent,

EIHUSEN - Direct

100

1  and it meets my intent.  And that goes really to the
2  core of the design function.  And if you can't
3  produce it and you don't have that in the files and
4  you're not managing it as far as your ISO 9000, yes.
5  On the surface, sir, no.
6      Q.    Is that, again, the total basis of your
7  opinion, the lack of records and lack of disclosure
8  that have been provided to you, upon which you
9  formulate your response to question of interest
10  number 2?
11      A.    Yes.
12      Q.    Question of interest number 3:  "Did
13  Defendants Altec/Osborne adequately warn of the
14  dangers of the use of the bucket and the need for
15  periodic inspection?"  Your response to that is no.
16  And, again, you say based on disclosures provided and
17  the manner of this failure.  Why don't you tell us
18  exactly what you used to formulate for the basis of
19  your opinion?
20      A.    The type of failure — Altec was very
21  good on inspection.  But they were inspections for
22  electrical characteristics.  There was no — very —
23  there was very, very little specific inspection
24  criteria to the safe use of the structural intent of
25  the — of the bucket.  And we find that in several

101

EIHUSEN - Direct

1  cases. Because third-party inspectors had already
2  passed off on the inspection of this bucket.
3          Quite frankly, when somebody with a
4  practiced composite eye came across it and saw the
5  edge delaminations, I knew there was a significant
6  problem with this design or with this particular
7  bucket, especially the one I removed from service.
8  None of that indication, no guidance on what
9  individual indications were provided in Altec's
10  information. So based on that, no.
11      Q.   Anything else?
12      A.   No.
13      Q.   Question of interest number 4: "Was the
14  bucket defective and unreasonably dangerous for its
15  intended use or any use Defendants Altec/Osborne
16  could reasonably foresee?" And your answer to that
17  is yes. Why don't you tell us each and every element
18  that you used as the basis for that opinion?
19      A.   The evidence put in front of me was the
20  same in 4.3. The evidence and the materials placed
21  in front of me.
22      Q.   I don't understand your answer.
23      A.   Well, you were -- let's -- okay. Let's
24  go through my rationale. Osborne was known -- had a
25  bucket with known folds or visual indications. It

102

EIHUSEN - Direct

1  had a known, in their words, discrepancy. I saw
2  no -- in their known discrepancies, there was nothing
3  in the manufacturing record, there was no work
4  product that said, this is okay. Nothing in Altec or
5  Osborne information said, this is going to be okay.
6  There was no testing to validate it. So based on
7  that, giving no concurrence of the competent design
8  authority, then you have to say -- you have to say --
9  you have to err on and say this bucket was defective.
10      Q.   Again, you didn't do any testing yourself
11  to determine what the effect of the known folds or
12  visual indications at the time of manufacture were,
13  did you?
14      A.   No. As already answered.
15      Q.   So you don't know whether or not that
16  even had any structural significance on this bucket,
17  do you?
18      A.   Oh, I know it had structural
19  significance, sir, based on the visual indications
20  and the failure --
21      Q.   You just don't know the extent of that
22  significance?
23      A.   We know it failed, sir.
24      Q.   You didn't test it, did you?
25      A.   No. We didn't do tests.

103

EIHUSEN - Direct

1      Q.   If you really want the answer to some
2  question, isn't the way you do it in science to test?
3  Isn't that the way you do it?
4          MR. BEUCKE:  Let me object to the vague
5  form of the question.
6      Q.   (By Mr. Ahl) You can still answer it.
7  Isn't that the way you determine an answer in
8  science, is to test something?
9      A.   If I see a thousand parts fail, and I see
10  duplication of failure modes, if I see duplication of
11  failure surfaces, you can start to read the
12  composite. In this case, it failed. I would have
13  loved to do testing. Unfortunately, to do any valid
14  testing, I would have had to destroy the evidence in
15  front of us. Because I'm not -- can't find another
16  bucket like this.
17          Would have loved to do some testing.
18  Would have loved to put it into analysis. But the
19  simple fact is, this bucket, based on the x-ray
20  indications, stands unique. And because of that, we
21  have to go on the visual indications of what we have.
22  Unless we destroy it. And the thing is, it's already
23  been destroyed.
24          MR. AHL:  Read the question back to him.
25  I'll move to strike that as being nonresponsive, but

104

EIHUSEN - Direct

1  read the question back to him.
2          (The requested portion of the record
3          was repeated.)
4      Q.   (By Mr. Ahl) Yes or no?
5      A.   Yes.
6      Q.   In your first report, you also on
7  page 19, which is section 8 of your report, come up
8  with what you call commentary. Which, am I correct
9  in my reading of that, that you're trying to recreate
10  how this -- this incident occurred? Reconstruct it
11  in a fashion?
12      A.   Yes.
13      Q.   In attempting to reconstruct the
14  incident, did you do any testing, modeling or
15  analysis that allowed you to formulate any
16  conclusions or impressions that you came up in regard
17  to how this actually occurred?
18      A.   You lay the visual -- the visual
19  indications of the parts themselves dictate how the
20  accident progresses. In -- you asked modeling?
21      Q.   Yes.
22      A.   You put the parts together, and you see
23  how it comes together. Is that any less different
24  than doing it in a computer? If you're having the
25  physical parts? If you're doing analysis, if that --

105

EIHUSEN - Direct

1    Q.    Did you do any computer modeling?

2    A.    No.

3    Q.    What exactly did you do to allow you to

4    come up with your commentary and reconstruct how you

5    believe this incident actually occurred?

6    A.    I looked at the evidence and the laminate

7    itself. I looked at how the load was on it. And how

8    it was — how it was in service. I looked at how,

9    mainly — mainly, the first thing is, you look at the

10   laminate. The laminate tells you how it fails.

11   Irregardless of what load was applied, it tells you

12   how — what happened and where and how it proceeded.

13   Q.    Do you also look at the direction of

14   travel of the different components in relation to

15   their final place of rest to where they were at the

16   time the failure occurred?

17   A.    At the time that this report was written,

18   I had no way to place the bucket in space. But I

19   could tell which direction it headed out relative to

20   its own — to itself.

21   Q.    Did you have a way to determine how far

22   it had traveled either in an up-and-down fashion or a

23   lateral fashion?

24   A.    It wasn't important to my analysis at the

25   time.

106

EIHUSEN - Direct

1    Q.    Okay.

2    A.    My analy- —

3    Q.    So you didn't do it?

4    A.    No. My analysis at the time was to —

5    was to stay focused on what the laminate was telling

6    me.

7    Q.    Okay.

8    A.    The evidence in there.

9    Q.    Have you done anything further since your

10   first analysis that would allow you to formulate

11   cause and effect in regard to the movement of

12   different components involved in the incident?

13   A.    My third report discussed potential cause

14   and effects of the...

15   Q.    Have you done any modeling or testing or

16   analysis in -- in terms of mathematics or anything

17   else as a basis for your reconstruction of this

18   incident?

19   A.    Very minor. But let's say no.

20   Q.    Okay. Ben Railsback's deposition was

21   just taken here shortly. And a copy of his file was

22   secured, which involved some records which included

23   some records of computer modeling that he did --

24   A.    Mm-hmm.

25   Q.    — in a reconstruction of this incident.

107

EIHUSEN - Direct

1    Have you seen those?

2    A.    No. I have not had that in my possession

3    or seen them.

4    Q.    Okay. One of the things that

5    Mr. Railsback was talking about was the movement of

6    the bucket after the failure.

7    A.    Mm-hmm.

8    Q.    You've seen his report in that regard?

9    A.    Yeah. I have some issues with that one,

10   but that's okay.

11   Q.    Okay. That's what we're here to talk

12   about, is your issues with it. Okay?

13   A.    Okay.

14   Q.    Have you ever seen his opinions and

15   conclusions modeled in a computer as far as the

16   amounts of energy he says was necessary to move

17   different components?

18   A.    No, I have not — not did that.

19   Q.    Do you have the ability to compute a

20   model?

21   A.    To computer model that?

22   Q.    Yes.

23   A.    No. But that's simple free body motion.

24   That should check out with — that's first year

25   engineering —

108

EIHUSEN - Direct

1    Q.    Okay.

2    A.    — on a hand calculator —

3    Q.    Okay.

4    A.    — for — to scope that out. You won't

5    get it within inches, but you should be within feet.

6    Q.    Okay. And that's how you did it?

7    A.    I didn't do it, sir.

8    Q.    Okay. You didn't even use a hand

9    calculator? You just looked at it and --

10   A.    I told you from the very beginning, I

11   looked at the laminate. It was interesting to me

12   that Mr. Railsback validated the positioning and the

13   exit direction that was indicated on the bucket. He

14   did — he did indicate the same. We did come to the

15   conclusion of what direction it went away from the

16   boom mount.

17   Q.    Do you agree with Mr. Railsback that at

18   the time of the failure of the bucket, it not only

19   moved vertically, but horizontally as well?

20   A.    Sure.

21   Q.    And you accept that the bucket ultimately

22   hit the rail of the truck before striking the ground?

23   Do you agree with that, or do you disagree with that?

24   A.    I think beyond a question kind of

25   question, the bucket hit the truck. I've seen a

109

EIHUSEN - Direct

1 great deal of structures dropped, and they can
2 bounce. So whether or not the primary impact was in
3 the dirt and we couldn't see it because of the
4 roughing up and it bounced into the truck, or hit the
5 truck directly, we don't know for sure. But it did
6 hit the truck. I think a good engineering adjustment
7 is, is that it hit the truck first before it hit the
8 ground.
9     Q.    So you do accept that?
10    A.    I say it's valid. It's a reasonable
11 assumption. But it's not — specifically, it's not
12 without question. And I'm being very specific here
13 to answer your question so we — so you understand.
14    Q.    And I'm just wondering, in your version
15 or your commentary or your reconstruction of this
16 incident, are you assuming that when that bucket
17 failed and fell, that it first struck the truck
18 before --
19    A.    I think it's very reasonable to consider
20 that, yes, sir.
21    Q.    Is that what you're assuming with all
22 your -- your analysis?
23    A.    Yes. I think that would be fair to
24 believe, that it hit the truck. But I want to be
25 very clear. When I state engineering opinion, I

110

EIHUSEN - Direct

1 make — make sure that there's between — if there's
2 any room for error or any room for variability. That
3 bucket could have hit the ground and bounced into the
4 truck. I have seen composite structures bounce.
5     Q.    How far from the truck did the bucket end
6 up at its point of rest, do you remember?
7     A.    Don't care.
8     Q.    Doesn't make any difference to you as to
9 whether it hit the ground, bounced up, hit the truck
10 and went somewhere else?
11    A.    No. Nope. That wasn't — you're talking
12 out — when it came — when it came loose of the
13 truck. At that point it becomes a great deal of
14 conjecture, sir.
15    Q.    Do you know how far or -- are you
16 assuming that the bucket moved horizontally a certain
17 distance from where it was at the time of failure
18 to --
19    A.    I think the horizontal distance could be
20 anywhere from four feet to six feet, I believe,
21 somewhere in there. I'd have to go look at the —
22 the plots and figure it out. It means if you include
23 the width of the bucket itself.
24    Q.    Well, we know where the bucket, based on
25 the mark on the bottom of it, struck the truck, don't

111

EIHUSEN - Direct

1 we?
2     A.    Right.
3     Q.    And we know where that rail on the truck
4 was?
5     A.    Right.
6     Q.    So we know how far the bucket was over
7 the truck when it actually struck; correct?
8     A.    What I can tell with certainty is, I
9 can — I can tell you the exit direction that the
10 bucket took away from the boom. That's what I can do
11 with some reasonable certainty.
12    Q.    Past that, you can't do much with
13 reasonable certainty?
14    A.    It becomes conjecture, sir, at that
15 point.
16    Q.    Okay.
17    A.    A good engineer — at that point your
18 engineering judgment comes in. And we can — I'm
19 sure that you — we'll talk about that later, as we
20 go on.
21    Q.    You would agree with me that given
22 gravity and given the weight of the bucket, there's a
23 certain length of time it would have taken from the
24 time it detached from the boom till it struck the
25 ground?

112

EIHUSEN - Direct

1     A.    Yes, sir.
2     Q.    And if it hit the truck, it also had to
3 move horizontally at a certain rate of speed --
4     A.    Yes, sir.
5     Q.    -- before it got to a point where --
6     A.    Yes, sir.
7     Q.    -- the truck was off the ground?
8     A.    Yes, sir.
9     Q.    Have you calculated those?
10    A.    No.
11    Q.    Have you calculated how much energy it
12 would take to move the weight of the bucket, the
13 distance that it moved horizontally, from where it
14 was on the boom to the point that it struck on the
15 truck?
16    A.    No.
17    Q.    Do you have the ability to do that?
18    A.    Yes.
19    Q.    Any reason you haven't?
20    A.    Because it wasn't necessary.
21    Q.    Okay. If you haven't seen any of
22 Mr. Railsback's file, I don't assume that you've seen
23 the computer model that he did of your commentary and
24 how you --
25    A.    No.

113

EIHUSEN - Direct

1    Q.    -- say --
2    A.    No. I have no idea. I haven't seen it
3    at all, sir.
4    Q.    Okay.
5    A.    But I do have some -- I did listen to him
6    discuss, and I can -- I can -- from his verbal
7    indication of that, I would -- I would probably say
8    that his initial conditions were probably not what I
9    was intending. It all comes back to the initial
10   conditions you use.
11   Q.    Are you critical of Mr. Railsback's
12   reconstruction of this accident as he computer
13   modeled it?
14   A.    Oh, I think -- I think his physical
15   orientation was nicely done. Good work on the
16   modeling and laying the -- taking the pictures.
17   Those are things that I could not do. But I think
18   what he lacks is an understanding of what -- how the
19   composite and -- the interaction of how the composite
20   fed into that picture. And I was reasonably pleased
21   on -- that when I said how the -- the bucket failed
22   and what direction it probably exited was in the
23   direction of where he had put it in the -- in
24   relation to the buck- -- to the truck. And so that's
25   why I said, it's reasonable to assume that the bucket

114

EIHUSEN - Direct

1    hit the truck first before it hit the ground. Not
2    with an absolute certainty, but it is quite
3    reasonable to believe that.
4    Q.    You were listening to -- to
5    Mr. Railsback's testimony?
6    A.    Yes, sir.
7    Q.    Did you hear him testifying about the
8    amount of force that he believed was necessary to
9    move the bucket horizontally and the time that it
10   would have taken to arrive where the truck rail was?
11   Did you hear that?
12   A.    Yeah. I heard that. And I have issue --
13   Q.    Do you disagree with that?
14   A.    Well, I'm not so much disagreeing with
15   it, but I have a question for Railsback on -- on that
16   is, if -- I want to be careful. This is a cup. If
17   this is the bucket, okay, and it has to move from
18   here to over there, he -- he said it had a side
19   load. He gave a fairly high side load to move it
20   over the time. The question is, is he applying that
21   load all the way over that time? He never -- he
22   wasn't ever really clear.
23         Because, quite frankly, there's no rocket
24   motor on that bucket. It isn't being thrusted over
25   that way. It all has to come from -- that load would

115

EIHUSEN - Direct

1    be better quantitized as -- in engineering as impulse
2    momentum. Okay?
3    Q.    Mm-hmm.
4    A.    Instead of having a load over that time,
5    it would be more of an impulse momentum. And that
6    would be more attuned to, have you ever bounced a
7    ball on a table?
8    Q.    Sure.
9    A.    You bounce a ball, and the ball absorbs
10   the energy and kicks back. What makes that work,
11   sir, is the ball stays a ball. It absorbs the energy
12   and gives it back to you. If the bucket would have
13   hit something and failed, that would be like trying
14   to bounce an egg. When you bounce an egg, you drop
15   it on the table, the eggshell cracks. It doesn't
16   bounce. The energy absorbed, and that would have hit
17   and basically stopped. It wouldn't have been any
18   side force to that.
19   Q.    So that's how you understand
20   Mr. Railsback's reconstruction? He's talking about
21   a -- a collision effect creating --
22   A.    I'm asking how he -- how that horizontal
23   force would get there. And I'm questioning the
24   physics of how that would happen.
25   Q.    You agree that it would take a certain

116

EIHUSEN - Direct

1    amount of energy, however, to move that bucket
2    laterally before it struck the ground?
3    A.    Yeah. But can -- can I give an analogy
4    here?
5    Q.    I just want to know if you agree with
6    that first.
7    A.    Yes.
8    Q.    Okay.
9    A.    Yes.
10   Q.    And you've not calculated in any fashion
11   in your own mind the amount of energy it would have
12   taken to move that bucket the distance horizontally
13   that it moved while still moving vertically down to
14   strike the rail of that truck?
15   A.    Right. But the issue is, is the -- what
16   you're -- my problem is, Railsback and Rakow
17   aren't -- they're not listening to the commentary or
18   the narrative on how this failed. Or what -- they're
19   not -- let me put it this way: They're not looking
20   to the evidence in the composite, in the laminate
21   itself. And let me give you a bit of analogy to get
22   started. Have you ever thrown bales out of a barn?
23   Q.    No.
24   A.    Never thrown bales out of a barn, of a
25   hay mound? One guy can take a bale and basically

117

EIHUSEN - Direct

1  load the truck just by a little bit of a swing.  They
2  can load and stack those bales and make it real easy
3  for the guys on the ground.  You can throw a bale
4  quite a ways if you've got height, horizontal
5  distance.  It's very easy.
6          What — the point I'm trying to make here
7  is the composite says the floor of the bucket was in
8  motion.  When "A" failed, that bucket was twisting
9  down.  It had an angular velocity.  It had an angular
10  momentum.  That's different than just straight
11  dropping.  Mr. Railsback kept saying, oh, it hinged
12  around this point.  That's not what I'm saying.  This
13  bucket, when it failed at "A," broke loose and
14  started down.  And started loading at "B."  Which
15  would have been the second noise, by the way.
16      Q.    For less than a second, is what you told
17  me before?
18      A.    Yes.
19      Q.    Okay.
20      A.    Based on what I'm seeing is — is — and
21  there's also, when "B" failed, you can see exactly
22  when "B" failed when you look at the fracture
23  surfaces on that — on the far wall.  It's in a "V."
24  The point of the "V" is where "B" failed.  So this
25  bucket has broken loose.  It's — it's hinging down.

118

EIHUSEN - Direct

1  I wish I had a Dixie cup.  The bucket is hinging down
2  away from it.  And it's in motion.  It's started
3  down.  It's being slowed down by "B" and at the
4  corner.  But when "B" breaks, that shear plane
5  reverses sides.  It also reverses sides and comes out
6  of that corner and snaps through and breaks in the
7  corner and exit in the direction that I, from day
8  one, identified.
9          That motion, how much energy, how much
10  angular momentum was in that at that point when it
11  was in motion and still attached, and that was when I
12  was saying is, this is like dropping a pendulum.  You
13  have a — you know, a pendulum or a ball on a string,
14  and you drop the ball and then you cut the string
15  somewhere in mid-drop, it's going to go sideways.
16  And that's what we had here.  This thing -- we had a
17  weight on a string.  It was dropping.  It was
18  swinging through.  And we snapped the string, and it
19  went sideways.
20      Q.    And you believe that the sequence that
21  you have just described created enough energy to move
22  that bucket from its place where it was on the boom
23  over to where it struck the rail on the -- on the
24  truck?
25      A.    I said it left in that direction,

119

EIHUSEN - Direct

1  explicitly, without a doubt.  I said after that, it's
2  reasonable that it had enough energy to hit the
3  truck.  To be clear, I have seen large composite
4  parts bounce.  It is not without the realm of reason
5  this thing could've hit dirt.  It bounced into the
6  truck.  But I said it is beyond — a good judgment
7  would say that it had enough energy to hit the truck.
8      Q.    Do you know where on the truck this hit?
9      A.    Yes.
10      Q.    You think it bounced up, how many feet up
11  into the back of the bed of the pickup and hit the
12  railing?  Is that what you're telling me?
13      A.    Have you ever seen parts bounce?
14      Q.    Is that what you're telling me?
15      A.    I said that's a possibility.
16      Q.    Okay.  Do you have any evidence of that?
17      A.    No.
18      Q.    Okay.
19      A.    And there's none there, I said, but it's
20  a possibility, sir.
21      Q.    So we could just sit here and think of a
22  million possibilities, but we have no evidence of
23  them?
24      A.    You have an evidence that it hit the
25  truck.

120

EIHUSEN - Direct

1      Q.    Okay.
2      A.    You don't know what happened before or
3  after that, sir.
4      Q.    Okay.
5      A.    Objective fact is, it hit the truck.
6      Q.    Any other criticisms that you have of
7  Mr. Railsback's reconstruction of this incident?
8      A.    Like I said, I think his spatial
9  orientation was good.  I — I had no qualms with it.
10  I — he did — he laid out the spatial orientation.
11  And his direction of the impact, the location of the
12  impact of the truck relative to the boom and relative
13  to where the bucket would have been in space fits the
14  evidence in the composite.
15      Q.    Let me ask you this:  If through the
16  application of physics and engineering principles we
17  would determine that the failure mode that you have
18  described would not create enough energy to move that
19  bucket from where it was located on the boom over to
20  the railing where it struck the truck, would you
21  agree that your reconstruction could not be accurate?
22      A.    No.  The evidence is in the composite.
23  You first go to the objective evidence, and the
24  objective evidence is in the composite.  After that,
25  it becomes subject.  It's pure speculation.  The

121

EIHUSEN - Direct

1    evidence in the composite is what you must go with,
2    because it's objective in front of you.
3        Q.    But we agree that it takes a certain
4    amount of energy to move the bucket from its place on
5    the boom over to the railing on the truck; correct?
6    We agree that that has to be?
7        A.    Right.
8        Q.    And if your analysis or your scenario or
9    your commentary, based on the application of
10    engineering principles and physics, wouldn't allow
11    for the creation of enough energy to make that
12    movement laterally before it would strike the ground,
13    would you agree that your commentary or your analysis
14    or your reconstruction, whatever you want to call it,
15    has to be wrong?
16        A.    No.
17        Q.    Okay.
18        A.    Because, again, we go back to the
19    evidence of the — what's — how the story is told in
20    the composite.
21        Q.    Okay.
22        A.    You're asking me — you're asking me to
23    take —
24            MR. BEUCKE:  Hey, he's finished with his
25    question.

122

EIHUSEN - Direct

1            THE WITNESS:  Okay.
2        Q.    (By Mr. Ahl)  Other than the description
3    of your commentary in your reports, have you done any
4    other testing, analysis or mathematical computations
5    regarding the reconstruction of this incident?  Other
6    than what you have in your reports?
7        A.    No.  The only interpretation is — I was
8    the sole interpretation of the x-rays.
9        Q.    Okay.  You've been provided with a copy
10    of a report from Dr. Rakow?
11        A.    Yes.
12        Q.    And you have authored a rebuttal report
13    in which you're critical of some of his methodology
14    and opinions and conclusions?
15        A.    Yes, sir.
16        Q.    You've told us about the criticisms that
17    you have of his — what do you call it?  The final —
18        A.    Finite element.
19        Q.    Finite element analysis.  Any other
20    testing methodology that he employed in his — in
21    reaching his opinions or conclusions that you're
22    particularly critical of?
23        A.    Well, it would be nice if he would have
24    tested a Keaschall bucket.
25        Q.    You believe that the buckets that they

123

EIHUSEN - Direct

1    ultimately did the testing on were different than the
2    bucket that was involved in this incident?
3        A.    The x-rays objectively say yes.
4        Q.    Did you do any testing or analysis or
5    calculations to determine whether or not the changes
6    affect the structural integrity or affect the
7    performance of the bucket?
8        A.    Be more specific.  There were several
9    changes.
10        Q.    Well, which ones were you talking about?
11        A.    I'm talking about them all, sir.
12        Q.    Okay.  Well, which ones do you have shown
13    in your x-rays?  Aren't they of the —
14        A.    Internals.
15        Q.    Well, let's go through.  Why don't you
16    tell me all of the changes that you believe are
17    present in the buckets that Rakow tested in
18    connec- — in regard to the one that was involved in
19    the Keaschall incident?
20        A.    Well, you have the buckets that you
21    qual'd.  We have no idea what they qual'd.  Their
22    qualification testing, I have no idea what they
23    tested.  But we do know that after qualification
24    tests were done, they made a significant drawing
25    change.  Without any testing.  So there — there's a

124

EIHUSEN - Direct

1    change there.
2        Q.    Okay.  And what was that drawing change?
3        A.    That was, they cut the flange in an extra
4    half inch.  It was part of the machining that we
5    talked about earlier.
6        Q.    Do you know why they did that?
7        A.    I have no idea, sir.  But it's there.
8        Q.    Did that in any way relate to the lanyard
9    or the — the place on — for the lanyard to be?
10        A.    Don't know, sir.
11        Q.    Okay.
12        A.    All I know is they made a — they
13    violated their spec when they did that.
14        Q.    Well, let's take that change.  And that's
15    the one that you've really been pointing to is the
16    difference with the Rakow testing, isn't it?  Or is
17    there other ones that you believe are —
18        A.    Well, you were asking me to go through
19    the changes.
20        Q.    Okay.  Well, let's go through them all,
21    and we'll get back to this one.
22        A.    Okay.
23        Q.    Okay.  What other changes?
24        A.    You have internal differences on the
25    fabrication of the bucket.

125

EIHUSEN - Direct

1   Q.   What are those?
2   A.   We have a — on the Rakor — on the Rakow
3   design, we have a solid, prefabbed insert for the rib
4   structure. Which is not found on the other ones. Or
5   it's just — if there is a prefab, it's completely
6   different by the morphology of the x-rays.
7   Q.   What else?
8   A.   That's enough, sir.
9   Q.   Can you think of any others? I don't
10  want to hear about them later.
11  A.   That'd be my biggest problem, sir.
12  Q.   Okay. And of the ones that you just
13  delineated, did you do any testing or calculations or
14  experiments to determine whether or not any of those
15  changes affected the performance of the bucket or the
16  structural integrity of it?
17  A.   No.
18  Q.   You just know that they were made?
19  A.   Yes.
20  Q.   Okay. I believe that in your opinions,
21  you have indicated that you believe that the failure
22  of the Keaschall bucket started at what you've
23  identified as location "A"; is that correct?
24  A.   Yes, sir.
25  Q.   What do you understand of the testing

126

EIHUSEN - Direct

1   that Dr. Rakow and Osborne did that you're critical
2   of because of the change of the design of the bucket?
3   What did they do?
4   A.   Well, it comes to design intent.
5   Q.   What did they do in the testing?
6   A.   They attempted to duplicate the crippled
7   condition. And when I say attempted, that doesn't
8   mean they were successful.
9   Q.   Okay. And obviously you don't believe
10  they were?
11  A.   No.
12  Q.   Okay. And why weren't they?
13  A.   Because when — they didn't understand
14  the design intent between the two buckets, or the two
15  designs.
16  Q.   I may misunderstand your report, but this
17  is what I get from it, and you tell me if I'm
18  misinterpreting it. Is that it was the delamination or
19  the defect in the area of location "A" that caused a
20  weakness that ultimately led to its failure over a
21  cycling term.
22  A.   For the Keaschall configuration, yes.
23  Q.   Okay. Do you believe that the folds and
24  visual indications identified by Osborne during the
25  manufacture of the subject platform were causal to

127

EIHUSEN - Direct

1   the failure?
2   A.   Certainly contributing. Right up there.
3   Q.   And what physical evidence or analysis
4   provides the basis for that?
5   A.   Well, the physical evidence in the
6   laminate and in the x-rays of the quality of the
7   laminate and its — certainly its ability to carry a
8   load in that — in those conditions.
9   Q.   Again, I think we've — we've determined
10  that you haven't done any experiments, calculations
11  or testing to evaluate the significance of any
12  pre-existing delaminations in the Keaschall platform;
13  is that correct?
14  A.   That's correct.
15  Q.   Okay. You've been provided with the
16  details about the testing of the platforms done by
17  Dr. Rakow?
18  A.   Yes.
19  Q.   My understanding is that they actually
20  removed an entire area of material where you have
21  identified these weaknesses, in your opinion, existed
22  in the Keaschall bucket?
23  A.   Mm-hmm.
24  Q.   Is that correct? Do you agree that
25  that's what they did?

128

EIHUSEN - Direct

1   A.   That's what they did.
2   Q.   Okay. Then they tested the buckets to
3   see if they would fail?
4   A.   That's correct.
5   Q.   Would you agree that removal of all of
6   that material would create a weakness greater than
7   any folds, creases, delaminations that you saw in the
8   Keaschall bucket?
9   A.   No. I said design intent. You didn't
10  cover design intent. There's a tremen-— there's
11  totally design intent differences between the two
12  configurations. And if you're not picking that up,
13  you can't understand the analysis or how those
14  buckets are put together. And that's where I'm going
15  when I was talking from the very beginning. There's
16  no competent design authority or intent. No design
17  intent showing the design.
18      The design intent for the Keaschall
19  bucket was for the load to come in at the interlock
20  area. The other ones, I have — strongly believe the
21  design intent was to tuck fiber into and reinforce
22  that area. So what they did is just remove excess
23  material from a — the design intent from a different
24  style of design. You want to talk — we have to talk
25  design intent, and we have to talk about testing or

129

EIHUSEN - Direct

1   looking at recreating the Keaschall design.
2        Q.     Do you know whether or not the -- the
3   change that you're talking about, the design intent,
4   was necessary to perform for the platform to pass the
5   newly added lanyard test in 2012 required by Altec?
6   Do you know that or not?
7        A.     We have -- the design intent -- you're
8   asking for the testing, if it was valid.  Now you're
9   asking for another question.  Be -- don't shift gears
10  on me.  Ask that question again.
11       Q.     Well, you're talking about the design
12  intent.  I was talking about the testing.  Let's go
13  back and talk about the testing.
14       A.     Thank you.
15       Q.     My original question was, do you agree
16  that removal of all of the area -- the material in
17  the area that Dr. Rakow did would weaken that
18  platform to a greater extent than the
19  delaminations --
20       A.     No.
21       Q.     -- that you saw?
22       A.     No.
23       Q.     You don't agree with that?
24       A.     Not for the Keaschall design.
25       Q.     Okay.  And why?  What's the basis of that

130

EIHUSEN - Direct

1   opinion?
2        A.     Because the Keaschall design is totally
3   different internally.
4        Q.     And -- and tell me what it is about that
5   internal difference that leads you to your
6   conclusion.
7        A.     On the -- on the Keaschall bucket, if you
8   look to -- pictures can be worth a thousand words
9   here.  Let's go to my very first report.
10       Q.     Okay.
11       A.     Because this hasn't changed since day
12  one.  Let's look at Figure 8.
13       Q.     Okay.
14       A.     What you're looking at, you see that
15  yellowing in there?
16       Q.     I do.
17       A.     That's a failure plane.  That's an old
18  failure plane.  Just like those failure planes that
19  are in -- in dark brown or black on the edge.  The
20  entire structure of the bucket is resolved through
21  that corner.  There's no help on pulling material
22  into it around the corner.  There's no -- the way
23  this is fabricated, that point, fail that location,
24  fail that location there, and the bucket starts its
25  catastrophic walk to failure.

131

EIHUSEN - Direct

1        Q.     And how is that different than the
2   buckets that were -- that were tested by Dr. Rakow?
3        A.     Mr. Ra-- if you go to Figure 9, you see
4   a solid insert.  That was premade.  That was made
5   ahead of time.  You can tell that because of the lack
6   of bonding, the smooth surfaces, the pimpling on it.
7   That was installed in the mold as a preformed block,
8   if you will.  The material on the Rakow bucket looks
9   like it's the same material out of the flange, and it
10  is tucked into the rib, and it folds around the
11  corner and provides strength of material going around
12  the corner.  And it would hold onto the side wall
13  longer.
14              Now, do I understand the design intent,
15  why somebody did this on the Ra-- on the Keaschall
16  style?  Yes.  Design intent would say, this is a much
17  better way to handle bolted loads at the bottom where
18  it attaches to the boom.  Because when you do it the
19  other way, and you fold the material in at the time
20  of manufacture, you get a -- let's go to my NDE
21  report.  Second report.  Let's go to Figure 14.
22  Which is closer to the...
23              MR. SHIVELY:  What's the date of the
24  report you're looking at?
25              THE WITNESS:  That would be the Appendix

132

EIHUSEN - Direct

1   A.  That would be March 3rd.
2              MR. SHIVELY:  Thank you.
3        Q.     (By Mr. Ahl)  Figure 14, you said?
4        A.     Fourteen and 15.  That would be page 11.
5   We can use mine.  You might be on the original --
6   you're on the consolidated report, I think.
7        Q.     Okay.  Well, here's the other one.
8        A.     Yeah.
9        Q.     Page what?
10       A.     Eleven.
11       Q.     Okay.
12       A.     If you look to the centerline of that
13  part, you'll see a gap.  That's a weakness.  And the
14  weakness there will manifest itself when you pull
15  things together.  And that will cause cracking and
16  removal from service in time.  Likely the reason why
17  the -- there was a bucket removed before I got to
18  Dawson, for that very same cracking around the bolt
19  holes.  I don't understand -- there was no criteria
20  why they made these changes.  But I can speak to
21  how -- design intent on why they may have made these
22  changes.
23              And -- but they resolve loads internally
24  completely different.  And that would have -- we
25  would show that on an FEA.  But you have to do a

133

EIHUSEN - Direct

1  proper job of modeling. You would have to nearly
2  destroy the part. And I was unwilling to do that.
3      Q.     You believe that it's this change that is
4  shown in Figure 14, View 2 and 3, that -- that makes
5  the testing that Dr. Rakow did not appropriate in
6  trying to help us with the --
7      A.     Failure on the Keaschall -- on the
8  Keaschall, yes, sir, I do.
9      Q.     Okay.
10     A.     I think it was a good -- a good start. I
11  was headed down that path myself. But when I
12  realized that the parts were completely different, I
13  didn't see any value in it.
14     Q.     Did you do any calculations, testing or
15  analysis to evaluate the significance of the
16  difference that you've just talked about?
17     A.     No, sir.
18     Q.     There's one thing I want to ask you about
19  here, I think. When you were pointing to that area
20  in the photograph that you say is a void area? Is
21  that what you called it on the x-ray where you said
22  that that was?
23            MR. BEUCKE: On Figure 14?
24            MR. AHL: Yes.
25     Q.     (By Mr. Ahl) You called that a void?

134

EIHUSEN - Direct

1      A.     Yes. It is -- the x-ray shows it has a
2  cavity.
3      Q.     Okay. And I know that you talk about
4  that in your report of August 1st of 2016 when you're
5  commenting on the Exponent report from Dr. Rakow --
6      A.     Mm-hmm.
7      Q.     -- and you indicate that the void content
8  of the laminate is well outside standard good
9  practice?
10     A.     It's well outside of their own spec.
11     Q.     Okay. What is considered standard good
12  practice?
13     A.     There, 24 to 28 percent based on fiber
14  volume fraction. I was -- I was -- I have a hard
15  time relating to that number myself. I was raised on
16  the reciprocal of bulk factor of 155 to 175, would be
17  a good number. But that's -- dates me into the late
18  '70s, early '80s as far as my composites training.
19     Q.     Did you do any testing yourself to check
20  out the Rakow results of his testing or just
21  determined that they didn't apply so --
22     A.     They wouldn't apply.
23     Q.     Okay. Would you agree with the
24  proposition that the removal of the material from the
25  test buckets would have compromised the platform

135

EIHUSEN - Direct

1  structure at or about location "A"? Do you agree
2  with that?
3      A.     For what design?
4      Q.     The ones that were tested by Dr. Rakow.
5  The removal of that material.
6      A.     For his bucket. If we're talking about
7  his buckets, they certainly would have affected his
8  buckets. But the -- the issue there, which I didn't
9  draw, is the crippling. He left the flange intact.
10  He left the flange intact behind it. And that's not
11  the way Keaschall failed, but he left his intact,
12  which helps -- let's face it. The design intent of
13  this -- these buckets are to be -- what was the Altec
14  description? A net hanging from a basketball rim.
15     Q.     You believe leaving that flange intact
16  invalidates all the testing that Dr. Rakow did?
17     A.     No.
18     Q.     Okay.
19     A.     I said he -- the reason -- what
20  invalidates his testing is he used the one part. You
21  were asking about his part, and I was making a
22  comment on his design.
23     Q.     Right. And his part and the design that
24  they used, what is it between the two of them that in
25  your mind invalidates the results? I understand

136

EIHUSEN - Direct

1  there's a change. But tell me specifically what
2  change it is that you're pointing to that says, that
3  makes the results of this testing different than it
4  otherwise would be.
5      A.     Let me break this down and make sure that
6  I answer your question and be responsive. The Rakor
7  bucket -- not Rakor, excuse me -- Rakow bucket is
8  internally layered. And its lamination, its
9  composite fabrication, is completely different than
10  the Keaschall bucket.
11     Q.     In what way?
12     A.     The internal rib structure of the
13  Keaschall bucket is made with, apparently, cloth.
14  And it's layered, pre -- and it's preformed ahead of
15  time. It's very dense. Looks very high quality.
16  You may see that in comparing views -- if we look at
17  views in Figure 9 in the -- it would be the March 3rd
18  report to --
19     Q.     There are two March 3rd reports, aren't
20  there? Or are they identical? I have two.
21     A.     No. They're identical.
22     Q.     Okay.
23     A.     In fact, I thought -- oh, this is...
24     Q.     Okay. What are you talking about now?
25  Exhibit what?

EIHUSEN - Direct

1    A.    104.  Thank you.  That's the page I was
2  actually looking for.  I thought they were...
3         (Exhibit No. 107 was marked for
4         identification.)
5    Q.    (By Mr. Ahl)  Okay.  Now we've marked as
6  Exhibit 107 something that you've just pulled from
7  your file.  Why don't we identify that first.  What
8  is Exhibit No. 107?
9    A.    That is a picture of the bucket that we
10  removed at -- this is a picture -- this is an x-ray
11  of the bucket we removed from Dawson.  And
12  Exhibit 104 is an x-ray of the Keaschall bucket.  And
13  Exhibit 107 has more in common with the Rakow design.
14  And there's potential of there was another
15  configuration change in here.  So it's a little hard
16  to track.  And I didn't shoot the x-rays.  But I'm --
17  of the two buckets I have, I'm looking at two
18  drastically different configurations.  And I'm
19  looking at Rakow, looking -- Rakow's x-rays
20  suggest -- not suggest, indicate that he's not
21  matching the -- the Keaschall design.
22    Q.    Okay.  And why don't you tell me what it
23  is about the change in the design that affects the
24  results of his test.  What changes the results?
25    A.    It's on how the load is transmitted

EIHUSEN - Direct

1  between the vertical rib and the horizontal flange.
2  That all speaks to how -- how that is -- how that
3  coupling is made.  How that load transfer is made
4  between those two features in the part is driven by
5  how it's built internally.  And until you get the
6  internal configurations right, you will not get the
7  testing or the analysis correct.
8    Q.    Okay.  And we've never tested the change
9  in the design against the Keaschall design to
10  determine if it has any difference on the structural
11  integrity of the -- of the bucket; is that true?
12    A.    That's true.
13         MR. BEUCKE:  Can we identify 107 by page
14  number and figure?
15         MR. AHL:  Yeah.  It's page number 11,
16  Figure 14, View 2-3, looking forward.
17         MR. BEUCKE:  Thank you.
18    Q.    (By Mr. Ahl)  That's what you were
19  pointing to; is that correct?
20    A.    Mm-hmm.
21    Q.    Yeah.  Any other criticisms of
22  Dr. Rakow's testing or analysis or opinions or
23  conclusions?
24    A.    I thought the -- I thought the analysis
25  of the contamination was a little different.

EIHUSEN - Direct

1    Q.    Why don't you tell me what you mean by
2  that?  That doesn't mean anything to me.
3    A.    Well, you had -- you had the manufacturer
4  of the component that couldn't identify what the
5  contaminates were.  And he put it in there.  And
6  he -- there's nothing inside the laminate that the
7  manufacturer didn't put in there.  And if the
8  manufacturer couldn't identify it, I have -- it gives
9  me problems.
10    Q.    Well, how -- how is that a criticism of
11  Dr. Rakow or his methodology or his testing or his
12  conclusions?
13    A.    Well, it was in his report.  Stated as
14  fact that they couldn't identify the contaminates.
15    Q.    Did you identify them?
16    A.    I believe, since I don't know --
17    Q.    Did you identify them?
18    A.    No.
19    Q.    Is it important that they be identified?
20    A.    I think it would be most helpful, yes.
21    Q.    Why didn't you do it?
22    A.    Because the analysis that was a joint lab
23  was supposed to share the results, and I'm not sure
24  that we -- well, let's just put it this way:  They
25  weren't germane to the -- to the failure, but they

EIHUSEN - Direct

1  would speak to manufacturing defects or the
2  manufacturing process.
3         The materials that I saw in excess in the
4  wet chemistry, the FTR, DMA, the delaminations
5  carried a high load of solvents, hexanes and other
6  things.  Which is not unusual for an RTM resin at
7  that time.  RTM resins carried a high load of
8  solvents so they could move them.  But it also
9  indicates that the solvents were never bumped from
10  the mold.  And that would indicate that the process
11  might not have been adequately addressing solvent
12  removal during the cure-up phase.  And I thought it
13  was interesting, but -- and one of the things I, you
14  know, commented on in manufacturing.  It spoke to
15  care during the manufacturing process.
16    Q.    No one told you you couldn't try and
17  identify those contaminants, did they?
18    A.    No.
19    Q.    Okay.  Any other testing, calculations,
20  or analysis that you have done in regard to your
21  investigation of this incident that we haven't talked
22  about here today?
23    A.    Well, we have the rest of the body.  You
24  have the thermo analysis that we -- that they looked
25  at.  And the other -- you know, the other testing

141

EIHUSEN - Direct

1    that was provided. Laboratory work. Interpretation
2    of that.
3         Q.    I guess what I'm more interested in is
4    what you've done. Not what has been done as a joint
5    effort. Everything that you've done. Any testing,
6    analysis, calculations?
7         A.    No. You have it all.
8         Q.    Okay. Do you intend on doing anything
9    else?
10        A.    That would be — there are some things
11   one can do for thought experience, but, no, not right
12   now.
13        Q.    I'm assuming that you're charging the
14   plaintiffs for your time in doing your -- your
15   investigation and your analysis?
16        A.    I've kept track of my log, which I've
17   supplied. I have not invoiced any time.
18        Q.    Okay. What is your hourly charge?
19        A.    325 an hour.
20        Q.    Okay. Do you have any rough estimation
21   as to how many hours you've put into this project so
22   far?
23        A.    Gosh. I never even totalled it out. I'm
24   sorry. It's on my logs. I just made sure my logs
25   were accurate.

142

EIHUSEN - Direct

1         Q.    Okay.
2         A.    We'd have to look at it.
3         Q.    Do you have a normal billing procedure
4    that you bill monthly, quarterly, semi-annually,
5    anything?
6         A.    I'm to the point where, you know, I'll
7    bill when I — you know, when I find the time, sir.
8    It's not important to me right now.
9         Q.    That was going to be my next question.
10   Is there any reason you haven't billed this?
11        A.    No.
12        Q.    Okay.
13        A.    No.
14        Q.    Your bill isn't -- isn't determined by
15   the outcome --
16        A.    No.
17        Q.    -- of this case?
18        A.    No, sir.
19        Q.    Okay.
20        A.    No, no, no. There's no arrangement
21   there.
22        Q.    Okay.
23        A.    No. None at all. It's me being
24   independent-minded, sir.
25             MR. AHL:  Okay. Why don't we take about

143

EIHUSEN - Direct

1    five minutes, and I think I'm just about done.
2             (At this time a brief recess was
3             taken.)
4         Q.    (By Mr. Ahl) I just have a couple more
5    questions, then I'm done, and I'm going to let
6    Mr. Shively ask you a few. During your examination,
7    you referred to another bucket that you took out of
8    service from Dawson Power.
9         A.    Yes, sir.
10        Q.    Where is that bucket?
11        A.    I believe it's in storage here in
12   Lincoln.
13        Q.    Okay. Did you ever determine what the
14   year of manufacture for that bucket was?
15        A.    It was after this one.
16        Q.    Do you know when?
17        A.    Yes. It's in my reports. It's not
18   something I have in — it's on the NDE report, I
19   believe. The serial number and the...
20        Q.    Did you perform x-rays on it?
21        A.    Oh, absolutely. That was the comparison.
22        Q.    Okay. And did you determine that that
23   one had a different design, in your opinion, than the
24   Keaschall bucket?
25        A.    Yes, sir.

144

EIHUSEN - Direct

1         Q.    Other than the x-raying, was anything
2    else done with that bucket in terms of testing or
3    analysis?
4         A.    Well, sir, the — when I went to Dawson
5    and I saw the bucket, it gave me concerns to — to my
6    eye, my trained eye. And so I asked to have it
7    removed from service. And it was brought to Lincoln,
8    and that bucket I was planning on destructively going
9    through and doing a lot of things to do those things
10   that would have been appropriate. And it ended up
11   being not worth the time.
12        Q.    So other than the x-raying, there was no
13   other testing or analysis done on that bucket?
14        A.    We had some cursory black mic studies.
15   If you look through, those are documented. What I
16   was looking for, extent of contamination. Sometimes
17   oils, hydraulic oils, have tracements in them, and
18   you can see how far they track into a laminate.
19   There are — there are tricks of the trade there that
20   you can — you can use. But no. They — they went
21   to storage.
22        Q.    Did you ever have an opportunity to
23   actually view the truck and the boom that was
24   involved in this incident?
25        A.    No. I looked at one similar, sir.

145

EIHUSEN - Direct

1    Q.    Would it have been helpful for you to see
2    the boom where the separation took place or not
3    really?
4    A.    I looked at the parts. If you can, my
5    charter starts at the — at the bolt holes of the
6    composite. So looking at those, you know, the piece
7    that stayed with the boom I had in front of me. And
8    so, therefore, we worked really hard with those
9    pieces, those parts.
10   Q.    So there would have been nothing that
11   would have been helpful to you to have the actual
12   boom or truck --
13   A.    Right.
14   Q.    -- available for your analysis?
15   A.    Right. And that goes to, you know, I'm
16   not a lineman, sir. But I am an expert in
17   composites.
18   Q.    Okay. Any other buckets that you -- or
19   platforms that you have had for your review or
20   analysis other than what was done with the Keaschall
21   bucket and then this second bucket that was taken out
22   of service?
23   A.    No. Just these two.
24         MR. AHL: I think that's all the
25   questions I have for you, then. I'll let Mr. Shively

146

EIHUSEN - Cross (Shively)

1    have a go.
2              CROSS-EXAMINATION
3    BY MR. SHIVELY:
4    Q.    First of all, I just want to make sure
5    that I'm up to date on everything that's happened
6    either in recent weeks and months and since your
7    deposition was originally taken in October. And so
8    with regard to your CV that you submitted in this
9    case, are there any changes or updates to that since
10   that time that you can think of?
11   A.    I'm on a lot of international committees.
12   The last one was yesterday morning I was reviewing
13   the results of HyPactor, which is impact damage to
14   composite parts and pre-normative research for
15   regulatory controls for international standards.
16   Q.    Does that include fiber composites?
17   A.    Yes. That's its only concern.
18   Q.    Anything else you can think of?
19   A.    No. It's -- like I said, it's -- no.
20   Q.    When Mr. Ahl was questioning you at your
21   first gathering of your deposition, you indicated
22   this was the only case you had in which you're
23   serving as an expert witness?
24   A.    That's correct.
25   Q.    Is that still the case?

147

EIHUSEN - Cross (Shively)

1    A.    Yes, sir.
2    Q.    With regard to fall protection, you
3    testimony -- you testified on direct examination
4    about a number of things. I just want to make sure
5    I'm following your testimony. You talked about the
6    difference in the length of the lanyard, I believe;
7    is that correct?
8    A.    That's correct.
9    Q.    And I believe you used the difference
10   between six feet and four feet?
11   A.    His was -- his lanyard was, I believe,
12   over six feet. I don't know the number.
13   Q.    And then at some point in time, are you
14   aware of a change that was made to that fall
15   protection system?
16   A.    There was a change made to the anchor
17   point.
18   Q.    Okay. And that was well after anything
19   was manufactured in connection with this bucket and
20   lift system?
21   A.    Right. Well, your words, sir. I would
22   have to check, sir.
23   Q.    Okay. Well, were you aware of a PUN
24   change in 2013 to the length of the lanyard?
25   A.    I was aware of a change, yes. It was in

148

EIHUSEN - Cross (Shively)

1    the — Altec made reference to it. And when I looked
2    at it, I went to the OSHA regulations. And they were
3    talking about the — why that came about, or the
4    OSHA — I was interested to know the why.
5    Q.    Well, with regard to the length of the
6    lanyard at the time of this incident, do you have any
7    opinions as to any problems caused by that length?
8    A.    Well, the rationale for changing the
9    length of the lanyard, as I understand it in the
10   OSHA, okay, and I'm speaking of having reviewed it,
11   sir, was that you don't want to cause more hazard
12   using the lanyard than not. And typical indications
13   of that would be fall back into — swing back or
14   swing through or drop into hazards. Okay? And
15   that's why OSHA dictated for, I think, for lift
16   trucks, fairly short attachments. Which makes
17   operational sense to me, that if you're hanging up in
18   the air, you've got half a chance of getting
19   controls. But there should be somebody down below
20   anyway. But you can reach the controls with a short
21   lanyard.
22   Q.    Well, do you have --
23   A.    This lanyard was — this lanyard that he
24   was using exceeded that.
25   Q.    Exceeded what?

149

EIHUSEN - Cross (Shively)

1    A.    His — the short lanyard.  He had the
2  older style long lanyard, which would have been legal
3  because he had no structure under him.  OSHA would
4  have been fine with the long lanyard because he had
5  nothing under him that he could fall into or through
6  or swing into that would cause more hazard than not
7  using the lanyard.
8    Q.    In other words, at the time of this
9  incident, did the fall protection system in place
10 violate any ANSI standards or OSHA standards or any
11 other standards you're aware of?
12   A.    No, sir, it did not.
13   Q.    Are you aware of any reason that the
14 safety harness could not have been attached to the
15 D-ring on the lanyard attachment?
16   A.    No, sir.  That would be subjective on
17 that point, sir.
18   Q.    Do you have any knowledge of whether that
19 D-ring to which the lanyard could have been attached
20 remained at the boom?
21   A.    Well, there's pictures of it remained,
22 that it was on the boom.  That's an objective fact.
23   Q.    You also talked with Mr. Ahl about the
24 timing involved in the failure of this platform.  And
25 do you believe there was a hesitation in the failure?

150

EIHUSEN - Cross (Shively)

1    A.    Yes.
2    Q.    And could you describe that for me?
3    A.    Okay.  Again, this hasn't changed from
4  the first time I wrote it, other than I've picked up
5  more and more refinements in the clues.  As I
6  envision it, as I — as I personally reconstruct the
7  accident at the start, but then go shift to what
8  bears objectively shown in the composite, I believe
9  that based on the positioning and what he was doing,
10 he was on the far outside corner standing.  All
11 right?  I believe that he probably heaved on
12 something that exceeded his weight with his upper
13 body strength.  Gave a push, pull, or whatever.  That
14 triggered the cascade.
15        He wouldn't have known about that.  There
16 would have been no visual indication or inspectable
17 thing from Altec on — that he was flying a crippled
18 part.  Maybe an experienced composite engineer would
19 have picked out there was a problem there, but him as
20 a user might not have.  Or didn't.  Actually didn't.
21        Anyway, the very first thing would have
22 been the failure location at "A."  There would have
23 been a pop and a snap.  A pretty good report.
24 Because there was a lot of energy in the bucket at
25 that point.  All right?  And that would have been a

151

EIHUSEN - Cross (Shively)

1  pretty good bang.  And what's happening at that point
2  now — and, understand, we're talking on relative
3  time scales.  I'm not putting any absolute numbers on
4  here.
5        I'm talking about time scales within how
6  things are moving in the laminate, is "A" failed and
7  rotated up and over.  The part came up and over and
8  tore.  There was a torsional tear.  It came — it
9  sheared, a torsional tear and broke free.  As it
10 broke free, a fracture plane developed almost
11 parallel to the inside surface of the bucket.  And it
12 started to rip down.  As the bucket lowered under his
13 weight, started down moving, that fracture plane
14 would have rolled up, starting in the corner.
15        As that — now, I'm going to shift ends.
16 I'm going to go — now I'm standing where he is
17 looking to what he would — if he turned around and
18 looked, he would have saw the fracture coming up the
19 backside.  And the "B" location now is taking the
20 load.  As the bucket is moving down, it's taking more
21 and more and more of the load.  In fact, it's — it
22 failed by torsion.  It literally tore apart.  It
23 separated in a torsion and came apart top to bottom.
24 It would have sounded — that would have sounded much
25 like a limb in an ice storm, a tree limb breaking and

152

EIHUSEN - Cross (Shively)

1  twisting, how you get a crack and a twist and then
2  breaks, and then it — you hear them twist out.  This
3  is similar to the same type of noise you would have
4  heard.
5        As "B" was failing, another crack would
6  have propagated out — or the crack propagated out
7  from "B" location and went out into the "V."  If you
8  look on the — the side of the failure plane,
9  that's — it's tearing the — the bucket is tearing
10 away from the corner.  All right?  So now we have the
11 bucket moving down.  The question is, was there
12 hesitation?  Did "B" hang on long enough, or did it
13 just continue to move through?  That's become
14 subjective at that part.
15        But we know the bucket — the floor of
16 the bucket was in motion.  It was coming down.  When
17 "B" failed, either — the failure at the "B" location
18 is witnessed at the V-notch.  Because now the
19 V-notch — all of the sudden the fracture — instead
20 of the fracture running that direction around, it
21 reverses.  And the face of the fracture changes now
22 from the — it changes sides because of side.  At
23 that point the fracture races down now to the most
24 stiffest, strongest part of the bucket remaining,
25 which is the corner.  You know, it's a reinforced

153

EIHUSEN - Cross (Shively)

1    corner.  And it came up.

2                And at that point when those met, what

3    happens now, instead of having vertical fracture

4    planes, we have a horizontal fracture plane, which

5    means that that corner was essentially bending,

6    snapped, just like that.  And that gave me -- if you

7    look, that aligns in that exit cone.  It's very hard

8    to say what direction it exited in, but you can put a

9    cone, an error cone, in it.  Because it all depends

10   on how long "B" held on, is dead center of the impact

11   point on the truck.

12               And that was one of my points of my

13   original analysis, that the -- the evidence in the

14   composite says it hinged here and broke free and

15   exited in that direction.  My problem is, I couldn't

16   point it into a direction.  And I never attempted.

17   That's something that Railsback did.  That's what I

18   said.  I liked his analysis there.  Now, how much

19   energy?  At the point of separation --

20               MR. BEUCKE:  I think you've answered his

21   question.

22               THE WITNESS:  Okay.

23        Q.    (By Mr. Shively)  You've talked of two

24   sounds.  You talked of a loud sound or noise when the

25   fracture began at point "A."  Am I correct?

154

EIHUSEN - Cross (Shively)

1        A.    Yes.

2        Q.    And then there was a second sound.  Was

3    that when "B" was starting to go?

4        A.    Yes.

5        Q.    Would those sounds be loud enough that

6    the operator would be able to hear them?

7        A.    Oh, yeah.

8        Q.    Do you have any opinion on the amount of

9    time involved from the time the failure began at "A"

10   and then through its hesitation and its other failing

11   that you've talked about?

12       A.    It depends on the strength of "B," how

13   long "B" held in.  Knowing -- seeing how "B" failed

14   and how it was being ripped apart, it was failing

15   somewhat slower.  And I say somewhat, being hard to

16   quantitize.  And that's why I said, it could have

17   been -- he could have had anywhere from an oh, gosh

18   to a heartbeat.  Between those two events happening.

19       Q.    And I -- I believe that you testified

20   earlier that you thought the time between the two

21   sounds was less than a second?

22       A.    Yeah.

23       Q.    Is that correct?

24       A.    Like I said, an oh, gosh.  It could have

25   been shorter.

155

EIHUSEN - Cross (Shively)

1        Q.    And what I'm asking now isn't the time

2    between the two sounds, but the time from the first

3    sound, the beginning of the failure, to the time the

4    platform detached from the boom.

5        A.    Oh.  Maybe another half second, second.

6    Certainly not inside of a thought process.

7        Q.    In terms of the possibilities or a range

8    of how long "B" hung on, can you quantify that at all

9    for us?  Less than five seconds?  Between one and

10   four?

11       A.    Oh, I think it was less than -- "B"

12   probably hung on for less than a second.

13       Q.    Could it have been up to two seconds from

14   the time the first sound happened and the time the

15   platform detached from the boom?

16       A.    About a two count.  Yeah, that'd be about

17   right.

18       Q.    In fact, you wondered if there was any

19   chance that the operator reached out and tried to

20   grab at something?

21       A.    I didn't wonder that.  I suggested that

22   he may have had, depending on how -- what his thought

23   processes were.  Okay?

24       Q.    Well, one of your thought processes, he

25   would have -- could have yelled, oh, no?

156

EIHUSEN - Cross (Shively)

1        A.    Yes.  Or, you know, oh, "S" or, yeah, any

2    number of very short...

3        Q.    Could have also reached out, tried to

4    grab something?

5        A.    Yeah.

6        Q.    And, in fact --

7        A.    But if his hands were full.

8        Q.    -- you wondered if there were any

9    injuries to his hands that would show that.  Am I

10   correct?

11       A.    Yeah.  If he -- if he came first, yes.

12       Q.    Did you ever find any information out

13   about that?

14       A.    I explicitly did not want to be involved

15   in any medical.

16       Q.    Although I have a copy of an e-mail from

17   you of April 18th, 2015, in which you say, to support

18   the engineering analysis it would be interesting but

19   not critical to find out if there were hand injuries

20   on the victim that would be consistent with any

21   panicked attempt to grab something?

22       A.    Right.  That would be -- I think I was

23   writing to Steve, and I was suggesting another expert

24   might be warranted.

25       Q.    And that hand injuries indicating a

157

EIHUSEN - Cross (Shively)

1  panicked attempt to grab something would back up the
2  rate of failure in the composite as the ability of
3  the human to recognize and respond to danger can be
4  estimated with reasonably accurate limits.  Did you
5  do anything to follow up on that?
6      A.    No.
7      Q.    But he -- potentially the operator had
8  some time to do something?
9      A.    I don't know.  I didn't see any -- there
10 was no -- no return on the -- on that e-mail if there
11 was --
12     Q.    But it would be reasonable that they
13 would have time to verbalize an oh-no moment;
14 correct?
15     A.    Yeah.
16     Q.    Yes?
17     A.    Yeah.  It would have been reasonable.  Or
18 shorter.
19     Q.    And during this potentially two-second
20 timeframe could have been moving the boom and
21 operating the -- the unit?
22          MR. BEUCKE:  Let me object to the
23 question insofar as it asks the witness to speculate.
24     Q.    (By Mr. Shively)  Go ahead.
25     A.    If we're speculating, I would rather

158

EIHUSEN - Cross (Shively)

1  speculate that he was using his wrench taking the
2  nut -- nut loose.  I would think that would be a
3  better speculation.  That he was working where he
4  should have been, taking the nut loose.
5      Q.    Assuming he was operating the boom
6  itself, there's no reason that he couldn't have
7  continued to operate it during this two --
8  potentially two-second timeframe?
9      A.    Speculation.
10     Q.    That's fine.
11     A.    But it depends on where you believe his
12 hands were.  I -- obviously, when he -- the bucket
13 did not fail when he crawled into it.  Close, but it
14 did not fail.  So that says what caused it to fail
15 when he crawled into it is, is I'm looking for
16 another causative effect of, he's working.  He's
17 using upper body strength.  He's probably putting
18 double his weight on whatever he's doing out there
19 over the edge.
20     Q.    You told me a while ago that he -- he may
21 have heaved on something.  Those were your words,
22 heaved on something?
23     A.    Mm-hmm.
24     Q.    Yes?
25     A.    Yes.

159

EIHUSEN - Cross (Shively)

1      Q.    What does that mean?  What would be the
2  something that he heaves on?
3      A.    Those are very big nuts that he was
4  removing on those -- on that pole, that transformer.
5  It's not farfetched to believe, having handled large
6  tools like that, that he sat and maybe locked a
7  socket up on it and had to break it loose and give it
8  a good yank, good pull, something that required a
9  significant part of his upper body strength to
10 multiply the load.
11     Q.    What is a resin area shrinkage analysis?
12     A.    What you do is -- it's very
13 straightforward.  You have a distance, and you --
14 your composite, you fill it with composite and you
15 cure it.  And you'll get a gap.  And the gap, you do
16 a ratio of the -- of the gap -- of the distance that
17 you filled and the gap that was created, and you get
18 an estimate of how much shrinkage your process is
19 providing and control that you're giving on -- on
20 a process.
21     Q.    Did you ever do a resin area shrinkage
22 analysis on the platform in question?
23     A.    Did I put a ruler on those pictures?  No.
24 Didn't need to.  There was a large gap there.
25 Normally you do that to make sure -- normally those

160

EIHUSEN - Cross (Shively)

1  analyses are done to validate your process
2  constraints between good parts.  You have a good part
3  that you know is good, and then you change a process
4  parameter and validate that you're getting -- you're
5  within reason.
6      Q.    Did you do one on the platform that was
7  removed from service at Dawson?
8      A.    No.
9      Q.    And did you do one on any other platforms
10 that you had access to?
11     A.    No.  Not platforms.
12     Q.    At some point did you feel that doing
13 such an analysis was indicated?
14     A.    For the design authority, yes.  A little
15 bit late after the fact, sir.
16     Q.    Was there ever anything that you
17 requested be done in terms of testing, experiments
18 that you were not authorized to do by those who hired
19 you?
20     A.    Oh, no.  I had full access.
21     Q.    And that would include contracting out
22 with any third party?
23     A.    Absolutely.  That was not an issue.
24     Q.    So some of the things that you at points
25 in time were considering doing, you ultimately

161

EIHUSEN - Cross (Shively)

1   decided just wouldn't — didn't need to be done. Am
2   I correct?
3       A.      I — yes. Absolutely.
4       Q.      As opposed to I really wanted this done,
5   but I wasn't allowed to do it?
6       A.      No, sir.
7       Q.      Okay. Did you consider having any third
8   party or contracted entity analyze the — evaluate
9   the contaminates?
10      A.      The contaminates, we were given results
11  of the FTIRs from a macro viewpoint. Okay? The
12  contaminates were either from the environment or in
13  situ, they were there at the time of manufacture.
14  Looking at the contaminates at the time of
15  manufacture, those that were enclosed in cavities,
16  they're consistent with — in my experience they're
17  consistent with the manufacturing process that didn't
18  vent them.
19      Q.      Do you have any opinions that there were
20  any manufacturing defects on any manufacturing
21  performed by Altec?
22      A.      Well, did Altec machine it?
23      Q.      I'm asking you.
24      A.      Well, no. It's a serious question. I
25  mean, there was — like I said, I — I have no idea

162

EIHUSEN - Cross (Shively)

1   who — who had the design authority. I had no idea.
2   There's nothing in Altec receiving what they
3   received. There's nothing that said this bucket was
4   received in this condition and it met spec. Which is
5   a violation of ISO 9000 in all regards. I mean,
6   there's some very basic things in risk management in
7   those surveys. And so if Altec simply received the
8   part, then they didn't manufacture it. The question
9   is, what did they — did they have any follow on
10  operations. I don't know.
11      Q.      With regard to the design of the
12  platform, of the Keaschall platform, are you aware of
13  any ANSI standard that was violated?
14      A.      No.
15      Q.      And I heard you earlier when Mr. Ahl was
16  questioning you express the idea that you think the
17  ANSI standards may not be how you would write them or
18  be — be that great. Is that a fair summary?
19      A.      I don't know if it's a fair summary. I
20  think we need to be very careful and very cautious in
21  the words here.
22      Q.      Well, I'm just trying to distinguish
23  between whether — whatever the standard was,
24  regardless of what you think of that standard, did —
25  are you aware of any --

163

EIHUSEN - Cross (Shively)

1       A.      I have checked — let me put it this way.
2   I pulled the — ANSI is the registrar. In fact,
3   they're our national registrar internationally. And
4   I'm a credited delegate within ANSI. The secretariat
5   for A92 is SAIA. The — it's an acronym for whatever
6   it is. They're the secretariat. I notice that there
7   are many — you know, I checked the people that were
8   in the committee.
9           I would like to have time to pull down
10  the meeting of the records of the A92 committee since
11  1992 on what composite materials. Okay?
12  Because I have known that in other ANSI standards and
13  other international standards, we have run across
14  many issues and addressed many issues of design and
15  testing in advanced composite products that I do not
16  see in this standard. And so in that regard, I would
17  have liked to review those meeting minutes.
18      Q.      Do you have any evidence at all that ANSI
19  A92 was violated in the design of this platform?
20      A.      No. As it's — as it was published. Let
21  me be very clear on that. As it was published.
22      Q.      Are you aware of any standard of a
23  governmental agency or a professional engineering
24  society or association that was violated in the
25  design of this platform?

164

EIHUSEN - Cross (Shively)

1       A.      All right. Here — here this goes back
2   to ANSI, several years back, A92, the secretariat
3   refused to upgrade — to be in conformance with the
4   international ISO standards for mobile lift
5   platforms. I — the number is in my files. You'll
6   find them. The international standards are quite —
7   structured quite different. That's okay. The U.S.
8   delegations defer to — or are different than the
9   Europeans at times. But it's interesting to note
10  that ANSI now has dictated that A92 will be in
11  compliance with ISO standards in the next
12  publication.
13          And so what I'm saying is, I don't know,
14  but there seems to be a great deal of work going on
15  right now. Again, I forget, there's 36 — ISO
16  3649 — there are three separate standards that are
17  broken out in international standards.
18      Q.      Does that apply here?
19      A.      They are mobile lift. If you were going
20  to — if you're going to use this truck in Europe,
21  you would be meeting those standards.
22      Q.      Never mind.
23      A.      Well, no. Okay.
24      Q.      Yeah. I'm not even going to have her
25  read the question back. No. I'm done with that

165

EIHUSEN - Cross (Shively)

1   question, and I think you're done with your answer,
2   to the extent it was an answer.
3           Back to the fall protection, you talked
4   about the -- being tethered to the lanyard and in
5   conjunction with a guillotine. I just want to make
6   sure I'm understanding what you're talking about
7   there.
8       A.   Sure. Let's see if we can get a picture.
9   Let's look to my original report, September 26th,
10  page 20, Figure 15. What you're looking at is the
11  boom in proximity to the pole. What I asked myself
12  or I started looking at, what would happen if
13  Mr. Keaschall would have had his fall protection on?
14  And given the length of his lanyard, he would have
15  been somewhere shoulder high or head high on that
16  sharp edge.
17      Q.   What sharp edge?
18      A.   The bottom of this. On that edge.
19      Q.   You're talking about the bottom of the
20  remaining structure?
21      A.   Right. Because he -- he belays off
22  the -- the lanyard -- or the anchor point. And when
23  you lay that -- lay that length down, where does he
24  end up? Where does he physically end up? And that
25  speaks to the idea of the OSHA requirements of length

166

EIHUSEN - Cross (Shively)

1   of lanyard. And that's why I was asking, if you're
2   saying the four-foot version of the lanyard that
3   Altec would have said should have been used, the
4   short one, I would have said no. That would have put
5   you right into that very sharp edge. And drug you
6   through it. The longer one, he was fine.
7           Bear in mind, he's coming through that.
8   I think it's -- when you start talking about him
9   actually being drug through that edge -- and he would
10  have been drug through that edge, because we know the
11  bucket went sideways. However theory you apply, he
12  would have been pushed down and under that edge and
13  held there by that lanyard. The question is, is
14  would you do that? Would you pick that for yourself?
15      Q.   So that's a subjective criteria rather
16  than following the actual rules of your employer?
17      A.   That would be a subjective. I said that
18  earlier. Very clear on that.
19      Q.   So if the employee deems it's okay to
20  violate a safety rule of a company, then they should
21  have the discretion to do that?
22      A.   No. That's not what I said.
23      Q.   Okay. Again, just so I'm clear, that
24  fall protection system complied with any OSHA
25  standard at the time?

167

EIHUSEN - Cross (Shively)

1       A.   The fall protection was compliant in that
2   it envisioned the bucket staying on the boom. With
3   the piece of the bucket separating from the boom,
4   maybe another expert may want to take a look at that
5   and say we were compliant or not. Certainly the
6   short one riding under that...
7       Q.   But that wasn't the standard at the time,
8   the shorter lanyard that you're talking about?
9       A.   Well, it was the standard when -- during
10  the accident, I believe. I'd have to check.
11      Q.   Except for that PUN was 2013, and the
12  accident happened in 2012. Do you have any argument
13  with that?
14      A.   No.
15      Q.   Okay.
16      A.   I -- sorry.
17      Q.   And to whether there was any other clear
18  back to the date of manufacture?
19      A.   The idea here is that the fall protection
20  lanyard should not cause more -- should not cause
21  more hazard than its use.
22      Q.   Do you have an opinion here that that
23  did -- that it would? Is that your professional
24  opinion?
25      A.   My professional opinion is that it's not

168

EIHUSEN - Cross (Shively)

1   clear that it didn't.
2       Q.   Referring to your report of
3   September 26th, 2015, page 3.
4       A.   What was the date again?
5       Q.   Your September 15 -- or 26th, 2015.
6       A.   Thank you. Page 3. Got it.
7       Q.   And that's where you list 11 different
8   opinions.
9       A.   Yes. Summaries.
10      Q.   And I want to talk about the summary 11,
11  because I don't understand it. In lay -- a
12  layperson's terms, can you tell me what that says?
13      A.   Do you know what ripstop -- ripstop cloth
14  is?
15      Q.   I'd rather you tell me.
16      A.   Ripstop cloth is when it gets cut, it has
17  enough strength or reinforcement to contain the rip.
18  It does not continue to tear. Much like plastic
19  wrap, you cut a plastic wrap, and it continues to run
20  and roll. That's the type of failure short strand
21  composite has. And it has that because it must rely
22  on the resin for its strength. It is a resin -- what
23  we experts call a resin-dominated strain field, or
24  resin-dominated strength field. You are only as
25  strong as your resin. You have to manage the resin

169

EIHUSEN - Cross (Shively)

1    for its long-term characteristics.  If the resin —
2    if will not stop a crack once it's running.  If
3    you're going to stop a crack, you need long fiber
4    reinforcements.
5              You're asking for, and I think the
6    analogy I used earlier is, short fiber has the
7    consistency of dryer lint, is the best way I can tell
8    you what it's like.  And you're pouring epoxy resin
9    into it, and you're making something hard.  Now, it's
10   normally used as coring materials.  You don't find it
11   in primary structure.  And, in fact, if you go look
12   at handbooks, no handbook lists this material or the
13   use of this material in primary structure.  I had to
14   look really deep in my own files to find even papers
15   that would even provide strengths.  Certainly not
16   anything with long-term fatigue and cycle resistance.
17   Lots of data on long fiber.  Hardly anything on short
18   fiber.
19        Q.    What do you mean by short fiber, random
20   mat was improperly applied in the design?
21        A.    You're carrying your primary structure.
22   If "B" would have been — if you would have had a
23   cloth or continuous fiber in the flange, there's a
24   good chance he'd be alive today.  This is — this
25   is — this material was improperly applied, and I

170

EIHUSEN - Cross (Shively)

1    think that's — okay.  My opinion.
2        Q.    As we morph between design and
3    manufacture, that's what I'm trying to understand.
4    Is the lack of material in the flange a design issue
5    from your standpoint or an issue that was done at the
6    time the platform was manufactured?
7        A.    You're speaking to design intent.  Using
8    of this — use of this short fiber, random material
9    in primary structure, especially primary structure
10   that's life-critical, is a design flaw.  Couple that
11   with manufacturing techniques or whatever later just
12   adds to it.
13        Q.    In number 11, do you talk of both, design
14   and manufacturing?  I'm trying to understand your
15   engineering language.
16        A.    Yes.  But primarily in — in 11, it's a
17   design consideration.  It's something up front.  If I
18   was going to a design handbook, this is not the
19   material you'd pick, is the best way to put that
20   answer, sir.
21        Q.    With regard to that same report of
22   September 26th, could you turn to page 6, please?
23        A.    Yes, sir.
24        Q.    Number 6 you indicate that you reviewed
25   depositions as provided by the client.  Could you

171

EIHUSEN - Cross (Shively)

1    tell me what those depositions were?
2        A.    Those would be all of the records that I
3    had to sign under court order for.
4        Q.    Well, as of the date of your report,
5    September 26th, 2015, do you have any recollection of
6    what depositions you were provided to review?
7        A.    It was the entire — all of the — okay.
8    Let's be explicit.  What number are you asking for?
9        Q.    That's my point.  Number 6, depositions.
10   As of the time you wrote this report, I'm interested
11   in knowing what depositions you had reviewed.
12        A.    Oh, I had all of them that — all of them
13   that had — were given to me that were taken before
14   this date, September 26th.
15        Q.    Is there any way to know what those were?
16        A.    Yeah.  They're in my files.
17        Q.    The actual deposition transcript --
18        A.    Yes.
19        Q.    -- would be in your file?
20        A.    Yes.  In fact, if you look — some of the
21   key ones I had printed out, and you can — I had them
22   numbered, where I was numbering and taking notes on
23   the different depositions.
24        Q.    What you're showing me now isn't a
25   deposition.  Do you know what a deposition is?

172

EIHUSEN - Cross (Shively)

1        A.    Let me see.  Yeah.  Is that not a
2    deposition?
3        Q.    No, sir.
4        A.    Okay.  Then I'm not a lawyer.  Question
5    and answer.  I thought a deposition was a question
6    and answer, sir.
7        Q.    That's what we're doing here today.
8        A.    Okay.
9        Q.    And after what we're doing here today,
10   the court reporter types it up.  And I was just
11   trying to find out what you looked at before you came
12   to your opinions in regard to transcripts of actual
13   depositions which were taken under oath in front of a
14   court reporter.
15        A.    Yeah.  And I — those — we had those
16   from — that were all in the package that I signed
17   for under court order.
18        Q.    So you believe any deposition transcript
19   that you reviewed would be in your file that you
20   provided us prior to today?
21        A.    Absolutely.
22        Q.    Thank you.
23        A.    Thank you.  A roundabout way, yes, sir.
24        Q.    Have you reviewed any deposition
25   transcripts subsequent to preparing this report?

173

EIHUSEN - Cross (Shively)

1    A.    No.
2    Q.    If you could look at your report of
3 August 1, 2016, and I'm referring to Figure 12,
4 page 11 -- page 13.
5    A.    Here it is. It's under that report.
6 What figure?
7    Q.    Figure 12 on page 13.
8    A.    Okay.
9    Q.    There you go.
10    A.    Thank you.
11    Q.    I'm just trying to get a scale of this.
12 What size of actual material is this figure
13 depicting?
14    A.    Oh, extremely small. The diameter of
15 fiber is — well, if you wanted, we could scale off
16 the diameter of the fiber. I'd have to check it.
17 But that's a very — that's a small scale.
18    Q.    In terms of millimeters, can you do any
19 better than very small?
20    A.    That's probably less than a quarter of a
21 millimeter. Or, actually, probably finer than that.
22 That might be a tenth of a millimeter. Fractional.
23 Obviously it's looking under a microscope, sir.
24          MR. SHIVELY: I don't have any other
25 questions.

174

EIHUSEN - Cross (Beucke)

1          MR. AHL: I have about two after you guys
2 finish up.
3          MR. BEUCKE: I'll save a few so you don't
4 grouse at me for going back and forth.
5          MR. AHL: We've established, that's okay.
6          MR. BEUCKE: Not with you, apparently.
7          MR. AHL: It had to be. Otherwise I
8 would have --
9          MR. SHIVELY: I didn't say a word.
10          CROSS-EXAMINATION
11 BY MR. BEUCKE:
12    Q.    Okay. Just a few clarification
13 questions, Mr. Eihusen. You mentioned ISO 9000
14 several times. Are those standards?
15    A.    Yes. They are internationally recognized
16 standards on managing risk in the design and
17 manufacturing process.
18    Q.    Do you have any -- do you have an opinion
19 as to whether those standards were violated in this
20 case?
21    A.    There was a request to produce materials
22 relating to the bucket. Those standards would have
23 required significant files to be generated during the
24 design process, during the fabrication process,
25 during the development process in both companies to

175

EIHUSEN - Cross (Beucke)

1 manage the risk of the product development. The fact
2 that they're not there, I don't know if that's an
3 oversight or it wasn't done. But certainly not
4 having it is a violation.
5    Q.    You were asked about your utilization of
6 any outside consultants in this matter. You did use
7 an outside consultant to perform the x-rays, did you
8 not?
9    A.    Yes. You have to be -- to use -- you
10 have to be licensed. And to handle the sources, you
11 have to be -- it takes a, what I would call, tech
12 level skill to do the setup and generate the shots.
13 But at that point, the interpretation was up to me at
14 an engineering level. Something I do.
15    Q.    In your September 26th, 2015, report,
16 reference page 4 for me, if you will.
17    A.    Yes, sir.
18    Q.    You responded on page 4 to question of
19 interest 1 and question of interest 2, have you not?
20    A.    Yes.
21    Q.    It appears that your response to each
22 question references the manufacturing and design
23 processes. Is that a fair statement?
24    A.    Well, yes. And because that's the first
25 step of the evaluation.

176

EIHUSEN - Cross (Beucke)

1    Q.    Your opinion -- as to question 1, your
2 opinion as to whether defendants used reasonable care
3 in the manufacture of the bucket, was a basis for
4 your opinion also your examination of the
5 photographs, the actual bucket, and documentation
6 relating to the bucket?
7    A.    Yes. As previously said.
8    Q.    As far as question number 2, your opinion
9 as to whether defendants used reasonable care in the
10 design of the bucket, was that also a basis for that
11 opinion, your examination of the photographs, the
12 bucket, and documentation related to the bucket?
13    A.    Yes.
14    Q.    These two opinions that you gave as to
15 questions number 1 and number 2, the basis for those
16 opinions is not solely based on a lack of information
17 provided to you, is it?
18    A.    No. We were -- as in section -- on the
19 summary points, those were generated in looking at
20 everything in total.
21    Q.    And that's as you previously testified to
22 in this deposition?
23    A.    That's correct.
24          MR. BEUCKE: That's all I have.
25          MR. GUENZEL: I have just a couple of

177

EIHUSEN - Cross (Guenzel)

1    questions, Mr. Eihusen.
2                    CROSS-EXAMINATION
3    BY MR. GUENZEL:
4         Q.    In addition to hiring an outside company
5    to do the x-rays, have you also used the services of
6    a -- of a professional photographer --
7         A.    Yes.
8         Q.    -- Kevin Binder?  And, now, your report
9    that was written in September of 2015 was done months
10   before the joint inspections that were done in
11   California in the spring of this year.  Is that fair
12   to say?
13        A.    Yes.
14        Q.    Having completed the joint inspection and
15   examination that was done in California this spring,
16   did some of the results of that work also support
17   your answers to questions 1 and 2 on page 4 of your
18   September 2015 report?
19               MR. AHL:  I'll object to the form of the
20   question.  There's no reasonable -- no proper and
21   sufficient foundation.  Go ahead.
22        Q.    (By Mr. Guenzel)  Such as the -- the
23   electron microscope photographs, the --
24        A.    Oh, did I use them on -- on the -- yes.
25        Q.    I mean, do some of the observations you

178

EIHUSEN - Cross (Guenzel)

1    made in California and do the results of the work
2    that was done in California support your opinion --
3    your answers to questions 1 and 2?
4         A.    Yes.  In fact, I never changed those from
5    the first time I wrote them.  They were based on the
6    evidence contained in the composite, the bucket, and
7    the documentation provided.
8         Q.    And you were asked some questions by
9    Mr. Ahl with regard to testing as being a key in the
10   scientific method.  Are -- are observations also used
11   by scientists in -- in developing opinions?
12        A.    Absolutely.  In fact, many -- many
13   inspection criterias for the safe use of composite
14   hardware are based on visual inspection techniques.
15   There are many ISO standards and many standards that
16   we could quote that visual inspection is the primary
17   and valid way of inspecting composite material.
18        Q.    And after this bucket itself failed, is
19   there any way to test its strength after the failure?
20        A.    Not as a unit.
21               MR. GUENZEL:  No other questions.
22               MR. AHL:  After those questions, I'm not
23   sure which of the three I've got to ask additional
24   questions to, but I'll start with you.  Just teasing.
25   Just teasing.

179

EIHUSEN - Redirect

1               MR. BEUCKE:  I would say I've heard worse
2    this morning, but I didn't see my wife this morning.
3               MR. AHL:  Shively wasn't that bad.
4               (Exhibit No. 108 was marked for
5               identification.)
6                    REDIRECT EXAMINATION
7    BY MR. AHL:
8         Q.    Let me show you what's now been marked by
9    the court reporter as Exhibit No. 108 and ask you if
10   you've ever seen that photograph before?
11        A.    Yes.
12        Q.    And can you identify that for us, what
13   that purports to show?
14        A.    You're looking at the accident location
15   apparently shortly after the body of Mr. Keaschall
16   had been recovered.
17        Q.    Do you understand that was taken by the
18   authorities who were investigating the incident?
19        A.    When you say authorities, I'm assuming
20   the sheriff's office.
21        Q.    That's who I would assume as well.
22        A.    But there were many pictures of the
23   location, so I wanted to make -- clarify which it was
24   one of.
25        Q.    That's the way I understand it.  Do you

180

EIHUSEN - Redirect

1    accept the positioning of all of the different
2    components and items of property that were involved
3    in this incident as reflected in Exhibit No. 108?  Do
4    you believe that that's how it actually looked?  Or
5    do you think it's different?
6         A.    I think that, to be fair, sir, I would
7    have to make -- one would have to comb the
8    depositions a little closer to make sure nothing had
9    been moved in the recovery of Mr. Keaschall.  That
10   would give me pause.  But, yeah, there's photographic
11   evidence the way it was.  But to ensure that beyond a
12   reasonable doubt, you would re-- look at the -- the
13   depositions on what was done.  I mean, there was
14   first aid applied.  There was people moving around.
15        Q.    You accept that that's where the pole
16   was?
17        A.    Yes.
18        Q.    You accept that's where the truck was?
19        A.    Yes.
20        Q.    You accept that that's the location where
21   the bucket came to rest after the incident, or you
22   don't know that?
23        A.    We don't know that.  We know the truck
24   wasn't moved by Mr. Keaschall.  We know the pole
25   wasn't moved by Mr. Keaschall.  The bucket...

181

EIHUSEN - Redirect

1    Q.    I'm going to ask you some questions about
2    that in just a minute.  And when I do, I want you to
3    assume that that bucket is in its final resting
4    position after the incident --
5    A.    Okay.
6    Q.    -- and no one moved it.  Okay?
7    A.    Okay.
8    Q.    First of all, I want to go back.
9    Mr. Shively was asking you some questions, and you
10   were explaining the failure sequence.  And you made a
11   statement about there being energy in the bucket at
12   the time of failure.  Do you remember saying that?
13   A.    I was saying that there was rotational
14   energy and rotational momentum before final
15   separation.  In fact, it was moving.  Yes.
16   Q.    Okay.  That energy that was in the bucket
17   at the time of the failure, where did that come from?
18   A.    That came from the moment arm, of it
19   swinging down.
20   Q.    What was producing the energy, though?
21   Was it the load in the bucket?
22   A.    Yeah.  The bucket itself, the load,
23   everything else.  It essentially -- like I said, it's
24   a pendulum on a string.
25   Q.    And you agree for that bucket to move

182

EIHUSEN - Redirect

1    from its position on the boom at the time of the
2    failure either downward or laterally, there had to be
3    some energy that was providing that movement?
4    A.    Yeah.  But if you go back to
5    Mr. Railsback's picture looking down on the bucket,
6    that distance from where this outside edge to the
7    truck is a lot closer than -- than this view gives
8    you credit for.  You might want to take a look at
9    that one.
10   Q.    Yeah.  And I'm just asking you whether
11   you agree with that proposition.  For the bucket to
12   move in any direction after separation, there had to
13   be energy to provide that movement.  Do you agree
14   with that from an engineering perspective?
15   A.    Yes.
16   Q.    Okay.  And I think that you were talking
17   about Mr. Keaschall performing some activity that may
18   have increased the load in the bucket or produced a
19   greater amount of energy at the time of failure;
20   correct?
21   A.    Mm-hmm.
22   Q.    And you were, I think, speculating that
23   it might be his use of a wrench and trying to loosen
24   a nut that may be stuck?
25   A.    It was a multiplying force that's

183

EIHUSEN - Redirect

1    something he could develop.
2    Q.    Okay.  What is that hanging from the
3    bucket?
4    A.    That's an impact wrench.
5    Q.    Okay.  And how does an impact wrench
6    work?
7    A.    It turns a nut.
8    Q.    Do you use manual force to do that, or do
9    you press a button and it uses either compressed air
10   or electricity?
11   A.    For every action, there's an equal
12   reaction.  That wrench --
13   Q.    Do you know how that wrench works?
14   A.    Yes, I do.
15   Q.    Is that -- have I described it correctly,
16   that it -- that the -- the ratchet or the wrench will
17   spin either through the application of compressed air
18   or electricity?
19   A.    That's -- it would spin.
20   Q.    Okay.  And do you use manual force like
21   you do on a regular ratchet to loosen a nut?
22   A.    The same force that you apply in a manual
23   wrench shows up in your wrist on that impact.
24   Q.    Okay.  Do you use the same bodily force
25   using an impact wrench as you would if you were using

184

EIHUSEN - Redirect

1    just a regular wrench with no assistance either
2    through electricity or air?
3    A.    That's why people use it, because it goes
4    easier.  Because the impact hammers it.  But the
5    engineering fact is, you hold onto the wrench.  You
6    transfer the load to whatever you're standing on.
7    And if you bind the socket, which is a lot of time
8    happening -- we're talking conjecture here.  I --
9    it's not -- it's very easy to bind sockets and have
10   to pull it, break it loose.
11   Q.    Okay.  That's an impact wrench, though,
12   isn't it?
13   A.    That's correct.
14   Q.    And it would work through the application
15   of what?  Do we know whether it's electricity or air?
16   A.    I would think for this application it
17   would be air.
18   Q.    And, again, looking at Exhibit No. 108, I
19   asked you about the movement of the bucket after
20   failure to move laterally a distance to strike the
21   back of the truck.  Do you remember those questions?
22   A.    Mm-hmm.
23   Q.    And do you see the railing on the back of
24   the truck where --
25   A.    Mm-hmm.

185

EIHUSEN - Redirect

1    Q.    -- the bucket hit?
2    A.    **Mm-hmm, I do.**
3    Q.    Okay.  Do you accept that that's where
4  the bucket hit?
5    A.    **It hit the truck there, yes.**
6    Q.    And it bent that railing, didn't it?
7    A.    **That's correct.**
8    Q.    And it would take -- took a sufficient
9  velocity or force to cause that fiberglass to put a
10  bend in that steel -- steel railing, wouldn't it?
11    A.    **Yes, sir, it would.**
12    Q.    And it left a mark on the bucket, too,
13  didn't it?
14    A.    **That's correct.**
15    Q.    And you were trying to give me a second
16  scenario where you thought that the bucket might have
17  fallen down, struck the ground, bounced up, hit the
18  railing and did the damage.  Is that -- is that your
19  scenario that you were talking about earlier?
20    A.    **I said, I agree with it hitting the**
21  **truck.  But, to be clear, and to be objective, there**
22  **is — I have seen large composite parts absorb energy**
23  **and bounce.  I have appreciation for this thing could**
24  **have come up six, eight feet in the air if it would**
25  **have hit the ground.**

186

EIHUSEN - Redirect

1    Q.    And do you believe it would have then
2  come down with enough force to bend that steel
3  railing after bouncing off the ground up six or seven
4  feet?
5    A.    **It's 800 to 1,000 pounds.  On edge, a lot**
6  **of things can happen, sir.  But I will say, I agree**
7  **with the first -- likely the first impact is to the**
8  **truck.  But that's not objective evidence.  There's**
9  **no objective way to know that, is what I was saying**
10  **to you, clearly.**
11    Q.    Based upon the application of engineering
12  principles and knowing what the effect on the
13  materials was, applying the standard within a
14  reasonable degree of engineering certainty, would you
15  agree that that bucket, after it separated from the
16  boom, struck the truck before ever striking the
17  ground?  Do you agree with that based on a reasonable
18  degree of engineering principles and certainty?
19    A.    **Reasonable, yes.  To a reasonable degree.**
20  **And I was — made that clear.  Yes, it's reasonable.**
21  **But I was giving you clarity that there are some**
22  **things here that are objectively true and some of**
23  **them that are subjectively reasonable.**
24    Q.    If I understood your answer to
25  Mr. Shively's question, it was the energy or the load

187

EIHUSEN - Redirect

1  in the bucket ultimately right before the failure
2  that you believe caused the end result of the
3  failure?
4    A.    **We're confusing here.  You're talking**
5  **about energy in motion.**
6    Q.    Well, let's just talk about the load,
7  then.
8    A.    **Okay.**
9    Q.    The load translates into energy at some
10  point, doesn't it, after the failure?
11    A.    **Force times distance is work.  Forced**
12  **times of distance divided by time is energy.  So**
13  **let's be very clear here.  There was a force applied**
14  **that exceeded the capability of the structure to**
15  **resist.**
16    Q.    And that's --
17    A.    **And we want to be clear on your units and**
18  **energy.  You're kind of mixing this up, and I want to**
19  **straighten that out a little bit.**
20    Q.    I just wrote down what you said, it was
21  the energy in the bucket.  But maybe I --
22    A.    **No, no.  What you're having is, is now —**
23  **energy in the bucket during separation, it's a**
24  **rotational inertia.  It's a stored energy.  Yes.**
25  **That's different than what you two were asking.  And**

188

EIHUSEN - Redirect

1  **so I wanted to clarify that.**
2    Q.    Okay.  And I want to be sure that I
3  understand your answer.  Then you believe it is the
4  load that was applied to the bucket that ultimately
5  led to its failure and separation?
6    A.    **It's a cascading failure, yes.**
7    Q.    Do you have an explanation as to where
8  that load came from?  Within a reasonable degree of
9  engineering certainty, do you have a reasonable — do
10  you have an explanation as to where that load came
11  from that caused the failure?
12    A.    **Yes.  I believe it was his own weight.**
13  **And what weight he could apply while he was in the**
14  **air.**
15    Q.    Well, his own weight, wouldn't it have
16  failed when he got into the bucket?
17    A.    **And what he could apply.  I was very**
18  **specific it was very near going when he got into**
19  **it.**
20    Q.    What do you mean by what he could apply?
21    A.    **I'm thinking, like, upper body strength.**
22  **I mean, we can —**
23    Q.    Again, we're just speculating now, aren't
24  we?
25    A.    **Yeah.**

189

1        MR. AHL:  Okay.  I think that's all the
2    questions that I have for you.  Thanks.
3        MR. SHIVELY:  No questions.
4        MR. BEUCKE:  No questions.
5        MR. GUENZEL:  No questions.
6        MR. BEUCKE:  We're done.  He'll read and
7    sign it.
8        (Deposition concluded at 1:10 p.m.)

190

191

1                AMENDMENT TO DEPOSITION
2    CASE:  KEASCHALL V. ALTEC/OSBORNE
3    WITNESS:  JOHN EIHUSEN, P.E.        _____No Changes
4        The witness herein states that he/she wishes to
5    make the following changes in his/her deposition:

7    PAGE   LINE   NOW READS   SHOULD READ   REASON FOR
                                            CHANGE

22            DEPONENT'S SIGNATURE

23        The signature above was subscribed and sworn to
     before me this ____ day of _____ , 20__.

25            GENERAL NOTARY PUBLIC
             MARCY BENGE, RPR, RMR, CRR

C E R T I F I C A T E
2    I, Marcy Benge, RMR, General Notary Public, duly
3    commissioned, qualified, and acting under a general
4    notarial commission within and for the State of
5    Nebraska, do hereby certify that:
6        JOHN EIHUSEN, P.E.
7    was by me first duly sworn to tell the truth, the
8    whole truth, and nothing but the truth; that the
9    foregoing deposition was taken by me at the time and
10   place herein specified and in accordance with the
11   within stipulations; that I am not counsel, attorney,
12   or relative of either party or otherwise interested
13   in the event of this suit.
14       IN TESTIMONY WHEREOF, I have hereunto set my
15   hand officially and attached my notarial seal at
16   Lincoln, Nebraska, this 7th day of December, 2016.

19            General Notary Public

## $

**$325** [2] - 21:10, 15
**$85** [1] - 21:12

## '

**'15** [1] - 52:10
**'70s** [1] - 134:18
**'77** [1] - 10:12
**'80s** [2] - 11:18; 134:18
**'90s** [1] - 11:18

## 1

**1** [15] - 37:22-24; 63:6, 8;
64:18; 65:22; 97:13; 98:8;
173:3; 175:19; 176:1, 15;
177:17; 178:3
**1,000** [1] - 186:5
**10** [7] - 77:14; 80:1; 82:3, 8,
16, 18; 86:8
**10,000** [1] - 19:17
**100** [2] - 5:1; 22:2
**101** [4] - 33:20, 23; 34:3;
36:18
**102** [3] - 42:1; 43:16; 44:15
**103** [8] - 53:5, 8; 55:4, 9,
18-19; 56:14; 57:13
**104** [7] - 56:6, 10; 57:13, 21;
63:1; 137:1, 12
**105** [5] - 87:14, 20-21; 88:23;
91:12
**106** [2] - 87:14, 21
**107** [5] - 137:3, 6, 8, 13;
138:13
**108** [4] - 179:4, 9; 180:3;
184:18
**11** [9] - 64:14; 85:1; 132:4;
138:15; 168:7, 10; 170:13,
16; 173:4
**12** [2] - 173:3, 7
**12th** [1] - 52:24
**13** [2] - 173:4, 7
**14** [6] - 5:3; 131:21; 132:3;
133:4, 23; 138:16
**15** [4] - 70:12; 132:4; 165:10;
168:5
**155** [1] - 134:16
**175** [1] - 134:16
**18th** [1] - 156:17
**19** [1] - 104:7
**1975** [1] - 9:11
**1979** [1] - 10:23
**1982** [1] - 12:22
**1988** [1] - 14:22
**1990** [1] - 14:22
**1992** [1] - 163:11
**1:10** [1] - 189:8
**1st** [1] - 134:4

## 2

**2** [12] - 13:25; 33:7; 66:7, 10;
99:13; 100:10; 133:4;
175:19; 176:8, 15; 177:17;
178:3
**2-3** [1] - 138:16
**20** [2] - 70:12; 165:10
**2012** [2] - 129:5; 167:12
**2013** [2] - 147:24; 167:11
**2014** [2] - 27:6
**2015** [12] - 37:25; 52:6, 24;
55:10; 63:3; 156:17; 168:3,
5; 171:5; 175:15; 177:9, 18
**2016** [5] - 5:3; 42:3; 48:12;
134:4; 173:3
**24** [1] - 134:13
**25** [1] - 19:2
**26th** [10] - 37:25; 52:8; 63:3;
165:9; 168:3, 5; 170:22;
171:5, 14; 175:15
**27th** [1] - 17:13
**28** [1] - 134:13
**29** [1] - 42:3

## 3

**3** [14] - 13:25; 57:12; 63:15,
18-19; 64:14; 65:23; 66:19;
67:12; 100:12; 133:4;
168:3, 6
**3-D** [3] - 31:1; 47:8; 96:17
**325** [1] - 141:19
**3310** [1] - 7:8
**36** [1] - 164:15
**3649** [1] - 164:16
**3rd** [4] - 48:12; 132:1;
136:17, 19

## 4

**4** [7] - 57:11; 68:24; 97:10;
101:13; 175:16, 18; 177:17
**4.3** [1] - 101:20

## 5

**5** [2] - 21:13; 69:17
**5/15** [1] - 45:21
**5/16** [1] - 45:21

## 6

**6** [8] - 33:14; 40:6, 10, 14;
71:14; 170:22, 24; 171:9

## 7

**7** [4] - 54:24; 64:25; 65:1;
73:16

## 8

**8** [6] - 64:24; 65:2; 74:10;
104:7; 130:12
**800** [1] - 186:5
**8:57** [1] - 42:3

## 9

**9** [8] - 64:25; 65:4, 12; 77:13;
131:3; 136:17
**9/15/57** [1] - 8:23
**9000** [6] - 97:23; 98:1; 100:4;
162:5; 174:13
**9:04** [1] - 5:3
**9:49** [1] - 41:9

## A

**A-d-d-a-x** [1] - 14:8
**a.m** [3] - 5:3; 41:9; 42:3
**A92** [8] - 79:2, 5, 16; 163:5,
10, 19; 164:2, 10
**abilities** [2] - 28:8; 78:12
**ability** [9] - 6:24; 31:11, 13,
15, 17; 107:19; 112:17;
127:7; 157:2
**able** [15] - 13:25; 18:16-18;
29:23; 30:8, 11, 17; 31:5;
32:8; 34:12; 35:18; 154:6
**absent** [1] - 48:19
**absolute** [3] - 77:11; 114:2;
151:3
**absolutely** [8] - 30:1; 53:4;
95:21; 143:21; 160:23;
161:3; 172:21; 178:12
**absorb** [1] - 185:22
**absorbed** [1] - 115:16
**absorbs** [2] - 115:9, 11
**accept** [7] - 108:21; 109:9;
180:1, 15, 18, 20; 185:3
**acceptable** [3] - 89:25; 90:1;
94:7
**accepted** [1] - 81:22
**access** [5] - 31:21; 51:2;
65:5; 160:10, 20
**accident** [11] - 38:18; 79:21;
80:21; 82:5; 83:12; 104:20;
113:12; 150:7; 167:10, 12;
179:14
**accounting** [4] - 22:7, 12;
25:7
**accurate** [4] - 53:13; 120:21;
141:25; 157:4
**acquired** [1] - 16:4, 6
**acronym** [1] - 163:5
**action** [1] - 183:11
**activity** [1] - 182:17
**actual** [10] - 10:16; 18:23;
21:13; 30:2; 49:17; 57:25;
58:16; 59:8; 62:10; 87:19;

145:11; 166:16; 171:17;
172:12; 173:12; 176:5
**Addax** [1] - 14:8
**added** [1] - 129:5
**addition** [1] - 177:4
**additional** [4] - 12:12; 38:7;
40:19; 178:23
**address** [4] - 7:5, 7-8; 95:23
**addressed** [2] - 163:11, 14
**addressing** [1] - 140:11
**adds** [1] - 170:12
**adequate** [1] - 52:3
**adequately** [3] - 80:2;
100:13; 140:11
**adjacent** [1] - 66:8
**adjourn** [1] - 41:6
**adjourned** [1] - 41:9
**adjustment** [1] - 109:6
**administrator** [1] - 13:13
**ads** [1] - 20:22
**Advanced** [1] - 14:11
**advanced** [8] - 13:20, 22;
14:10; 15:24; 17:18; 18:10,
16; 163:15
**advertise** [1] - 20:18
**advised** [1] - 62:1
**Aerial** [1] - 69:20
**affect** [5] - 71:3; 90:18; 123:6
**affected** [2] - 125:15; 135:7
**affects** [3] - 71:1; 89:20;
137:23
**age** [4] - 5:11; 8:20; 18:22,
24
**agency** [1] - 163:23
**ago** [3] - 20:15; 45:22;
158:20
**agree** [27] - 63:23; 64:3, 7,
12; 91:22; 108:17, 23;
111:21; 115:25; 116:5;
120:21; 121:3, 6, 13;
127:24; 128:5; 129:15, 23;
134:23; 135:1; 181:25;
182:11, 13; 185:20; 186:6,
15, 17
**agreed** [1] - 28:12
**agreement** [1] - 23:18
**ahead** [5] - 34:9; 131:5;
136:14; 157:24; 177:21
**Ahl** [29] - 5:7, 20; 33:22;
44:19; 53:7; 54:22; 56:4, 9;
57:20; 72:25; 73:8; 80:4;
82:17; 83:1; 84:14; 86:25;
87:16; 95:16; 103:6; 104:4;
122:2; 132:3; 133:25;
137:5; 138:18; 143:4;
146:20; 149:23; 162:15
**ahl** [2] - 33:15; 178:9
**AHL** [33] - 5:16; 33:18; 40:4,
8; 41:8; 42:7; 44:18; 54:19;
55:6, 11, 21, 25; 56:3;

57:14; 72:23; 79:25; 82:14, 21; 86:24; 95:12; 103:24; 133:24; 138:15; 142:25; 145:24; 174:1, 5, 7; 177:19; 178:22; 179:3, 7; 189:1
**aid** [1] - 180:14
**Air** [1] - 88:16
**air** [8] - 148:18; 183:9, 17; 184:2, 15, 17; 185:24; 188:14
**aligns** [1] - 153:7
**alive** [1] - 169:24
**allow** [4] - 71:24; 105:3; 106:10; 121:10
**allowable** [1] - 61:3
**allowables** [1] - 85:19
**allowed** [3] - 78:1; 104:15; 161:5
**almost** [1] - 151:10
**Altec** [23] - 5:7; 23:23; 40:21, 24; 43:4; 47:20; 80:12; 81:4; 93:7; 97:14; 98:17; 99:13; 100:20; 102:4; 129:5; 135:13; 148:1; 150:17; 161:21; 162:2, 7; 166:3
**Altec's** [1] - 101:9
**Altec/Osborne** [2] - 100:13; 101:15
**alternative** [1] - 81:22
**aluminum** [1] - 75:5
**ambiguous** [1] - 79:23
**amount** [7] - 18:12; 114:8; 116:1, 11; 121:4; 154:8; 182:19
**amounts** [1] - 107:16
**analogy** [3] - 116:3, 21; 169:6
**analy** [1] - 106:2
**analyses** [1] - 160:1
**Analysis** [1] - 63:9
**analysis** [58] - 12:4; 25:20; 26:6, 19; 39:17; 46:23; 49:3, 22; 50:10, 18; 60:8; 62:21; 63:20; 74:6; 86:21; 90:23; 92:9, 14; 94:1, 7; 95:15; 97:5, 7; 99:2; 103:18; 104:15, 25; 105:24; 106:4, 10, 16; 109:22; 121:8, 13; 122:4, 19; 123:4; 127:3; 128:13; 133:15; 138:7, 22, 24; 139:22; 140:20, 24; 141:6, 15; 144:3, 13; 145:14, 20; 153:13, 18; 156:18; 159:11, 22; 160:13
**analytical** [1] - 50:13
**analyze** [1] - 161:8
**analyzing** [1] - 21:16

**anchor** [2] - 147:16; 165:22
**angular** [3] - 117:9; 118:10
**angularity** [1] - 34:22
**annually** [1] - 142:4
**ANSI** [14] - 78:15; 79:16; 83:19, 24; 84:1; 149:10; 162:13, 17; 163:2, 4, 12, 18; 164:2, 10
**answer** [36] - 6:11, 14, 18; 15:17; 24:6; 46:18; 50:11; 51:5, 21-22; 63:11; 67:11; 71:6; 75:2; 79:15; 82:6, 18; 83:5, 8; 87:2; 95:9; 96:20; 101:16, 22; 103:1, 6-7; 109:13; 136:6; 165:1; 170:20; 172:5; 186:24; 188:3
**answered** [4] - 6:23; 26:11; 102:14; 153:20
**answering** [1] - 63:16
**answers** [2] - 177:17; 178:3
**anyway** [2] - 148:20; 150:21
**apart** [5] - 34:23; 59:19; 151:22; 154:14
**apologies** [4] - 56:23; 57:7; 73:3, 7
**apparent** [1] - 74:2
**appear** [1] - 53:12
**appearing** [4] - 5:4-6, 8
**appendix** [1] - 48:11
**Appendix** [1] - 131:25
**application** [6] - 120:16; 121:9; 183:17; 184:14, 16; 186:11
**applications** [5] - 77:17; 78:8, 10, 18
**applied** [8] - 74:1; 85:5; 105:11; 169:20, 25; 180:14; 187:13; 188:4
**apply** [8] - 134:21; 164:18; 166:11; 183:22; 188:13, 17, 20
**applying** [2] - 114:20; 186:13
**appreciate** [2] - 25:14; 87:8
**appreciation** [1] - 185:23
**approach** [1] - 60:5
**appropriate** [3] - 98:6; 133:5; 144:10
**April** [1] - 156:17
**area** [22] - 12:16; 60:17; 61:3, 6; 72:1, 7; 81:8; 84:13; 90:13; 91:2; 95:6; 126:19; 127:20; 128:20, 22; 129:16; 133:19; 159:11, 21
**areas** [3] - 12:7; 34:3, 5
**argument** [1] - 167:12
**Arkansas** [1] - 18:4
**arm** [1] - 181:18
**arrangement** [1] - 142:20
**arrive** [3] - 37:16; 73:23;

114:10
**arrived** [3] - 26:19; 32:3; 35:17
**arriving** [1] - 35:14
**as-built** [1] - 97:1
**aside** [1] - 89:1
**assigned** [1] - 12:2
**assistance** [1] - 184:1
**association** [1] - 163:24
**assume** [9] - 6:22; 28:12; 32:4; 46:6; 63:10; 112:22; 113:25; 179:21; 181:3
**assuming** [10] - 9:6; 29:21; 46:18; 88:17; 109:16, 21; 110:16; 141:13; 158:5; 179:19
**assumption** [2] - 73:4; 109:11
**atmospheric** [1] - 65:6
**attach** [2] - 33:4
**attached** [3] - 118:11; 149:14, 19
**attaches** [1] - 131:18
**attachment** [1] - 149:15
**attachments** [1] - 148:16
**attempt** [4] - 63:11; 93:2; 156:21; 157:1
**attempted** [3] - 126:6; 153:16
**attempting** [1] - 104:13
**attend** [2] - 10:2, 15
**attendance** [1] - 10:5
**attorney** [3] - 25:11; 39:2
**attorneys** [1] - 38:3
**attuned** [1] - 115:6
**audible** [1] - 75:23
**August** [2] - 134:4; 173:3
**authored** [1] - 122:12
**authorities** [2] - 179:18
**authority** [9] - 89:25; 98:14, 16; 99:19; 102:8; 128:16; 160:14; 162:1
**authorized** [1] - 160:18
**available** [8] - 8:11; 24:13; 38:21; 48:15, 22; 49:1; 62:8; 145:14
**awarding** [1] - 10:6
**aware** [14] - 18:9; 78:24; 84:16; 93:9; 94:8; 96:21; 147:14, 23, 25; 149:11, 13; 162:12, 25; 163:22
**awkward** [1] - 6:5

## B

**B.S** [1] - 10:25
**bachelor** [1] - 11:2
**bachelor's** [3] - 10:18; 11:19; 12:15
**background** [3] - 5:23; 9:2;

38:17
**backside** [1] - 151:19
**bad** [3] - 6:7; 68:13; 179:3
**balance** [1] - 38:13
**Baldwin** [3] - 15:5, 8, 16
**baldwin** [1] - 15:14
**bale** [2] - 116:25; 117:3
**bales** [3] - 116:22, 24; 117:2
**ball** [7] - 115:7, 9, 11; 118:13
**Ballard** [3] - 16:4, 7
**bang** [1] - 151:1
**barn** [2] - 116:22, 24
**base** [1] - 39:15
**based** [22] - 34:22; 36:7; 37:1; 74:21; 82:2; 89:5; 99:7; 100:16; 101:10; 102:6, 19; 103:19; 110:24; 117:20; 121:9; 134:13; 150:9; 176:16; 178:5, 14; 186:11, 17
**basic** [1] - 162:6
**basis** [29] - 16:2; 17:23; 35:21; 39:20; 49:14; 63:24; 65:21; 66:19, 21; 67:12; 69:15, 20; 71:10; 73:21; 74:22; 85:12; 97:19; 98:7; 99:8, 16; 100:6, 18; 101:18; 106:17; 127:4; 129:25; 176:3, 10, 15
**basket** [1] - 78:3
**basketball** [1] - 135:14
**bear** [1] - 166:7
**bears** [1] - 150:8
**became** [2] - 10:1; 42:14
**become** [1] - 152:13
**becomes** [7] - 60:18; 63:18; 74:2; 81:1; 110:13; 111:14; 120:25
**bed** [1] - 119:11
**began** [2] - 153:25; 154:9
**beginning** [3] - 108:10; 128:15; 155:3
**begs** [1] - 96:6
**behind** [1] - 135:10
**belays** [1] - 165:21
**belonging** [1] - 38:13
**below** [1] - 148:19
**Ben** [1] - 106:20
**bend** [4] - 75:5; 185:10; 186:2
**bending** [2] - 35:7; 153:5
**bent** [1] - 185:6
**best** [8] - 6:24; 11:11; 22:23; 24:1, 5; 60:12; 169:7; 170:19
**better** [7] - 33:12, 16; 80:23; 115:1; 131:17; 158:3; 173:19
**between** [23] - 12:17; 18:14; 40:24; 71:16; 76:24; 77:4;

85:23; 91:8; 110:1; 126:14; 128:11; 135:24; 138:1, 4; 147:10; 154:18, 20; 155:2, 9; 160:2; 162:23; 170:2
**Beucke** [1] - 5:4
**BEUCKE** [21] - 40:6, 10, 13; 54:18; 79:22; 84:11; 86:23; 103:4; 121:24; 133:23; 138:13, 17; 153:20; 157:22; 174:3, 6, 11; 176:24; 179:1; 189:4, 6
**beyond** [3] - 108:24; 119:6; 180:11
**big** [1] - 159:3
**biggest** [2] - 47:24; 125:11
**bill** [4] - 21:10; 142:4, 7, 14
**Bill** [1] - 27:19
**billable** [1] - 2:11
**billed** [3] - 21:13, 22; 142:10
**billing** [3] - 27:10; 41:3; 142:3
**bind** [2] - 184:7, 9
**Binder** [1] - 177:8
**birth** [1] - 8:22
**bit** [12] - 30:25; 43:10; 47:19; 75:10; 86:5; 96:2, 4; 116:21; 117:1; 160:15; 187:19
**black** [4] - 57:18; 130:19; 144:14
**block** [1] - 131:7
**blocks** [2] - 21:11
**blue** [1] - 43:19
**bodily** [1] - 183:24
**body** [10] - 47:6; 73:18; 85:15; 107:23; 140:23; 150:13; 158:17; 159:9; 179:15; 188:21
**bolt** [3] - 132:14, 18; 145:5
**bolted** [1] - 131:17
**bolts** [1] - 94:17
**bonding** [2] - 65:14; 131:6
**boom** [29] - 6:1; 35:10; 61:19, 23; 81:11; 108:16; 111:10, 24; 112:14; 118:22; 120:12, 19; 121:5; 131:18; 144:23; 145:2, 7, 12; 149:20, 22; 155:4, 15; 157:20; 158:5; 165:11; 167:2; 182:1; 186:16
**bottom** [8] - 82:10; 94:13, 21; 110:25; 131:17; 151:23; 165:18
**bought** [1] - 17:3
**bounce** [9] - 109:2; 110:4; 115:9, 14, 16; 119:4. 13; 185:23
**bounced** [7] - 109:4; 110:3, 9; 115:6; 119:5, 10; 185:17
**bouncing** [1] - 186:3

**branch** [1] - 76:21
**break** [10] - 26:9, 11; 59:6; 64:6; 70:11; 87:6, 17; 136:5; 159:7; 184:10
**breaking** [1] - 151:25
**breaks** [4] - 75:7; 118:4, 6; 152:2
**Brian** [1] - 14:16
**brief** [2] - 87:12; 143:2
**briefly** [1] - 32:17
**bring** [23] - 16:17; 22:3, 7; 24:12, 17, 19, 21-23; 25:2, 5; 27:12; 38:14, 16; 39:19, 24; 40:2, 15, 21, 25; 41:3; 42:20
**broke** [5] - 32:12; 117:13; 151:9; 153:14
**broken** [2] - 117:25; 164:17
**brought** [11] - 16:16; 22:13, 18; 23:5; 24:7, 10; 39:7; 42:18; 43:22; 44:16; 144:7
**brown** [1] - 130:19
**Brunswick** [8] - 13:17, 19-20; 14:2; 17:11; 18:13
**bubbles** [1] - 65:13
**buck** [1] - 113:24
**bucket** [171] - 32:12, 22; 34:19; 35:10, 12, 17; 36:10, 14; 46:24; 49:17; 50:6; 60:15; 61:12; 70:10; 73:6, 21; 75:12; 76:3; 78:14; 79:10; 81:5, 8-9; 82:8, 10; 86:7, 12, 19, 22; 88:1, 3, 8; 89:4; 91:16, 18; 92:3, 5; 93:8; 96:13, 23; 97:1, 15; 98:15; 99:15, 22; 100:14, 25; 101:2, 7, 14, 25; 102:9, 16; 103:16, 19; 105:18; 107:6; 108:13, 18, 21, 25; 109:16; 110:3, 5, 16, 23-24; 111:6, 10, 22; 112:12; 113:21, 25; 114:9, 17, 24; 115:12; 116:1, 12; 117:7, 13, 25; 118:1, 22; 120:13, 19; 121:4; 122:24; 123:2, 7; 124:25; 125:15, 22; 126:2; 127:22; 128:8, 19; 130:7, 20, 24; 131:8; 132:17; 135:6; 136:7, 10, 13; 137:9, 11-12; 138:11; 143:7, 10, 14, 24; 144:2, 5, 8, 13; 145:21; 147:19; 150:24; 151:11, 20; 152:9, 11, 15-16, 24; 158:12; 162:3; 166:11; 167:2; 174:22; 176:3, 5-6, 10, 12; 178:6, 18; 180:21; 181:3, 11, 16, 21-22, 25; 182:5, 11, 18; 183:3; 184:19; 185:1, 4, 12, 16; 186:15;

187:1, 21, 23; 188:4, 16
**bucket.** [1] - 180:25
**buckets** [14] - 47:25; 122:25; 123:17, 20; 126:14; 128:2, 14; 131:2; 134:25; 135:7, 13; 137:17; 145:18
**build** [8] - 16:12; 19:24; 31:2; 66:23; 88:1; 93:8; 98:1
**building** [1] - 17:18
**built** [6] - 16:15; 50:7; 74:15; 92:12; 97:1; 138:5
**bulk** [1] - 134:16
**bullet** [2] - 63:8; 64:15
**bumped** [1] - 140:9
**bunch** [1] - 55:15
**business** [4] - 7:5, 7, 9, 13-14, 23; 8:1; 14:13; 20:14, 18, 20; 31:12; 48:22; 49:2
**businesses** [1] - 8:1
**but..** [1] - 88:25
**button** [2] - 96:18; 183:9
**buy** [1] - 31:21
**buying** [1] - 98:18
**BY** [6] - 5:16; 42:7; 146:3; 174:11; 177:3; 179:7

# C

**CAD** [2] - 96:17
**calculated** [3] - 112:9, 11; 116:10
**calculations** [17] - 26:7, 20; 64:19; 66:2, 15; 67:14; 69:3; 73:9; 74:8; 77:19; 86:10; 123:5; 125:13; 127:10; 133:14; 140:19; 141:6
**calculator** [2] - 108:2, 9
**California** [5] - 23:17; 177:11, 15; 178:1
**capability** [2] - 61:4; 187:14
**capacity** [5] - 71:17; 72:14, 18; 73:11; 85:4
**care** [7] - 23:17; 97:14; 99:14; 110:7; 140:15; 176:2, 9
**career** [1] - 20:16
**careful** [2] - 114:16; 162:20
**carefully** [1] - 77:22
**carried** [4] - 17:23; 96:2; 140:5, 7
**carry** [5] - 86:5; 91:18, 23; 92:5; 127:7
**carrying** [2] - 78:11; 169:21
**cascade** [1] - 150:14
**cascading** [1] - 188:6
**case** [6] - 6:18; 7:7; 8:18; 21:2, 20, 22; 22:8, 11, 19, 22; 23:8; 25:20; 27:1, 17;

38:14; 48:15; 49:3, 7; 62:22; 66:25; 93:1; 103:12; 142:17; 146:9, 22, 25; 174:20
**cases** [2] - 20:25; 101:1
**catastrophic** [3] - 73:20; 75:15; 130:25
**catch** [1] - 59:2
**category** [1] - 25:23
**causal** [1] - 126:25
**causative** [1] - 158:16
**caused** [8] - 71:15, 20, 25; 126:19; 148:7; 158:14; 187:2; 188:11
**causes** [1] - 60:2
**cautioned** [1] - 5:11
**cautious** [1] - 162:20
**cavities** [1] - 161:15
**cavity** [1] - 134:2
**CD** [1] - 40:18
**CDs** [1] - 25:13
**cell** [2] - 16:4, 7
**center** [2] - 18:10; 153:10
**centerline** [1] - 132:12
**certain** [5] - 110:16; 111:23; 112:3; 115:25; 121:3
**certainly** [8] - 80:11; 127:2, 7; 135:7; 155:6; 167:5; 169:15; 175:3
**certainty** [7] - 111:8, 11, 13; 114:2; 186:14, 18; 188:9
**certificate** [1] - 97:24
**certificates** [1] - 10:6
**certified** [1] - 5:12
**chance** [6] - 6:17; 39:13; 52:17; 148:18; 155:19; 169:24
**change** [19] - 89:9; 99:4; 123:25; 124:1, 14; 126:2; 129:3; 133:3; 136:1; 137:15, 23; 138:8; 147:14, 16, 24-25; 160:3
**changed** [4] - 35:5; 130:11; 150:3; 178:4
**changer** [2] - 53:24; 58:18
**changes** [13] - 14:4; 123:5, 9, 16; 124:19, 23; 125:15; 132:20, 22; 137:24; 146:9; 152:21
**changing** [3] - 91:6; 148:8
**channel** [1] - 89:20
**channeling** [1] - 90:18
**characteristics** [2] - 100:22; 169:1
**charge** [5] - 21:9, 11, 15; 23:2; 141:18
**charged** [1] - 21:20
**charges** [2] - 21:8, 23
**charging** [1] - 141:13
**charter** [2] - 84:18; 145:5

check [6] - 50:1; 107:24; 134:19; 147:22; 167:10; 173:16
checked [3] - 88:14; 163:1, 7
checkmark [1] - 89:11
chemistry [1] - 140:4
circumstances [1] - 28:21
claimed [1] - 58:17
claiming [2] - 61:11; 78:13
CLARCOR [2] - 15:15, 18
clarification [1] - 174:12
clarify [2] - 179:23; 188:1
clarity [2] - 42:21; 186:21
class [1] - 75:4
classes [1] - 11:6
classified [1] - 43:7
clear [15] - 56:17; 57:3; 98:15; 109:25; 114:22; 119:3; 163:21; 166:18, 23; 167:17; 168:1; 185:21; 186:20; 187:13, 17
clearance [1] - 17:24
clearly [1] - 186:10
client [1] - 170:25
close [5] - 36:22; 48:8; 58:21; 158:13
close-up [1] - 58:21
close-ups [1] - 36:22
closed [2] - 88:20; 89:16
closer [5] - 13:5; 75:12; 131:22; 180:8; 182:7
closure [1] - 69:19
cloth [5] - 85:21; 136:13; 168:13, 16; 169:23
clues [1] - 150:5
Coleman [16] - 15:22; 17:2, 5; 29:9, 20; 46:1; 47:6; 51:8; 52:5, 11, 23; 56:19; 57:16; 58:13; 59:4; 64:24
Coleman's [1] - 34:13
college [1] - 10:20
collision [1] - 115:21
color [1] - 65:8
colors [1] - 65:4
comb [1] - 180:7
coming [4] - 17:4; 151:18; 152:16; 166:7
commenced [1] - 5:9
comment [1] - 135:22
commentary [8] - 104:8; 105:4; 109:15; 112:23; 116:17; 121:9, 13; 122:3
commented [1] - 140:14
commenting [1] - 134:5
commercial [2] - 19:6
Commercial [1] - 14:11
committee [2] - 163:8, 10
committees [2] - 19:14; 146:11

common [4] - 24:11; 27:15, 18; 137:13
communication [2] - 39:2
companies [1] - 174:25
company [11] - 12:13; 13:21; 14:7, 9, 24; 15:13, 15, 18; 97:24; 166:20; 177:4
comparing [1] - 136:16
comparison [1] - 143:21
compelling [2] - 47:11; 51:19
competent [3] - 99:19; 102:7; 128:16
complete [5] - 6:18; 19:23; 42:18; 74:16
completed [1] - 177:14
completely [6] - 77:16; 79:5; 125:5; 132:24; 133:12; 136:9
compliance [1] - 164:11
compliant [2] - 167:1, 5
complied [1] - 166:24
component [6] - 5:24; 16:21; 28:15, 17; 30:2; 139:4
components [4] - 105:14; 106:12; 107:17; 180:2
composite [49] - 17:18; 20:6; 28:19; 32:15; 34:23; 47:10; 49:12, 15; 51:19; 62:16; 66:14; 67:10; 73:17; 75:25; 76:12; 79:4; 84:18; 101:4; 103:12; 110:4; 113:19; 116:20; 117:7; 119:3; 120:14, 22, 24; 121:1, 20; 136:9; 145:6; 146:14; 150:8, 18; 153:14; 157:2; 159:14; 163:11, 15; 168:21; 178:6, 13, 17; 185:22
Composites [6] - 13:17, 19-20; 17:11, 21, 25; 19:8
composites [18] - 13:22; 18:11; 50:18; 51:17; 66:22; 74:16-18; 75:3, 6; 79:3; 85:15; 94:8; 96:1; 134:18; 145:17; 146:16
compressed [2] - 183:9, 17
compromised [2] - 73:17; 134:25
computations [1] - 122:4
compute [1] - 107:19
computer [9] - 31:8; 59:7; 104:24; 105:1; 106:23; 107:15, 21; 112:23; 113:12
con [1] - 49:10
concern [2] - 88:7; 146:17
concerning [1] - 89:23
concerns [1] - 144:5
concluded [1] - 189:8
conclusion [7] - 16:18; 30:15; 34:11; 73:23; 97:20;

108:15; 130:6
conclusions [24] - 29:6, 24; 30:8, 22; 32:4, 8; 34:12; 35:20; 36:25; 37:6; 47:4; 49:8, 25; 50:15; 63:20; 64:2, 21; 76:9; 104:16; 107:15; 122:14, 21; 138:23; 139:12
concurrence [1] - 102:7
condensed [1] - 96:18
condition [6] - 71:19; 74:17, 21; 97:1; 126:7; 162:4
conditions [3] - 113:8, 10; 127:8
cone [3] - 153:7, 9
confidential [1] - 37:15
confidentiality [2] - 23:19; 38:12
configuration [2] - 126:22; 137:15
configurations [3] - 128:12; 137:18; 138:6
confirmation [1] - 65:24
confirmed [1] - 36:13
conformance [1] - 164:3
confusing [1] - 187:4
conjecture [3] - 110:14; 111:14; 184:8
conjunction [1] - 165:5
connec [1] - 123:18
connecting [1] - 94:21
connection [2] - 94:15; 147:19
consider [3] - 50:21; 109:19; 161:7
consideration [1] - 170:17
considered [2] - 45:25; 134:11
considering [1] - 160:25
consistency [4] - 89:17; 169:7
consistent [4] - 78:7; 156:20; 161:16
consolidated [1] - 132:6
constraints [1] - 160:2
construct [1] - 16:12
constructed [2] - 68:12
construction [1] - 15:10
consultant [2] - 48:21; 175:7
consultants [2] - 49:22; 175:8
consulted [2] - 20:25; 49:5
consulting [6] - 7:12; 20:13; 48:13, 22; 49:2
Cont'd [1] - 42:6
contact [1] - 65:14
contacted [10] - 27:1, 9, 14, 24; 28:5; 32:4; 37:4; 41:5; 45:3, 8
contain [1] - 168:17

contained [3] - 44:6; 52:22; 178:6
containment [1] - 19:18
contains [2] - 43:16, 22
contaminants [1] - 140:17
contaminates [6] - 139:5, 14; 161:9, 12, 14
contamination [3] - 65:6; 138:25; 144:16
contemplated [1] - 50:2
content [2] - 90:2; 134:7
context [1] - 44:20
continue [4] - 19:1; 35:2; 152:13; 168:18
continued [5] - 11:6; 32:14; 158:7
continues [1] - 168:19
continuous [2] - 67:8; 169:23
contract [2] - 31:13; 48:16
contracted [3] - 8:12; 50:12; 161:8
contracting [2] - 48:20; 160:21
contractor [1] - 17:22
contractors [2] - 13:24
contributing [1] - 127:2
control [4] - 85:7; 98:1; 99:2; 159:19
controls [3] - 146:15; 148:19
conversation [1] - 45:18
copies [6] - 23:13; 24:12; 25:2; 52:14; 54:14
copy [9] - 24:15; 43:24; 44:3, 15; 53:13; 58:13; 106:21; 122:9; 156:16
core [2] - 85:18; 100:2
coring [1] - 169:10
corner [15] - 32:17, 22; 118:4, 6-7; 130:21; 131:11; 150:10; 151:14; 152:10, 25; 153:1, 5
corporate [1] - 15:16
correct [47] - 6:17; 34:2, 7-8; 36:6; 42:20; 54:25; 55:1; 57:12, 23; 62:18, 22-23; 63:12; 64:11; 67:14, 18; 73:13, 15; 74:12; 91:15, 18; 95:18; 104:8; 111:7; 121:5; 125:23; 127:13, 24; 128:4; 138:7, 19; 146:24; 147:7; 153:25; 154:23; 156:10; 157:14; 161:2; 176:23; 182:20; 184:13; 185:7, 14
correctly [3] - 63:15; 67:12; 183:15
corresponds [1] - 88:3
cost [1] - 21:13
could've [1] - 119:5

counsel [5] - 5:4, 7-8; 42:3
count [1] - 155:16
country [1] - 45:15
County [1] - 40:19
couple [4] - 87:17; 143:4; 170:10; 176:25
coupling [1] - 138:3
course [1] - 10:16
court [16] - 23:19; 28:24; 29:2; 38:12; 42:23; 43:1; 47:13; 53:1, 8; 70:2; 97:23; 171:3; 172:10, 14, 17; 179:9
cover [1] - 128:10
crack [5] - 152:1, 5-6; 169:2
cracking [2] - 132:15, 18
cracks [1] - 115:15
crawled [2] - 158:13, 15
creases [1] - 128:7
create [2] - 120:18; 128:6
created [5] - 65:16; 72:13; 81:9; 118:21; 159:17
creating [1] - 115:21
creation [1] - 121:11
credence [1] - 96:2
credible [6] - 50:3, 9; 94:7; 96:23
credit [1] - 182:8
credited [1] - 163:4
credits [2] - 10:7; 66:23
crippled [2] - 126:6; 150:17
crippling [1] - 135:9
criteria [4] - 96:1; 100:24; 132:19; 166:15
criterias [1] - 178:13
critical [12] - 77:17; 78:8, 18; 95:19; 113:11; 122:13, 22; 126:1; 156:19; 170:10
criticism [1] - 139:10
criticisms [4] - 95:23; 120:6; 122:16; 138:21
CROSS [3] - 146:2; 174:10; 177:2
cross [1] - 85:21
CROSS-EXAMINATION [3] - 146:2; 174:10; 177:2
cross-ply [1] - 85:21
cup [2] - 114:16; 118:1
cure [2] - 140:12; 159:15
cure-up [1] - 140:12
cursory [1] - 144:14
cut [5] - 72:7; 118:14; 124:3; 168:16, 19
cutout [1] - 67:9
cutouts [1] - 67:9
cutting [5] - 67:1, 22; 68:2, 17; 71:21
CV [4] - 11:9; 14:6, 17; 146:8
cycle [2] - 75:12; 169:16

cycles [1] - 60:25
cycling [3] - 60:25; 85:7; 126:21

# D

D-ring [2] - 149:15, 19
damage [5] - 67:22; 68:18, 25; 146:13; 185:18
danger [1] - 157:3
dangerous [1] - 101:14
dangers [1] - 100:14
dangling [1] - 81:18
dark [5] - 56:18, 20, 24; 58:23; 130:19
data [3] - 24:2; 25:2; 169:17
date [14] - 8:22; 11:8; 27:5, 9; 40:5; 48:3, 10; 53:14; 131:23; 146:5; 167:18; 168:4; 171:4, 14
dated [5] - 37:24; 52:8, 24; 55:9; 63:3
dates [4] - 11:10; 14:6; 55:12; 134:17
Dawson [3] - 5:6; 40:18, 24; 62:1; 132:18; 137:11; 143:8; 144:4; 160:7
day-to-day [2] - 16:2; 19:11
dead [1] - 153:10
deal [5] - 36:24; 97:7; 109:1; 110:13; 164:14
dealing [1] - 12:3
debatable [1] - 81:1
decided [3] - 15:1; 51:1; 161:1
deemed [1] - 70:22
deems [1] - 166:19
deep [7] - 56:18-20, 24; 57:18; 72:6; 169:14
defect [18] - 57:8; 58:2, 19; 59:14, 16, 20, 24; 60:3, 5, 17; 61:6, 10; 65:1; 66:7; 70:25; 71:1; 126:19
defective [2] - 101:14; 102:9
defects [9] - 65:5; 66:24; 67:5, 21; 68:1, 4; 140:1; 161:20
Defendant [2] - 5:7
defendants [2] - 176:2, 9
Defendants [3] - 99:13; 100:13; 101:15
defense [2] - 13:24; 17:21
Defense [1] - 17:12
defer [1] - 164:8
degree [8] - 10:18, 24; 11:20; 12:14; 186:14, 18-19; 188:8
degrees [1] - 10:6
delamination [6] - 56:21; 57:19; 65:7, 10; 71:16;

126:18
delaminations [8] - 67:2; 68:8, 24; 101:5; 127:12; 128:7; 129:19; 140:4
delay [1] - 87:4
delegate [1] - 163:4
delegations [1] - 164:8
delineated [1] - 125:13
demise [1] - 18:23
dense [1] - 136:15
depicting [1] - 173:13
deposition [19] - 5:9, 22; 24:16; 39:14; 42:4, 13; 52:21; 106:20; 146:7, 21; 171:17, 25; 172:2, 5, 18, 24; 176:22; 189:8
Deposition [2] - 41:9
depositions [13] - 23:21; 40:19; 47:18; 170:25; 171:1, 6, 9, 11, 23; 172:13; 180:8, 13
depth [1] - 65:2
describe [1] - 150:2
described [5] - 44:17; 91:2; 118:21; 120:18; 183:15
description [2] - 122:2; 135:14
design [93] - 13:23; 15:10; 16:20, 22; 17:17; 50:5; 60:6, 8, 10, 13; 61:11; 70:24; 78:3, 6, 13, 25; 79:10; 82:12; 84:3; 85:2, 5, 14; 89:24; 90:4, 6; 91:16; 93:8; 96:24; 98:1, 14, 16; 99:14, 19, 24-25; 100:2; 101:6; 102:7; 125:3; 126:2, 4, 14; 128:9-11, 16-18, 21, 23-25; 129:1, 3, 7, 11, 24; 130:2; 131:14, 16; 132:21; 135:3, 12, 22-23; 137:13, 21, 23; 138:9; 143:23; 160:14; 162:1, 11; 163:14, 19, 25; 169:20; 170:2, 4, 7, 10, 13, 17-18; 174:16, 24; 175:22; 176:10
designated [3] - 34:1, 6; 36:18
designation [1] - 12:21
designed [7] - 16:15; 18:3, 20; 82:9; 91:23; 92:5
designer [1] - 60:9
designing [1] - 16:20
designs [1] - 126:15
destroy [4] - 68:12; 103:14, 22; 133:2
destroyed [1] - 103:23
destroying [1] - 97:2
destructively [1] - 144:8
detached [3] - 111:24; 155:4, 15

detail [1] - 64:19
detailed [1] - 65:21
detailing [2] - 23:21; 62:21
details [1] - 127:16
determine [24] - 30:8, 11; 46:13; 61:5, 10; 67:17; 72:17; 73:9; 75:16; 86:10, 18, 21; 92:9, 17; 102:11; 103:7; 105:21; 120:17; 123:5; 125:14; 138:10; 143:13, 22
determined [6] - 42:17; 66:10; 69:8; 127:9; 134:21; 142:14
develop [2] - 96:25; 183:1
developed [1] - 151:10
developing [2] - 19:19; 178:11
development [2] - 174:25; 175:1
diagrams [2] - 32:23; 33:24
diameter [2] - 173:14, 16
dictate [1] - 104:19
dictated [2] - 148:15; 164:10
difference [12] - 62:12, 15, 19; 85:23; 96:11; 110:8; 124:16; 130:5; 133:16; 138:10; 147:6, 8
differences [2] - 124:24; 128:11
different [29] - 6:9; 23:23; 65:4; 75:8; 86:14; 104:23; 105:14; 106:12; 107:17; 117:10; 123:1; 125:6; 128:23; 130:3; 131:1; 132:24; 133:12; 136:3, 9; 137:18; 138:25; 143:23; 164:7; 168:7; 171:23; 180:1, 5; 187:25
difficult [1] - 78:19
difficulty [1] - 45:15
digitally [1] - 51:14
diplomas [1] - 10:6
DIRECT [2] - 5:15; 42:6
direct [1] - 147:3
direction [15] - 105:13, 19; 108:13, 15; 111:9; 113:22; 118:7, 25; 120:11; 152:20; 153:8, 15-16; 182:12
directly [1] - 109:5
dirt [2] - 109:3; 119:5
disagree [2] - 108:23; 114:13
disagreeing [1] - 114:14
discernible [1] - 89:6
disclosed [4] - 38:24; 89:5; 93:7; 99:22
disclosure [2] - 99:6; 100:7
disclosures [8] - 23:23; 47:14; 60:7; 97:21; 98:6; 99:5, 9; 100:16

discrepancies [2] - 89:24; 102:2
Discrepancies [1] - 88:14
discrepancy [1] - 102:1
discretion [1] - 166:21
discuss [1] - 113:6
discussed [1] - 106:13
discussions [1] - 45:4
disposed [1] - 62:5
disseminate [1] - 43:8
distance [12] - 91:8; 110:17, 19; 112:13; 116:12; 117:5; 159:13, 16; 182:6; 184:20; 187:11
distinguish [1] - 162:22
divided [1] - 187:12
division [2] - 19:6
Dixie [1] - 118:1
DMA [1] - 140:4
doc [1] - 45:12
document [2] - 44:6; 99:3
documentation [3] - 176:5, 12; 178:7
documented [1] - 144:15
documents [17] - 14:20; 23:16, 22; 24:11; 29:1; 38:12, 20; 40:14, 17-18; 42:22; 43:6; 47:14; 70:2; 98:2, 18
dominated [2] - 168:23
done [50] - 6:9; 50:25; 51:10; 65:18; 66:5; 67:6; 72:7; 73:8; 74:2; 82:12; 83:6; 92:25; 93:4; 94:7, 17-18; 95:7; 106:9, 15; 113:15; 122:3; 123:24; 127:10, 16; 140:20; 141:4; 143:1, 5; 144:2, 13; 145:20; 160:1, 17; 161:1, 4; 164:25; 165:1; 170:5; 175:3; 177:9, 15; 178:2; 180:13; 189:6
double [1] - 158:18
doubt [2] - 119:1; 180:12
dovetail [2] - 32:13; 60:14
down [32] - 15:23; 16:16; 35:11; 67:16; 75:9; 80:22; 99:12; 105:22; 116:13; 117:9, 14, 25; 118:1, 3; 133:11; 136:5; 148:19; 151:12, 20; 152:11, 16, 23; 163:9; 165:23; 166:12; 181:19; 182:5; 185:17; 186:2; 187:20
downward [1] - 182:2
Dr [12] - 97:4; 122:10; 126:1; 127:17; 129:17; 131:2; 133:5; 134:5; 135:4, 16; 138:22; 139:11
drastically [1] - 137:18
draw [5] - 28:11; 32:8; 34:12;
64:2; 135:9
drawing [2] - 123:24; 124:2
drawings [2] - 99:20, 23
drew [1] - 35:21
drive [8] - 23:6, 10-11; 43:15, 19; 44:16; 52:13; 54:12
driven [1] - 138:4
drop [4] - 115:14; 118:14; 148:14
dropped [1] - 109:1
dropping [3] - 117:11; 118:12, 17
drug [4] - 81:20; 166:5, 9
dry [4] - 68:25; 69:6; 89:21
dryer [3] - 85:23; 86:1; 169:7
duly [1] - 5:11
duplicate [3] - 43:7; 44:6; 126:6
duplicated [1] - 44:4
duplication [2] - 103:10
during [13] - 44:9; 87:25; 126:24; 140:12, 15; 143:6; 157:19; 158:7; 167:9; 174:23-25; 187:23
duties [1] - 19:11
DVT [1] - 60:24
Dynamics [3] - 19:5

E

e-mail [10] - 52:24; 53:9, 13; 55:9; 56:16; 57:21; 98:19; 156:16; 157:10
e-mails [3] - 23:6; 50:1; 52:21
early [2] - 11:18; 134:18
easier [1] - 184:4
easy [4] - 82:9; 117:2, 5; 184:9
edge [17] - 56:25; 57:17; 58:6; 60:15; 69:24; 101:5; 130:19; 158:19; 165:16-18; 166:5, 9-10, 12; 182:6; 186:5
education [1] - 11:5
educational [2] - 9:1; 57:9
effect [12] - 58:6; 60:20; 61:10; 86:10, 18; 90:8; 97:25; 102:11; 106:11; 115:21; 158:16; 186:12
effectively [1] - 98:24
effects [2] - 99:1; 106:14
effort [2] - 50:21; 141:5
egg [2] - 115:14
eggs [1] - 78:2
eggshell [1] - 115:15
EiCon [1] - 7:11
eight [2] - 55:20; 185:24
EIHUSEN [1] - 5:10
eihusen [1] - 55:8
Eihusen [5] - 5:19; 39:12; 174:13; 177:1
either [22] - 6:15, 17; 12:14; 22:9; 25:22; 31:21; 36:23; 44:7; 55:24; 72:5; 74:19; 82:6; 90:23; 105:22; 146:6; 152:17; 161:12; 182:2; 183:9, 17; 184:1
electrical [1] - 100:22
electricity [4] - 183:10, 18; 184:2, 15
electron [1] - 177:23
element [5] - 92:14; 97:5; 101:17; 122:18
elements [3] - 96:8, 19
eleven [1] - 132:10
employed [2] - 13:9; 122:20
employee [1] - 166:19
employees [1] - 7:18
employer [2] - 84:4; 166:16
employment [1] - 13:16
enclosed [1] - 161:15
end [6] - 11:18; 20:16; 110:5; 165:24; 187:2
ended [1] - 144:10
ends [1] - 151:15
energy [32] - 107:16; 112:11; 115:10, 16; 116:1, 11; 118:9, 21; 119:2, 7; 120:18; 121:4, 11; 150:24; 153:19; 181:11, 14, 16, 20; 182:3, 13, 19; 185:22; 186:25; 187:5, 9, 12, 18, 21, 23
engaged [1] - 42:14
engine [1] - 16:5
engineer [10] - 8:25; 9:3; 12:2, 19; 15:9; 16:19; 17:17; 19:9; 111:17; 150:18
engineering [28] - 10:19; 11:3, 7; 12:11, 14; 20:11; 70:23; 77:12; 80:6; 91:17; 107:25; 109:6, 25; 111:18; 115:1; 120:16; 121:10; 156:18; 163:23; 170:15; 175:14; 182:14; 184:5; 186:11, 14, 18; 188:9
ensure [1] - 180:11
entails [1] - 64:9
enter [1] - 9:4
entire [15] - 24:21; 31:7; 39:7, 19, 24; 40:2, 8; 43:17, 22; 44:9; 47:6; 98:9; 127:20; 130:20; 171:7
entity [1] - 161:8
environment [2] - 68:9; 161:12
envision [1] - 150:6
envisioned [1] - 167:2
epoxy [1] - 169:8
equal [1] - 183:11
equally [1] - 12:17
equipment [5] - 8:6; 31:18; 48:21; 49:1; 50:19
err [1] - 102:9
error [2] - 110:2; 153:9
especially [3] - 89:16; 101:7; 170:9
essentially [4] - 19:4; 63:15; 153:5; 181:23
establish [5] - 64:1, 20; 66:16; 69:4; 77:19
established [1] - 174:5
estimate [1] - 159:18
estimated [1] - 157:4
estimating [1] - 22:1
estimation [1] - 141:20
Europe [1] - 164:20
Europeans [1] - 164:9
evaluate [8] - 45:13; 58:7; 81:23; 90:11, 22; 127:11; 133:15; 161:8
evaluation [3] - 70:24; 175:25
events [4] - 76:25; 77:9; 154:18
eventually [1] - 31:4
evidence [36] - 30:10; 37:2; 40:23; 47:10; 49:13; 51:18; 62:16; 66:13; 68:6, 8, 16; 71:23; 73:25; 76:12; 101:19; 103:14; 105:6; 106:8; 116:20; 119:16, 22, 24; 120:14, 22-24; 121:1, 19; 127:3, 5; 153:13; 163:18; 178:6; 180:11; 186:8
evidenced [1] - 32:19
evolutions [1] - 17:11
exact [7] - 11:8, 10; 14:6; 20:12; 27:5; 44:15; 48:3
exactly [9] - 17:16; 40:14; 71:23; 81:9; 91:14; 95:22; 100:18; 105:3; 117:21
examination [6] - 51:11; 143:6; 147:3; 176:4, 11; 177:15
EXAMINATION [6] - 5:15; 42:6; 146:2; 174:10; 177:2; 179:6
examined [2] - 5:12; 37:2
example [1] - 18:19
exceed [1] - 84:12
exceeded [4] - 148:24; 150:12; 187:14
excellent [1] - 18:13
except [2] - 62:25; 167:11
excess [2] - 128:22; 140:3
exchangers [1] - 12:10

**exclude** [1] - 48:24
**excluding** [1] - 47:14
**excuse** [2] - 27:6; 136:7
**executed** [1] - 47:13
**executing** [1] - 38:11
**exhaustibly** [1] - 24:12
**Exhibit** [34] - 33:20, 22; 34:3; 36:18; 42:1; 43:16; 44:15; 53:5, 8; 55:4, 9, 18-19; 56:6, 10, 14; 57:11, 21; 63:1; 87:14, 21; 88:22; 91:12; 136:25; 137:3, 6, 8, 12-13; 179:4, 9; 180:3; 184:18
**exhibit** [9] - 5:1; 33:4; 34:10; 53:15; 55:17; 87:9, 19
**exist** [2] - 57:21; 99:4
**existed** [3] - 55:22; 65:11; 127:21
**existing** [2] - 59:3; 127:12
**exit** [4] - 108:13; 111:9; 118:7; 153:7
**exited** [3] - 113:22; 153:8, 15
**expected** [1] - 38:3
**expenses** [1] - 21:12
**experience** [6] - 28:7; 66:22; 67:13; 74:5; 141:11; 161:16
**experienced** [1] - 150:18
**experimental** [1] - 73:4
**experiments** [17] - 8:10; 20:1; 25:20; 26:6, 16, 22; 64:19; 66:1, 15; 67:13; 69:3; 73:9; 77:18; 86:9; 125:14; 127:10; 160:17
**expert** [11] - 23:15; 46:10; 63:16; 65:23; 81:25; 92:22; 94:8; 145:16; 146:23; 156:23; 167:4
**Expert** [1] - 63:9
**expertise** [1] - 84:13
**experts** [7] - 25:3; 35:18; 45:15; 50:21; 51:1; 168:23
**expire** [1] - 76:24
**explain** [1] - 56:1
**explaining** [1] - 181:10
**explanation** [2] - 188:7, 10
**explicit** [1] - 171:8
**explicitly** [2] - 119:1; 156:14
**Exponent** [1] - 134:5
**exposed** [1] - 68:9
**express** [1] - 162:16
**expressed** [3] - 36:5; 37:1; 98:7
**extending** [1] - 71:16
**extensive** [2] - 58:3; 67:4
**extent** [4] - 102:21; 129:18; 144:16; 165:2
**external** [5] - 68:25; 71:14, 20, 25; 73:11

**extra** [1] - 124:3
**extremely** [3] - 17:8; 47:11; 173:14
**eye** [6] - 51:10, 23-24; 56:25; 65:19; 101:4; 144:6

## F

**fabric** [1] - 85:21
**fabricated** [6] - 18:1-3, 7, 21; 130:23
**fabrication** [3] - 124:25; 136:9; 174:24
**face** [3] - 98:4; 135:12; 152:21
**facilitated** [4] - 67:21, 25; 68:18, 25
**fact** [22] - 60:1; 61:6; 72:12; 81:9; 85:18; 103:19; 120:5; 136:23; 139:14; 149:22; 151:21; 155:18; 156:6; 160:15; 163:2; 169:11; 171:20; 175:1; 178:4, 12; 181:15; 184:5
**factor** [1] - 134:16
**fail** [13] - 54:20; 74:17; 76:1; 77:25; 80:3; 103:9; 128:3; 130:23; 158:13
**failed** [46] - 20:5; 28:19, 22; 30:16; 32:10, 12, 18; 34:14; 35:1; 37:7; 45:14; 46:8, 14-15, 24; 47:11; 51:20; 72:20; 73:6, 19; 75:20; 76:3; 77:16; 81:5, 9; 83:5; 88:3; 102:23; 103:12; 109:17; 113:21; 115:13; 116:18; 117:8, 13, 21-22, 24; 135:11; 151:6, 22; 152:17; 154:13; 178:18; 188:16
**failing** [5] - 76:2, 21; 152:5; 154:10, 14
**fails** [2] - 61:4; 105:10
**failure** [80] - 29:7; 30:12-14, 23-24; 34:16, 25; 35:2; 36:21, 23; 37:8; 57:3; 59:1; 64:22; 71:18; 73:17, 20; 74:11, 16, 19, 22; 75:13, 15, 23; 76:14; 77:15, 24; 88:8; 89:3; 90:17, 20; 93:9, 11, 17, 19; 96:1; 99:1; 100:17, 20; 102:20; 103:10; 105:16; 107:6; 108:18; 110:17; 120:17; 125:21; 126:20; 127:1; 130:17, 25; 133:7; 139:25; 149:24; 150:22; 152:8, 17; 154:9; 155:3; 157:2; 168:20; 178:19; 181:10, 12, 17; 182:2, 19; 184:20; 187:1, 3, 10; 188:5, 11

**failures** [1] - 35:3
**fair** [8] - 44:18; 73:14; 109:23; 162:18; 175:23; 177:11; 180:6
**fairly** [4] - 49:11; 77:6; 114:19; 148:16
**fall** [24] - 79:21; 80:15, 24; 81:2, 7; 82:4, 18; 83:12, 19; 84:5, 10, 22; 147:2, 14; 148:13; 149:5, 9; 165:3, 13; 166:24; 167:1, 19
**fallen** [1] - 185:17
**family** [1] - 15:3
**far** [20] - 11:4; 21:15; 57:19; 65:2; 67:4; 85:24; 93:11; 97:5; 100:4; 105:21; 107:15; 110:5, 15; 111:6; 117:23; 134:18; 141:22; 144:18; 150:10; 176:8
**farfetched** [1] - 159:5
**fashion** [9] - 6:10; 22:22; 31:9; 50:8; 90:23; 104:11; 105:22; 116:10
**fatigue** [1] - 169:16
**FEA** [5] - 50:3, 9; 93:8; 96:24; 132:25
**features** [2] - 91:17; 138:4
**fed** [1] - 113:20
**federal** [1] - 23:20
**fee** [1] - 21:3
**feet** [4] - 108:5; 110:20; 119:10; 147:10, 12; 185:24; 186:4
**fell** [2] - 80:15; 109:17
**felt** [1] - 24:4
**few** [3] - 143:6; 174:3, 12
**fiber** [24] - 69:1, 6-7; 85:3, 6, 16, 25; 86:2, 5-6, 11, 21; 128:21; 134:13; 146:16; 169:3, 6, 17-19, 23; 170:8; 173:15
**fiberglass** [1] - 185:9
**field** [3] - 51:17; 168:23
**fifty** [1] - 8:21
**fifty-nine** [1] - 8:21
**Figure** [15] - 33:7, 14; 64:24; 65:1, 12; 130:12; 131:3, 21; 133:4, 23; 136:17; 138:16; 165:10; 173:3
**figure** [9] - 33:11; 55:13; 65:4; 110:22; 132:3; 138:14; 173:6, 12
**file** [20] - 24:21; 39:8, 19, 25; 40:2, 9; 41:5; 42:13, 19; 43:17, 22; 70:13; 76:7; 87:7, 18; 106:21; 112:22; 137:7; 171:19; 172:19
**files** [7] - 23:1; 40:11; 100:3; 164:5; 169:14; 171:16; 174:23

**fill** [2] - 89:18; 159:14
**filled** [1] - 159:17
**filler** [1] - 85:17
**filter** [1] - 15:10
**Filters** [4] - 15:5, 8, 14, 16
**filters** [1] - 15:10
**filtration** [1] - 15:9
**final** [7] - 92:14; 97:5; 98:16; 105:15; 122:17; 181:3, 14
**financially** [1] - 15:2
**findings** [1] - 26:8
**fine** [4] - 83:13; 149:4; 158:10; 166:6
**finer** [1] - 173:21
**finish** [2] - 26:4; 174:2
**finished** [1] - 121:24
**finite** [2] - 122:18
**first** [56] - 5:11; 21:2; 26:11, 25; 27:6; 28:5; 33:9, 13; 36:4; 37:2, 4, 20; 41:5; 42:14, 25; 44:20; 45:3, 8; 46:4, 7, 12; 47:5; 52:7; 56:4; 60:2; 63:2; 70:20; 77:4; 79:15; 87:21; 93:16; 96:5; 104:6; 105:9; 106:10; 107:24; 109:7, 17; 114:1; 116:6; 120:23; 130:9; 137:7; 146:4, 21; 150:4, 21; 155:2, 14; 156:11; 175:24; 178:5; 180:14; 181:8; 186:7
**fit** [1] - 73:25
**fits** [1] - 120:13
**five** [5] - 16:8; 63:10; 80:9; 143:1; 155:9
**five-point** [1] - 80:9
**fixed** [2] - 59:17
**flange** [22] - 32:11, 14; 33:1; 34:14, 18; 60:16; 66:25; 67:8; 71:22; 86:6; 88:16; 96:12; 124:3; 131:9; 135:9, 15, 138:1; 169:23; 170:4
**flaw** [12] - 53:22; 60:18, 20, 22-23; 61:2; 65:10; 69:24; 72:19; 85:4; 170:10
**flaws** [6] - 56:20; 71:14, 20, 25; 72:11; 73:11
**floor** [6] - 82:10; 91:24; 92:7; 94:14; 117:7; 152:15
**Florida** [1] - 9:16
**flow** [7] - 69:1, 18; 71:2, 4; 89:18, 20; 90:19
**flowing** [1] - 91:7
**flying** [1] - 150:17
**FMEAs** [1] - 99:1
**focus** [1] - 12:15
**focused** [1] - 106:5
**fold** [2] - 71:1; 131:19
**folds** [9] - 71:3; 90:7, 12; 101:25; 102:11; 126:23;

128:7; 131:10
**follow** [2] - 157:5; 162:9
**following** [3] - 26:13; 147:5; 166:16
**follows** [3] - 5:9, 12; 42:5
**foot** [5] - 80:13; 81:4, 10, 13; 166:2
**force** [12] - 114:8; 115:18, 23; 182:25; 183:8, 20, 22, 24; 185:9; 186:2; 187:11, 13
**forced** [1] - 187:11
**forces** [1] - 67:2
**Ford** [1] - 16:6
**foresee** [1] - 101:16
**forget** [1] - 164:15
**form** [5] - 66:9; 79:22; 84:11; 103:5; 177:19
**formal** [1] - 11:5
**format** [2] - 23:7; 25:22
**formed** [2] - 66:8; 67:7
**formulate** [6] - 65:22; 73:22; 95:10; 97:20; 100:9, 18; 104:15; 106:10
**formulated** [3] - 38:5; 49:11; 76:8
**formulates** [1] - 99:8
**formulating** [10] - 30:21; 36:20; 47:3; 49:8, 24; 63:25; 64:9; 71:9
**forth** [1] - 174:4
**forward** [3] - 6:25; 39:20; 138:16
**foundation** [1] - 177:21
**four** [8] - 21:12; 80:13; 81:4, 13; 110:20; 147:10; 155:10; 166:2
**four-foot** [4] - 80:13; 81:4, 13; 166:2
**four-hour** [1] - 21:12
**fourteen** [1] - 132:4
**fourth** [1] - 27:7
**fraction** [1] - 134:14
**fractional** [1] - 173:22
**fracture** [18] - 32:16, 20; 34:17; 35:7; 47:9; 77:9; 85:6; 117:22; 151:10, 13, 18; 152:19-21, 23; 153:3, 25
**fractured** [1] - 35:5
**frankly** [2] - 101:3; 114:23
**free** [4] - 107:23; 151:9; 153:14
**friend** [2] - 27:16, 18
**front** [10] - 34:10; 62:24; 65:25; 101:19, 21; 103:15; 121:2; 145:7; 170:17; 172:13
**FTIRs** [1] - 161:11
**FTR** [1] - 140:4

**fuel** [2] - 16:4, 7
**full** [4] - 5:17; 51:2; 156:7; 160:20
**function** [3] - 60:10; 70:23; 100:2
**furnaces** [1] - 12:10

## G

**game** [2] - 53:24; 58:18
**gap** [8] - 59:20; 72:3; 132:13; 159:15-17, 24
**gaps** [1] - 72:3
**gathering** [1] - 146:21
**gear** [1] - 79:21
**gears** [1] - 129:9
**general** [8] - 12:7; 15:11; 19:6; 48:5; 63:24; 64:12; 81:7
**General** [2] - 19:5
**generally** [3] - 64:3, 8
**generate** [2] - 16:12; 175:12
**generated** [6] - 38:2; 42:14; 44:7; 53:14; 174:23; 176:19
**generating** [1] - 37:13
**generation** [1] - 15:24
**generator** [1] - 16:13
**generous** [2] - 79:6; 93:15
**germane** [1] - 139:25
**given** [12] - 6:14; 22:9; 28:14; 29:4; 35:22; 38:25; 70:25; 111:21; 161:10; 165:14; 171:13
**Glaesemann** [2] - 27:19
**gosh** [3] - 141:23; 154:17, 24
**governmental** [1] - 163:23
**grab** [4] - 155:20; 156:4, 21; 157:1
**graduate** [1] - 10:22, 24
**graduated** [1] - 9:6
**graduating** [1] - 11:19
**gravity** [1] - 111:22
**great** [12] - 17:4; 24:2; 36:24; 59:10; 68:9; 81:14; 85:15; 97:6; 109:1; 110:13; 162:18; 164:14
**greater** [3] - 128:6; 129:18; 182:19
**grew** [2] - 9:25; 71:15
**ground** [14] - 108:22; 109:8; 110:3, 9; 111:25; 112:7; 114:1; 116:2; 117:3; 121:12; 185:17, 25; 186:3, 17
**grounding** [1] - 73:3
**group** [1] - 18:14
**grouse** [1] - 174:4
**grown** [1] - 9:24
**GUENZEL** [10] - 44:14; 55:7,

14, 23; 56:2; 57:13; 176:25; 177:3; 178:21; 189:5
**Guenzel** [15] - 5:5; 27:15, 24; 32:4; 35:22; 37:1, 11; 38:12, 16, 23; 43:20, 24; 45:11; 46:6; 177:22
**guess** [8] - 21:5; 26:13; 39:17; 60:19; 79:7; 92:1, 3; 141:3
**guidance** [6] - 12:11; 23:20; 90:1; 101:8
**guillotine** [3] - 80:20; 81:19; 165:5
**guy** [1] - 116:25
**guys** [2] - 117:3; 174:1

## H

**half** [3] - 124:4; 148:18; 155:5
**hammers** [1] - 184:4
**hand** [6] - 25:12; 56:9; 108:2, 8; 156:19, 25
**handbook** [2] - 169:12; 170:18
**handbooks** [2] - 85:14; 169:12
**handed** [4] - 25:13; 47:13; 54:23; 56:11
**handle** [3] - 24:2; 131:17; 175:10
**handled** [3] - 25:24; 40:12; 159:5
**hands** [3] - 156:7, 9; 158:12
**hang** [1] - 152:12
**hanging** [7] - 80:20; 81:18; 97:24; 135:14; 148:17; 183:2
**happy** [3] - 6:9, 16; 17:8
**hard** [9] - 23:6; 60:11; 85:19; 134:14; 137:15; 145:8; 153:7; 154:15; 169:9
**hardly** [1] - 169:17
**hardware** [1] - 178:14
**harness** [1] - 149:14
**harnesses** [1] - 80:9
**hay** [1] - 116:25
**hazard** [3] - 148:11; 149:6; 167:21
**hazards** [2] - 81:10; 148:14
**head** [3] - 31:5; 58:10; 165:15
**headed** [2] - 105:19; 133:11
**hear** [5] - 114:7, 11; 125:10; 152:2; 154:6
**heard** [5] - 44:4; 114:12; 152:4; 162:15; 179:1
**heartbeat** [1] - 154:18
**heat** [1] - 12:10

**heaved** [3] - 150:11; 158:21
**heaves** [1] - 159:2
**heavily** [1] - 68:8
**heavy** [1] - 67:1
**height** [1] - 117:4
**held** [3] - 153:10; 154:13; 166:13
**help** [4] - 40:6; 46:23; 130:21; 133:6
**helpful** [4] - 27:17; 139:20; 145:1, 11
**helps** [1] - 135:12
**hereinafter** [1] - 5:12
**hesitated** [2] - 32:17; 35:6
**hesitation** [3] - 149:25; 152:12; 154:10
**Hexagon** [1] - 19:7
**hexanes** [1] - 140:5
**high** [11] - 9:3, 6; 80:7; 95:5; 114:19; 136:15; 140:5, 7; 165:15
**High** [1] - 9:10
**highlighted** [1] - 94:20
**hinge** [2] - 32:21; 35:9
**hinged** [2] - 117:11; 153:14
**hinging** [2] - 117:25; 118:1
**hire** [1] - 31:20
**hired** [3] - 49:21; 50:11; 160:18
**hiring** [3] - 48:19, 25; 177:4
**history** [1] - 17:25
**hit** [27] - 108:22, 25; 109:4, 6-7, 24; 110:3, 9; 112:2; 114:1; 115:13, 16; 119:2, 5, 7-8, 11, 24; 120:5; 185:1, 4-5, 17, 25
**hitting** [1] - 185:20
**hmm** [13] - 6:21; 61:20; 106:24; 107:7; 115:3; 127:23; 134:6; 138:20; 158:23; 182:21; 184:22, 25; 185:2
**hold** [2] - 131:12; 184:5
**holes** [2] - 132:19; 145:5
**home** [7] - 7:8, 24; 13:9; 15:13; 28:3; 31:12, 16
**hope** [2] - 56:2
**horizontal** [7] - 32:11; 35:3; 110:19; 115:22; 117:4; 138:1; 153:4
**horizontally** [6] - 108:19; 110:16; 112:3, 13; 114:9; 116:12
**horse** [1] - 16:8
**hour** [7] - 21:9-12, 15; 141:19
**hourly** [1] - 141:18
**hours** [3] - 21:25; 22:2; 141:21
**human** [1] - 157:3

hung [3] - 80:11; 155:8, 12
hurry [1] - 68:13
hydraulic [1] - 144:17
HyPactor [1] - 146:13
hypotheses [2] - 64:1, 10

**I**

ice [2] - 76:21; 151:25
idea [14] - 11:15; 21:23; 51:3;
71:4; 98:20; 113:2; 123:21;
124:7; 161:25; 162:1, 16;
165:25; 167:19
identical [4] - 61:25; 62:1;
136:20
identification [8] - 5:2;
33:21; 42:2; 53:6; 56:7;
87:15; 137:4; 179:5
identified [11] - 53:4; 54:24;
56:5; 69:19, 24; 85:3;
118:8; 125:23; 126:24;
127:21; 139:19
identify [11] - 43:21; 87:22;
137:7; 138:13; 139:4, 8,
14-15, 17; 140:17; 179:12
images [1] - 57:21
imagine [1] - 78:19
immediate [1] - 20:7
immediately [1] - 30:11
impact [12] - 109:2; 120:11;
146:13; 153:10; 183:4, 23,
25; 184:4, 11; 186:7
impending [1] - 74:11
importance [1] - 88:22
important [8] - 24:4, 7-8, 24;
39:25; 105:24; 139:19;
142:8
impressions [4] - 49:9, 25;
50:15; 104:16
improper [1] - 69:18
improperly [3] - 85:5;
169:20, 25
impulse [2] - 115:1, 5
in-service [1] - 71:18
inaccurate [3] - 6:15; 55:12,
16
inadequate [1] - 70:22
inappropriate [1] - 95:25
inasmuch [1] - 79:15
inception [1] - 7:21
inch [1] - 124:4
inches [1] - 108:5
incident [23] - 38:8; 50:19;
61:24; 84:9; 104:10, 14;
105:5; 106:12, 18, 25;
109:16; 120:7; 122:5;
123:2, 19; 140:21; 144:24;
148:6; 149:9; 179:18;
180:3, 21; 181:4
include [6] - 8:2; 19:12;

96:10; 110:22; 146:16;
160:21
included [1] - 106:22
incomplete [3] - 6:15; 69:1,
17
inconsistent [2] - 77:17;
78:14
incorporation [1] - 7:16
increased [1] - 182:18
increases [1] - 43:13
incremental [2] - 42:22;
43:13
incrementally [1] - 43:11
independent [3] - 68:16;
71:23; 142:24
independent-minded [1] -
142:24
independently [3] - 26:2, 5;
50:24
indicate [11] - 27:9; 53:20;
55:2; 61:17; 63:8; 77:9;
108:14; 134:7; 137:20;
140:10; 170:24
indicated [12] - 34:23; 35:7;
46:5; 65:11; 69:23; 88:6;
89:10; 108:13; 125:21;
146:21; 160:13
indicates [6] - 56:25; 57:18;
65:5, 13; 79:9; 140:9
indicating [3] - 56:20; 79:9;
156:25
indication [10] - 58:2, 24;
64:25; 66:18; 68:10; 69:6;
101:8; 113:7; 150:16
indications [14] - 32:19;
59:21; 66:4; 67:15; 72:4;
101:9, 25; 102:12, 19;
103:20; 104:19; 126:24;
148:12
indicative [2] - 32:24; 56:22
individual [3] - 92:4; 99:18;
101:9
individuals [1] - 49:5
Industries [1] - 5:25
industry [4] - 66:22; 67:13;
79:4; 85:16
inertia [1] - 187:24
information [22] - 28:14, 25;
29:10; 37:9, 15; 38:7, 13;
39:16; 46:22; 49:6, 8, 24;
50:14; 55:16; 87:25; 89:5,
8; 99:10; 101:10; 102:5;
156:12; 176:16
informed [1] - 24:18
initial [6] - 32:16; 49:11;
50:3; 76:4, 19; 113:8
injuries [3] - 156:9, 19, 25
input [2] - 97:7; 99:3
inquired [2] - 28:7
insert [4] - 66:9; 73:20;

125:3; 131:4
insertion [1] - 18:7
inside [4] - 74:1; 139:6;
151:11; 155:6
insofar [1] - 157:23
inspect [1] - 35:11
inspectable [1] - 150:16
inspecting [1] - 178:17
inspection [11] - 34:15; 74:5;
87:23; 100:15, 21, 23;
101:2; 177:14; 178:13, 16
Inspection [1] - 69:20
inspections [2] - 100:21;
177:10
inspectors [1] - 101:1
instability [1] - 17:4
installed [1] - 131:7
instead [5] - 35:7; 81:13;
115:4; 152:19; 153:3
Institute [1] - 9:16
institution [2] - 10:3; 18:15
institutions [1] - 98:24
instructive [1] - 58:9
intact [2] - 135:9-11, 15
integrated [1] - 92:1
integrity [3] - 123:6; 125:16;
138:11
intend [2] - 60:10; 141:8
intended [1] - 101:15
intending [1] - 113:9
intent [34] - 50:5; 60:6, 8, 13;
70:24; 78:4, 6; 90:6; 91:5,
21; 99:25; 100:1, 24;
126:4, 14; 128:9-11, 16-18,
21, 23, 25; 129:3, 7, 12;
131:14, 16; 132:21;
135:12; 170:7
interaction [1] - 113:19
interdirectional [1] - 85:20
interest [9] - 97:10, 13; 98:8;
99:13; 100:9, 12; 101:13;
175:19
interested [3] - 141:3; 148:4;
171:10
interesting [4] - 108:11;
140:13; 156:18; 164:9
interference [1] - 80:15
interject [1] - 55:7
interlock [2] - 32:13; 128:19
internal [5] - 68:24; 124:24;
130:5; 136:12; 138:6
internally [4] - 130:3; 132:23;
136:8; 138:5
internals [1] - 123:14
international [8] - 19:14;
79:12; 146:11, 15; 163:13;
164:4, 6, 17
internationally [2] - 163:3;
174:15
interpretation [4] - 122:7;

141:1; 175:13
introduced [1] - 5:21
invalidates [3] - 135:16, 20,
25
invest [1] - 25:25
investigating [1] - 179:18
investigation [14] - 5:24;
25:19; 39:21; 42:15; 44:9,
23; 49:7, 12; 61:18; 62:21;
63:12, 21; 140:21; 141:15
invoiced [1] - 141:17
involve [2] - 12:8; 16:1
involved [12] - 16:20; 50:19;
61:23; 106:12, 22; 123:2,
18; 144:24; 149:24; 154:9;
156:14; 180:2
involves [1] - 12:6
involving [1] - 5:24
irregardless [1] - 105:11
irrelevant [1] - 67:24
is.. [1] - 136:23
ISO [10] - 97:23; 98:1; 100:4;
162:5; 164:4, 11, 15;
174:13; 178:15
isotropically [1] - 96:14
issue [6] - 114:12; 116:15;
135:8; 160:23; 170:4
issued [1] - 47:16
issues [8] - 15:1; 84:2; 99:6;
107:9, 12; 163:11, 14
items [16] - 30:3; 49:13, 17;
51:19; 59:21; 66:14; 76:13;
89:22; 105:7, 20; 110:23;
116:21; 132:14; 158:6;
178:18; 181:22

**J**

Jack [1] - 14:14
job [5] - 19:11; 45:16; 84:5;
92:22; 133:1
jobs [1] - 98:25
jog [2] - 44:25; 45:4
JOHN [1] - 5:10
John [1] - 5:19
joint [5] - 61:4; 139:22;
141:4; 177:10, 14
judgment [6] - 77:7, 12;
80:6; 83:3; 111:18; 119:6
jump [6] - 52:13; 54:12; 63:6;
80:10, 18, 22
jumped [2] - 55:15, 19
jumps [1] - 30:24
jury [2] - 82:6, 19
justification [1] - 38:21
justify [1] - 30:25

**K**

Kearney [4] - 9:25; 15:7, 13;

17:6
**Keaschall** [36] - 5:4; 38:9; 74:10; 79:20; 82:3; 97:1; 122:24; 123:19; 125:22; 126:22; 127:12, 22; 128:8, 18; 129:1, 24; 130:2, 7; 131:15; 133:7; 135:11; 136:10, 13; 137:12, 21; 138:9; 143:24; 145:20; 162:12; 165:13; 179:15; 180:9, 24-25; 182:17
**Keaschall's** [2] - 73:18; 84:4
**keep** [3] - 55:16; 81:10, 12
**keeping** [1] - 81:7
**Keester** [1] - 14:14
**kept** [2] - 117:11; 141:16
**Kevin** [1] - 177:8
**key** [2] - 171:21; 178:9
**kicks** [1] - 115:10
**kind** [7] - 9:25; 14:9; 48:4; 66:3; 97:8; 108:24; 187:18
**knowing** [3] - 154:13; 171:11; 186:12
**knowledge** [4] - 22:23; 24:1, 5; 149:18
**known** [10] - 75:8, 13; 89:24; 101:24; 102:1, 11; 150:15; 163:12
**knowns** [2] - 73:5

## L

**lab** [4] - 48:15, 20, 22; 139:22
**laboratory** [5] - 8:4; 19:25; 50:20; 51:3; 141:1
**labs** [1] - 48:16
**lack** [12] - 84:21; 86:15; 97:21; 99:5, 9; 100:7; 131:5; 170:4; 176:16
**lacks** [1] - 113:18
**laid** [3] - 96:8, 19; 120:10
**laminar** [1] - 59:21
**laminate** [26] - 25:25; 57:1; 58:7, 25; 65:3; 68:11, 13; 71:17; 72:15; 74:14, 22; 85:8; 90:13; 105:6, 10; 106:5; 108:11; 116:20; 127:6; 134:8; 139:6; 144:18; 151:6
**lamination** [2] - 90:8; 136:8
**language** [1] - 170:15
**lanyard** [31] - 81:11, 13; 82:25; 83:1; 124:8; 129:5; 147:6, 11, 24; 148:6, 9, 12, 21, 23; 149:1, 4, 7, 15, 19; 165:4, 14, 22; 166:1, 13; 167:8, 20
**large** [8] - 53:21; 58:3; 68:1; 76:19; 119:3; 159:5, 24;

185:22
**larger** [3] - 15:15, 18; 33:14
**Larry** [1] - 5:3
**last** [10] - 13:25; 24:6; 35:9; 42:8, 12, 18; 44:23; 48:6; 52:20; 146:12
**late** [2] - 134:17; 160:15
**lateral** [1] - 105:23
**laterally** [4] - 116:2; 121:12; 182:2; 184:20
**launch** [3] - 18:2, 5
**lawful** [1] - 5:11
**lawyer** [1] - 172:4
**lay** [8] - 31:1, 5; 89:15; 96:7; 104:18; 165:23; 168:11
**layered** [2] - 136:8, 14
**layering** [1] - 57:18
**laying** [1] - 113:16
**layperson's** [1] - 168:12
**layup** [2] - 69:18; 88:20
**lead** [1] - 24:6
**leads** [1] - 130:5
**leasing** [1] - 48:25
**least** [2] - 31:2; 85:17
**leave** [5] - 14:2, 23; 15:21; 17:1
**leaving** [2] - 13:15; 135:15
**led** [2] - 126:20; 188:5
**left** [7] - 13:3; 17:17; 118:25; 135:9-11; 185:12
**legal** [3] - 80:14, 16; 149:2
**length** [11] - 76:24; 80:13; 111:23; 147:6, 24; 148:5, 7, 9; 165:14, 23, 25
**less** [6] - 77:3; 104:23; 117:16; 154:21; 155:9, 11-12; 173:20
**level** [2] - 175:12, 14
**levels** [2] - 18:17, 25
**licensed** [1] - 175:10
**life** [5] - 77:17; 78:8, 18; 86:7; 170:10
**life-critical** [4] - 77:17; 78:8, 18; 170:10
**lift** [5] - 6:1; 147:20; 148:15; 164:4, 19
**light** [1] - 82:17
**likely** [5] - 15:16; 72:6; 95:8; 132:16; 186:7
**limb** [2] - 151:25
**limit** [1] - 35:25
**limits** [1] - 157:4
**Lincoln** [16] - 13:13; 14:8; 17:6, 12, 21, 25; 18:2, 4, 8-9, 21; 19:8; 35:17; 143:12; 144:7
**line** [2] - 15:12; 58:23
**linear** [2] - 74:18
**lineman** [1] - 145:16

**lines** [2] - 56:18, 20
**lint** [3] - 85:24; 86:1; 169:7
**list** [7] - 10:17; 23:7; 38:25; 63:10; 64:14; 168:7
**listed** [1] - 60:2
**listen** [2] - 72:25; 113:5
**listened** [1] - 75:25
**listening** [2] - 114:4; 116:17
**lists** [1] - 169:12
**literally** [1] - 151:22
**literature** [1] - 68:23
**LLC** [3] - 7:11; 20:15; 23:3
**load** [46] - 32:14-16, 19; 34:19; 35:6; 60:23; 61:3; 71:19; 74:1; 75:20; 78:11; 86:5; 91:18, 23; 92:6; 105:7, 11; 114:19, 21, 25; 115:4; 117:1; 127:8; 128:19; 137:25; 138:3; 140:5, 7; 151:20; 159:10; 181:21; 182:18; 184:6; 186:25; 187:6, 9; 188:4, 8, 10
**loaded** [3] - 92:11; 93:12; 94:3
**loading** [2] - 86:2; 117:14
**loads** [2] - 131:17; 132:23
**located** [4] - 11:24; 15:6; 94:12; 120:19
**location** [40] - 7:10; 15:16; 17:13; 18:15; 30:12, 23-24; 32:17, 21, 25; 34:14, 21-22; 35:9; 36:23; 59:1; 60:17; 64:23; 90:21; 91:4, 11; 95:5; 120:11; 125:23; 126:19; 130:23; 135:1; 150:22; 151:19; 152:7, 17; 179:14, 23; 180:20
**locations** [2] - 33:25; 34:1
**lock** [2] - 32:13; 84:1
**lock-off** [1] - 84:1
**locked** [2] - 58:9; 159:6
**locking** [1] - 60:14
**locks** [1] - 60:15
**log** [3] - 42:24; 45:19; 141:16
**logged** [1] - 45:21
**logs** [4] - 43:12; 48:2; 141:24
**long-term** [2] - 169:1, 16
**look** [62] - 7:15; 10:12, 16; 11:8, 14; 12:23; 14:16; 15:24; 21:25; 24:3; 28:9, 17; 29:5; 30:2; 33:10; 40:16; 46:10; 48:2; 51:15, 22; 52:5; 55:8, 19; 57:17; 59:7; 62:3; 63:2; 64:22, 24; 65:12; 73:24; 81:2, 16-17; 83:4; 85:14; 95:1; 98:10, 23, 25; 105:9, 13; 110:21; 117:22; 130:8, 12; 132:12; 136:16; 142:2; 144:15;

152:8; 153:7; 165:9; 167:4; 169:11, 14; 171:20; 173:2; 180:12; 182:8
**look-through** [1] - 24:3
**looked** [21] - 20:5; 37:5; 47:5, 22; 51:24; 57:8; 59:25; 69:11; 70:21; 105:6-8; 108:9, 11; 140:24; 144:25; 145:4; 148:1; 151:18; 172:11; 180:4
**looking** [63] - 10:13; 16:11; 28:15; 29:1, 24; 30:9, 18, 20; 32:2, 9; 33:22; 34:13; 36:10, 13, 17; 46:6; 47:9, 20, 24; 49:14, 16-17; 50:5; 51:15; 52:4, 19; 57:1, 4; 58:4, 17, 22-23; 65:4; 66:11; 69:9; 75:3; 76:6; 87:1, 10; 91:6; 116:19; 129:1; 130:14; 131:24; 137:2, 17, 19; 138:16; 144:16; 145:6; 151:17; 158:15; 161:14; 165:10, 12; 173:23; 176:19; 179:14; 182:5; 184:18
**looks** [3] - 96:12; 131:8; 136:15
**loose** [9] - 23:16; 32:12; 110:12; 117:13, 25; 158:2, 4; 159:7; 184:10
**loosen** [2] - 182:23; 183:21
**loss** [1] - 75:18
**loud** [2] - 153:24; 154:5
**loved** [3] - 103:13, 17
**low** [1] - 95:6
**lowered** [1] - 151:12

## M

**M.E** [1] - 10:25
**ma'am** [1] - 5:14
**machine** [4] - 31:21; 66:25; 72:3; 161:22
**machined** [1] - 67:9
**machining** [11] - 67:7; 68:13, 25; 71:15, 19, 21, 25; 72:2, 8, 10; 124:4
**macro** [1] - 161:11
**mail** [10] - 52:24; 53:9, 13; 55:9; 56:16; 57:21; 98:19; 156:16; 157:10
**mails** [3] - 23:6; 50:1; 52:21
**main** [1] - 92:5
**major** [1] - 13:23
**man** [1] - 14:14
**manage** [2] - 168:25; 175:1
**management** [2] - 98:2; 162:6
**managing** [2] - 100:4; 174:16
**Manassas** [1] - 7:8

manifest [1] - 132:14
manner [5] - 37:15; 46:15; 51:7; 77:16; 100:17
manual [3] - 183:8, 20, 22
manufacture [19] - 65:9, 16; 68:11; 72:5, 8, 10; 86:22; 97:15; 102:12; 126:25; 131:20; 143:14; 161:13, 15; 162:8; 167:18; 170:3; 176:3
manufactured [4] - 5:25; 62:13; 147:19; 170:6
manufacturer [3] - 139:3, 7
manufacturing [23] - 53:22; 58:19; 59:14, 24; 60:18; 61:15; 67:17; 69:23, 25; 89:17; 98:9; 102:3; 140:1, 14-15; 161:17, 20; 170:11, 14; 174:17; 175:22
March [4] - 48:12; 132:1; 136:17, 19
mark [7] - 33:4, 18; 53:1; 55:6; 56:4; 110:25; 185:12
marked [17] - 5:1; 33:20; 34:5; 42:1; 43:16; 53:5, 8; 56:6, 10; 62:25; 87:14, 20; 137:3, 5; 179:4, 8
married [1] - 13:7
massive [1] - 40:25
master's [2] - 11:7; 12:15
mat [7] - 69:2; 85:3, 16, 25; 86:11, 22; 169:20
matching [1] - 137:21
material [35] - 8:11; 22:3; 25:10; 43:7; 52:19; 60:21; 72:11; 85:18, 20; 89:15; 96:7, 11-12, 19; 127:20; 128:6, 23; 129:16; 130:21; 131:8, 11, 19; 134:24; 135:5; 169:12, 25; 170:4, 8, 19; 173:12; 178:17
materials [17] - 12:4, 13; 13:21; 14:10; 42:13; 44:5; 52:22; 75:4; 76:6; 86:2, 14-15; 101:20; 140:3; 169:10; 174:21; 186:13
math [1] - 9:4
mathematical [1] - 122:4
mathematics [1] - 106:16
matter [2] - 43:23; 175:6
me... [1] - 86:25
mean [15] - 43:1; 57:13; 79:24; 126:8; 139:1; 159:1; 161:25; 162:5; 169:19; 177:25; 180:13; 188:20, 22
means [6] - 59:3; 60:9; 65:7; 88:17; 110:22; 153:5
measured [1] - 50:5
mechanical [5] - 8:25; 9:2; 11:2, 7; 12:2

media [1] - 15:10
medical [2] - 47:15; 156:15
meeting [3] - 163:10, 17; 164:21
meets [3] - 79:16; 99:25; 100:1
memory [4] - 45:1, 5; 94:22; 95:3
mentioned [1] - 174:13
meritable [1] - 96:20
met [3] - 35:3; 153:2; 162:4
metal [1] - 75:4
method [7] - 63:25; 64:7, 9; 73:4; 90:24; 92:8; 178:10
methodology [4] - 95:20; 122:13, 20; 139:11
mic [1] - 144:14
microscope [2] - 173:23; 177:23
microscopic [1] - 51:11
mid [3] - 11:17; 118:15
mid-drop [1] - 118:15
middle [3] - 48:6; 88:13
midplane [1] - 59:21
midplanes [1] - 59:22
Midwest [1] - 13:5
might [12] - 21:17; 27:17; 60:24; 99:4; 132:5; 140:11; 150:20; 156:24; 173:22; 182:8, 23; 185:16
MIL-HDBK-17 [1] - 40:23
millimeter [2] - 173:21
millimeters [1] - 173:18
million [1] - 119:22
mind [11] - 31:2; 47:9; 58:1; 95:10; 98:14; 116:11; 135:25; 164:22; 166:7
minded [1] - 142:24
Minden [2] - 9:10
mine [1] - 132:5
minor [2] - 47:23; 106:19
minute [4] - 48:8; 87:5; 89:2; 181:2
minutes [3] - 70:12; 143:1; 163:17
mises [1] - 95:25
Mises [2] - 94:12; 96:3
misinterpreting [1] - 126:18
missile [1] - 18:1
missing [1] - 42:24
mission [3] - 14:1; 78:9, 18
misunderstand [1] - 126:16
misunderstood [1] - 75:1
mixing [2] - 56:24; 187:18
MLRS [1] - 18:3
mobile [2] - 164:4, 19
mode [9] - 29:7; 30:14, 24; 35:7; 36:21; 77:15; 80:3; 85:17; 120:17

model [6] - 96:15, 17; 107:20; 112:23
modeled [3] - 96:13; 107:15; 113:13
modeling [9] - 31:8; 96:14; 104:14, 20; 105:1; 106:15, 23; 113:16; 133:1
modes [2] - 99:1; 103:10
mold [9] - 59:18; 69:19; 88:20; 89:15; 91:6; 131:7; 140:10
molded [1] - 71:2
molding [1] - 69:2
moment [3] - 34:24; 157:13; 181:18
momentum [5] - 115:2, 5; 117:10; 118:10; 181:14
monthly [1] - 142:4
months [3] - 55:20; 146:6; 177:9
morning [8] - 5:22; 6:3, 14, 25; 43:15; 146:12; 179:2
morph [1] - 170:2
morphology [1] - 125:6
most [7] - 18:6, 9, 19; 19:16; 65:1; 139:20; 152:23
motion [7] - 107:23; 117:8; 118:2, 9, 11; 152:16; 187:5
motor [1] - 114:24
motors [2] - 16:7; 18:7
mound [1] - 116:25
mount [1] - 108:16
mounted [1] - 49:20
mounting [1] - 94:17
mouth [2] - 20:21; 27:17
move [19] - 6:25; 50:10; 103:25; 107:16; 112:3, 12; 114:9, 17, 19; 116:1, 12; 118:21; 120:18; 121:4; 140:8; 152:13; 181:25; 182:12; 184:20
moved [8] - 108:19; 110:16; 112:13; 116:13; 180:9, 24-25; 181:6
movement [6] - 106:11; 107:5; 121:12; 182:3, 13; 184:19
moving [8] - 116:13; 151:6, 13, 20; 152:11; 157:20; 180:14; 181:15
MR [71] - 5:16; 33:8, 18; 40:4, 6, 8, 10, 13; 41:8; 42:7; 44:14, 18; 54:18; 55:6, 11, 14, 21, 23, 25; 56:2; 57:13; 72:23; 79:22, 25; 82:14, 21; 84:11; 86:23; 95:12; 103:4, 24; 121:24; 131:23; 132:2; 133:23; 138:13, 15, 17; 142:25; 145:24; 146:3; 153:20; 157:22; 173:24;

174:1, 3, 5-7, 9, 11; 176:24; 177:3, 19; 178:21; 179:1, 3, 7; 189:1, 3
multiples [1] - 58:14
multiply [1] - 159:10
multiplying [1] - 182:25
multitude [1] - 18:6
must [2] - 121:1; 168:21
MX [1] - 18:1

# N

naked [4] - 51:10, 23-24; 65:18
name [5] - 5:17, 20; 14:4; 17:11; 27:19
names [1] - 18:15
narrative [3] - 31:7; 76:14; 116:18
NASA [1] - 16:16
national [3] - 79:12; 163:3
nature [1] - 20:2
NDE [4] - 47:23; 67:3; 131:20; 143:18
near [5] - 59:22; 61:25; 66:8; 73:19; 188:18
nearly [1] - 133:1
Nebraska [5] - 9:5, 10, 13; 15:7; 18:10
necessarily [2] - 80:8; 81:14
necessary [9] - 8:17; 31:24; 37:14; 39:22; 107:16; 112:20; 114:8; 129:4
need [8] - 8:13; 17:23; 31:14; 50:10; 87:9; 100:14; 159:24; 161:1; 162:20; 169:3
need-to-know [1] - 17:23
needed [2] - 22:18; 66:3
needing [1] - 22:14
needs [1] - 71:4
net [1] - 135:14
never [10] - 72:2; 83:25; 114:21; 116:24; 138:8; 140:9; 141:23; 153:16; 164:22; 178:4
new [1] - 40:5
Newhouse [1] - 20:9
newly [1] - 129:5
next [6] - 11:4; 13:16; 37:10; 142:9; 164:11
nice [1] - 122:23
nicely [1] - 113:15
nine [1] - 8:21
noise [3] - 117:15; 152:3; 153:24
none [10] - 66:3, 5-6; 93:7; 98:2; 101:8; 119:19; 142:23
nonresponsive [1] - 103:25

**norm** [1] - 20:9
**Norm's** [1] - 20:10
**normal** [1] - 142:3
**normally** [6] - 84:3; 87:24; 92:10; 159:25; 169:10
**normative** [1] - 146:14
**Nos** [1] - 87:14
**notch** [2] - 152:18
**note** [2] - 70:15; 164:9
**notes** [6] - 23:21; 25:7; 27:8, 10; 171:22
**nothing** [14] - 22:21; 43:17; 44:11; 89:6; 97:5; 99:24; 102:2, 4; 139:6; 145:10; 149:5; 162:2; 180:8
**nothing's** [1] - 22:25
**notice** [3] - 17:5; 24:15; 163:6
**November** [1] - 42:3
**number** [47] - 37:22-24; 63:15; 64:18; 65:22; 66:7, 19-20; 67:12; 68:24; 69:17; 71:14; 73:16; 74:10; 77:13; 80:1; 82:3, 8, 18; 85:1; 86:8; 88:1, 4; 97:13; 98:8; 99:13; 100:10, 12; 101:13; 134:15, 17; 138:14; 143:19; 147:4, 12; 156:2; 164:5; 170:13, 24; 171:8; 176:8, 15
**numbered** [1] - 171:22
**numbering** [1] - 171:22
**numbers** [3] - 77:11; 90:3; 151:3
**numerous** [3] - 18:2; 19:13; 36:22
**nut** [6] - 158:2, 4; 182:24; 183:7, 21
**nuts** [1] - 159:3

**O**

**oath** [3] - 5:14; 42:8; 172:13
**object** [5] - 79:22; 84:11; 103:4; 157:22; 177:19
**objective** [8] - 120:5, 23-24; 121:2; 149:22; 185:21; 186:8
**objectively** [3] - 123:3; 150:8; 186:22
**observations** [3] - 67:18; 177:25; 178:10
**observe** [1] - 61:15
**Observed** [1] - 88:14
**obviously** [5] - 28:18; 96:10; 126:9; 158:12; 173:23
**occupant** [1] - 91:19
**occupation** [1] - 8:24
**occurred** [6] - 38:8; 75:17; 104:10, 17; 105:5, 16

**occurring** [1] - 75:16
**October** [2] - 5:3; 146:7
**offered** [2] - 14:7; 15:22
**office** [2] - 8:2; 179:20
**Office** [1] - 40:25
**officially** [2] - 37:12; 38:11
**oh-no** [1] - 157:13
**oils** [2] - 144:17
**old** [1] - 130:17
**older** [1] - 149:2
**once** [1] - 169:2
**one** [77] - 14:1; 17:10; 18:18; 21:11; 26:12; 27:11; 33:10, 12; 43:21; 47:24; 52:22; 54:24; 57:8; 58:2; 60:1, 5; 61:25; 62:1, 3, 10, 25; 64:17; 67:8; 70:3, 10; 73:6; 75:12; 76:7, 10, 19; 77:4; 79:15, 19; 80:13; 81:10, 12; 87:9; 88:15; 89:10; 93:10, 17-18, 21; 96:22; 101:7; 107:4, 9; 116:25; 118:8; 123:18; 124:15, 21; 130:12; 132:7; 133:18; 135:20; 140:13, 16; 141:11; 143:15, 23; 144:25; 146:12; 153:12; 155:9, 24; 160:6, 9; 164:4, 6; 167:6; 179:24; 180:7; 181:6; 182:9
**one-tenth-of-an-hour** [1] - 21:11
**ones** [11] - 24:4; 65:8; 70:5; 123:10, 12; 124:17; 125:4, 12; 128:20; 135:4; 171:21
**open** [1] - 88:17
**opened** [4] - 67:25; 68:2; 72:4
**opening** [2] - 58:6; 59:20
**opens** [1] - 72:11
**operate** [1] - 158:7
**operated** [1] - 7:9
**operating** [2] - 157:21; 158:5
**operation** [4] - 71:15, 25; 72:2, 8
**operational** [2] - 84:2; 148:17
**operations** [1] - 162:10
**operator** [3] - 154:6; 155:19; 157:7
**opinion** [74] - 28:10; 34:11; 35:14; 36:5, 13, 20; 39:3; 53:25; 60:4, 20, 22; 63:16; 65:22; 66:20; 67:12, 20; 68:15; 69:5, 15, 21; 70:19; 71:9, 11; 73:10, 22-23; 74:24; 75:14; 77:20; 78:15, 17; 79:9; 80:1, 23, 25; 82:1, 3; 83:11, 13-14, 18; 84:21, 23; 85:10, 13; 92:5;

97:20; 98:7; 99:5, 9, 17; 100:7, 19; 101:18; 109:25; 127:21; 130:1; 143:23; 154:8; 167:22, 24-25; 170:1; 174:18; 176:1, 4, 8, 11; 178:2
**opinions** [36] - 29:6, 24; 30:8, 21; 32:3, 8; 34:11; 35:20; 36:25; 37:6; 39:15; 47:4; 49:8, 10, 25; 50:14; 63:20; 64:9, 15, 21; 66:17; 76:9, 23; 84:13; 107:14; 122:14, 21; 125:20; 138:22; 148:7; 161:19; 168:8; 172:12; 176:14, 16; 178:11
**opportunity** [3] - 61:18; 66:12; 144:22
**opposed** [3] - 80:11; 85:20; 161:4
**options** [1] - 20:17
**order** [7] - 28:24; 29:2; 43:2; 47:12; 171:3; 172:17
**organization** [1] - 17:7
**orientation** [4] - 35:6; 113:15; 120:9
**original** [8] - 23:18; 24:3; 30:23; 97:11; 129:15; 132:5; 153:13; 165:9
**originally** [1] - 146:7
**Osborne** [13] - 5:8, 25; 23:24; 40:17; 43:5; 61:14; 69:19; 97:14; 99:14; 101:24; 102:5; 126:1, 24
**OSHA** [16] - 78:15; 80:16; 83:21; 84:9, 14, 16, 22; 148:2, 4, 10, 15; 149:3, 10; 165:25; 166:24
**otherwise** [4] - 25:22; 44:7; 136:4; 174:7
**ought** [1] - 55:18
**outcome** [1] - 142:15
**outlines** [1] - 87:24
**outside** [11] - 13:9; 47:3; 64:25; 88:19; 134:8, 10; 150:10; 175:6; 177:4; 182:6
**overall** [1] - 16:22
**overseeing** [1] - 19:22
**oversight** [1] - 175:3
**own** [8] - 50:25; 95:10; 105:20; 116:11; 134:10; 169:14; 188:12, 15
**owned** [2] - 1:15; 16:6
**owner** [1] - 14:13
**owners** [1] - 15:1

**P**

**P.E** [1] - 5:10

**p.m** [1] - 189:8
**package** [1] - 172:16
**page** [31] - 7:4; 37:23; 40:6, 10, 14; 54:24; 62:25; 63:4, 6, 8, 15, 19; 64:14; 65:23; 97:10; 104:7; 132:4, 9; 137:1; 138:13, 15; 165:10; 168:3, 6; 170:22; 173:4, 7; 175:16, 18; 177:17
**panicked** [2] - 156:21; 157:1
**paper** [4] - 7:16; 23:13, 21
**papers** [1] - 169:14
**paragraph** [3] - 37:21, 24; 63:18
**parallel** [1] - 151:11
**parameter** [1] - 160:4
**parameters** [1] - 12:9
**pardon** [1] - 11:1
**part** [38] - 5:25; 23:22; 25:19; 28:19; 31:2; 32:10; 45:14; 48:22; 50:21; 61:17; 65:25; 67:7; 68:20; 70:2; 71:3; 72:9; 75:5; 80:19; 89:19, 22; 90:4; 124:4; 132:13; 133:2; 135:20, 23; 138:4; 150:18; 151:7; 152:14, 24; 159:9; 160:2; 162:8
**particular** [7] - 48:14; 76:2; 77:24; 88:1, 21; 101:6
**particularly** [1] - 122:22
**parties** [2] - 24:13; 42:4
**parts** [20] - 12:12; 17:18; 20:6; 67:10; 68:22; 71:2; 75:25; 76:1; 103:9; 104:19, 22, 25; 119:4, 13; 133:12; 145:4, 9; 146:14; 160:2; 185:22
**party** [3] - 101:1; 160:22; 161:8
**pass** [4] - 60:23; 77:13; 129:4
**passed** [1] - 101:2
**past** [1] - 111:12
**patents** [2] - 40:21; 47:20
**path** [1] - 133:11
**pathways** [1] - 78:11
**pause** [2] - 81:14; 180:10
**PDF** [1] - 23:6
**PDFs** [1] - 23:10
**peer** [1] - 96:21
**pendulum** [3] - 118:12; 181:24
**people** [6] - 18:9; 51:7; 98:23; 163:7; 180:14; 184:3
**per** [2] - 21:10, 15
**perceived** [2] - 22:14, 17
**percent** [3] - 13:25; 21:13; 134:13
**perceptually** [1] - 75:10

**perform** [4] - 50:12; 129:4; 143:20; 175:7
**performance** [4] - 13:25; 18:18; 123:7; 125:15
**performed** [8] - 47:23; 49:22; 64:20; 66:2, 16; 69:4; 77:19; 161:21
**performing** [2] - 84:5; 182:17
**period** [3] - 17:24; 68:9; 96:1
**periodic** [1] - 100:15
**permanent** [1] - 75:6
**person** [1] - 73:6
**personally** [1] - 150:6
**personnel** [1] - 69:25
**perspective** [3] - 85:22; 91:17; 182:14
**Petroleum** [2] - 11:23; 12:25
**Petroleum's** [1] - 13:15
**phase** [1] - 140:12
**Phillips** [3] - 11:23; 12:24; 13:15
**photograph** [10] - 36:18; 56:13; 57:25; 58:11, 17; 59:8, 25; 87:9; 133:20; 179:10
**photographer** [1] - 177:6
**photographic** [4] - 30:10; 37:2; 40:23; 180:10
**photographs** [51] - 28:9, 11; 29:2, 5, 8, 16, 19-20, 25; 30:5, 9, 18, 21, 25; 31:9; 32:2, 9, 23; 33:24; 34:13; 35:21; 36:2, 8, 19; 37:5; 45:24; 46:22; 49:16; 51:9, 12-13, 15; 52:5, 11, 23; 53:18, 22; 54:2, 5, 17; 55:3; 65:21; 66:11; 69:9, 11; 87:6; 176:5, 11; 177:23
**photos** [1] - 47:6
**phrase** [1] - 77:22
**physical** [8] - 67:21; 68:18; 73:24; 86:4; 104:25; 113:14; 127:3, 5
**physically** [2] - 35:12; 165:24
**physics** [3] - 115:24; 120:16; 121:10
**pick** [6] - 39:25; 40:1, 4; 58:15; 166:14; 170:19
**picked** [2] - 150:4, 19
**picking** [1] - 128:12
**pickup** [1] - 119:11
**picture** [9] - 33:14; 56:22; 57:2; 113:20; 137:9; 165:8; 182:5
**pictures** [15] - 23:15; 45:13; 56:19; 57:17; 64:23; 65:11; 81:17; 113:16; 130:8; 149:21; 159:23; 179:22
**piece** [5] - 31:6; 60:13;

145:6; 167:3
**pieces** [4] - 66:11; 73:24; 145:9
**pilot** [1] - 9:20
**pimpling** [1] - 131:6
**pinned** [1] - 29:2
**place** [9] - 45:18; 81:6; 105:15, 18; 118:22; 121:4; 124:9; 145:2; 149:9
**placed** [1] - 101:20
**places** [1] - 80:8
**Plaintiff** [1] - 5:4
**plaintiffs** [1] - 141:14
**plane** [7] - 118:4; 130:17; 151:10, 13; 152:8; 153:4
**planes** [4] - 35:5; 47:9; 130:18; 153:4
**planning** [1] - 144:8
**plans** [1] - 99:2
**plant** [1] - 61:14
**plastic** [2] - 168:18
**platform** [21] - 91:22; 92:10, 18; 93:12; 94:3, 14; 126:25; 127:12; 129:4, 18; 134:25; 149:24; 155:4, 15; 159:22; 160:6; 162:12; 163:19, 25; 170:6
**Platform** [1] - 69:20
**platforms** [3] - 127:16; 145:19; 160:9, 11; 164:5
**pleased** [1] - 113:20
**plies** [1] - 71:16
**plot** [2] - 93:21; 94:6
**plots** [1] - 110:22
**plural** [1] - 34:11
**plus** [1] - 21:13
**ply** [1] - 85:21
**point** [50] - 21:21; 32:18; 34:16; 35:10; 37:3, 9, 12; 45:23; 47:19; 63:9; 65:14; 67:3, 24; 68:17; 71:20, 24; 75:19; 77:12, 15; 80:9; 83:15; 88:11; 110:6, 13; 111:15, 17; 112:5, 14; 117:6, 12, 24; 118:10; 130:23; 142:6; 147:13, 17; 149:17; 150:25; 151:1; 152:23; 153:2, 11, 16, 19, 25; 160:12; 165:22; 171:9; 175:13; 187:10
**pointing** [4] - 124:15; 133:19; 136:2; 138:19
**points** [5] - 64:15; 84:1; 153:12; 160:24; 176:19
**pole** [4] - 159:4; 165:11; 180:15, 24
**pop** [1] - 150:23
**portable** [1] - 16:9
**portfolio** [2] - 29:20; 46:1
**portion** [6] - 16:21; 73:1;

82:23; 95:13; 104:2
**position** [9] - 14:7; 15:2, 22, 24; 16:1; 17:4; 35:4; 181:4; 182:1
**positioning** [3] - 108:12; 150:9; 180:1
**possession** [1] - 107:2
**possibilities** [2] - 119:22; 155:7
**possibility** [2] - 119:15, 20
**possible** [3] - 67:6; 84:19; 90:20
**potential** [3] - 60:2; 106:13; 137:14
**potentially** [3] - 157:7, 19; 158:8
**pounds** [1] - 186:5
**pouring** [1] - 169:8
**Power** [4] - 5:6; 40:18, 20; 143:8
**power** [3] - 15:24; 16:9, 12
**Powermate** [3] - 15:23; 17:2, 5
**practice** [2] - 134:9, 12
**practiced** [1] - 101:4
**pre** [4] - 66:8; 127:12; 136:14; 146:14
**pre-existing** [1] - 127:12
**pre-formed** [1] - 66:8
**pre-normative** [1] - 146:14
**precisely** [1] - 38:19
**predicate** [1] - 81:5
**predicated** [1] - 81:6
**prefab** [1] - 125:5
**prefabbed** [1] - 125:3
**preformed** [3] - 60:13; 131:7; 136:14
**preliminary** [1] - 35:20
**premade** [1] - 131:4
**premises** [1] - 8:2
**prepare** [1] - 20:16
**prepared** [1] - 62:20
**preparing** [1] - 172:25
**present** [5] - 13:10; 20:8; 21:24; 42:4; 123:17
**press** [1] - 183:9
**pressed** [2] - 85:23; 86:1
**pressure** [5] - 18:20, 22; 19:14, 17
**pretty** [3] - 60:11; 150:23; 151:1
**previous** [1] - 6:15
**previously** [3] - 13:1; 176:7, 21
**primarily** [1] - 170:16
**primary** [13] - 18:7; 30:24; 32:10; 77:14; 78:3; 85:2; 109:2; 169:11, 13, 21; 170:9; 178:16

**principal** [2] - 19:9; 96:5
**principally** [1] - 36:20
**principles** [3] - 120:16; 121:10; 186:12, 18
**printed** [1] - 171:21
**problem** [7] - 41:7; 67:10; 101:6; 116:16; 125:11; 150:19; 153:15
**problems** [2] - 139:9; 148:7
**procedure** [1] - 142:3
**proceed** [2] - 18:16; 70:23
**proceeded** [1] - 105:12
**process** [19] - 61:15; 67:17; 71:19, 21; 89:17; 99:1; 140:2, 10, 15; 155:6; 159:18, 20; 160:1, 3; 161:17; 174:17, 24
**processes** [3] - 155:23; 175:23
**procured** [1] - 19:5
**produce** [2] - 100:3; 174:21
**produced** [5] - 22:9; 29:9; 43:4; 98:3; 182:18
**producing** [1] - 181:20
**product** [11] - 15:11; 16:9; 17:19; 23:9; 24:10; 79:14; 80:2; 99:21, 23; 102:4; 175:1
**products** [2] - 79:11; 163:15
**Products** [1] - 14:12
**profession** [1] - 8:24
**professional** [7] - 9:20; 12:19; 83:10; 163:23; 167:23, 25; 177:6
**professionalism** [1] - 66:23
**professors** [1] - 18:14
**proffer** [1] - 28:18
**program** [1] - 18:5
**programs** [2] - 18:6, 16
**progress** [1] - 61:2
**progresses** [1] - 104:20
**progressive** [1] - 75:19
**progressively** [1] - 61:1
**project** [5] - 16:18, 23; 19:16; 38:6; 141:21
**projects** [4] - 12:3; 19:10, 16, 20
**proof** [1] - 60:23
**propagated** [7] - 32:16, 20; 34:17; 37:8; 152:6
**propagating** [1] - 34:18; 35:8
**propagation** [2] - 30:14; 85:4
**proper** [3] - 38:11; 133:1; 177:20
**properly** [1] - 95:8
**properties** [2] - 96:7, 19
**property** [1] - 180:2
**proposition** [2] - 134:24; 182:11

**protection** [21] - 79:21; 80:24; 81:2, 7; 82:4, 19; 83:12, 19; 84:5, 10, 22; 147:2, 15; 149:9; 165:3, 13; 166:24; 167:1, 19
**protective** [1] - 43:2
**prototype** [1] - 16:15
**prove** [1] - 64:11
**proved** [1] - 58:4
**provide** [6] - 25:10; 59:5; 85:6; 97:6; 169:15; 182:13
**provided** [38] - 12:10; 23:17; 29:10, 16, 19; 37:20; 38:3, 7, 10, 17, 24; 43:14, 20; 44:7; 45:24; 46:2, 21-22; 47:2; 49:6; 50:13; 51:8; 52:20; 60:16; 99:3, 10; 100:8, 16; 101:9; 122:9; 127:15; 141:1; 170:25; 171:6; 172:20; 176:17; 178:7
**provides** [2] - 127:4; 131:11
**providing** [3] - 13:23; 159:19; 182:3
**proximity** [1] - 165:11
**psi** [1] - 19:17
**Public** [4] - 5:6; 13:14; 40:18, 20
**publication** [1] - 164:12
**publications** [1] - 20:23
**published** [6] - 11:14; 23:11; 33:13; 37:20; 163:20
**pull** [7] - 33:3; 59:19; 86:5; 150:13; 159:8; 163:9; 184:10
**pulled** [4] - 34:19, 23; 137:6; 163:2
**pulling** [1] - 130:21
**PUN** [2] - 147:23; 167:11
**purchasing** [1] - 12:12
**pure** [1] - 120:25
**purports** [2] - 87:22; 179:13
**purpose** [1] - 7:1
**push** [1] - 150:13
**pushed** [3] - 75:12; 96:17; 166:12
**put** [26] - 20:22; 60:9; 77:11; 78:20; 81:2, 23; 82:9; 85:22; 90:20; 94:6; 101:19; 103:18; 104:22; 113:23; 116:19; 118:14; 139:5, 7, 24; 141:21; 153:8; 159:23; 163:1; 166:4; 170:19; 185:9
**putting** [3] - 76:2; 151:3; 158:17

## Q

**qual'd** [2] - 123:21

**qualification** [2] - 123:22
**qualified** [1] - 9:2
**quality** [3] - 89:19; 127:6; 136:15
**qualms** [1] - 120:9
**quantify** [1] - 155:8
**quantitize** [1] - 154:16
**quantitized** [1] - 115:1
**quantity** [1] - 86:25
**quarter** [4] - 27:6; 173:20
**quarterly** [1] - 142:4
**quasi** [1] - 80:14
**questioning** [3] - 115:23; 146:20; 162:16
**questions** [29] - 5:22; 26:9; 63:10, 16; 64:4; 88:25; 89:1; 90:4; 97:10; 143:5; 145:25; 173:25; 174:13; 176:15; 177:1, 17; 178:3, 8, 21-22, 24; 181:1, 9; 184:21; 189:2
**quite** [9] - 51:18; 52:3; 67:5; 101:3; 114:2, 23; 117:4; 164:6
**quote** [1] - 178:16

## R

**R&D** [1] - 20:11
**ra** [1] - 131:3
**Ra** [1] - 131:15
**races** [1] - 152:23
**rail** [5] - 108:22; 111:3; 114:10; 116:14; 118:23
**railing** [8] - 119:12; 120:20; 121:5; 184:23; 185:6, 10, 18; 186:3
**Railsback** [7] - 107:5; 108:12, 17; 114:15; 116:16; 117:11; 153:17
**Railsback's** [7] - 106:20; 112:22; 113:11; 114:5; 115:20; 120:7; 182:5
**raised** [1] - 134:15
**Rakor** [3] - 125:2; 136:6
**Rakow** [26] - 93:23, 25; 94:6; 95:24; 96:14; 97:6; 116:16; 122:10; 123:17; 124:16; 125:2; 126:1; 127:17; 129:17; 131:2, 8; 133:5; 134:5, 20; 135:4, 16; 136:7; 137:13, 19; 139:11
**Rakow's** [3] - 97:4; 137:19; 138:22
**random** [8] - 85:3, 16, 25; 86:11, 21; 169:19; 170:8
**range** [2] - 16:9; 155:7
**rapidly** [2] - 49:11; 77:6
**ratchet** [2] - 183:16, 21
**rate** [2] - 112:3; 157:2

**rather** [3] - 157:25; 166:15; 168:15
**ratio** [1] - 159:16
**rationale** [2] - 101:24; 148:8
**ray** [8] - 47:22; 54:3; 58:4; 103:19; 133:21; 134:1; 137:10, 12
**raying** [2] - 144:1, 12
**rays** [16] - 25:24; 47:24; 54:4, 6; 66:24; 67:3; 122:8; 123:3, 13; 125:6; 127:6; 137:16, 19; 143:20; 175:7; 177:5
**re** [2] - 41:6; 180:12
**re-adjourn** [1] - 41:6
**reach** [3] - 18:17, 25; 148:20
**reached** [5] - 65:3; 71:18; 75:19; 155:19; 156:3
**reaches** [1] - 60:14
**reaching** [3] - 18:24; 59:2; 122:21
**reacting** [1] - 57:5
**reaction** [1] - 183:12
**read** [12] - 33:6; 72:23; 78:16; 82:14, 21; 84:17; 95:12; 103:11, 24; 104:1; 164:25; 189:6
**reading** [2] - 63:14; 104:9
**ready** [1] - 42:10
**real** [1] - 117:2
**realized** [3] - 50:7; 96:25; 133:12
**really** [18] - 14:3; 50:9; 60:19; 62:11; 77:11; 78:7; 79:19; 80:25; 85:19; 100:1; 103:1; 114:22; 124:15; 145:3, 8; 161:4; 169:14
**realm** [1] - 119:4
**reason** [13] - 6:5; 11:13; 42:20; 51:4; 79:19; 112:19; 119:4; 132:16; 135:19; 142:10; 149:13; 158:6; 160:5
**reasonable** [24] - 30:15; 97:14; 99:14; 109:10, 19; 111:11, 13; 113:25; 114:3; 119:2; 157:12, 17; 176:2, 9; 177:20; 180:12; 186:14, 17, 19-20, 23; 188:8
**reasonably** [3] - 101:16; 113:20; 157:4
**reasons** [1] - 96:22
**rebuttal** [1] - 122:12
**rec** [1] - 50:2
**receive** [1] - 24:15
**received** [4] - 11:6; 162:3, 7
**receiving** [2] - 98:18; 162:2
**recent** [1] - 146:6
**recently** [1] - 15:14
**recess** [2] - 87:12; 143:2

**reciprocal** [1] - 134:16
**recognize** [1] - 157:3
**recognized** [2] - 35:4; 174:15
**recollection** [3] - 11:11, 13; 171:5
**recommenced** [1] - 42:4
**recommendation** [2] - 27:16; 50:3
**recommending** [1] - 80:12
**reconstruct** [4] - 104:10, 13; 105:4; 150:6
**reconstruction** [9] - 106:17, 25; 109:15; 113:12; 115:20; 120:7, 21; 121:14; 122:5
**record** [24] - 5:18; 7:5; 39:24; 44:15; 69:23; 70:1, 18, 21; 71:8, 12-13; 73:1; 82:23; 88:2, 6, 12, 22; 89:3; 90:4; 95:13; 98:19; 102:3; 104:2
**recorded** [3] - 25:21; 26:7, 23
**records** [9] - 22:8, 12; 41:3; 70:4; 100:7; 106:22; 163:10; 171:2
**recovered** [1] - 179:16
**recovery** [1] - 180:9
**recreate** [1] - 104:9
**recreating** [1] - 129:1
**recurring** [1] - 89:19
**REDIRECT** [1] - 179:6
**reduced** [1] - 72:14
**reduces** [1] - 60:17
**reducing** [2] - 61:3; 71:17
**reduction** [2] - 72:18; 73:10
**redundancies** [1] - 80:1
**redundant** [5] - 78:5, 11, 20
**refer** [2] - 63:24; 64:8
**reference** [3] - 86:14; 148:1; 175:16
**referenced** [2] - 56:13
**references** [4] - 23:7; 40:22; 86:13; 175:22
**referred** [2] - 91:3; 143:7
**referring** [8] - 40:13; 55:3; 57:12, 24; 58:12; 91:10; 168:2; 173:3
**refinements** [1] - 150:5
**reflected** [3] - 53:14; 88:11; 180:3
**reflection** [1] - 80:6
**refused** [1] - 164:3
**regard** [23] - 21:20; 38:6; 43:23; 44:21; 49:6; 63:20; 79:1, 11; 88:8; 95:17; 104:16; 106:11; 107:8; 123:18; 140:20; 146:8; 147:2; 148:5; 162:11; 163:16; 170:21; 172:12; 178:9

regarding [2] - 73:10; 122:5
regardless [2] - 21:14; 162:24
regards [2] - 86:12; 162:5
registrar [2] - 163:2
regular [3] - 52:14; 183:21; 184:1
regulation [1] - 79:11
regulations [2] - 78:25; 148:2
regulatory [1] - 146:15
reinforce [1] - 128:21
reinforced [2] - 85:21; 152:25
reinforcement [5] - 69:2, 18; 85:2, 6; 168:17
reinforcements [1] - 169:4
relate [3] - 22:11; 89:3; 124:8
related [2] - 22:19; 176:12
relates [1] - 22:22
relating [3] - 134:15; 174:22; 176:6
relation [2] - 105:14; 113:24
relationship [1] - 18:13
relative [4] - 105:19; 120:12; 151:2
relatively [1] - 96:13
released [6] - 21:4; 23:23; 25:3; 29:1; 35:1
reliability [1] - 18:25
relied [3] - 36:19; 69:4; 71:8
relief [3] - 67:9; 71:22
rely [2] - 6:24; 168:21
relying [1] - 70:19
remained [2] - 149:20
remaining [2] - 152:24; 165:20
remember [10] - 26:25; 29:18; 42:17; 44:24; 45:7, 17; 67:7; 110:6; 181:12; 184:21
removal [6] - 128:5; 129:16; 132:16; 134:24; 135:5; 140:12
remove [2] - 72:12; 128:22
removed [12] - 22:25; 43:17; 44:11; 57:2; 72:7; 101:7; 127:20; 132:17; 137:10; 144:7; 160:7
removes [1] - 72:11
removing [1] - 159:4
rent [1] - 8:13
renting [1] - 48:25
repair [1] - 12:11
repeated [4] - 73:2; 82:24; 95:14; 104:3
Report [1] - 69:20
report [52] - 33:7, 13; 37:21, 24; 40:14; 48:11; 52:8; 54:15, 17; 60:2; 63:3, 14;

65:23; 76:5, 15; 87:23; 91:3, 11; 94:6; 97:9, 11; 104:6; 105:17; 106:13; 107:8; 122:10, 12; 126:16; 130:9; 131:21, 24; 132:6; 134:4; 136:18; 139:13; 143:18; 150:23; 165:9; 168:2; 170:21; 171:4, 10; 172:25; 173:2, 5; 175:15; 177:8, 18
reporter [5] - 53:1, 8; 172:10, 14; 179:9
reports [8] - 23:10, 14; 54:25; 62:20; 122:3, 6; 136:19; 143:17
request [1] - 174:21
requested [6] - 37:11; 73:1; 82:23; 95:13; 104:2; 160:17
require [1] - 83:19; 84:1, 4
required [5] - 8:12; 24:19; 129:5; 159:8; 174:23
requirements [2] - 37:14; 165:25
requires [3] - 83:21; 90:5; 98:1
reschedule [1] - 39:18
research [2] - 47:19; 146:14
resin [26] - 59:17, 22; 65:13; 69:1, 17; 71:2, 4; 89:16, 18, 20; 90:2; 91:7; 140:6; 159:11, 21; 168:22-25; 169:1, 8
resin-dominated [2] - 168:23
resins [1] - 140:7
resist [3] - 34:20; 85:4; 187:15
resistance [1] - 169:16
resistant [1] - 77:15
resisted [1] - 34:21
resolve [1] - 132:23
resolved [1] - 130:20
resolving [2] - 47:8; 73:18
respond [1] - 157:3
responded [2] - 175:18
response [6] - 5:14; 97:17; 99:15; 100:9, 15; 175:21
responses [1] - 97:10
responsibility [1] - 16:23
responsible [2] - 17:18; 19:13; 99:18
responsive [1] - 136:6
rest [6] - 30:14; 47:13; 105:15; 110:6; 140:23; 180:21
resting [1] - 181:3
result [6] - 10:5; 60:3, 22; 72:19; 96:20; 187:2
resulted [1] - 69:18
results [14] - 25:22; 26:8, 23;

93:20; 134:20; 135:25; 136:3; 137:24; 139:23; 146:13; 161:10; 177:16; 178:1
resume [1] - 14:6
retained [5] - 44:21; 46:4, 17; 49:21; 50:23
retired [1] - 27:23
retort [2] - 76:5, 8
retorts [1] - 76:17
return [1] - 157:10
returned [1] - 23:14
reverses [3] - 118:5; 152:21
review [15] - 25:25; 31:5; 45:12; 47:21; 49:14; 51:9; 52:23; 53:18; 65:20; 70:24; 89:24; 96:21; 145:19; 163:17; 171:6
reviewed [7] - 23:7, 22; 148:10; 170:24; 171:11; 172:19, 24
reviewing [1] - 146:12
rib [19] - 54:20; 60:14; 66:9; 73:19; 88:15; 89:12; 90:15, 21, 25; 91:13; 94:15, 21; 96:11; 125:3; 131:10; 136:12; 138:1
ribs [2] - 82:10; 91:8
riding [1] - 167:6
rights [2] - 16:4, 7
rim [1] - 135:14
ring [2] - 149:15, 19
rip [2] - 151:12; 168:17
ripped [1] - 154:14
ripstop [3] - 168:13, 16
risk [4] - 98:2; 162:6; 174:16; 175:1
Robert [1] - 5:6
rocket [1] - 114:23
rod [2] - 75:5, 7
roll [1] - 168:20
rolled [1] - 151:14
room [2] - 110:2
rotate [1] - 31:4
rotated [1] - 151:7
rotation [1] - 32:18
rotational [3] - 181:13; 187:24
rough [1] - 141:20
roughing [1] - 109:4
roundabout [1] - 172:23
RTM [2] - 140:6
rule [1] - 166:20
ruler [1] - 159:23
rules [1] - 166:16
run [3] - 7:23; 163:13; 168:19
running [3] - 34:16; 152:20; 169:2
RV [1] - 15:23

## S

safe [3] - 80:2; 100:24; 178:13
safety [3] - 19:15; 149:14; 166:20
SAIA [1] - 163:5
sat [1] - 159:6
satellite [1] - 18:6
saved [1] - 86:7
saw [12] - 17:4, 6; 59:25; 71:1; 83:25; 101:4; 102:1; 128:7; 129:21; 140:3; 144:5; 151:18
scale [3] - 173:11, 15, 17
scales [2] - 151:3, 5
scenario [3] - 121:8; 185:16, 19
schedule [1] - 21:3
schemes [1] - 15:25
school [3] - 9:3, 7, 18
School [1] - 9:10
Schools [1] - 13:14
science [5] - 9:4; 11:2, 7; 103:2, 8
scientific [9] - 8:6; 26:18; 63:25; 64:7; 73:4; 92:8; 178:10
scientists [1] - 178:11
Scope [1] - 63:9
scope [3] - 19:23; 22:14, 17; 37:13, 17, 21; 38:2, 5; 46:5; 108:4
seal [2] - 42:23; 43:1
sealed [1] - 65:8
second [18] - 18:1; 50:6; 77:4; 96:23; 117:15; 131:21; 145:21; 154:2, 21; 155:5, 12; 157:19; 158:8; 185:15
seconds [2] - 155:9, 13
secrecy [1] - 23:18
secret [1] - 17:24
secretariat [3] - 163:4, 6; 164:2
section [3] - 66:10; 104:7; 176:18
secure [2] - 8:14; 20:20
secured [2] - 87:17; 106:22
see [44] - 29:5; 39:19; 43:10; 51:17; 53:3; 54:18; 57:16; 58:5, 19-20; 59:1, 7; 61:11, 18; 62:14; 64:11, 23, 25; 65:12; 73:12; 89:23; 99:7; 103:9; 104:22; 109:3; 117:21; 128:3; 130:14; 131:3; 132:13; 133:13; 136:16; 144:18; 145:1; 157:9; 163:16; 165:8; 172:1; 179:2; 184:23

**seeing** [4] - 56:23; 99:3; 117:20; 154:13
**seem** [1] - 95:19
**self** [1] - 80:6
**self-reflection** [1] - 80:6
**semi** [1] - 142:4
**semi-annually** [1] - 142:4
**senior** [1] - 17:17
**sense** [3] - 6:6; 21:19; 148:17
**separate** [3] - 63:10; 64:14; 164:16
**separated** [5] - 32:14, 20, 22; 151:23; 186:15
**separating** [1] - 167:3
**separation** [7] - 35:10; 145:2; 153:19; 181:15; 182:12; 187:23; 188:5
**September** [12] - 37:25; 52:8; 63:3; 165:9; 168:3, 5; 170:22; 171:5, 14; 175:15; 177:9, 18
**sequence** [2] - 118:20; 181:10
**serial** [3] - 88:1, 4; 143:19
**series** [1] - 52:21
**serious** [1] - 161:24
**service** [16] - 18:24; 19:1; 57:5; 61:1; 62:2, 4; 71:15, 18; 101:7; 105:8; 132:16; 143:8; 144:7; 145:22; 160:7
**Services** [1] - 7:11
**services** [7] - 7:12; 8:16; 13:23; 31:22; 37:12; 50:13; 177:5
**serving** [1] - 146:23
**set** [5] - 45:12; 60:14; 63:19; 75:6; 89:1
**setting** [1] - 64:15
**setup** [1] - 175:12
**seven** [2] - 16:8; 186:3
**several** [6] - 14:4; 33:11; 100:25; 123:8; 164:2; 174:14
**share** [2] - 51:1; 139:23
**shared** [3] - 50:20; 51:1, 3
**sharp** [5] - 80:19; 81:19; 165:16; 166:5
**shear** [8] - 32:10, 12; 34:15; 35:8; 60:17; 61:3; 73:19; 118:4
**sheared** [1] - 151:9
**sheet** [2] - 43:12; 88:13
**sheriff** [1] - 23:24
**Sheriff** [1] - 40:19
**sheriff's** [1] - 179:20
**Sheriff's** [1] - 40:25
**Sherman** [2] - 40:19, 24
**shift** [3] - 129:9; 150:7;

151:15
**shifted** [1] - 35:5
**shipped** [1] - 18:4
**shipping** [1] - 98:17
**SHIVELY** [7] - 33:8; 131:23; 132:2; 146:3; 173:24; 174:9; 189:3
**Shively** [7] - 5:6; 143:6; 145:25; 153:23; 157:24; 179:3; 181:9
**Shively's** [1] - 186:25
**shoot** [1] - 137:16
**shop** [2] - 69:22
**short** [17] - 80:12; 85:3, 16, 25; 86:11, 21; 87:16; 148:16, 20; 149:1; 166:4; 167:6; 168:20; 169:6, 17, 19; 170:8
**short...** [1] - 156:2
**shorter** [3] - 154:25; 157:18; 167:8
**shortly** [2] - 106:21; 179:15
**shot** [1] - 87:24
**shots** [1] - 175:12
**shoulder** [1] - 165:15
**show** [13] - 33:24; 34:3; 43:19; 53:2, 7; 94:11; 95:4, 16; 97:5; 132:25; 156:9; 179:8, 13
**showed** [6] - 49:13; 66:24; 93:11; 94:2, 9, 12
**showing** [2] - 128:17; 171:24
**shown** [2] - 123:12; 133:4; 150:8
**shows** [4] - 56:18; 58:14; 134:1; 183:23
**shrinkage** [5] - 59:17, 23; 159:11, 18, 21
**shrinks** [1] - 59:19
**shuttle** [1] - 18:23
**shuttles** [1] - 18:23
**side** [22] - 36:23; 57:2, 19; 58:22; 59:3; 66:9; 88:15; 89:12; 90:15, 17, 19, 25; 91:13; 94:16, 21; 114:18; 115:18; 131:12; 152:8, 22
**sides** [4] - 59:18; 118:5; 152:22
**sideways** [3] - 118:15, 19; 166:11
**sign** [2] - 171:3; 189:7
**signed** [3] - 47:12; 99:20; 172:16
**significance** [9] - 89:11, 14; 90:12, 24; 102:16, 19, 22; 127:11; 133:15
**significant** [8] - 60:18; 88:7; 89:2; 98:1; 101:5; 123:24; 159:9; 174:23
**signing** [1] - 38:11

**signs** [1] - 51:16
**similar** [5] - 78:9; 79:3; 144:25; 152:3
**simple** [5] - 72:12; 74:20; 81:8; 103:19; 107:23
**simply** [6] - 29:24; 32:8; 34:12; 68:7; 69:9; 162:7
**single** [1] - 77:15
**sit** [2] - 11:15; 119:21
**site** [1] - 47:21
**situ** [1] - 161:13
**six** [7] - 55:19; 81:10; 110:20; 147:10, 12; 185:24; 186:3
**six-foot** [1] - 81:10
**size** [3] - 9:24; 173:12
**skid** [1] - 88:16
**skill** [1] - 175:12
**slash** [2] - 97:14; 99:13
**slowed** [1] - 118:3
**slower** [1] - 154:15
**small** [3] - 173:14, 17, 19
**smooth** [2] - 65:12; 131:6
**snap** [1] - 150:23
**snapped** [2] - 118:18; 153:6
**snaps** [1] - 118:6
**snuff** [1] - 79:5
**society** [1] - 163:24
**socket** [2] - 159:7; 184:7
**sockets** [1] - 184:9
**soft** [1] - 80:3
**softly** [1] - 77:25
**sold** [2] - 14:25; 15:15
**sole** [2] - 23:2; 122:8
**solely** [2] - 36:7; 176:16
**solemnly** [1] - 5:11
**solid** [2] - 125:3; 131:4
**solvent** [1] - 140:11
**solvents** [3] - 140:5, 8
**someone** [3] - 48:20; 79:20; 90:5
**sometimes** [1] - 144:16
**somewhat** [2] - 154:15
**somewhere** [7] - 8:14; 11:20; 52:9; 110:10, 21; 118:15; 165:15
**soon** [2] - 39:18; 41:1
**sorry** [2] - 141:24; 167:16
**sort** [1] - 26:18
**sound** [7] - 59:8; 63:6; 75:23; 153:24; 154:2; 155:3, 14
**sounded** [3] - 76:21; 151:24
**sounds** [4] - 153:24; 154:5, 21; 155:2
**sources** [2] - 47:3; 175:10
**southern** [1] - 13:4
**space** [8] - 8:2; 18:20, 22; 31:1, 3; 47:8; 105:18; 120:13
**spatial** [2] - 120:8, 10

**speaking** [2] - 148:10; 170:7
**speaks** [4] - 60:8; 89:19; 138:2; 165:25
**spec** [4] - 91:20; 124:13; 134:10; 162:4
**special** [2] - 12:3; 19:10
**specific** [10] - 12:16; 29:8; 93:5; 94:4; 98:10; 99:6; 100:23; 109:12; 123:8; 188:18
**specifically** [12] - 22:12; 29:18; 46:16; 47:15; 53:21; 59:13; 92:2; 96:16; 98:25; 99:16; 109:11; 136:1
**specification** [1] - 98:23
**specified** [3] - 12:9; 15:9
**specifying** [1] - 81:12
**speculate** [2] - 157:23; 158:1
**speculating** [3] - 157:25; 182:22; 188:23
**speculation** [3] - 120:25; 158:3, 9
**speed** [1] - 112:3
**Spencer** [1] - 14:16
**spend** [1] - 30:20
**spent** [4] - 22:8; 36:24; 79:2
**spin** [3] - 14:11; 183:17, 19
**spin-off** [1] - 14:11
**split** [2] - 12:17
**spots** [1] - 89:21
**spring** [4] - 52:6, 9; 177:11, 15
**spun** [1] - 19:7
**stable** [1] - 15:2
**stack** [1] - 117:2
**stage** [1] - 18:1
**staining** [2] - 58:5, 23
**stand** [2] - 82:2; 92:7
**standard** [19] - 21:10; 77:21; 79:10; 83:25; 84:9, 15-16, 23; 134:8, 11; 162:13, 23-24; 163:16, 22; 166:25; 167:7, 9; 186:13
**standards** [27] - 19:10, 15; 78:14, 24; 79:4, 12; 84:2; 146:15; 149:10; 162:17; 163:12; 164:4, 6, 11, 16-17, 21; 174:14, 16, 19, 22; 178:15
**standing** [3] - 150:10; 151:16; 184:6
**standpoint** [1] - 170:5
**stands** [2] - 88:15; 103:20
**start** [11] - 9:3; 14:7, 24; 50:6; 65:4; 66:24; 103:11; 133:10; 150:7; 166:8; 178:24
**start-up** [2] - 14:7, 24
**started** [16] - 13:20; 17:7; 20:15; 34:19; 37:12; 66:25;

68:2, 4; 116:22; 117:14; 118:2; 125:22; 151:12; 165:12
**starting** [4] - 9:3; 64:18; 151:14; 154:3
**starts** [2] - 130:24; 145:5
**State** [1] - 9:25
**state** [4] - 5:17; 7:5; 44:14; 109:25
**statement** [7] - 63:17; 64:12; 65:23; 73:14; 175:23; 181:11
**stay** [3] - 16:24; 19:3; 106:5
**stayed** [1] - 145:7
**staying** [1] - 167:2
**stays** [1] - 115:11
**steel** [4] - 80:7; 185:10; 186:2
**step** [1] - 175:25
**Stephen** [1] - 5:7
**Steve** [3] - 5:20; 45:11; 156:23
**Steven** [1] - 5:5
**sticking** [1] - 30:10
**stiffest** [1] - 152:24
**stiffnesses** [1] - 96:11
**still** [9] - 19:4, 8-9; 42:8; 98:13; 103:6; 116:13; 118:11; 146:25
**Stirling** [1] - 16:12
**stop** [5] - 6:6, 8, 16; 169:2
**stopped** [2] - 44:24; 115:17
**storage** [2] - 143:11; 144:21
**stored** [1] - 187:24
**storm** [2] - 76:22; 151:25
**story** [1] - 121:19
**straight** [5] - 9:12; 56:24; 80:10, 22; 117:10
**straighten** [1] - 187:19
**straightforward** [1] - 159:13
**strain** [1] - 168:23
**strains** [3] - 85:7; 96:3, 5
**strand** [1] - 168:20
**street** [1] - 15:23
**strength** [18] - 72:15; 75:18; 85:24; 86:4, 12, 15; 90:10; 131:11; 150:13; 154:12; 158:17; 159:9; 168:17, 22, 24; 178:19; 188:21
**strengths** [1] - 169:15
**stress** [4] - 12:4; 95:5, 25
**stresses** [5] - 92:10, 18; 93:11; 94:2, 12
**striations** [1] - 56:25
**strike** [4] - 103:25; 116:14; 121:12; 184:20
**striking** [2] - 108:22; 186:16
**string** [5] - 118:13, 17-18; 181:24

**strong** [1] - 168:25
**strongest** [1] - 152:24
**strongly** [1] - 128:20
**struck** [10] - 109:17; 110:25; 111:7, 24; 112:14; 116:2; 118:23; 120:20; 185:17; 186:16
**structural** [15] - 19:17; 71:17; 72:14, 18; 73:11; 75:25; 85:17; 90:12, 24; 100:24; 102:16, 18; 123:6; 125:16; 138:10
**structure** [24] - 18:7; 30:15; 51:19; 74:2; 77:14, 24; 78:3, 5-7, 21; 92:1; 125:4; 130:20; 135:1; 136:12; 149:3; 165:20; 169:11, 13, 21; 170:9; 187:14
**structured** [2] - 74:15; 164:7
**structures** [4] - 12:18; 78:9; 109:1; 110:4
**stuck** [1] - 182:24
**studies** [1] - 144:14
**style** [3] - 128:24; 131:16; 149:2
**subject** [2] - 120:25; 126:25
**subjective** [4] - 149:16; 152:14; 166:15, 17
**subjectively** [1] - 186:23
**submitted** [1] - 146:8
**subsequent** [1] - 172:25
**successful** [1] - 126:8
**sudden** [2] - 74:16; 75:14; 152:19
**sufficient** [4] - 9:4; 79:18; 177:21; 185:8
**suggest** [1] - 137:20
**suggested** [1] - 155:21
**suggesting** [1] - 156:23
**suitable** [9] - 45:15; 46:10; 81:21; 85:5; 86:2; 90:2; 92:22; 96:24; 99:25
**sum** [1] - 43:13
**summaries** [1] - 168:9
**summary** [6] - 63:17; 162:18; 168:10; 176:19
**summer** [1] - 52:9
**summertime** [1] - 48:7
**Sunbeam** [1] - 17:3
**Superior** [1] - 17:13
**supervisor** [1] - 20:7
**supplied** [1] - 141:17
**support** [3] - 156:17; 177:16; 178:2
**supporting** [1] - 49:24
**suppose** [1] - 8:2
**supposed** [2] - 24:17; 139:23
**surface** [6] - 34:22; 67:15; 71:16; 72:3; 100:5; 151:11
**surfaces** [2] - 34:16; 47:10;

65:12; 77:9; 103:11; 117:23; 131:6
**surprised** [1] - 43:10
**surveys** [1] - 162:7
**survivable** [2] - 78:1; 80:21; 82:12
**Sweeny** [1] - 11:25
**swing** [4] - 117:1; 148:13; 149:6
**swinging** [2] - 118:18; 181:19
**sworn** [1] - 5:11
**swung** [1] - 80:19
**system** [6] - 6:1; 9:5; 147:15, 20; 149:9; 166:24
**systematically** [1] - 97:2
**systems** [1] - 12:3

## T

**table** [3] - 22:24; 115:7, 15
**tanks** [1] - 18:22
**task** [1] - 19:23
**tea** [3] - 85:24; 86:3
**tear** [3] - 151:8; 168:18
**tearing** [2] - 152:9
**teasing** [2] - 178:24
**tech** [1] - 175:11
**technical** [1] - 28:8
**techniques** [3] - 47:23; 170:11; 178:14
**Technologies** [1] - 16:5
**Technology** [2] - 9:16; 14:11
**technology** [5] - 9:19; 13:22; 16:17; 18:10, 12
**telltale** [1] - 51:16
**ten** [1] - 87:5
**ten-minute** [1] - 87:5
**tends** [1] - 59:17
**tensile** [2] - 85:7, 17
**tenth** [2] - 21:11; 173:22
**term** [2] - 126:21; 169:1, 16
**terms** [9] - 57:25; 60:6; 94:2; 106:16; 144:2; 155:7; 160:17; 168:12; 173:18
**test** [9] - 26:7; 72:17; 102:24; 103:2, 8; 129:5; 134:25; 137:24; 178:19
**tested** [8] - 16:15; 122:24; 123:17, 23; 128:2; 131:2; 135:4; 138:8
**testified** [5] - 5:12; 33:25; 147:3; 154:19; 176:21
**testify** [2] - 55:12; 84:18
**testifying** [2] - 21:16; 114:7
**testimony** [7] - 39:14; 79:8; 87:19; 88:5; 114:5; 147:3, 5
**testing** [60] - 8:7; 20:2; 25:21, 25; 26:6, 14, 22;

61:5, 7, 9, 12; 64:1, 10, 20; 74:6; 86:9, 17, 20; 90:23; 102:6, 10; 103:13, 17; 104:14; 106:15; 122:4, 20; 123:1, 4, 22, 25; 124:16; 125:13, 25; 126:5; 127:11, 16; 128:25; 129:8, 12-13; 133:5, 14; 134:19; 135:16, 20; 136:3; 138:7, 22; 139:11; 140:19, 25; 141:5; 144:2, 13; 160:17; 163:15; 178:9
**tests** [11] - 66:2, 16; 67:14; 69:3; 73:9; 77:19; 97:4; 98:21; 102:25; 123:24
**tet** [1] - 96:18
**tether** [3] - 80:11, 17
**tethered** [1] - 165:4
**Texas** [2] - 11:25; 13:4
**that'd** [2] - 125:11; 155:16
**that..** [1] - 167:6
**THE** [6] - 33:9; 40:11, 16; 122:1; 131:25; 153:22
**the..** [3] - 106:14; 131:22; 143:19
**themselves** [2] - 47:25; 104:19
**theories** [2] - 63:25; 64:10
**theorizing** [1] - 76:7
**theory** [1] - 166:11
**therefore** [1] - 145:8
**thermo** [1] - 140:24
**thermodynamics** [1] - 12:18
**thick** [1] - 67:1
**thinking** [3] - 20:16; 32:3; 188:21
**third** [5] - 27:6; 101:1; 106:13; 160:22; 161:7
**third-party** [1] - 101:1
**thousand** [2] - 103:9; 130:8
**thousands** [1] - 20:5
**three** [5] - 10:18; 16:25; 26:10; 164:16; 178:23
**throes** [2] - 14:25; 17:2
**throughout** [2] - 63:11; 91:3
**throw** [1] - 117:3
**thrown** [2] - 116:22, 24
**thrusted** [1] - 114:24
**thumb** [3] - 43:15, 19; 44:16
**tie** [1] - 82:10
**timeframe** [3] - 48:5; 157:20; 158:8
**timeline** [1] - 36:3; 37:3
**timing** [1] - 77:9; 149:24
**title** [2] - 20:10, 12
**today** [13] - 11:16; 22:4, 7; 24:17; 27:12; 38:15; 43:22; 54:9; 140:22; 169:24; 172:7, 9, 20
**together** [9] - 27:22; 31:7;

56:22; 60:9; 73:25; 104:22; 128:14; 132:15

**took** [8] - 23:17; 45:18; 87:16; 96:17; 111:10; 143:7; 145:2; 185:8

**tool** [3] - 67:1, 22; 72:10

**tools** [5] - 68:2, 4, 17; 92:4; 159:6

**top** [6] - 34:14, 19; 66:8; 82:11; 90:21; 151:23

**tore** [2] - 151:8, 22

**torsion** [3] - 34:20; 151:22

**torsional** [2] - 151:8

**total** [3] - 43:13; 100:6; 176:20

**totalled** [1] - 141:23

**totally** [4] - 66:10; 77:16; 128:11; 130:2

**touch** [1] - 69:10

**touched** [1] - 69:12

**toughness** [1] - 85:7

**TOW** [1] - 18:5

**toward** [1] - 11:18

**towel** [2] - 85:24; 86:3

**tracements** [1] - 144:17

**track** [3] - 137:16; 141:16; 144:18

**trade** [1] - 144:19

**trained** [2] - 56:25; 144:6

**training** [2] - 9:20; 134:18

**trains** [1] - 71:4

**transcript** [3] - 33:6; 171:17; 172:18

**transcripts** [2] - 172:12, 25

**transfer** [4] - 10:11; 89:16; 138:3; 184:6

**transferable** [1] - 10:8

**transformer** [1] - 159:4

**translates** [1] - 187:9

**transmitted** [1] - 137:25

**travel** [2] - 21:12; 105:14

**traveled** [1] - 105:22

**traveler** [3] - 69:22; 87:24

**treat** [1] - 37:15

**treated** [2] - 43:6; 96:13

**treatment** [1] - 23:19

**tree** [2] - 76:21; 151:25

**tremen** [1] - 128:10

**tremendous** [1] - 18:12

**tricks** [1] - 144:19

**tried** [4] - 16:17; 34:20; 155:19; 156:3

**triggered** [2] - 73:20; 150:14

**trouble** [2] - 57:1; 58:25

**truck** [51] - 47:21; 61:19, 23; 81:11; 108:22, 25; 109:4-7, 17, 24; 110:4, 9, 13, 25; 111:3, 7; 112:2, 7, 15; 113:24; 114:1, 10; 116:14;

117:1; 118:24; 119:3, 6-8, 25; 120:5, 12, 20; 121:5; 144:23; 145:12; 153:11; 164:20; 180:18, 23; 182:7; 184:21, 24; 185:5, 21; 186:8, 16

**trucks** [2] - 49:20; 148:16

**true** [10] - 7:21; 18:23; 21:14; 50:16; 53:12; 67:18; 138:11; 186:22

**truthfully** [1] - 6:23

**try** [1] - 140:16

**trying** [11] - 104:9; 115:13; 117:6; 133:6; 162:22; 170:3, 14; 172:11; 173:11; 182:23; 185:15

**tube** [2] - 18:3, 5

**tubes** [1] - 18:2

**tuck** [1] - 128:21

**tucked** [1] - 131:10

**turn** [1] - 170:22

**turned** [2] - 70:4; 151:17

**turns** [1] - 183:7

**twist** [2] - 152:1

**twisting** [2] - 117:8; 152:1

**two** [35] - 7:16; 9:17; 10:4; 13:1; 15:20; 20:15; 43:12; 62:20; 64:4, 6; 76:10, 25; 98:24; 126:14; 128:11; 135:24; 136:19; 137:17; 138:4; 145:23; 153:23; 154:18, 20; 155:2, 13, 16; 157:19; 158:7; 174:1; 176:14; 187:25

**two-second** [2] - 157:19; 158:8

**tying** [1] - 56:21

**type** [8] - 9:18; 49:23; 50:12, 17; 51:11; 100:20; 152:3; 168:20

**types** [2] - 79:11; 172:10

**typical** [2] - 67:10; 148:12

**typically** [4] - 59:20; 63:24; 78:8; 84:1

## U

**U.S** [1] - 164:7

**ultimately** [10] - 8:14; 17:20; 26:19; 37:16; 108:21; 123:1; 126:20; 160:25; 187:1; 188:4

**uncompensated** [2] - 59:17, 23

**under** [23] - 16:8; 28:21, 24; 32:19; 34:24; 42:8, 23; 43:1; 63:8; 75:20; 81:18, 20; 149:3, 5; 151:12; 166:12; 167:6; 171:3; 172:13, 17; 173:5, 23

**understood** [3] - 6:22; 68:3; 186:24

**unfortunately** [2] - 77:1; 103:13

**uniform** [1] - 65:8

**unique** [2] - 24:10; 103:20

**unit** [2] - 157:21; 178:20

**units** [2] - 69:19; 187:17

**University** [3] - 9:5, 13; 10:1

**university** [2] - 9:19, 21

**UNL** [5] - 10:8, 11, 15; 11:8; 18:14

**unless** [1] - 103:22

**unreasonably** [1] - 101:14

**unsuppressed** [1] - 34:17

**unsure** [1] - 15:17

**unusual** [1] - 140:6

**unwilling** [1] - 133:2

**up** [60] - 11:8, 14; 12:23; 14:7, 24; 29:6, 23; 36:4; 56:18, 24; 58:14, 21; 59:2; 60:14; 67:25; 68:2; 72:4, 11; 79:5; 82:1; 96:7; 97:9; 104:7, 16; 105:4, 22; 109:4; 110:6, 9; 119:10; 127:2; 128:12; 140:12; 144:10; 146:5; 148:17; 150:4; 151:7, 14, 18; 153:1; 155:13; 157:1, 5; 159:7; 165:24; 170:17; 172:10; 174:2; 175:13; 183:23; 185:17, 24; 186:3; 187:18

**up-and-down** [1] - 105:22

**updates** [1] - 146:9

**upgrade** [1] - 164:3

**upper** [4] - 150:12; 158:17; 159:9; 188:21

**ups** [1] - 36:22

**user** [1] - 150:20

**uses** [1] - 183:9

**utilization** [1] - 175:5

**utilize** [1] - 8:7

**utilized** [1] - 92:19

## V

**V-notch** [2] - 152:18

**vague** [1] - 103:4

**valid** [3] - 64:2; 103:13; 109:10; 129:8; 178:17

**validate** [3] - 102:6; 160:1, 4

**validated** [2] - 18:21; 108:12

**validation** [2] - 90:3; 99:21

**value** [1] - 133:13

**variability** [1] - 110:2

**various** [1] - 33:25

**velocity** [2] - 117:9; 185:9

**vent** [1] - 161:18

**verbal** [1] - 113:6

**verbalize** [1] - 157:13

**verbally** [1] - 24:18

**version** [5] - 33:16; 96:14; 109:14; 166:2

**vertical** [5] - 66:9; 73:18; 138:1; 153:3

**vertically** [2] - 108:19; 116:13

**vessel** [1] - 19:15

**vessels** [2] - 18:20; 19:14

**victim** [1] - 156:20

**view** [6] - 33:14; 35:18; 58:24; 59:4; 144:23; 182:7

**View** [2] - 133:4; 138:16

**viewing** [1] - 66:11

**viewpoint** [1] - 161:11

**views** [2] - 136:16

**violate** [3] - 79:10; 149:10; 166:20

**violated** [7] - 79:1; 84:22; 124:13; 162:13; 163:19, 24; 174:19

**violation** [3] - 84:8; 162:5; 175:4

**VIPER** [1] - 18:5

**virtue** [1] - 46:17

**visible** [1] - 88:19

**visit** [2] - 39:13; 61:14

**visual** [15] - 32:19; 66:18; 69:6; 74:5, 11; 101:25; 102:12, 19; 103:21; 104:18; 126:24; 150:16; 178:14, 16

**visually** [1] - 65:24

**void** [3] - 133:20, 25; 134:7

**volume** [2] - 24:2; 134:14

**von** [2] - 94:12; 96:3

**Von** [1] - 95:25

**VP** [1] - 20:11

## W

**wait** [1] - 48:8

**walk** [2] - 98:10; 130:25

**wall** [4] - 94:21; 97:25; 117:23; 131:12

**warn** [1] - 100:13

**warning** [1] - 74:11

**warranted** [1] - 156:24

**washcloth** [1] - 86:4

**watch** [1] - 67:16

**ways** [1] - 117:4

**we..** [1] - 14:20

**weaken** [2] - 60:21; 129:17

**weakened** [1] - 61:6

**weakness** [5] - 89:21; 126:20; 128:6; 132:13

**weaknesses** [1] - 127:21

**wear** [1] - 84:5

**wearing** [5] - 79:20; 80:24;

82:4; 84:10, 21
**weeks** [1] - 146:6
**weight** [16] - 34:20; 73:18;
75:9; 91:18, 23; 92:6;
111:22; 112:12; 118:17;
150:12; 151:13; 158:18;
188:12, 15
**welding** [1] - 12:9
**were..** [1] - 137:2
**wet** [2] - 69:1; 140:4
**where'd** [1] - 11:22
**white** [1] - 65:8
**whole** [1] - 72:9
**why'd** [1] - 17:1
**width** [1] - 110:23
**wife** [3] - 13:7, 9; 179:2
**willfully** [1] - 70:22
**willing** [1] - 28:9
**wish** [1] - 118:1
**WITNESS** [6] - 33:9; 40:11,
16; 122:1; 131:25; 153:22
**witness** [3] - 82:1; 146:23;
157:23
**witness's** [1] - 84:12
**Witness's** [1] - 5:14
**witnessed** [1] - 152:18
**witnesses** [2] - 23:15, 20
**wonder** [1] - 155:21
**wondered** [2] - 155:18; 156:8
**wondering** [1] - 109:14
**wood** [1] - 75:7
**word** [3] - 20:21; 27:16;
174:9
**words** [7] - 78:2; 102:1;
130:8; 147:21; 149:8;
158:21; 162:21
**works** [1] - 183:13
**world** [3] - 14:1; 18:18; 48:17
**worn** [1] - 83:20
**worried** [1] - 91:9
**worse** [1] - 179:1
**worst** [1] - 90:20
**worth** [2] - 130:8; 144:11
**wrap** [2] - 168:19
**wrench** [12] - 158:1; 182:23;
183:4, 12-13, 16, 23, 25;
184:1, 5, 11
**wrinkle** [5] - 88:14, 18-19;
89:12; 90:25
**wrinkles** [1] - 90:8
**wrist** [1] - 183:23
**write** [1] - 162:17
**writing** [1] - 156:23
**written** [5] - 25:22; 79:16;
84:2; 105:17; 177:9
**wrote** [5] - 57:20; 150:4;
171:10; 178:5; 187:20

## X

**x-ray** [8] - 47:22; 54:3; 58:4;
103:19; 133:21; 134:1;
137:10, 12
**x-raying** [2] - 144:1, 12
**x-rays** [16] - 25:24; 47:24;
54:4, 6; 66:24; 67:3; 122:8;
123:3, 13; 125:6; 127:6;
137:16, 19; 143:20; 175:7;
177:5

## Y

**yank** [1] - 159:8
**year** [7] - 10:11, 22; 45:22;
48:6; 107:24; 143:14;
177:11
**years** [12] - 7:17; 9:17; 10:4,
18; 13:2; 15:20; 16:25;
19:2; 20:15; 51:16; 164:2
**yelled** [1] - 155:25
**yellowing** [1] - 130:15
**yesterday** [2] - 42:25; 146:12
**yield** [2] - 74:17; 75:4
**young** [1] - 15:3
**yourself** [7] - 5:23; 7:19;
26:2, 5; 102:10; 134:19;
166:14

1

```
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA

JULIE KEASCHALL, Personal    ) Case No. 4:14-CV-03070
Representative of the        )
Estate of Kurtis Keaschall,  )
deceased, and DAWSON PUBLIC  ) DEPOSITION OF
POWER DISTRICT,              ) WILLIAM COLEMAN, M.S., P.E.
                             ) TAKEN ON BEHALF OF
       Plaintiffs,           ) DEFENDANTS
                             )
    vs.                      )
                             )
ALTEC INDUSTRIES, INC., and  )
OSBORNE INDUSTRIES, INC.,    )
                             )
       Defendants.           )
```

Taken at the law offices of Johnson, Flodman, Guenzel &
   Widger, 1227 Lincoln Mall, Lincoln, Nebraska, on
   November 30, 2016, commencing at 8:12 a.m.

---

3

                    I N D E X

APPEARANCES . . . . . . . . . . . . . . . . . .    2

STIPULATIONS . . . . . . . . . . . . . . . . . .   4

REPORTER'S CERTIFICATE . . . . . . . . . . . . . 108

AMENDMENT TO DEPOSITION PAGE . . . . . . . . . . 109

WITNESS:

   William Coleman, M.S., P.E.

   Direct Examination by Mr. Ahl . . . . . . . . .  5

   Cross-Examination by Mr. Shively . . . . . . . 81

   Redirect Examination by Mr. Ahl . . . . . . . 103

EXHIBITS:                                 Marked  Found

109. File of William Coleman . . . . . . .  14    Binder

110. Photograph . . . . . . . . . . . . . . 69    Binder

---

2

```
                A P P E A R A N C E S

For Plaintiff          MR. LARRY W. BEUCKE
Keaschall:             PARKER GROSSART BAHENSKY BEUCKE
                         BOWMAN & SYMINGTON, LLC
                       1516 1st Avenue
                       Kearney, NE  68848

For Plaintiff Dawson   MR. STEVEN E. GUENZEL
Public Power:          JOHNSON, FLODMAN, GUENZEL &
                         WIDGER
                       1227 Lincoln Mall
                       Lincoln, NE  68508

For Defendant Altec:   MR. ROBERT W. SHIVELY
                       SHIVELY & LANNIN, PC, LLO
                       4400 South 86th Street
                       Suite 100
                       Lincoln, NE  68526

For Defendant          MR. STEPHEN L. AHL
Osborne:               WOLFE, SNOWDEN, HURD, LUERS &
                         AHL
                       1248 O Street
                       Suite 800
                       Lincoln, NE  68508
```

---

4

```
                 S T I P U L A T I O N S

      It is stipulated and agreed by and between the
parties hereto:

      1.  That the deposition of William Coleman,
M.S., P.E. may be taken before Marcy Benge, RMR,
General Notary Public, at the time and place set
forth on the title page hereof.

      2.  That the deposition is taken pursuant to
notice.

      3.  That the requirements of Neb. Ct. R. Disc.
Section 6-330 (B) (A) and (C) are waived.

      4.  That the original deposition will be
delivered to Mr. Stephen L. Ahl, Attorney for
Defendant Osborne.

      5.  That all objections except as to form and
foundation are reserved until time of trial.

      6.  That the testimony of the witness may be
transcribed outside the presence of the witness.

      7.  That the signature of the witness to the
transcribed copy of the deposition is not waived.
```

JS WURM & ASSOCIATES, (402) 475-3376

EXHIBIT
C

5

COLEMAN - Direct

1  WILLIAM COLEMAN, M.S., P.E.,
2  of lawful age, being first duly
   cautioned and solemnly sworn as
3  hereinafter certified, was examined
   and testified as follows:
4

5  (Witness's response to oath:  "Yes, I do.")
6  DIRECT EXAMINATION
7  BY MR. AHL:
8  Q.    Would you state your full name for the
9  record, please?
10  A.    William R. Coleman.
11  Q.    Mr. Coleman, my name is Steve Ahl, and
12  we've just been introduced a few minutes ago.  I
13  represent Osborne Industries in regard to a lawsuit
14  that's presently pending here in Nebraska that I
15  understand that you have been retained to provide
16  some services in connection with the investigation of
17  an aerial lift bucket that failed; is that correct?
18  A.    Yes.
19  Q.    I'm going to ask you some questions.
20  First I'm going to ask you some questions about
21  yourself and your educational background to find out
22  a little bit about you, who you are, what you do and
23  what you've done.  I'm going to ask you about your
24  investigation and services provided in regard to this
25  particular accident.  Do you understand that?

6

COLEMAN - Direct

1  A.    I do.
2  Q.    Okay.  If I ask you a question that
3  doesn't make sense or just seems awkward or you don't
4  understand it for any reason, it's probably a bad
5  question.  So if you'd just stop me and let me know
6  that I've asked a bad question, I'll be happy to ask
7  it in a different fashion to make sure that we're
8  talking about the same thing at the same time.  Will
9  you do that?
10  A.    I'll do the best I can.
11  Q.    Okay.  And if as we go along you think an
12  answer you've given me to a previous question is
13  either inaccurate or incomplete for any reason, stop
14  me and let me know that.  I'd be happy to give you a
15  chance to go back and either correct your answer or
16  complete it, as the case may be.  Will you do that?
17  A.    I'll try to do all these things.
18  Q.    Okay.
19  A.    As best I can do them.
20  Q.    Okay.  And if you don't do any of those
21  things, I'm going to assume you've understood the
22  question, you've answered it truthfully and to the
23  best of your ability.  And can I rely on that as we
24  go forward?
25  A.    I hope so.  I know you can expect

7

COLEMAN - Direct

1  truthful answers.  If I don't know, I don't
2  understand your question, that's another thing.  But
3  I'm sure we can communicate fine.
4  Q.    We'll try our best.
5  A.    Okay.
6  Q.    Okay.  What is your current business
7  address?
8  A.    1906 Atchison Drive, Norman, Oklahoma.
9  The ZIP is 73069.
10  Q.    What business is located there?
11  A.    Analytical & Materials Engineering.
12  Q.    What type of a business is that?
13  A.    We specialize in analyzing metallurgical
14  and material failures.  We do laboratory testing.  We
15  do different types of materials analysis.  We work
16  for companies that have materials problems.  It isn't
17  all failures.  Lots of times it's looking at a
18  process that's ongoing, in need of improvement, or
19  somebody just wants to know some things about the
20  materials they're using.
21  Q.    You say "we."  How big a company is
22  Analytical & Materials Engineering, Inc.?
23  A.    There are five of us.  But really there's
24  only two -- three engineers:  two full time, one
25  intern.

8

COLEMAN - Direct

1  Q.    You're one of the full time?
2  A.    Yes, sir.
3  Q.    Who is the other?
4  A.    Phillip Perkins.
5  Q.    And who's your intern?
6  A.    Right now it's a young man named Tyler
7  Garde.  That's G-a-r-d-e.  There'll be another in the
8  spring and probably a new hire in the summer.
9  Q.    How long has Analytical & Materials
10  Engineering, Inc., been in existence?
11  A.    It will be 18 years this coming February.
12  Q.    You've indicated that your business does
13  a series of different types of activities from
14  looking at failures to looking at different processes
15  to improving products.  I'm assuming that you also
16  get involved in the forensics and in litigation; is
17  that correct?
18  A.    Yes.
19  Q.    If you were to give me your best estimate
20  as to what percentage of your time is devoted to
21  working on lawsuits as opposed to working for a
22  company trying to improve a process or a product,
23  what would you tell me that is?
24  A.    I would say about half of my time is
25  devoted to litigation.  Or things that may

9

COLEMAN - Direct

1  potentially end up there.
2      Q.    Okay.  Does your business advertise in
3  any legal publications for business in the legal --
4      A.    No.
5      Q.    -- setting?
6      A.    Sorry.  I didn't mean to cut you off.
7  No, we don't.
8      Q.    Okay.  Have you ever?
9      A.    No.
10     Q.    Have you ever testified in lawsuits in
11  Nebraska before?
12     A.    I don't know.  It seems like I have, but
13  I -- I can't recall.  It's been a long time.
14     Q.    Okay.  If you think of something as we go
15  along, just stop me and let me know, and we can --
16     A.    Sure.
17     Q.    -- pick that up.  What is your occupation
18  or profession?
19     A.    I'm a metallurgical engineer.
20     Q.    And what is your educational background
21  that got you to that position?
22     A.    I have a bachelor of science in
23  metallurgical engineering.  I received that from
24  University of Oklahoma in Norman in '78.  And then I
25  have a master's degree also in metallurgical

10

COLEMAN - Direct

1  engineering, also from OU.  That was in 1979.  My
2  minors were in analytical chemistry and physics --
3  I'm sorry.  Analytical chemistry.  Not and physics.
4  And I continued into the Ph.D. program until about
5  '85 or so.  Well, when my daughter was born, so it
6  would've been '86.
7      Q.    Did that ultimately result in the
8  awarding of a Ph.D. degree?
9      A.    No.  I did not finish the degree.  Family
10  duties had to take precedence.
11     Q.    Okay.  What is your position with
12  Analytical & Materials Engineering, Inc.?
13     A.    It's my company.
14     Q.    You own it?
15     A.    Yes.
16     Q.    Is everyone else there an employee of
17  yours?
18     A.    Yes.  My wife thinks she owns it, but
19  she's an employee.
20     Q.    We won't tell her that.
21     A.    I've tried.
22     Q.    Has that been true since its inception,
23  that you've been the owner?
24     A.    Yes.
25     Q.    And you may have told me this.  When did

11

COLEMAN - Direct

1  that business -- when was it first formed?
2      A.    February of 1999.
3      Q.    Why don't you give me just kind of a
4  thumbnail sketch of what you did prior to starting
5  that business in 1999?
6      A.    Okay.
7      Q.    Let's start with your awarding of your
8  bachelor's degree.
9      A.    Okay.  This is somewhat overlapping, but
10  I'll try to separate it as cleanly as I can.
11     Q.    Okay.
12     A.    After graduation, with the bachelor's
13  degree, I was employed as a graduate assistant in the
14  department of chemical engineering and materials
15  science at OU, and I was responsible for lab classes,
16  teaching labs, like a lot of graduate programs do.
17  You kind of fold into the program by teaching and
18  learning how to deal with students.
19          At the same time, I was working for a
20  company called Associated Metallurgists, who was --
21  that was formed by my advisor, my major professor at
22  OU, Bob Block.  The company name was Associated
23  Metallurgists.  And we did forensic work, failure
24  analysis.  That's what we got started doing.  I did
25  those two things -- I actually worked for Associated

12

COLEMAN - Direct

1  Metallurgists from 1978, maybe even '77, the very
2  tail end, through '99.  And then I left to start my
3  own company.
4          In the late '80s, early '90s, I became an
5  adjunct professor in the department of chemical
6  engineering.  I taught courses, core courses in
7  structures and properties of materials, physical
8  metallurgy, failure analysis, corrosion and fraction
9  mechanics.  On an -- I was there on a teaching basis.
10  I didn't have a research appointment.  I did that
11  until the late -- mid to late '90s.  And then I went
12  full time just into where I am now.  So that period
13  from '78 to 1999 was a mixture of consulting and
14  academic work.
15     Q.    Just listening to your description of
16  what you've done in the past, it seems to me that the
17  main focus of your education and day-to-day
18  activities has been in the metallurgical area.  Is
19  that a fair reading of what you've just said?
20     A.    No, it isn't really fair.  It's -- I can
21  see why one would say that because of the degree
22  name.  And it does start out with metallurgical, but
23  it ends up, when you deal with failures, you look at
24  all materials eventually.  I spend a great deal of
25  time doing fractures of composites, plastics,

13

COLEMAN - Direct

1  glasses. Most of the work is metal. There's more
2  metal than those other things around. So -- but
3  through the years, it's -- there's more of an equal
4  blend of things than there is just steels and coppers
5  and aluminums.
6      Q.  Have you had any specific training in
7  composite materials?
8      A.  I took a couple of classes in college
9  in -- which is really theoretical mechanics of
10 composite materials. I've worked on lots of failures
11 and had to learn on the fly, I guess you would say.
12     Q.  Those classes that you've just indicated
13 that you had taken, were those at the undergraduate
14 level?
15     A.  They were graduate courses. I took one
16 when I was a senior per graduate credit, and I took
17 another during grad school.
18     Q.  In coming here today, we served a
19 subpoena duces -- or a notice duces tecum for you to
20 bring your entire file that has been compiled since
21 the beginning of the work on this case up through
22 today. Did you do that?
23     A.  I did, but I -- I don't think I remember
24 seeing a subpoena attached to it. There was a
25 notice.

14

COLEMAN - Direct

1      Q.  Okay.
2      A.  That doesn't matter to me. I bring it
3  all anyway.
4      Q.  Well, let's just say it's a notice. But
5  it asked you to bring your entire file, did it not?
6      A.  I'm sure it did, and I do. And I did.
7      Q.  Do you have your file with you today?
8      A.  I do.
9      Q.  Is that everything that has been
10 generated by you or on your behalf since beginning
11 work on this project?
12     A.  Yes.
13     Q.  Okay. Is that what's sitting in front of
14 you?
15     A.  Yes.
16     Q.  Why don't we just hand that to the court
17 reporter, and we'll have her mark that.
18         (Exhibit No. 109 was marked for
19         identification.)
20     Q.  (By Mr. Ahl) Okay. The court reporter
21 has now marked as an exhibit the materials that are
22 in front of you to your left as Exhibit No. 109. Is
23 that the file that you brought with here -- with you
24 here today?
25     A.  It is.

15

COLEMAN - Direct

1      Q.  What all does that include? Why don't
2  you just give me kind of a brief outline of what is
3  included in there.
4      A.  I can. It's not that difficult. I have
5  a working notebook. That's the blue one on top.
6  I've got a file that contains discovery materials.
7  Those would be answers to interrogatories and
8  pleadings and that sort of thing. I've got copies of
9  a few depositions. I have two engineering standards.
10 I've got some technical literature. I think I've got
11 copies of my photographs. Reports. Reports by other
12 experts in this case. I think that's all. Oh, I've
13 got the CDs, too, that were provided to me that have
14 all the discovery answers and such on them.
15     Q.  You indicate the blue notebook. You've
16 referenced that as a working notebook. What do you
17 mean by that?
18     A.  I've got my -- my field notes in here,
19 laboratory notes, photographs that aren't contained
20 in my report. I have -- I've got the deposition
21 notice. This is just things that I have generated or
22 collected which are mine, as separate from these
23 other pieces.
24     Q.  At any time have you removed anything
25 that was once a part of this file?

16

COLEMAN - Direct

1      A.  No. It's as it has been. It's just
2  getting thicker.
3      Q.  Okay. Since beginning your work on this
4  file, have you consulted with anyone or had anyone
5  assist you in any way other than other employees of
6  your own business with any facet of this
7  investigation or analysis?
8      A.  Yes.
9      Q.  Why don't you tell me who?
10     A.  Okay. Two people. One is the director
11 of mechanical engineering at OU. His name is -- I'm
12 not sure how you pronounce it. I can't remember.
13 Altas Gahn? I can pull his name up for you later at
14 a break. And then another guy named Rick Doherty who
15 is from Seattle.
16     Q.  Who is he, though?
17     A.  He was a gentleman that worked for a
18 structural -- a fiberglass structural business in
19 Seattle. I'm not sure what they do routinely. But
20 their business was fiberglass.
21     Q.  Mr. Doherty's business?
22     A.  Yes.
23     Q.  Okay. Let's start with the mechanical
24 engineer at OU.
25     A.  Okay.

17

COLEMAN - Direct

1    Q.    When did you consult with him?
2    A.    It's been a couple of years now.  Let me
3    borrow my notebook there for a second --
4    Q.    Sure.
5    A.    -- before you take things out of it and
6    tarnish it.  I don't like talking about somebody
7    without a name.  I wasn't even close.  Cengiz Altan,
8    A-l-t-a-n, was his name.
9    Q.    Okay.
10   A.    I met with him first.  And I met with him
11   because I found a paper in the technical literature
12   that addressed defects in resin transfer mold and
13   composites.  And I found out he was from OU.  So I
14   went to talk to him.  Had one contact with him.  That
15   was it.
16   Q.    Do you remember when that was?
17   A.    It's been at least two years.
18   Q.    Okay.  Did he provide you with any
19   information or data that you have incorporated into
20   any of your opinions or conclusions?
21   A.    No.
22   Q.    Did you provide any information to him
23   about this case?
24   A.    I -- no.  Other than -- I didn't talk to
25   him about the case.  I talked to him about resin

18

COLEMAN - Direct

1    transfer molded composites as a rule, as an entity of
2    material.
3    Q.    Okay.  What did he tell you?
4    A.    Not very much.  I think he -- and my
5    reason for going there was because of the paper that
6    I found.  And I wanted to know what his -- I was
7    really looking for information about the types of
8    defects that were typically uncovered, either
9    concealed or otherwise, visible to the eye, in those
10   kinds of materials.  And he didn't have that kind of
11   background --
12   Q.    Okay.
13   A.    -- that could help me.  So I didn't --
14   Q.    Didn't pursue it?
15   A.    -- consult with him anymore.
16   Q.    And you listed another individual that
17   you consulted with?
18   A.    Right.  Rick Doherty.
19   Q.    Yeah.  And how did it happen that you
20   consulted with him?  Did you know him or --
21   A.    No, I didn't know him.  I'm a little
22   fuzzy on -- on how that began.  But my recollection
23   is -- and Mr. Beucke and Mr. Guenzel will correct me,
24   I'm sure, if this is wrong.  But my recollection was,
25   is they asked me to find somebody that might have a

19

COLEMAN - Direct

1    background or an everyday interaction with some kind
2    of fiberglass or composite material.  And I -- I
3    found him, I think, on the internet.  That's what I
4    remember.
5    Q.    Okay.  Did you consult with him on this
6    case?
7    A.    Not really in a meaningful way.  There
8    was a beginning.  And it never really went past the
9    early stages.
10   Q.    Meaningful way may mean something
11   different to you than me, so why don't you tell me
12   what you did?
13   A.    Okay.  I told him what I was doing.  I
14   told him I had a failure of a basket, fiberglass
15   bucket, basically a bucket truck, man lift bucket.
16   And I asked for their -- their company's background
17   in doing this sort of work.  He ended up coming to
18   Norman and looking at the bucket.  And we had a
19   couple of phone calls, but nothing past that as I
20   remember.  Nothing was really generated.  It didn't
21   have anything to do with my opinions.  They do
22   different things than I do.
23   Q.    As a result of his coming to Norman and
24   making observations about the bucket, did he ever
25   give you any impressions or opinions or anything of

20

COLEMAN - Direct

1    that nature as to what may have caused the failure?
2    A.    The questions I asked him, he was unable
3    to answer.  And just because -- I don't know how far
4    involved he got into the case other than the early
5    onset work that was done.
6    Q.    Was he paid anything for his work?
7    A.    I have no idea.
8    Q.    Anyone else that you have consulted with
9    in any fashion at all in regard to your work on this
10   matter?
11   A.    No.
12   Q.    In your position as a consultant, have
13   you ever had your testimony disallowed as a result of
14   a Daubert challenge?
15   A.    Never.
16   Q.    Let's talk specifically about this case.
17   Do you remember when you were first contacted?
18   A.    I do.
19   Q.    When was that?
20   A.    It was roughly a month after the
21   accident, in July of 2012.
22   Q.    Okay.  Who were you contacted by?
23   A.    Mr. Guenzel called my office.
24   Q.    Do you know how he happened to get your
25   name?

21

COLEMAN - Direct

1    A.    No.
2    Q.    When Mr. Guenzel called your office, you
3    had a conversation with him, I'm assuming?
4    A.    We did.
5    Q.    Did he tell you why he was calling?
6    A.    He did.
7    Q.    What'd he tell you?
8    A.    He told me there'd been a bucket truck on
9    location. The bucket had fractured, fallen to the
10   ground. The man in it was killed.
11   Q.    Did he tell you anything else about the
12   incident?
13   A.    I need to look at my file. I couldn't
14   tell you exactly what he told me.
15   Q.    Okay. Why don't we -- why don't we take
16   a look, then.
17   A.    It keeps getting pirated across the
18   table.
19         MR. SHIVELY: And I don't need it
20   anymore.
21         THE WITNESS: It's okay.
22   A.    Well, I was close. It was actually June
23   the 8th, 2012, two days after the accident, that
24   Mr. Guenzel called me.
25   Q.    (By Mr. Ahl) Okay.

22

COLEMAN - Direct

1    A.    My notes, which are sketchy at best,
2    reflect the lineman was working. A bucket fell off
3    the boom. The truck and equipment were in storage in
4    Lexington, Nebraska. He gave me some names of people
5    and his firm name. And he said that he thought the
6    manufacturer was Altec.
7    Q.    Did he tell you anything else about the
8    incident?
9    A.    If he did, I didn't write it down.
10   Q.    Okay. Did he ask whether this would be
11   something in your area of expertise?
12   A.    I'm sure he did. And I -- I recall also
13   him speaking about, I understand you've worked on
14   other bucket truck cases, and I said yes. And then
15   we kind of went from there.
16   Q.    Okay. At that point in time, did you
17   become retained?
18   A.    Yes.
19   Q.    Were you provided any materials at that
20   time or shortly thereafter regarding the incident?
21   A.    I was. Shortly thereafter, I got some
22   photographs taken by somebody. Maybe the sheriff.
23   I'm not sure who took them. A little background
24   information on what was going on, what happened. And
25   then after that, I went up to Nebraska.

23

COLEMAN - Direct

1    Q.    Did anybody ever tell you what they
2    thought may have happened? In -- in regard to why
3    the bucket may have separated?
4    A.    No, they didn't.
5    Q.    Okay. What was the next thing that you
6    did after talking with Mr. Guenzel, and I assume you
7    got some background materials?
8    A.    I did.
9    Q.    Okay. What'd you do?
10   A.    I went to the Dawson Public Power
11   facility in Lexington and did a -- and inspected the
12   bucket, the truck and the pole.
13   Q.    Do you remember what you were asked to do
14   in either the initial phone call or at some point in
15   time in regard to the scope of your work? What was
16   the purpose of you going there?
17   A.    Well, the first purpose was to see what
18   kind of failure had occurred. The second thing was
19   to see what the failure involved equipmentwise. At
20   the time, I didn't know whether the -- the boom had
21   broken, whether a bolt had fractured. I didn't know.
22   And Mr. Guenzel didn't know. So -- or at least if he
23   did, we didn't discuss that. My first question was,
24   I need to see this stuff. So he said, I'll arrange
25   for you to go. So I came up to Nebraska.

24

COLEMAN - Direct

1    Q.    Okay. Were you asked to do anything in
2    particular? To make any determinations? You were
3    going to look at it, but what were you going to do
4    with that information?
5    A.    Well, the idea was to determine why it
6    failed.
7    Q.    Okay.
8    A.    And because I'm a materials person, the
9    second topic to be addressed was, are the material
10   issues that are associated with this failure, did it
11   contain defects that precipitated the failure. What
12   can you tell us about the -- the broken bucket.
13   Q.    So you -- you went to Lexington,
14   Nebraska?
15   A.    I did.
16   Q.    When you got to Lexington, did you meet
17   with anybody?
18   A.    Yes, sir.
19   Q.    Who?
20   A.    Dean Kunkee, I believe is his name.
21   Q.    An employee of Dawson?
22   A.    Right. There were three people that I
23   met. But he was the one that walked out in the shop
24   with me. The other two gentlemen, one's name was
25   Jeremy Kaiser, and the other was Bob Heinz.

25

COLEMAN - Direct

1    Q.    Did any of the three of them provide you
2  with any information about the bucket, the truck, the
3  boom or the incident itself?
4    A.    A little bit.
5    Q.    Who?  Who told you -- who gave you the
6  facts?
7    A.    Mr. Kunkee is what I recall.  And I don't
8  know that it was fact based, but it was -- the first
9  question I had for him was, when are these inspected?
10 Has this one been -- has anybody been here to look at
11 it?  Is everything as it was?  You know, has it been
12 touched or disassembled since the accident?  And his
13 reply was, everything here is preserved as it was
14 when it left the scene.  Nobody had disassembled.
15 Nobody had done anything to the equipment.  It was
16 quarantined in the back, you know, cones around it,
17 and tarps covering the bucket so it couldn't be
18 dinged or beat up or whatever else you could do to
19 it.
20   Q.    Were you provided any other information
21 at that time?
22   A.    I don't remember anything else other than
23 the few materials that I had before I got there.
24   Q.    Did you inspect the various components of
25 the equipment?

26

COLEMAN - Direct

1    A.    I did.
2    Q.    The truck?
3    A.    In part, yes.
4    Q.    The boom?
5    A.    Yes.
6    Q.    The components of the bucket that had
7  failed?
8    A.    Yes, sir.
9    Q.    Anything else?  The pole?
10   A.    Yes.
11   Q.    Anything else?
12   A.    Let's see.  The truck, the boom, the
13 platform, the bucket fragments, the bucket which had
14 separated from the truck in addition to the bucket
15 flap that was left attached to the truck, and the
16 pole.  I believe that's all.
17   Q.    There was still part of the bucket flap
18 attached to the boom?
19   A.    Yes.
20   Q.    Did you think it was important to
21 physically observe all of these components to arrive
22 at ultimately your opinions and conclusions?
23   A.    Of course.
24   Q.    That's all of that equipment that you
25 needed to see?

27

COLEMAN - Direct

1    A.    It's what I saw.  I tried to photograph
2  things I thought were relevant.  And not just
3  associated with the accident, but with the general
4  condition of the truck and the boom.
5    Q.    That was important to you in trying to
6  formulate your ultimate opinions and conclusions?
7    A.    Yes.
8    Q.    Okay.  As part of your observations, what
9  did you do?  Photograph the various components?
10   A.    Yes.  I think you've seen the -- you
11 probably have seen the -- book of the photographs
12 I took.
13   Q.    I have.
14   A.    So there was a lot of photographs taken.
15 There was a lot to look at.
16   Q.    Okay.
17   A.    That ends up being my sort of working
18 file as I'm going, you know, photographing the
19 pieces, the condition of the items as I found them.
20   Q.    Other than make the observations that you
21 did and photograph the various pieces of equipment
22 and components that were present that day, did you do
23 anything else while you were at Dawson that day?
24   A.    Well, I made some notes when I was there,
25 if that's what you're -- I'm not sure what your

28

COLEMAN - Direct

1  question is referring to.
2    Q.    Well, I want to -- did you do anything
3  else?
4    A.    I didn't do any testing.
5    Q.    Okay.
6    A.    Let me back up.  I understand where
7  you're going with this.  I was there to document the
8  incoming condition of the failed components.  Which
9  included the things that it was attached to
10 beforehand:  the truck, the boom.  You know, it's
11 a -- it's a working unit.  So I documented the
12 condition of that.  There was no testing, no
13 disassembly, no nondestructive inspection or with
14 some tools that you might use in the business that
15 day.  It was strictly to document what was there and
16 what the failure involved.
17   Q.    And you did take some notes as you were
18 going along doing that?
19   A.    I did.
20   Q.    And I suspect you were noting things of
21 significance that you either observed or was -- or
22 were photographing?
23   A.    I tried to.  On a for instance, I took
24 the information down off the templates that
25 identified the manufacturer of the boom and serial

29

COLEMAN - Direct

1 numbers and those sorts of things.

2 Q. What else did you find of significance

3 that you made notes of?

4 A. That the boom was cradled, meaning that

5 it's resting on top of the truck as it would be if it

6 was going down the road. Cradled means sitting in

7 the saddle. I found the circumferential crazing on

8 the boom.

9 Q. What's that?

10 A. It's -- crazing is a pattern of

11 oxidation, and it's an indication of use at times and

12 wear that occurs on materials. Crazing would be like

13 you see the crack pattern on old dinnerware, for

14 instance. You see it on the sidewalls of tires. I

15 found that on the boom.

16 Q. Was that of significance to you?

17 A. Sure.

18 Q. Okay. Why?

19 A. Well, it just indicates the state of the

20 boom at the time when I saw it. I didn't -- for

21 instance, I didn't see any impact damage marks or

22 areas where the boom was really distorted or defaced

23 in any way. It wasn't damaged, per se. It just

24 shows that the fiberglass on the boom is -- it's had

25 a lifetime. It's not unusual to see it.

30

COLEMAN - Direct

1 Q. Okay. Anything else that you noted of

2 significance during your observations?

3 A. On the top side of the boom I found the

4 typical wear zone, the contact zone that's along the

5 top part.

6 Q. What do you mean by that?

7 A. It's the spot where the boom had the most

8 contact with anything. Whether it's sitting on the

9 truck or something it rubs against. You know, you're

10 always looking at -- when I'm looking at booms, I

11 always look at what sort of cosmetic condition is it

12 in. And how would I describe it. And I would say

13 there's always wear. There's always nicks and cuts.

14 But I saw nothing that was graphic or demonstrative

15 of abuse or any pre-existing problems that may have

16 affected the way it serves as a dielectric. You

17 know, an insulating boom.

18 Q. Okay.

19 A. Nothing structural I could find was wrong

20 with the boom.

21 Q. Any other notes of significance?

22 A. I made a couple sketches of the wear

23 patterns, the straps, the warning locations. And I

24 sketched out the segment of the bucket that had

25 fallen and the segment that remained attached to the

31

COLEMAN - Direct

1 boom. Those are all of my notes that were made that

2 day in addition to the photographs.

3 Q. Okay. And those are contained in your

4 working file?

5 A. Yes, sir.

6 Q. And are they under any particular tab so

7 if we want to go back to find them again?

8 A. Inspection note, 7/13/2012.

9 Q. Okay. You've told us about your

10 inspection. You've told us about your photography.

11 You've told us about making notes of significant

12 findings. Did you do anything else while you were at

13 Dawson that day?

14 A. Are you asking about whether I did things

15 other than look at the bucket?

16 Q. Yeah. Other than the things I just

17 noted. You made your observations. You looked at

18 the truck. You looked at the boom. You looked at

19 the platform. You looked at the fragments. You

20 photographed it all. You made notations of different

21 things that you saw that you felt were significant.

22 Did you do anything else while you were present at

23 Dawson during your time of investigation?

24 A. Other than a conversation with Dean

25 Kunkee, no.

32

COLEMAN - Direct

1 Q. And was that the conversation you've

2 already related to us, or was there another one?

3 A. Well, there was kind of a beginning and

4 an end to the day.

5 Q. Okay. Why don't you tell us about the

6 end to the day?

7 A. It was more of just a closing

8 conversation. I've done what I needed to do. I'm

9 going to ask Mr. Guenzel to have the components of

10 the bucket shipped to me. Be on the lookout for

11 that. When you package it, I'd like you to do it

12 this way. And I told him how I wanted the packaging.

13 That's what I remember talking about. That's not

14 every detail, but it's close.

15 Q. Okay. Was either Mr. Beucke or

16 Mr. Guenzel there with you?

17 A. No.

18 Q. Just you?

19 A. Just me.

20 Q. Did you spend any additional time at

21 Dawson during this visit, other than the day you were

22 there performing the functions that you've already

23 detailed for us?

24 A. No.

25 Q. Have you ever been back?

**COLEMAN - Direct** 33

1  A.  No.
2  Q.  Did you tell anybody at Dawson to
3  maintain control of the boom and the truck because of
4  its significance to this accident?
5  A.  Yes.
6  Q.  Who did you tell?
7  A.  Mr. Kunkee.  I told him that because this
8  was part of an investigation of a failure and an
9  accident, that there will be other people here at
10  some point to look at this.  So keep it where you can
11  preserve it.
12  Q.  Okay.  Did he understand that?
13  A.  You'll have to ask him.
14  Q.  Okay.  Did he seem to?
15  A.  I suppose so.
16  Q.  Okay.  Maybe I asked you this:  Have you
17  ever been back to Dawson?
18  A.  No.
19  Q.  Have you ever talked with Mr. Kunkee
20  again?
21  A.  No.
22  Q.  After your --
23  A.  I don't think so.  Unless I had to give
24  him an address where to ship it.
25  Q.  Okay.

**COLEMAN - Direct** 34

1  A.  I don't think I did, though.
2  Q.  But I mean about substantive --
3  A.  No.
4  Q.  -- items in regard to this failure?
5  A.  No.  Sorry I cut you off again.
6  Q.  That's okay.
7  A.  I did not.
8  Q.  Ever talk with anybody else from Dawson
9  about anything substantive having to do with either
10  the failure or this incident?
11  A.  No, sir.
12  Q.  You indicated you were going to have the
13  bucket shipped back to your address?
14  A.  Right.
15  Q.  I'm assuming that occurred?
16  A.  It did.
17  Q.  When?
18  A.  I don't know that I have the -- the
19  shipping receipt here.  But I can find out when that
20  was.
21  Q.  Just give me a general idea.  Within the
22  next month?
23  A.  It was fairly soon.  It wasn't a long
24  time.
25  Q.  Okay.  That was shipped to Analytical &

**COLEMAN - Direct** 35

1  Materials Engineering, Inc.?
2  A.  Yes, sir.  Yes, sir, it was.
3  Q.  Do you have a laboratory there?
4  A.  Yes.
5  Q.  And it's fully equipped with everything
6  that you need to do this type of analysis?
7  A.  That's not a fair question.  But I'll
8  give you the answer that goes with it.
9  Q.  Okay.
10  A.  Nobody has everything.  I have
11  microscopes.  I have certain types of metallurgical
12  equipment.  I've got all kinds of stereomicroscopic
13  equipment with cameras attached.  And we've got
14  hardness equipment and metallurgical equipment and
15  some load cells and those sorts of things.
16  Q.  X-ray equipment?
17  A.  I hire it out when I need x-ray done.
18  Just like I don't have an FTRI unit.  I hire it out.
19  I wouldn't use it enough to justify having it.
20  Q.  The bucket is -- the platform and its
21  components are shipped down to your business.  It
22  arrives there.  Why don't you tell me what you do?
23  A.  What I do when I get it, or what I do
24  when -- in general?
25  Q.  No.  When you get it, what do you do?

**COLEMAN - Direct** 36

1  A.  The first thing is to uncrate it.
2  Q.  Okay.
3  A.  And see when it's uncrated if it was
4  undamaged from transit.
5  Q.  Okay.  What did you determine?
6  A.  That it was packaged correctly and safely
7  and that there was no damage to the components any
8  different than what I saw at Lexington.
9  Q.  The scope of your work hadn't changed?
10  You were still focused on trying to determine why
11  this failure occurred?
12  A.  Yes.
13  Q.  Were you trying to determine anything
14  else?
15  A.  I think it all comes back to
16  investigating the failure of the bucket or whatever
17  that entails.  That was my -- my goal.  That's why I
18  had that part shipped.
19  Q.  Did you have a plan at that time as to
20  how you were going to go about your analysis to see
21  if you could determine why the failure occurred?
22  A.  I think the idea was to formulate a plan
23  when I had the pieces in front of me.
24  Q.  Did you formulate a plan?
25  A.  Yes.  To a degree, I did.

37

COLEMAN - Direct

Q.   Okay.  Well, why don't you tell me what you formulated that you were going to do to help try and arrive at a conclusion or an opinion as to why this failure may have occurred?

A.   The first thing I did was to -- after photographing it just as it came in was to examine the fracture surfaces to determine the origin of the fracture and to see if the origin contained evidence of manufacturing or fabrication defects.  Those --

Q.   And how did you make those observations?

A.   Well, I looked at them.

Q.   Just --

A.   I put them under lights, laboratory lights, microscopes.  I did those things that I would normally do when examining a fracture of any material.  I documented the surfaces of those fractures.  I made a bunch of measurements.  And eventually I came to the point where I needed some information on the manufacturer of this product, these kinds of products.  So at some point thereafter, I advised Mr. Guenzel that that would be something I would like to do.  That's as far as the plan got at that point.

Q.   So you photographed the components again or the various pieces.  You looked at them with your

38

COLEMAN - Direct

naked eye under lights as well as microscopically?

A.   Right.

Q.   And you ultimately recorded your observations?

A.   Yes.

Q.   How did you do that?

A.   Photographs.

Q.   And those are contained in the photographs that we've received from you on a prior occasion?

A.   Yes.

Q.   Did you do anything else at that time with your original plan up to the point where you determined you'd like to get some information from the manufacturer?

A.   I thought it would be a good idea to involve someone who was a -- had different skills in structural analysis to examine this equipment and provide some input on what sort of loads and stresses would be in different parts of the bucket.

Q.   You didn't feel comfortable that your company or you could do that?

A.   That's not my area.

Q.   Okay.  So you didn't feel comfortable trying to do it?

39

COLEMAN - Direct

A.   Whether I felt comfortable or not was one thing.  Whether someone else is more qualified to do it is another.

Q.   You didn't feel you were the person to do it?

A.   I wanted some help doing it, because it's not something I could do economically or -- or quickly.  Which I suppose is the same thing.

Q.   Let me ask you this:  Did you ever have one of your students or an intern or somebody from your business ever contact Osborne telling that they were from the University of Oklahoma to try and get information about this product?

A.   No.  In fact, I would have said the otherwise, the other way.  I said, we never call a party that's potentially involved in a case for information.  That's not the right path to do things.  So they would not do that.

Q.   Okay.  So if Osborne has a record that indicates somebody identifying themselves from the University of Oklahoma asking about information on this product, you wouldn't know anything about that?

A.   No.

Q.   Okay.

A.   There are other people on the faculty

40

COLEMAN - Direct

that deal with these problem -- kinds of problems.  Not necessarily from a materials or mechanical standpoint, but from an electrical standpoint.  I don't have any affiliation with -- on any of those things.  And I wouldn't direct someone to do that.

Q.   Okay.  I just wanted to make sure that you wouldn't know anything about that, if they have that information in their data?

A.   No.  And I'm not affiliated with OU anymore, either.

Q.   Okay.

A.   So that's somebody else.

Q.   Were you back at the -- back when you first got involved in this project?

A.   No, sir.  I -- I haven't been affiliated or taught class at OU since the late '90s.

Q.   Were any of your interns from OU back at that time?

A.   The interns are always from OU.  The ones I've had.

Q.   Okay.

A.   At that time, I don't even know that I had an intern.

Q.   Okay.

A.   I'm not sure.

41

COLEMAN - Direct

1    Q.    Okay.  If they would have the name of the
2    individual, we could tell you that, and you could
3    tell us whether you knew them and whether they were
4    ever an intern for you?
5    A.    I sure could.
6    Q.    Okay.
7    A.    And I'm not afraid to tell you if -- if
8    there was.  But there's nothing in the file that
9    shows that.  And we make records of things like that
10   when we're chasing details.
11   Q.    Okay.  You indicate that you got to a
12   point where you believed that you needed information
13   from the manufacturer, and that was kind of the end
14   of your initial game plan?
15   A.    Yes.
16   Q.    What happened next in your investigation
17   and analysis?  What did you do next?
18   A.    Mr. Guenzel and Mr. Beucke came to
19   Norman, and I shared with them what I had found.  A
20   bit of the game plan.  That's really what they came
21   down for.  Maybe just to meet me to see if I was real
22   or not.  I don't know.
23   Q.    Okay.  What did you show them that you
24   had found at that point in time?
25   A.    Well, I showed them the condition that

42

COLEMAN - Direct

1    the bucket was in and the issues I needed information
2    about and advised them at the time that we might need
3    to involve another person.  I think that's how it
4    began.
5    Q.    Okay.  Did anything come out of that
6    discussion in terms of a new game plan or what was
7    going to happen next with your involvement?
8    A.    I think it was -- and this is somewhat
9    speculative, because I don't know the details of the
10   conversation.  But it was, I need to find somebody
11   that has a background in manufacture or structural
12   analysis of these components, similar components.
13   Q.    Okay.  And was that ultimately done?
14   A.    Yes.
15   Q.    Was that Mr. Eihusen that was ultimately
16   brought on board to do that, do you know?
17   A.    As far as I know, yes.
18   Q.    Well, let's get back to what you were
19   doing.  You had -- you had looked at the fracture
20   sites under microscope and under lights.  What was
21   the next thing that you did to arrive at any opinions
22   or conclusions that you ultimately hold?
23   A.    I'm uncertain of the chronology of
24   events, but at some point I looked at inspection
25   records and -- of the truck involved.  I looked at --

43

COLEMAN - Direct

1    I think I've already said photographs.  We discussed
2    a plan of attack, so to speak, in doing a different
3    kind of analysis on the bucket than I was ordinarily
4    inclined to do.  Which we've talked about.
5            I think after that -- and all this was
6    nondestructive.  There was no testing, anything
7    invasive done on the -- the evidence as I received
8    it.  There were no cuts.  There were no -- no testing
9    of any kind was done.  I felt like at some point, it
10   would be done.  And -- and shortly thereafter, I
11   think my involvement sort of slowed down.  I didn't
12   do anything with it for quite some time.
13   Q.    Okay.  What initially was the type of
14   analysis that you wanted to do that you say
15   ultimately was changed to a different type of
16   analysis?
17   A.    Well, I don't know that it's what I
18   wanted to do, but it was at least a first
19   approximation of determining what would be the most
20   useful steps in the laboratory to do.  And one of
21   them, of course, was to -- to have a section removed
22   from the bucket body so we could determine the
23   chemistry of the materials to determine what they
24   were made of, what the bucket was made of.  To look
25   at the fibers in cross-section to determine what sort

44

COLEMAN - Direct

1    of structure was inside the rim of this bucket.
2    Those are the things I was concerned with.  In
3    addition to the -- the foreign material that I saw on
4    the inside of the fracture origin, some sort of
5    yellow compound that was present.  I didn't know why
6    it was present.  I wanted to know what it was.  I
7    wanted to know if it was typical for products of this
8    type to have a foreign body inside them.  That's
9    where it came down to finding someone who was
10   familiar with the process, who understood the
11   mechanics of fabricating a bucket.
12   Q.    Those questions and concerns that you had
13   about the discoloration and the fracture surfaces,
14   did you ever do anything to answer those questions
15   yourself?
16   A.    I didn't perform a test on it at the time
17   because I didn't have the authority to do it.  Later
18   on down the calendar of this case, apparently some
19   work was done on that.  With limited success.  I
20   didn't participate in that.  I didn't know that it
21   was going on.  So I didn't do those tests.  But I was
22   aware that the substance at the fracture origin would
23   be of importance to know.
24   Q.    After -- have you now told us everything
25   that you did while you -- after initially receiving

45

COLEMAN - Direct

1 the bucket down at your laboratory in terms of trying
2 to determine the cause of this failure?
3     **A.**    **At that time, yes. Other than take some**
4 **dimensions of the bucket.**
5     Q.    Have you ever done any experiments,
6 testing, or performed any calculations whatever in --
7 in regard to trying to determine what the failure of
8 this bucket may have been?
9     **A.**    **Experiments can't be performed on this**
10 **piece of evidence. You can do laboratory work that's**
11 **invasive, cutting it up. I know what I asked to have**
12 **done, and I know that part of that work is an**
13 **examination at the fracture. So that really isn't an**
14 **experiment, but that's part of the evaluation and**
15 **the, quote, unquote, testing phase from my end.**
16     Q.    Making your observations, that's part of
17 your testing?
18     **A.**    **Absolutely. Because the -- the critical**
19 **part of what I do is looking at fracture surfaces.**
20 **That in itself is a type of test. It's just not**
21 **where you break something with a hammer and see what**
22 **happens.**
23     Q.    Other than making the observation of the
24 fracture surface, did you do any other testing,
25 experiments, calculations or any other scientific

46

COLEMAN - Direct

1 process to determine what was the cause of this
2 failure?
3     **A.**    **I was not involved in that part of this**
4 **work.**
5     Q.    Okay. So your answer is no?
6     **A.**    **That's true. I didn't do tests as you**
7 **said them. As long as you understand that you don't**
8 **have to go put a meter and a gauge on something to**
9 **have a meaningful examination and make that part of**
10 **your test or analysis. As long as we're on the same**
11 **page there, then -- then we can move on.**
12     Q.    I think I understand your answer.
13     **A.**    **Okay.**
14     Q.    You're not telling me that you can
15 determine what caused the failure simply by looking
16 at the fracture surfaces, are you?
17     **A.**    **Sorry. I missed the first part.**
18     MR. AHL: You want to read that back to
19 him?
20     (The requested portion of the record
21     was repeated.)
22     **A.**    **Oh, yes, you can.**
23     Q.    (By Mr. Ahl) You can?
24     **A.**    **You bet.**
25     Q.    So that's all that's necessary in this

47

COLEMAN - Direct

1 case, is just to look at the fracture surfaces?
2     **A.**    **Well, it depends on what information one**
3 **is trying to gather. My information that I needed**
4 **was, where did the failure occur. And is there a**
5 **defect in material that is coincident with the**
6 **origin. That's what I'm looking for. It's the same**
7 **way if you look at metals. You're trying to isolate**
8 **an origin and determine whether or not it's from a**
9 **load history or it's generated from a localized flaw.**
10 **And that's sort of the -- the approach you have to**
11 **take when you're looking at a fracture.**
12     Q.    So that's all you needed to do in this
13 case?
14     **A.**    **It's what I needed to do.**
15     Q.    Okay.
16     **A.**    **There are other questions that can be**
17 **answered by other people doing different things. And**
18 **there's lots of peripheral information that I like to**
19 **have. But as far as determining this is where it**
20 **starts, this is the problem, I did that.**
21     Q.    And maybe we're just talking about the
22 cause of the failure as being -- maybe we've got a
23 semantic difference there.
24     **A.**    **Okay.**
25     Q.    Are you telling me that you can simply

48

COLEMAN - Direct

1 look at the -- the fracture surfaces of this material
2 and determine whether it was an overload, whether it
3 was some other type of outside force, or whether the
4 bucket just simply failed by looking at that fracture
5 surface? Is that what you're telling me?
6     **A.**    **I'm telling you that what I can see is an**
7 **origin and a defect cluster at the origin. And**
8 **defects at a fracture origin denote a problem in the**
9 **fabrication of the device. That's what I need to**
10 **answer, the first question I was asked to answer.**
11 **The second part of my work would be to, what is the**
12 **foreign material? And I would have done that had I**
13 **stayed involved with the case for that period of**
14 **time, but it just didn't -- that wasn't something**
15 **that I was asked to do.**
16     Q.    Well, when you find your -- the defect
17 cluster that you've just talked about, did you ever
18 do any testing to determine the structural
19 significance of that defect might be?
20     **A.**    **No. That wasn't part of my assignment.**
21     Q.    And we don't know that in this case, do
22 we?
23     **A.**    **No.**
24     Q.    Have you ever seen any testing that
25 would -- that would indicate that?

49

COLEMAN - Direct

1    A.    That would indicate what?

2    Q.    The structural significance of any defect

3    in the manufacturing process that you just talked

4    about.

5    A.    Well, the structural defect -- the effect

6    of the structural defect is right in front of us.

7    That's the failure.  That's the consequence of it.

8    Q.    But we --

9    A.    I don't need to make calculations to know

10    that.

11    Q.    You don't need to know how much force or

12    load it would take to cause a failure at that -- at

13    that location where you've indicated there's been a

14    defect?  You don't need to know that?

15    A.    No, I don't.  In fact, on a whole part,

16    one that's completely defect free, it's good to know

17    those kind of numbers.  That's the way you would have

18    to categorize the integrity of the -- the product

19    that you make, is to know -- is on paper, does it

20    match what you see in the field.  How much load will

21    it take.  And it passes -- those kind of things pass

22    all the exams and the test loads that the standards

23    require.  But it -- it may not necessarily during one

24    of those tests uncover the presence of a critical

25    defect in the material.

50

COLEMAN - Direct

1    Q.    How long had this bucket been in service,

2    do you know?

3    A.    Seven years.

4    Q.    Okay.  And had it failed before?

5    A.    Not that I know of.

6    Q.    Okay.  You shipped the bucket back to

7    Nebraska, ultimately?

8    A.    Yes.

9    Q.    Do you know when you did that?

10    A.    I've got record of it somewhere.  It

11    would be -- I know I have it.  Putting my fingers on

12    it in the file is another thing, but I do have record

13    of it.

14    Q.    After you shipped the -- the bucket and

15    the --

16    A.    Time-out.  Sorry to interrupt you.

17    Q.    That's okay.

18    A.    June 29th of 2015.

19    Q.    Okay.  After shipping the bucket and its

20    parts back to Nebraska, have you done any other

21    analysis in regard to this particular incident or the

22    failure of the bucket?

23    A.    Yes.  I have looked at benchtopwise and

24    microscopically the cross-sections that were cut from

25    the bucket by -- adjacent to the failure.

51

COLEMAN - Direct

1    Q.    Okay.  And when did you do that?

2    A.    Between -- well, it's not between.  Let's

3    say the end of the summer when I received those parts

4    back.  Probably between August and September.

5    Q.    There was some -- some -- an examination

6    done out in California and some -- some testing done?

7    A.    Yes.

8    Q.    Were you part of that?

9    A.    No.

10    Q.    The parts that you received, were those

11    provided to you after that work was done out in

12    California?

13    A.    Yes.

14    Q.    And you examined them microscopically?

15    A.    I did.

16    Q.    And is the results of that microscopic

17    examination also in your working notebook?

18    A.    Yes, sir.

19    Q.    Why don't you tell us what you did, what

20    you saw, and what the significance of that was to

21    you?

22    A.    What I did was -- let me first tell you

23    what I received so we'll be sure that that is clear

24    to you.

25    Q.    Okay.

52

COLEMAN - Direct

1    A.    I received the specimens that were

2    labeled "A," "B," "C," and "D" as they were -- as the

3    work was done in California.  So it's a chunk of the

4    bucket that you can hold in your hand, a small piece,

5    cut from the bucket body.  That was "A" at the origin

6    of the fracture and "B" at the other primary failure

7    origin on the rim of the bucket.  So two primary clumps of

8    material saw cut from the bucket body.

9    There was another flap of material from

10    the -- the side of the bucket, for lack of a better

11    way to describe it.  Not the rim, but the -- the flap

12    of material that came with the rim when it pulled

13    away.  About palm size.

14    Q.    Okay.

15    A.    And then there was a small fragment that

16    had been cut from one of these pieces that was used

17    in the laboratory work done at Exponent.  I had those

18    four pieces.  I spent my time with "A" and "B," the

19    two parts adjacent to the fracture and where the

20    cross-sections had been exposed when they were cut.

21    What I did was examine those under the microscope.  I

22    photographed those pieces.  I found a myriad of

23    cracks, internal delaminated areas, and internal

24    crack zones in those cross-sections.  There was a

25    discoloration at the surface of the flaws.  It was a

53

COLEMAN - Direct

1    pretty nasty looking cross-section, to put it mildly.
2        Q.    Okay.  And what, if any, impressions or
3    conclusions did you draw from your observations?
4        A.    It told me that the -- the defect
5    population was -- was high.  That there were -- there
6    was enough discontinuity in the section to weaken it
7    in the presence of whatever load it was going to see
8    and that it was going to cause -- I could understand
9    why the failure began in this location with so many
10   anomalies in the material.
11       Q.    Did you ever do any calculations,
12   testings, or experiments to determine what load it
13   would take to actually create a failure in the areas
14   that you've just identified?
15       A.    I didn't do calculations to do what I
16   could see with the naked eye.  When there is a flaw
17   that runs nearly the entire length of the
18   cross-section and was a gaping wound in the
19   cross-section, I didn't see any reason to calculate
20   that.  There was enough of it in there to understand
21   completely why the failure could have occurred.
22       Q.    So you don't know what level of load it
23   would have taken to cause that area to begin to fail
24   or fail.  Fair statement?
25       A.    No one can know the load that it takes to

54

COLEMAN - Direct

1    fail this cross-section exactly.  Because every
2    section will be different.
3        Q.    And I'm not talking about exactly.  You
4    didn't do anything to help you determine generally,
5    specifically, or exactly what load it would take to
6    cause that area to fail, did you?
7        A.    No, I didn't.  I didn't need to.
8        Q.    Okay.  Other than observing things either
9    microscopically or with your eye and photographing
10   them, did you do anything else?
11       A.    You make it sound so trivial when you
12   phrase it that way, and it's not that way at all.
13       Q.    Okay.  Well, if I'm making it sound
14   trivial, I apologize.  But did you do anything else?
15       A.    My work was done at that point.
16       Q.    Okay.
17       A.    It was sufficient to -- to tell
18   Mr. Guenzel and Mr. Beucke that this bucket failed
19   because it had internal defects.  And the structure
20   in the area that's most critical, where this thing is
21   nearly attached to the rib and to the boom, has a
22   problem with it.  And I showed them what the problem
23   was, and we discussed it.  My work at that point was
24   done.
25       Q.    And you've not done anything since?

55

COLEMAN - Direct

1        A.    I've read depositions and the like, but I
2    haven't done any more lab work.
3        Q.    Okay.  You've seen the photographs of the
4    scene where this occurred, where the truck was, where
5    the boom was, where the pole was?
6        A.    Yes, sir.
7        Q.    Have you done any work at all to develop
8    any type of a reconstruction as to how -- how this
9    incident occurred?
10       A.    No.  I haven't been asked to do that.
11       Q.    Are you familiar with the fall protection
12   that was available for Mr. Keaschall to use that day?
13       A.    Why, sure.  I've worn them many times.
14       Q.    Do you believe that that is a safety
15   requirement that should be followed when you're
16   working in a man lift bucket like this at the height
17   Mr. Keaschall was at?
18       A.    Well, sure it is.  That's a common thing
19   in the field.  He had his harness on.  I don't think
20   it was attached to the D-ring.  He may have thought
21   it was and it wasn't, but he didn't -- it wasn't at
22   the time he fell.
23       Q.    And having the harness on without having
24   it attached is like not having it on, isn't it?
25       A.    Yeah, it is.  That's true.  You know,

56

COLEMAN - Direct

1    that's -- that is designed not to help you in case
2    the bucket fails.  It's designed if you fall out of
3    the bucket, if you get shocked, if you get pulled out
4    from some other means, that'll protect you.
5        Q.    It's also going to keep you from falling
6    to the ground if the bucket fails; correct?
7        A.    And it also has no relation to the
8    defects in the tub.
9        Q.    I didn't ask if it did.  I just said it's
10   going to keep you from hitting the ground if the
11   bucket fails, isn't it?
12       A.    In that strict of sense, yes, it would.
13       Q.    Okay.  So Mr. Keaschall would not have
14   fallen to the ground that day if he simply would have
15   attached to the D-ring his lanyard for the fall
16   protection that he had on.  You agree with that?
17             MR. BEUCKE:  Excuse me.  I want to object
18   to the question.  Lack of foundation and asks this
19   witness to speculate.
20       Q.    (By Mr. Ahl)  Go ahead and speculate.
21       A.    In theory, no.  I mean, that's -- that's
22   what the device is called.  It's a fall protection
23   piece of equipment.
24       Q.    As required by OSHA?
25       A.    Yes.

**57**

COLEMAN - Direct

1    Q.    Did you get into the details with Dawson
2    as to whether or not they required it?
3    A.    I didn't really need to discuss it with
4    them.  I knew they required it.
5    Q.    Okay.
6    A.    Like I said, he had it on.  He may have
7    forgotten to attach it or maybe it came unattached.
8    But they know the rules.
9    Q.    Yeah.  And not having it on and attached
10   would be a violation of both OSHA and those rules of
11   Dawson.  Agree with that?
12   A.    Yes.
13   Q.    After concluding your work, on page 7 of
14   your report you list certain conclusions and
15   opinions?
16   A.    Yes.
17   Q.    Why don't you get your report out, and
18   let's talk about these for a minute.
19   A.    Okay.
20        MR. SHIVELY:  Can we take a break?
21        MR. AHL:  Yeah.  Why don't we take a
22   five-minute break before we get started on these.
23        (At this time a brief recess was
24        taken.)
25   Q.    (By Mr. Ahl)  Okay.  I think we ended up

**58**

COLEMAN - Direct

1    by starting to look at page 7 of your report, which
2    includes your conclusions and opinions?
3    A.    Right.
4    Q.    Are those all of the conclusions and
5    opinions that you've arrived at in regard to your
6    work on this matter?
7    A.    I think so.
8    Q.    Okay.  And it indicates that based upon
9    your macroscopic and laboratory examination of the
10   evidence vehicle, lift assembly, fiberglass man lift
11   bucket, the materials and documents reviewed, your
12   education and work experience, those are your
13   opinions and conclusions; right?
14   A.    Yes.
15   Q.    And does that statement there include all
16   of the bases for your opinions?  That is your
17   examination, both macroscopically and laboratory
18   examination, your viewing of the different
19   components, the documents that you've reviewed and
20   your education and work experience.  Anything else
21   that you've used to formulate any of your opinions or
22   conclusions?
23   A.    I think that covers it.  You know,
24   there's a lot of experience involved in looking at
25   fractures and determining why they occur.

**59**

COLEMAN - Direct

1    Q.    Okay.
2    A.    But I think that it's covered there.
3    Q.    Okay.  Let's talk about your first
4    opinion or conclusion that says, "Inherent
5    manufacturing defects have been discovered in the
6    subject Altec/Osborne man lift."  And then you go on
7    to say, "These defects include foreign material and
8    zones of incompletely cured resin, resulting in
9    specific planes of weakness.  Fracture of the bucket
10   can be traced directly to the regions containing
11   these flaws."  Why don't you, in laymen's terms, tell
12   me what you're saying there.
13   A.    I thought that was pretty clear.  I think
14   I did it earlier, but I'll try to do it again.  Maybe
15   I can do it cleaner.  There are zones and regions of
16   weakness in this cross-section.  And because they
17   represent inhomogeneities in the material and thus
18   are present in the load bearing cross-section, their
19   response to loading is such that it will cause
20   immediate fracture.  The areas that I saw were a
21   combination of uncured sites, incompletely cured
22   sites.  There are open cracks now.  We don't know
23   when they formed.  They may have formed during the
24   lifetime of the product.  They may have been formed
25   early on, right -- during the manufacturing.  We will

**60**

COLEMAN - Direct

1    never know those answers.  But those defects are at
2    the origin of the failure, along with that foreign
3    substance that's there.
4    Q.    Okay.  And exactly where on the lift
5    bucket do you determine that area to be?
6    A.    It would be the location that's been
7    labeled "A."
8    Q.    Okay.
9    A.    By the various experts that have looked
10   at this.
11   Q.    Okay.
12   A.    It's the area where the rib is next to
13   the flange.
14   Q.    Okay.  And that's where you have
15   discovered the defects that you've talked about with
16   the foreign material and zones of incompletely cured
17   resin?
18   A.    Yes.
19   Q.    Okay.  Did you do anything to determine
20   what the effect of that defect would be on the
21   strength of the bucket in that location, if any?
22   A.    I didn't need to do anything.  It was --
23   the fracture that occurred told me what the effect of
24   those defects were.
25   Q.    The effect on the strength of the

61

COLEMAN - Direct

1    material?
2        A.    Or lack of strength as it may be, yes.
3        Q.    Do you know how much load was on this
4    bucket at the time it failed?
5        A.    I don't know.
6        Q.    Number 2, "The fabrication defects, which
7    are primarily sub-surface, precipitated fracture and
8    premature failure of the fiberglass man lift bucket."
9    Then you say, "Fracture could have been instantaneous
10   or progressive, or perhaps both.  Neither scenario
11   would have provided a warning of impending failure."
12             Let's take -- let's break that down.  The
13   fabrication defects which are primarily subsurface
14   precipitated fracture and premature failure of the
15   fiberglass man lift bucket.  What do you base that
16   on?
17       A.    I saw no flaws that began at the surface
18   or in the gel coat.  I saw them in the cross-section
19   inside the ring form.  So those would be considered
20   subsurface.  They're not visible to the naked eye.
21       Q.    Okay.
22       A.    That's the reason for that comment, is
23   that -- are we just going with the first sentence
24   here, or are we continuing?
25       Q.    And "precipitated fracture and premature

62

COLEMAN - Direct

1    failure of the fiberglass man lift bucket," what do
2    you base that on?
3        A.    Well, there's no indication from looking
4    at the bucket beforehand that failure was imminent.
5    There's no indication that there was a crack at the
6    surface that precipitated at the surface, as I said,
7    and moved to the interior of the rib wall and caused
8    the failure.  The flaws are on the inside.  That's
9    the structural part of this device.  Not the surface
10   coating.  So the fracture began there and at whatever
11   flaw was present when the bucket was loaded.
12       Q.    In your investigation and the testing
13   that you did, were you ever able to determine whether
14   or not, with the defects that you say that you found
15   that were present in this bucket --
16       A.    Right.
17       Q.    -- whether or not it still would have
18   performed at the level of load that it was designed
19   to handle?  Do you know that?
20       A.    I don't know what the loading was.  So I
21   can't answer your question cleanly.  And I also don't
22   know the extent of the defects or all of their
23   orientation or if they're more dense in one area than
24   others.
25       Q.    And I guess what my -- the essence of the

63

COLEMAN - Direct

1    question is, even if we take your first opinion or
2    conclusion at face value and say that you -- and we
3    agree that you found these defects in the
4    manufacturing process, the foreign material and the
5    zones of incompletely cured resin, I guess what I'm
6    wondering is whether or not you have done anything to
7    determine whether or not the platform still could
8    have performed as it was designed to perform under
9    the conditions and load that it was designed to
10   handle with those defects.  Did you do anything to
11   determine that?
12       A.    Not -- not a calculation or a specific
13   test.
14       Q.    Okay.
15       A.    Not to -- not to put a boldface on what I
16   already know.
17       Q.    And we don't know what it was -- how it
18   was loaded at the time of failure, do we?
19       A.    No.  We don't know.  We don't know -- I
20   mean, the typical loading on these things, whatever
21   foreseeable use there is, it has to be able to -- the
22   bucket has to be able to handle the things that even
23   you don't want it to do.  That's why you warn about
24   it.  Because you know what will happen if you do
25   that.  And if the defects are there, then the loading

64

COLEMAN - Direct

1    scenario really doesn't matter.  You know what a good
2    one is and you know a good one will withstand a lot
3    of load.
4        Q.    And we do know that sometimes operators
5    get these hung up on things and can create a load on
6    them by either getting them stuck on a pole, for
7    instance, or pushing against something that they
8    shouldn't be?
9        A.    I would be surprised if those things
10   didn't happen on a daily basis.
11       Q.    Okay.  And we don't know what type of a
12   load those create?
13       A.    No.  It's a foreseeable use.
14       Q.    Okay.  Number 3 says, "The defects were
15   present at the time the man bucket left the control
16   of the manufacturer."  How do you know that?
17       A.    Well, they're inherent flaws.  We've got
18   areas that are uncured slash unbonded in the
19   cross-section.  It may be a bit fair to talk about
20   that without -- about looking at the end of this
21   middle sentence in item 2.  Because it says we don't
22   know whether fracture was instantaneous or
23   progressive.  And that really means that the cracking
24   doesn't have to show up immediately when it's made.
25   It may be that the condition of this cross-section of

65

COLEMAN - Direct

1    the bucket is prone to cracking at some point in its
2    lifetime as it ages.  So whatever defect population
3    was there at the onset may have increased during the
4    useful life of the bucket.  And we don't know which
5    one it was.
6        Q.    You can't tell that by your observations?
7        A.    No.  You can tell a fatigue crack from
8    a -- an instantaneous load or a corrosion crack, for
9    instance, in many materials, metals and plastics
10   included, and, composites.  But in this instance, it
11   would be more of a progressive weakening of the
12   cross-section because of the likelihood of plastics
13   breaking down and crack networks forming during
14   routine service.  So we don't know exactly how bad it
15   was or when it went.
16       Q.    Okay.  And would that be more true if
17   this platform and the boom would have been loaded
18   to -- from time to time at a rate much greater than
19   its rated capacity?  Would that facilitate the
20   cracking, if a much greater load than what it's rated
21   for was placed on it?
22       A.    It might contribute some of it, but it
23   would certainly be loading that you would anticipate,
24   because these things are -- these things are
25   overdesigned in theory.  They're designed to take a

66

COLEMAN - Direct

1    pretty healthy load.  They don't work when they have
2    problems inside.  That's the problem.  We can't
3    disassociate a load with the failure because the
4    defect orientation and population is unknown.
5        Q.    I'm assuming that throughout your career
6    you've looked at a lot of fiberglass, a lot of
7    resins, a lot of different materials that include
8    those -- those items?
9        A.    Yes, sir, I have.
10       Q.    Is it common for a component that is made
11   out of fiberglass to have some areas of -- where the
12   resin has not completely cured?
13       A.    Yes.
14       Q.    And in each case, that wouldn't be termed
15   a defect in the manufacturing process, would it?
16       A.    I would say on a localized basis, it
17   would be more of a -- of an isolated flaw.  It -- I
18   would make an analogy to a piece of pipe that is
19   intended to be seamless when made at a pipe mill,
20   meaning it isn't put together by welding.  It's --
21   it's made by the metal being formed with a mandrel
22   when it's really hot.  And there are times when metal
23   folds over on itself and doesn't rebond with the sub
24   straight beneath it, and it has what we call a seam.
25   And a fold or a lap or a seam in a piece of tubing

67

COLEMAN - Direct

1    sits there in a benign way until it happens to be
2    loaded in a way that makes the defect explode.
3             It's close to what we have here, is a
4    defect that lays in wait.  But as the product ages
5    and the crack network grows and becomes concentrated
6    in a heavily loaded area, it will fail at a lower
7    load.
8        Q.    And, again, we don't know in terms of
9    this bucket or any of the Osborne buckets based on
10   the defects that you discovered in your analysis what
11   load it would have taken to cause that failure?
12       A.    That's right.  We don't know.
13       Q.    Would you agree with me that if we went
14   out and looked at any component that's made
15   completely out of fiberglass, we would find areas of
16   incompletely cured resin in that?
17             MR. BEUCKE:  Excuse me.  Are you talking
18   about any component in a bucket or any fiber --
19             MR. AHL:  Anything made completely out of
20   fiberglass that we would find areas of incomplete
21   cured resin.
22       A.    I would say it would be likely you would
23   find areas like that.  It's not a perfect process.
24   Because it is a composite.  So it's put on in pieces
25   as opposing to being something like a metal that's

68

COLEMAN - Direct

1    moved around and shaped to a form.  This is made to a
2    form.  And all cast materials have products -- or
3    have problems with them.  Metals like plastics.  And
4    when the defects are concentrated or there are
5    foreign things in the cast material, it may live for
6    a while.  And then it may die suddenly.  Without
7    warning.
8        Q.    (By Mr. Ahl)  Let's go to number 5 where
9    you -- you proffer the opinion that the decedent,
10   Kurtis Keaschall, neither caused nor contributed to
11   the failure of the man lift bucket.  See that?
12       A.    I do.
13       Q.    What's the basis of that opinion?
14       A.    There isn't evidence in my view that any
15   type of overload symptoms existed.  I know we have a
16   failure of a material, and there is a load that made
17   it go.  I can't deny that.  But in terms of him doing
18   something that -- that caused the defects, no.  He
19   didn't do that.  He didn't damage the bucket by
20   sticking a knife through it and doing things that
21   made it fail early.  The defects are inherent.
22       Q.    Okay.  And you don't know what load he
23   had on that bucket at the time of the failure?
24       A.    No, I don't know.
25             MR. AHL:  Okay.  Do you have that

69

COLEMAN - Direct

1 photograph from yesterday?
2      (At this time an off-the-record
3      discussion was had.)
4      (Exhibit No. 110 was marked for
5      identification.)
6 **Q.**    (By Mr. Ahl)  Let me show you what now --
7 the court reporter has now marked as Exhibit No. 110.
8 Have you seen that photograph before?
9 **A.**    I have.
10 **Q.**    That's one that was provided to you --
11 **A.**    Yes.
12 **Q.**    -- correct?  What do you understand that
13 photograph to depict?
14 **A.**    What I understand what it shows?
15 **Q.**    Yeah.
16 **A.**    Well, it's the scene.  The accident
17 scene.
18 **Q.**    Okay.  And is it your understanding that
19 that's the accident scene as it existed right after
20 the accident, after Mr. Keaschall obviously has been
21 removed?
22 **A.**    That's the way I understand it.
23 **Q.**    Okay.  Shows the orientation of the truck
24 and the boom and the pole, and over on the far
25 right-hand side, about two-thirds of the way down, we

70

COLEMAN - Direct

1 see the bucket?
2 **A.**    Yeah.  We know that the truck is in the
3 position it was in, most likely, because the
4 outriggers are still deployed.  And, as I understand
5 it, no one got in and moved the controls.  I don't
6 know about the bucket location, but it is what it is
7 in this picture.
8 **Q.**    Okay.  And I think -- why don't we accept
9 the -- the testimony that the bucket is in its final
10 rest area after it failed off of the boom.  Okay?
11 **A.**    Okay.
12 **Q.**    Do you know what the distance from the
13 pole over to the truck would be?  Did you see that
14 measurement?
15 **A.**    There was a measurement made.  I don't
16 recall what it was.
17 **Q.**    Do you have that anywhere in your
18 materials?
19 **A.**    If I have it, it's -- I think what you're
20 referring to is the drawing that the early
21 investigation provided.
22 **Q.**    Right.  Is there a measurement there from
23 the pole to the truck?
24 **A.**    There is a pole to truck.
25 **Q.**    What's that distance?

71

COLEMAN - Direct

1 **A.**    It says ten feet.
2 **Q.**    Okay.
3 **A.**    Now, we don't know which part of the
4 truck.  That's what it says.
5 **Q.**    Okay.  But you wouldn't expect it --
6 would you expect it to be the side of the truck
7 that's closest to the pole?
8 **A.**    Intuitively, that's right.  But sometimes
9 those intuitions are proven wrong.
10 **Q.**    Okay.  Well, let's assume --
11 **A.**    That's all you can go by for now.
12 **Q.**    Let's just assume that's right, too.
13 **A.**    Okay.
14 **Q.**    In your analysis of this failure, did you
15 ever determine when the bucket detached, how it came
16 off the boom and where it ended up?
17 **A.**    No.
18 **Q.**    Is that important to you?
19 **A.**    Not in what I was doing.
20 **Q.**    Okay.  If we assume that the pole is ten
21 feet away from the truck laterally -- okay?
22 **A.**    Okay.
23 **Q.**    That's what your pic- -- that's what your
24 diagram shows; right?
25 **A.**    That's what the number says.

72

COLEMAN - Direct

1 **Q.**    When this bucket detached, it had to move
2 ten feet laterally if it hit the truck.  Is your
3 understanding that it hit the truck or not?
4 **A.**    Well, I know people have suggested that
5 that was the reason for the deformation of the
6 channel on the side of the truck.
7 **Q.**    Okay.  And the reason for the paint
8 transfer from -- of the red from the truck to the
9 bottom of the bucket?  You saw that, didn't you?
10 **A.**    I did.
11 **Q.**    Okay.  And do you have another
12 explanation for that, the deformation of the rail or
13 the mark on the bucket?
14 **A.**    I don't.
15 **Q.**    Okay.  If that -- if that's true that the
16 bucket, when it separated from the boom, came over
17 and moved laterally ten feet and hit the -- do you
18 see the deformation of the rail on the truck?
19 **A.**    Sure.
20 **Q.**    Okay.  Let's assume that that's what
21 happened.  And then the bucket hit that and then
22 ultimately ended up over at its place of rest.  Do
23 you have an explanation of how that bucket moved
24 laterally ten feet from the pole over to the place
25 where it would have struck the truck?

73

COLEMAN - Direct

1      MR. BEUCKE:  Let me object to the form of
2  the question insofar as it assumes that the bucket
3  moved ten feet from the truck.  The testimony was that the pole was
4  ten feet from the truck.  I think the question
5  assumes a fact that has not been established.
6      Q.    (By Mr. Ahl)  Okay.  Well, let's assume
7  that the bucket was right next to the truck at the
8  time -- or right next to the pole at the time.  Would
9  you have an explanation as to how that bucket moved
10  laterally ten feet from where the pole is located to
11  the rail on the side of the truck?
12      A.    **No, I don't.**
13      Q.    Would you agree that it would take a
14  certain amount of energy to move that bucket ten feet
15  laterally from an engineering perspective?
16      A.    **If we're assuming that the bucket moves**
17  **without being controlled to move.  You're talking**
18  **about as a part of the accident sequence?**
19      Q.    Well, it fails and separates from the
20  boom.
21      A.    **Okay.**
22      Q.    And we know that it's going to come down
23  because of gravity; correct?
24      A.    **Yes.**
25      Q.    And if we assume the facts as I've laid

74

COLEMAN - Direct

1  them out, that the pole is ten feet from the truck,
2  the boom and the bucket were next to the pole, that
3  means that when it separates from the boom, the
4  platform separates from the boom, it moves also
5  laterally ten feet before striking the truck.  Agree
6  with that?  If all my facts are correct?
7      A.    **I'll go along you.**
8      Q.    Okay.
9      A.    **I don't think it has any bearing on what**
10  **I'm doing, but I go along with what you're saying.**
11      Q.    Why don't you think it has any bearing on
12  what you're doing?
13      A.    **Well, I -- I mean, that's not what my**
14  **purpose of this is.  My purpose was to look at the**
15  **fracture and determine why the bucket broke.  I just**
16  **haven't participated in any reconstruction efforts.**
17      Q.    Okay.  Would it tell us something about
18  maybe a load that was placed on the bucket that would
19  create enough energy to move that bucket laterally?
20      A.    **Maybe.**
21      Q.    Can you think of any other method by
22  which that energy would be present if that bucket
23  moved ten feet laterally to hit the truck?
24      A.    **I haven't considered that.  I -- I have**
25  **looked at that dent in the channel in the truck.  I**

75

COLEMAN - Direct

1  **don't know that that's the result of the bucket**
2  **hitting it any more than I know the red paint on the**
3  **bucket is from impact with that.  The whole truck's**
4  **red.  You could get red paint on it any number of**
5  **ways.  But I don't know about your scenario.**
6      Q.    Okay.  I understand.  I just want you to
7  assume that it's accurate.  I'm just wondering if you
8  have another explanation for the energy that it would
9  take to move that bucket laterally ten feet from the
10  pole to the place where, if we assume that it hit the
11  truck, it hit the truck?
12      A.    **Right.  I guess what you're asking me is,**
13  **is there a side load enough that would make it bounce**
14  **off the pole.  If it's hung up on the pole, will it**
15  **bounce back.  I don't know the answer to that.**
16      Q.    Okay.
17      A.    **And it doesn't matter to me either way.**
18      Q.    It would be important, though, if we were
19  trying to determine potentially what load was on this
20  bucket at the time of failure?
21      A.    **It's one consideration that a person**
22  **reconstructing would have to account for.**
23      Q.    Okay.  You did a second report that is
24  dated August 29th of 2016.
25      A.    **Yes, sir.**

76

COLEMAN - Direct

1      Q.    And in looking that -- at that report, I
2  don't see any new opinions or conclusions that you
3  have arrived at since your original report.  Am I
4  correct or am I wrong?
5      A.    **You are correct.**
6      Q.    Okay.  And, again, since Mr. Eihusen has
7  become involved and you shipped the bucket back to
8  Nebraska, the only thing that you did was make your
9  observations macroscopically and microscopically when
10  you were provided with the samples of material from
11  California?
12      A.    **There you go again trivializing what I've**
13  **done on this case.**
14      Q.    Well, correct me, then.  What else?
15      A.    **It wasn't trivial.  It's the cornerstone**
16  **of a failure investigation, is looking at a fracture.**
17      Q.    Well, but correct me if you've done
18  things other than that.  Whether it's trivial --
19  trivial or not, we'll let somebody else decide.
20      A.    **I just want to make sure you understand**
21  **my opinions.**
22      Q.    Oh, I'm giving you all the credit in the
23  world.
24      A.    **So I haven't done any additional**
25  **laboratory work other than look at those**

77

COLEMAN - Direct

1   cross-sections since I've had them and take
2   photographs of those.
3       Q.   You still have them?
4       A.   I do.
5       Q.   Okay.
6       A.   The rest of this work are things that
7   have been provided to me since my report was
8   originally authored.
9       Q.   Anything -- you've been given a copy of
10  Ben Railsback's report?
11      A.   Yes.
12      Q.   Anything in there that you're critical
13  of?
14      A.   I haven't gone through it in such
15  excruciating detail that I could say I agree with
16  assumptions that are made and the bases for arriving
17  at a conclusion of reconstructing the accident.  I
18  just haven't done that.
19      Q.   Okay.
20      A.   I do think that the side loading issue,
21  even if it's out there, wouldn't be an issue had
22  there not been a problem with the structure itself.
23  It would be able to handle side loading.  There's
24  even a side loading criteria.
25      Q.   It would be able to handle a side load

78

COLEMAN - Direct

1   regardless of how much that load was?
2       A.   It would be able to handle -- it should
3   be able to handle every foreseeable side load in
4   service and survive.  That's why they're
5   overdesigned.  So if there's a flaw in there, they
6   don't behave that way, that's the material or the
7   product's problem.
8       Q.   I understand.  But there's always design
9   limits, aren't there?  And people can abuse or
10  overload any product they want to, can't they?
11      A.   Yes, they can.
12      Q.   Okay.  You were provided a copy of
13  Dr. Rakow's report?
14      A.   Yes.
15      Q.   Anything in there that you're critical
16  about?
17      A.   I disagree with his conclusions for the
18  same reasons we've already talked about.
19      Q.   Which conclusions?
20      A.   Well, I think that there are -- there
21  are -- the defects that are present in this structure
22  are benign flaws, I don't agree with that.  I think
23  the fracture and this occurrence demonstrate cleanly
24  otherwise.  I also disagree with the assumption that
25  because there are a few of these he's looked at out

79

COLEMAN - Direct

1   of 9,000 and those have delaminations in them, that
2   you can write off and say, all these are good, it
3   doesn't matter how many defects are present because
4   they all have them.  That's a reckless approach at
5   analyzing a failure.
6       Q.   Do you know how many of these buckets
7   have actually failed in service in the last 20 years?
8       A.   I would -- I would estimate very few.  I
9   don't know how many have failed, but I wouldn't think
10  a big population of them fail.
11      Q.   Do you know if Dawson ever had one fail
12  before in their use of them?
13      A.   I don't know.  I've seen buckets fail.
14      Q.   I'm not asking you that.  I'm asking you
15  about Osborne platforms.
16      A.   I don't know.
17      Q.   Okay.  And you don't know how many of
18  them would have had this same condition that you've
19  described as being the defective condition?
20      A.   I don't know.
21      Q.   Okay.
22      A.   No one will know that.
23      Q.   Okay.  Do you intend to do any additional
24  work or formulate any other opinions or conclusions
25  as part of your work?

80

COLEMAN - Direct

1       A.   I anticipate reviewing depositions as
2   they're taken.  Maybe even attending them of the
3   various experts.  If there are other depositions that
4   are taken, I expect to be asked to review those as
5   well.  There may be other lab functions that -- that
6   arise upon reviewing those depositions or hearing
7   what people have to say.  At this point, we haven't
8   really discussed it.  I don't expect my opinions to
9   change.  I expect them to be enhanced if there's more
10  invasive work done.  But we haven't really talked
11  about that.
12      Q.   Okay.  I'm assuming that you charge for
13  your services by the hour?
14      A.   Yes, sir.
15      Q.   What's your hourly rate?
16      A.   295.
17      Q.   Okay.  Do you know approximately what
18  your bill has been so far for the work that you've
19  performed in regard to this analysis?  A ballpark
20  figure is close enough for me.
21      A.   Good.  Because that's -- that's all I can
22  do.
23      Q.   That's all we need.
24      A.   It's less than probably $20,000 over the
25  last four years.

81

COLEMAN - Cross

1    MR. AHL: Okay. I think that's all the
2    questions I have for you today. I'm going to let
3    Mr. Shively ask a few. Okay?
4    THE WITNESS: The duck hunter.
5    MR. AHL: Correct. So watch out for him.
6    He's deadly.
7    MR. SHIVELY: There's no movie called
8    that, that I know of.
9    THE WITNESS: Are you saying you don't
10   hunt deer?
11   MR. SHIVELY: That's true. That's
12   correct.
13   THE WITNESS: Nor do I.
14   MR. SHIVELY: If it flies, I hunt it.
15            CROSS-EXAMINATION
16   BY MR. SHIVELY:
17   Q.    Mr. Coleman, I'm Bob Shively, as you
18   know. We met just prior to the deposition, and I
19   represent Altec in this case. And we, with your
20   report dated September 30th of 2015, were given your
21   vitae at that time. And I just want to make sure
22   it's current. Have you updated it or revised it
23   since September 30th of 2015?
24   A.    No.
25   Q.    Is it missing anything that you think

82

COLEMAN - Cross

1    should be added?
2    A.    **I don't know. I get so tired of doing**
3    **that stuff, I just don't pay attention to it.**
4    Q.    And I don't blame you. But specifically,
5    for example, with regard to publications, the vitae
6    we have has the last publication you authored being
7    in, I believe, 1980?
8    A.    **Long ago.**
9    Q.    Okay. Nothing new in recent years?
10   A.    **No. There are no papers involving**
11   **buckets.**
12   Q.    And would that also be true with regard
13   to lectures and unpublished presentations? Nothing
14   new that's not on your vitae?
15   A.    **I don't know. I don't think so. There**
16   **have been so many publications -- or presentations.**
17   **But those are -- those are small group things. Not**
18   **with respect to anything in this case. Mostly oil**
19   **field equipment.**
20   Q.    And we have a 2015 fee schedule. I
21   assume you updated that in 2016?
22   A.    **Yes.**
23   Q.    Because in 2015 the rate was 265. I
24   assume you raised it in 2016 to the 295 that you
25   testified to?

83

COLEMAN - Cross

1    A.    **I think so. I don't know when I did**
2    **that.**
3    Q.    Can you think of any other changes in the
4    fee schedule from the 2015 one?
5    A.    **Oh, I'm sure Phil Perkins' rate has**
6    **changed. And there may be a change in some of the**
7    **specials below it. But really it's pretty close to**
8    **the same.**
9    Q.    Had you ever done any work on behalf of
10   Dawson Public Power prior to this case?
11   A.    **No, sir.**
12   Q.    And that would be work in any regard:
13   consulting, forensic, litigation?
14   A.    **No.**
15   Q.    How about do you know who the insurer for
16   Dawson is?
17   A.    **No.**
18   Q.    Had you ever worked with Mr. Guenzel's
19   firm prior to this case?
20   A.    **No.**
21   Q.    And how about Mr. Beucke's firm?
22   A.    **No.**
23   Q.    Mr. Ahl was questioning you about two
24   reports that we've received, the first one of
25   September 30th of 2015 and the second one of

84

COLEMAN - Cross

1    August 29th of 2016. Do you understand that?
2    A.    **I do.**
3    Q.    And in your August 29th, 2016, report you
4    refer to the review of engineering literature and
5    technical publications. Do you recall that?
6    A.    **Of course.**
7    Q.    When did you review those in connection
8    with your work in this case, approximately?
9    A.    **A specific date, I couldn't tell you,**
10   **sir.**
11   Q.    Well, I notice that it's -- you didn't
12   list any such review of materials prior to your -- or
13   in your report of September 30th of 2015. You do
14   list them in your August 29th, 2016, report. Can we
15   infer from that that you reviewed those materials
16   after your September 30, 2015, report?
17   A.    **Maybe I looked at them again. Those --**
18   **most of those publications came out of my existing**
19   **library. Others came out later. I don't know when**
20   **was -- which was what.**
21   Q.    And so specifically the publications that
22   you list in your August 29, 2016, report, do you know
23   where you got those?
24   A.    **A couple of these I've had. Another**
25   **couple came from -- I think Mr. Eihusen sent a**

85

COLEMAN - Cross

1    couple. I don't remember which is which. And I
2    can't say that I can, with great precision, recall a
3    lot of -- most of these papers.
4        Q.    I understand. So the -- at least a
5    couple of them you think you got from Mr. Eihusen;
6    correct?
7        A.    Yes.
8        Q.    With regard to Mr. Eihusen, have you ever
9    met him?
10       A.    I met him yesterday.
11       Q.    Did you ever have any conversations with
12   Mr. Eihusen about his work on this case, opinions and
13   methodology, anything he's done, prior to yesterday?
14       A.    Yes, sir.
15       Q.    Okay. When did you first visit with
16   Mr. Eihusen?
17       A.    I think it was when he was first brought
18   on board by Mr. Guenzel and Mr. Beucke. I don't know
19   when that was. Within the last, you know, year
20   sometime. And then I spoke with him once on one
21   other occasion.
22       Q.    The first conversation that you've told
23   me about, what do you remember about it?
24       A.    My recollection, foggy as it may be, is
25   that we discussed some of the problems associated

86

COLEMAN - Cross

1    with manufacturing this type of good. Particularly
2    with -- with resin transfer molding. The types of
3    defects that may be present. And I think -- and I
4    also think he was -- had just looked at the bucket
5    for the first time. So he may have had questions for
6    me about -- about things, too.
7        Q.    So the defects you just referred to, are
8    you talking about in the manufacturing process?
9        A.    Yes.
10       Q.    And then the second conversation you had
11   with him?
12       A.    A little bit more substantive, as I
13   recall. And it was about opinions and conclusions in
14   the report, my report. We discussed the structural
15   components of the bucket and the failure mode.
16   That's about it, I think.
17       Q.    Did he share with you what he thought
18   caused the failure?
19       A.    I'm sure he did at the time.
20       Q.    Anything stand out that you disagreed
21   with each other on anything?
22       A.    I wouldn't call it disagreement. I would
23   say that his efforts were focused in another area
24   more so than mine. He was more associated with
25   analyzing the bucket structure, inspection techniques

87

COLEMAN - Cross

1    and those sorts of things. And I wasn't really
2    involved with that.
3        Q.    And you remain not involved with those
4    things today; correct?
5        A.    That's not my -- I mean, I'm not a
6    structural mechanics person. I think he has lived in
7    that world so long, he's part of the fiber himself.
8    And so, you know, we're crossing over different areas
9    here.
10       Q.    To your knowledge, have you ever spoken
11   to anyone affiliated with Altec about anything having
12   to do with this case?
13       A.    No.
14       Q.    Have you spoken with any of the other
15   retained experts whose reports you've read in this
16   case?
17       A.    No. I've never met any of those three
18   gentlemen.
19       Q.    In your report of September 30, 2015, you
20   mention a yellowed area in the platform or bucket.
21   Do you recall that?
22       A.    I do.
23       Q.    And does that have any significance to
24   you, the fact that you found yellowed -- a yellowed
25   area?

88

COLEMAN - Cross

1        A.    Well, it's significant in the sense that
2    it's at the origin and it appeared to be a foreign
3    material in the corner and in another component. And
4    it was inconsistent with the appearance of the
5    remainder of the cross-section.
6        Q.    In what way?
7        A.    Well, it's yellow, first of all. But
8    because it also seems to be associated with -- or I
9    would call it a heterogeneous area. In material
10   sciences, that means an odd zone, a bad zone, a
11   defective zone, an area of weakness that's
12   concentrated around an impurity or some other
13   substance.
14       Q.    Do you have an opinion on what might have
15   caused the yellowed area?
16       A.    I think that there are different
17   explanations for it. I don't know which is the right
18   one. There are issues with curing. There are issues
19   with bleeding solvents. You know, chemical
20   inconsistencies. And laminations and voids and other
21   things which provide the source of a crack or some
22   other microscopic flaw or macroscopic flaw. I don't
23   know what the yellow can be attributed to, and it
24   hasn't been identified cleanly yet.
25       Q.    Whatever possible cause of that would be,

89

COLEMAN - Cross

1    would it have been during the manufacturing process?
2        A.    I'll take your question to mean this: It
3    isn't something that occurred after the failure. It
4    is not a result of exposure to the air. It's an
5    inherent part of the component. It's not weathering
6    or oxidation that occurs after a failure.
7        Q.    You've also referred to foreign
8    materials. Did you ever identify specifically what
9    foreign materials were in the fiber of that platform?
10       A.    No. I've not had a chance to do that,
11   and I understand that was part of the exercises in
12   California that were inconclusive as well. The one
13   thing we do know is that it's at the origin and that
14   it's not supposed to be there. We just don't know
15   what it is.
16       Q.    Do you know whether it -- or do you have
17   an opinion on whether any foreign material actually
18   contributed to the failure or caused it?
19       A.    I have to leave it at something being
20   inhomogeneous. I can't tell you if something was
21   entrapped intentionally or, you know, a piece of
22   something was entrapped in a mold. I don't think
23   it's necessarily that. I think it's a consequence of
24   injecting the mold, curing, and some compound
25   reactions.

90

COLEMAN - Cross

1        Q.    With regard to your conclusions and
2    opinions, you have given us the opinion that there
3    were inherent manufacturing defects in the man lift
4    bucket; correct?
5        A.    Yes.
6        Q.    Do you know who manufactured the lift
7    bucket?
8        A.    It's my understanding it was Osborne in
9    Kansas.
10       Q.    Are you aware of any involvement of Altec
11   in the actual manufacturing of the lift bucket?
12       A.    I think Altec is the designer, not the
13   fabricator. As I understand it.
14       Q.    That's your understanding?
15       A.    That's what I know.
16       Q.    You're not aware of any machining that
17   was done by Altec; correct?
18       A.    I don't -- I don't know about that.
19   There has to be machining done on this, but I don't
20   know who would have done it. I would think that
21   would be done at the principal place it was
22   fabricated.
23       Q.    And so with regard to your third
24   conclusion and opinion where you state the defects
25   were present at the time the man bucket left the

91

COLEMAN - Cross

1    control of the manufacturer, were you referring to
2    whoever manufactured the lift bucket itself?
3        A.    Yes.
4        Q.    You're not offering any opinions with
5    regard to the design of the bucket and any effect it
6    had on the cause of the failure?
7        A.    Not so much in the -- in the actual
8    design on paper. I'll offer this: If there is a
9    problem with these buckets, it's that the defects are
10   hidden from not just the users' view, but the
11   inspectors' view. So in the chance that there are a
12   cluster or a highly populated area of the bucket that
13   is -- let's say, started out badly, meaning from
14   manufacture, or weakened during service because of
15   residual problems in the melt, those defects remain
16   concealed to those people.
17       I've also seen no life expectancy for
18   these buckets and no way to know when the bucket
19   should be retired from service other than just
20   visually looking at it. And I think that's good for
21   lots of occasions, but when there happens to be one
22   that's made poorly, those things go undetected.
23       Q.    The cluster of defects that you talk
24   about, those would be unable to be detected when the
25   product was new as well as after it had been used for

92

COLEMAN - Cross

1    a period of time; is that correct?
2        A.    That's true. That's one of the problems
3    with composites and nonmetallic materials, is you're
4    limited on the kinds of inspection methods that are
5    available. Yes, there are some things you can do,
6    but there are ghastly expenses, and they are very
7    difficult to perfect. It does not mean that you
8    didn't do it, but it's hard to do that in the field.
9    Or at a customer's lab without bringing a unit to
10   them. It's very complicated.
11       Q.    The manufacturing defects you're talking
12   about are on the inside, not visible to the naked
13   eye; correct?
14       A.    That's right. And maybe I need to clean
15   that answer up a little bit. Hidden defects are the
16   worst, because they can explode and give you a
17   brutal, unwarned about, so to speak, failure. When
18   the material is prone to deteriorating or weakening
19   with time because of interactions inside as a part of
20   the plastic, those things go undetected. But if you
21   inspected later on down the line, you would know if
22   the bucket material had deteriorated, cracked,
23   oxidized, whatever else otherwise, and maybe have a
24   better idea of when a bucket should be retired from
25   service.

93

COLEMAN - Cross

1    Q.    The -- the defects you've identified in
2  this bucket, would those have been visible at the
3  time of manufacture?
4    A.    Not necessarily.  Some may.  Some may
5  not.  And there's no way to know what the answer is
6  in the middle.  Because we don't know the propensity
7  for internal cracking in these kinds of materials
8  yet.
9    Q.    What inspection at the time it left
10  Osborne would have been detectable, if anything?
11    A.    I don't know that you could find anything
12  other than x-raying every bucket that you make.  That
13  seems impractical to me.
14    Q.    And you're not aware of that happening in
15  the industry, that each single bucket that comes in
16  gets x-rayed; correct?
17    A.    No, it does not.  I would be shocked if
18  that was the case.
19    Q.    And the other way to find out would be
20  cut into them; correct?
21    A.    There are other ways to do testing.
22  There are other ways that would permit you to find
23  defects.  For instance, if you were to use techniques
24  like acoustic emission or some ultrasound methods,
25  the presence of flaws in critical areas can be

94

COLEMAN - Cross

1  detected.  And certainly you could do that at the
2  factory, but I don't know that people do that.
3    Q.    Your conclusions and opinions in this
4  case don't include anything with regard to
5  inspections; correct?
6    A.    That's right.  Other than to say that
7  there was no indication on the inspection in February
8  before the accident occurred that there was no
9  visible problem with the unit.
10    Q.    And that inspection was done by Dawson;
11  correct?
12    A.    Yes, sir.
13    Q.    And you're not offering conclusions and
14  opinions with regard to warnings.  That wasn't part
15  of your scope of work.  Correct?
16    A.    No, it's not.
17    Q.    I asked a poor question.  It might look
18  bad when we look at it later.  I think I asked you is
19  it correct, and you said no.  But I assume your
20  answer meant, no, you're not offering opinions on
21  warnings as a cause of the failure here?
22    A.    I think you asked a worse question the
23  second time.
24    Q.    I'm sure I did, which happens.
25    A.    Let me make sure I understand what you're

95

COLEMAN - Cross

1  saying.
2    Q.    I just want to make sure you're not
3  offering any opinions in this case with regard to
4  deficient warnings, for example?
5    A.    No.  I am not offering anything on
6  warnings.  I've not been asked to do that.  That's
7  not my area.
8    Q.    Not your area of expertise; correct?
9    A.    No, it is not.
10    Q.    You're not a safety expert.  You're a
11  materials and metals --
12    A.    I could be because of what I've seen and
13  what I've been involved with, but I don't like to do
14  that.  That's not my -- my thing.
15    Q.    And you haven't been asked to do any of
16  that in this case?
17    A.    Not at this point.
18    Q.    So your sole opinions that you're
19  offering today have to do with the manufacturing
20  defects; correct?
21    A.    Yes.
22    Q.    In your report of August 29, 2016, you
23  indicate that you reviewed four depositions taken in
24  this case?
25    A.    Yes, sir.

96

COLEMAN - Cross

1    Q.    As we sit here today, are those the only
2  depositions you've reviewed concerning this case?
3    A.    That's all that I have.
4    Q.    Okay.  That was my next question.
5    A.    I know.  There you go.
6    Q.    You're ahead of me.  Most people are.
7  The -- you haven't been provided any depositions
8  other than those four; correct?
9    A.    That's true.
10    Q.    You reviewed the investigative report of
11  Anand Shah.  And he goes by Andy.  Do you have any
12  criticisms or disagreements with the report you
13  reviewed of Mr. Shah?
14    A.    Sure, I do.
15    Q.    Okay.  Go ahead and tell us about them.
16    A.    He thinks I'm wrong.  I think I'm right.
17    Q.    Okay.
18    A.    That's really what it boils down to.  He
19  attributes -- the one thing I do agree with him on is
20  the origin of the failure at the junction between the
21  rim and the rib, in that area, location "A."  I agree
22  with -- I'm glad to see that he agreed with me on
23  that.  He does not agree that -- well, what he said
24  was, is that the delaminations are present and
25  they're in all these things.  So he says they're all

97

COLEMAN - Cross

1   defective, basically.  They all contain defects.
2   Just most of them don't matter.
3       I think that's reckless.  I think, much
4   as your person or people that looked at this failure
5   and Mr. Shah that looked at it said that they can
6   tell by looking at it that it was overloaded, that's
7   a pretty good test from their eyes as well, although
8   without the scientific basis for it.  I look at it
9   and I can see the manufacturing defect.  So in that
10  sense, what I think is a defect and what Mr. Shah
11  thinks is a defect are two different things.
12      Q.   Can you think of any other criticisms or
13  disagreements in his work?
14      A.   I disagree with his statement that says
15  that the -- because the fibers in the plastic are
16  parallel to the crack, that shear location and damage
17  are consistent with side loading.  And he bases that
18  off the test pattern of an Altec in-house test, I
19  guess, in 2002.  I don't think that that is
20  indicative of side loading, necessarily.  Just
21  because what he says there, that the fiber is
22  parallel to the crack.  Fibers run all directions in
23  these things.
24      He says the side loading is excessive.  I
25  disagree with that.  And that it doesn't fail from

98

COLEMAN - Cross

1   normal -- failure didn't occur from normal operating
2   loads.  I disagree with that as well.  There's
3   nothing that tells me that this is -- the use on this
4   bucket, either beforehand or at the time of the
5   accident, was something that created the defects.  It
6   may have exposed the defects, but the use was
7   foreseeable.
8       And even if it was misused, that's the
9   reason these things are overdesigned.  Which all goes
10  back to, with the failure as such and these things
11  that are supposed to be so strong and occur at a low
12  load, the defects must be the overwhelming cause and
13  not the use.  I disagree with his position on that.
14      I also agree with -- disagree with his
15  statement -- and it may be semantics.  But I disagree
16  with the fact that there is no evidence to support
17  that the extent and level at which the cracks are
18  present are sufficient to cause failure.  I think
19  it's -- I think that's wrong.  I think, yes, there
20  are defects that can live in materials and not result
21  in a failure.  I think that's possible in metals, I
22  think it's possible in polymers, and I think it's
23  possible in composites.  It's when the defects are
24  located at certain positions that makes them erupt in
25  service and cause a catastrophic failure, it's

99

COLEMAN - Cross

1   important.
2       I think, secondly, that the defects may
3   not be present necessarily at the moment the material
4   comes off the product line, but because of the
5   condition, the ongoing changing condition of polymers
6   in general, is that cracking and deterioration can --
7   can happen in service.  And, consequently, those
8   defects become paramount in the performance of
9   something like a bucket.  So those are my
10  disagreements with his report.
11      Q.   And as you were testifying about
12  Mr. Shah's report, you were actually referring to
13  some handwritten notes you had in your file; correct?
14      A.   Right.  I do.  There's two pages of them.
15  And they are just paraphrased.
16      Q.   Did you create similar notes with regard
17  to your review of the reports of Mr. Railsback or
18  Dr. Rakow?
19      A.   No.
20      Q.   Why not?
21      A.   I haven't had time to do it.
22      Q.   Okay.  So you got to Mr. Shah's first.
23  Is that a fair -- fair summery?
24      A.   I did it last night.  I just wrote them
25  down by hand.  I've read the reports.  But I just

100

COLEMAN - Cross

1   thought I better look at this because you're going to
2   ask me.  So I did, and I just didn't do the other
3   two.
4       Q.   You didn't get to Rakow's report or
5   Railsback's report?
6       A.   Oh, I read them.  I've read them.  I just
7   didn't annotate them.  This is just paraphrased.
8   There's no opinions in these notes.  I just
9   highlighted a few pages and said, this is what they
10  said on those pages.
11      Q.   Okay.
12      A.   And you get that, so...
13      Q.   Have you ever spoken with anyone who has
14  represented that they saw the actual bucket fall from
15  the sky?
16      A.   No.
17      Q.   You don't have any knowledge specifically
18  of what Mr. Keaschall was doing at the time of the
19  failure?
20      A.   I've only heard what he was up at the
21  site for.  I don't know what he was doing.
22      Q.   At the specific time of failure; correct?
23      A.   Right.  I don't know.
24      Q.   Have you ever worked, actually been
25  employed, where you were up in an aerial lift bucket?

101

COLEMAN - Cross

1       A.      Employed?
2       Q.      Well, have you ever worked doing that
3    kind of work?
4       A.      No.
5       Q.      And during your earlier testimony, you
6    made it sound like you've been in a lot of these
7    buckets.
8       A.      I have.
9       Q.      That's what I want you to tell me about.
10      A.      I've — I've worked for many power
11   companies.
12      Q.      As an expert?
13      A.      Yes, sir.
14      Q.      Okay.
15      A.      And I've been in bucket trucks many,
16   many, many times.
17      Q.      Have you actually run the booms —
18      A.      Oh, yeah.
19      Q.      — yourself?  Okay.
20      A.      Yes, sir.  Are you not going to ask me
21   what I was doing?  I'm going to have to tell you
22   without you asking me?
23      Q.      Sure.  Go ahead.
24      A.      Most of those cases involved power line
25   failures.  And electrocutions or fires that result.

102

COLEMAN - Cross

1    And it's — like I said, I do a lot of work for the
2    power companies.  So we're looking at splices, line
3    failures.  And many times that involves getting up in
4    the buckets and looking at splices and where people
5    shoot lines with shotguns.  It's all defense work.
6    There.  I just had to say that.
7       Q.      Mr. Ahl was asking you about instructions
8    you may have given to the people at Dawson with
9    regard to the bucket and any component parts or any
10   parts of the bucket.  Do you remember that?
11      A.      Yes.
12      Q.      And did you give Dawson any instructions
13   with regard to the pole?
14      A.      I don't remember specifically an
15   instruction about the pole.  I remember saying there
16   are going to be other people that want to look at
17   this.  Keep it all and quarantine it.  That's all I
18   recall discussing.  I don't think I saw the
19   transformers or any other equipment that would have
20   been taken out of service either.
21           MR. SHIVELY:  I don't have any other
22   questions.
23           MR. AHL:  Do you have any?  I have a
24   couple more, but go ahead.
25           MR. BEUCKE:  No.  I don't have any.

103

COLEMAN - Redirect

1           MR. GUENZEL:  I don't have any questions
2    either.
3                REDIRECT EXAMINATION
4    BY MR. AHL:
5       Q.      I have just a couple of additional
6    questions that I forgot to ask you —
7       A.      Okay.
8       Q.      — when we were first talking.  Are you
9    aware of any engineering or scientific testing that
10   can be done in regard to one of these platform or
11   lift buckets that we've been referring to, to find
12   out where the stresses are on that bucket when
13   they're loaded?
14      A.      I'm sure it's been done.  I would think
15   that Altec probably has design folks that do that.
16   That's how they would arrive at the size and shape
17   and the materials chosen, I would think.
18      Q.      And I can't remember the exact name of
19   the test that I've heard.  The finite...
20      A.      Element analysis.
21      Q.      Element analysis?
22      A.      FEA.
23      Q.      You're familiar with that process?
24      A.      Yes, sir, I am.
25      Q.      And what is that process designed to do?

104

COLEMAN - Redirect

1       A.      It's designed to create a package of
2    spots on an object where one can know exactly what
3    the stresses are during operation or however else you
4    want to do something.
5       Q.      Okay.
6       A.      That's the purpose.  It's a tool in
7    design.
8       Q.      Okay.  That process could be applied to
9    one of these platforms to determine when it's in use,
10   where the particular stresses would be in relation to
11   the bucket; correct?
12      A.      Yes.
13      Q.      Did you do that in regard to one of these
14   buckets?
15      A.      No.  I don't do finite element work.
16      Q.      Okay.  Do you think that would be
17   important in this case, to find out where the
18   stresses were on the bucket while it was being in
19   use?
20      A.      If you're evaluating the design, yes.  I
21   also think it's good to know what stresses are
22   present where.  And I expect that that would be
23   something Mr. Eihusen can do.  And there are a lot of
24   people that do that.  I just don't do it.
25      Q.      When this particular bucket or a bucket

105

COLEMAN - Redirect

1  like the one that was being used by Mr. Keaschall was
2  in use, do you know where primarily the stresses are
3  located on the bucket?
4        A.    Well, there's stresses all over the
5  bucket. But the heavy loading is up where the
6  attachment points are.
7        Q.    Do you think the load is distributed
8  generally across the floor --
9        A.    Well --
10       Q.    -- or not?
11       A.    -- let's -- I don't know that I can
12  answer your question that way. Of course the bucket
13  is going to hold whatever weight is standing in it or
14  whatever tools are in it. And it's going to be
15  transmitted back to the connection points, where the
16  ribs are bolted to the assembly, to the truck. And
17  that's the reason that -- and the stresses are
18  highest there. That's the reason there's ribs, and
19  that's the reason there's a thickened rim as opposed
20  to the rest of the bucket.
21            So you know the stresses are going to be
22  bigger there. That's why it's beefier. And there
23  are stresses that occur on other parts of the bucket
24  as well, and defining what those are at specific
25  sites, I haven't done that.

106

COLEMAN - Redirect

1        Q.    Okay. Do you know whether that's been
2  done as part of the investigation process in trying
3  to determine what caused this failure?
4        A.    I don't remember seeing any finite
5  element work.
6        Q.    Okay. You have, in your analysis,
7  determined that the starting point for the failure
8  was what we've determined earlier or have been
9  referring to as location "A"?
10       A.    Yes. In that vicinity. That's true.
11       Q.    Have you determined whether or not while
12  this bucket was in use location "A" would be a low
13  stress point?
14       A.    I would think it would be a high stress
15  point.
16       Q.    You would think that?
17       A.    Yes. Yes, I would.
18       Q.    And why do you think that?
19       A.    Because that's where it's attached.
20       Q.    At point "A"?
21       A.    Well, it's in that area. It's -- it's
22  close to the area where the ribs and the rim are
23  attached to the struc- -- to the truck. And it's not
24  at the point, but it's near it.
25       Q.    It's well above it, isn't it?

107

COLEMAN - Redirect

1        A.    Oh, sure, it's above it.
2        Q.    Okay.
3        A.    But it's on the same side. I mean, it's
4  not a little hinge. I don't mean that. I don't mean
5  to discredit that. It's just on that side of the
6  bucket where it's attached is where the loads are
7  high. Of course, the loads get higher when you go
8  from a big area to a small area. They're accentuated
9  in those corners and curves and smaller areas, too.
10       Q.    So based on your analysis and your
11  opinions and conclusions, your education, training
12  and background, location "A" is a high stress area
13  when that bucket is in use; true?
14       A.    Well, it's one of the areas. It's not
15  the only area.
16       Q.    Well, I didn't say the only area. I said
17  you consider it to be a high stress area when that
18  bucket is being used?
19       A.    I do.
20            MR. AHL: Okay. I have no further
21  questions.
22            MR. SHIVELY: I have no questions.
23            THE WITNESS: I need to read and sign.
24            MR. BEUCKE: Yes, you do.
25  (Deposition concluded at 10:38 a.m.)

108

1                 C E R T I F I C A T E
2        I, Marcy Benge, RMR, General Notary Public, duly
3  commissioned, qualified, and acting under a general
4  notarial commission within and for the State of
5  Nebraska, do hereby certify that:
6        WILLIAM COLEMAN, M.S., P.E.
7  was by me first duly sworn to tell the truth, the
8  whole truth, and nothing but the truth; that the
9  foregoing deposition was taken by me at the time and
10  place herein specified and in accordance with the
11  within stipulations; that I am not counsel, attorney,
12  or relative of either party or otherwise interested
13  in the event of this suit.
14        IN TESTIMONY WHEREOF, I have hereunto set my
15  hand officially and attached my notarial seal at
16  Lincoln, Nebraska, this 7th day of December, 2016.
17
18            _____
19            General Notary Public
20
21
22
23
24
25

109

1                   AMENDMENT TO DEPOSITION
2    CASE: KEASCHALL V. ALTEC/OSBORNE
3    WITNESS: WILLIAM COLEMAN, M.S., P.E. _____No Changes
4        The witness herein states that he/she wishes to
5    make the following changes in his/her deposition:
6

7    <u>PAGE</u>   <u>LINE</u>   <u>NOW READS</u>   <u>SHOULD READ</u>   <u>REASON FOR</u>
                                      <u>CHANGE</u>

8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____

21

        _____
22          DEPONENT'S SIGNATURE

23      The signature above was subscribed and sworn to
     before me this ____ day of _____ , 20__.
24

        _____
25          GENERAL NOTARY PUBLIC

| $ | 9 |
|---|---|
| **$20,000** [1] - 80:24 | **9,000** [1] - 79:1 |

| **A** |
|---|

**a.m** [1] - 107:25
**ability** [1] - 6:23
**able** [7] - 62:13; 63:21; 77:23, 25; 78:2
**absolutely** [1] - 45:18
**abuse** [2] - 30:15; 78:9
**academic** [1] - 12:14
**accentuated** [1] - 107:8
**accept** [1] - 70:8
**accident** [14] - 5:25; 20:21; 21:23; 25:12; 27:3; 33:4, 9; 69:16, 19-20; 73:18; 77:17; 94:8; 98:5
**account** [1] - 75:22
**accurate** [1] - 75:7
**acoustic** [1] - 93:24
**activities** [2] - 8:13; 12:18
**actual** [3] - 90:11; 91:7; 100:14
**added** [1] - 82:1
**addition** [3] - 26:14; 31:2; 44:3
**additional** [4] - 32:20; 76:24; 79:23; 103:5
**address** [3] - 7:7; 33:24; 34:13
**addressed** [2] - 17:12; 24:9
**adjacent** [2] - 50:25; 52:19
**adjunct** [1] - 12:5
**advertise** [1] - 9:2
**advised** [2] - 37:21; 42:2
**advisor** [1] - 11:21
**aerial** [2] - 5:17; 100:25
**affected** [1] - 30:16
**affiliated** [3] - 40:9, 15; 87:11
**affiliation** [1] - 40:4
**afraid** [1] - 41:7
**age** [1] - 5:2
**ages** [2] - 65:2; 67:4
**ago** [2] - 5:12; 82:8
**agree** [12] - 56:16; 57:11; 63:3; 67:13; 73:13; 74:5; 77:15; 78:22; 96:19, 21, 23; 98:14
**agreed** [1] - 96:22
**ahead** [5] - 56:20; 96:6, 15; 101:23; 102:24
**ahl** [3] - 46:18; 68:8; 83:23
**AHL** [9] - 5:7; 57:21; 67:19; 68:25; 81:1, 5; 102:23; 103:4; 107:20
**Ahl** [9] - 5:11; 14:20; 21:25; 46:23; 56:20; 57:25; 69:6; 73:6; 102:7

**air** [1] - 89:4
**Altan** [1] - 17:7
**ALTAN** [1] - 17:8
**altas** [1] - 16:13
**Altec** [8] - 22:6; 81:19; 87:11; 90:10, 12, 17; 97:18; 103:15
**Altec/Osborne** [1] - 59:6
**aluminums** [1] - 13:5
**amount** [1] - 73:14
**analogy** [1] - 66:18
**analysis** [21] - 7:15; 11:24; 12:8; 16:7; 35:6; 36:20; 38:18; 41:17; 42:12; 43:3, 14, 16; 46:10; 50:21; 67:10; 71:14; 80:19; 103:20; 106:6; 107:10
**Analytical** [4] - 7:22; 8:9; 10:12; 34:25
**analytical** [3] - 7:11; 10:2
**analyzing** [3] - 7:13; 79:5; 86:25
**Anand** [1] - 96:11
**Andy** [1] - 96:11
**annotate** [1] - 100:7
**anomalies** [1] - 53:10
**answer** [15] - 6:12, 15; 20:3; 35:8; 44:14; 46:5, 12; 48:10; 62:21; 75:15; 92:15; 93:5; 94:20; 105:12
**answered** [2] - 6:22; 47:17
**answers** [4] - 7:1; 15:7, 14; 60:1
**anticipate** [2] - 65:23; 80:1
**anyway** [1] - 14:3
**apologize** [1] - 54:14
**appearance** [1] - 88:4
**appeared** [1] - 88:2
**applied** [1] - 104:8
**appointment** [1] - 12:10
**approach** [2] - 47:10; 79:4
**approximation** [1] - 43:19
**area** [29] - 12:18; 22:11; 38:23; 53:23; 54:6, 20; 60:5, 12; 62:23; 67:6; 70:10; 86:23; 87:20, 25; 88:9, 11, 15; 91:12; 95:7; 96:21; 106:21; 107:8, 12, 15
**areas** [13] - 29:22; 52:23; 53:13; 59:20; 64:18; 66:11; 67:15, 20, 23; 87:8; 93:25; 107:9, 14
**arise** [1] - 80:6
**arrange** [1] - 23:24
**arrive** [4] - 26:21; 37:3; 42:21; 103:16
**arrived** [2] - 58:5; 76:3
**arrives** [1] - 35:22
**arriving** [1] - 77:16

**assembly** [2] - 58:10; 105:16
**assignment** [1] - 48:20
**assist** [1] - 16:5
**assistant** [1] - 11:13
**Associated** [3] - 11:20, 22, 25
**associated** [5] - 24:10; 27:3; 85:25; 86:24; 88:8
**assume** [13] - 6:21; 23:6; 71:10, 12, 20; 72:20; 73:6, 25; 75:7, 10; 82:21, 24; 94:19
**assumes** [2] - 73:2, 5
**assuming** [6] - 8:15; 21:3; 34:15; 66:5; 73:16; 80:12
**assumption** [1] - 78:24
**assumptions** [1] - 77:16
**Atchison** [1] - 7:8
**attach** [1] - 57:7
**attached** [14] - 13:24; 26:15, 18; 28:9; 30:25; 35:13; 54:21; 55:20, 24; 56:15; 57:9; 106:19, 23; 107:6
**attachment** [1] - 105:6
**attack** [1] - 43:2
**attending** [1] - 80:2
**attention** [1] - 82:3
**attributed** [1] - 88:23
**attributes** [1] - 96:19
**August** [7] - 51:4; 75:24; 84:1, 3, 14, 22; 95:22
**authored** [2] - 77:8; 82:6
**authority** [1] - 44:17
**available** [2] - 55:12; 92:5
**awarding** [2] - 10:8; 11:7
**aware** [5] - 44:22; 90:10, 16; 93:14; 103:9
**awkward** [1] - 6:3

| **B** |
|---|

**bachelor** [1] - 9:22
**bachelor's** [2] - 11:8, 12
**background** [9] - 5:21; 9:20; 18:11; 19:1, 16; 22:23; 23:7; 42:11; 107:12
**bad** [5] - 6:4, 6; 65:14; 88:10; 94:18
**badly** [1] - 91:13
**ballpark** [1] - 80:19
**base** [2] - 61:15; 62:2
**based** [4] - 25:8; 58:8; 67:9; 107:10
**bases** [3] - 58:16; 77:16; 97:17
**basis** [5] - 12:9; 64:10; 66:16; 68:13; 97:8
**bearing** [3] - 59:18; 74:9, 11
**beat** [1] - 25:18
**became** [1] - 12:4

become [3] - 22:17; 76:7; 99:8
becomes [1] - 67:5
beefier [1] - 105:22
beforehand [3] - 28:10; 62:4; 98:4
began [5] - 18:22; 42:4; 53:9; 61:17; 62:10
begin [1] - 53:23
beginning [5] - 13:21; 14:10; 16:3; 19:8; 32:3
behalf [2] - 14:10; 83:9
behave [1] - 78:6
below [1] - 83:7
Ben [1] - 77:10
benchtopwise [1] - 50:23
beneath [1] - 66:24
benign [2] - 67:1; 78:22
best [6] - 6:10, 19, 23; 7:4; 8:19; 22:1
bet [1] - 46:24
better [3] - 52:10; 92:24; 100:1
between [4] - 51:2, 4; 96:20
Beucke [5] - 18:23; 32:15; 41:18; 54:18; 85:18
BEUCKE [5] - 56:17; 67:17; 73:1; 102:25; 107:24
Beucke's [1] - 83:21
big [3] - 7:21; 79:10; 107:8
bigger [1] - 105:22
bill [1] - 80:18
bit [6] - 5:22; 25:4; 41:20; 64:19; 86:12; 92:15
blame [1] - 82:4
bleeding [1] - 88:19
blend [1] - 13:4
Block [1] - 11:22
blue [2] - 15:5, 15
board [2] - 42:16; 85:18
Bob [3] - 11:22; 24:25; 81:17
body [4] - 43:22; 44:8; 52:5, 8
boils [1] - 96:18
boldface [1] - 63:15
bolt [1] - 23:21
bolted [1] - 105:16
book [1] - 27:11
boom [33] - 22:3; 23:20; 25:3; 26:4, 12, 18; 27:4; 28:10, 25; 29:4, 8, 15, 20, 22, 24; 30:3, 7, 17, 20; 31:1, 18; 33:3; 54:21; 55:5; 65:17; 69:24; 70:10; 71:16; 72:16; 73:20; 74:2
booms [2] - 30:10; 101:17
born [1] - 10:5
borrow [1] - 17:3
bottom [1] - 72:9

bounce [2] - 75:13, 15
break [5] - 16:14; 45:21; 57:20, 22; 61:12
breaking [1] - 65:13
brief [2] - 15:2; 57:23
bring [3] - 13:20; 14:2, 5
bringing [1] - 92:9
broke [1] - 74:15
broken [2] - 23:21; 24:12
brought [3] - 14:23; 42:16; 85:17
brutal [1] - 92:17
bucket [138] - 5:17; 19:14, 18, 24; 21:8; 22:2, 14; 23:3, 12; 24:12; 25:2, 17; 26:6, 13-14, 17; 30:24; 31:15; 32:10; 34:13; 35:20; 36:16; 38:20; 42:1; 43:3, 22, 24; 44:1, 11; 45:1, 4, 8; 48:4; 50:1, 6, 14, 19, 22, 25; 52:4, 7-8, 10; 54:18; 55:16; 56:2, 6, 11; 58:11; 59:9; 60:5, 21; 61:4, 8, 15; 62:1, 4, 11, 15; 63:22; 64:15; 65:1, 4; 67:9, 18; 68:11, 19, 23; 70:1, 6, 9; 71:15; 72:1, 9, 13, 16, 21, 23; 73:2, 7, 9, 14, 16; 74:2, 15, 18-19, 22; 75:1, 3, 9, 20; 76:7; 86:4, 15, 25; 87:20; 90:4, 7, 11, 25; 91:2, 5, 12, 18; 92:22, 24; 93:2, 12, 15; 98:4; 99:9; 100:14, 25; 101:15; 102:9; 103:12; 104:11, 18, 25; 105:3, 5, 12, 20, 23; 106:12; 107:6, 13, 18
buckets [10] - 67:9; 79:6, 13; 82:11; 91:9, 18; 101:7; 102:4; 103:11; 104:14
bunch [1] - 37:17
business [15] - 7:6, 10, 12; 8:12; 9:2; 11:1, 5; 16:6, 18, 20-21; 28:14; 35:21; 39:11
BY [3] - 5:7; 81:16; 103:4

## C

calculate [1] - 53:19
calculation [1] - 63:12
calculations [5] - 45:6, 25; 49:9; 53:11, 15
calendar [1] - 44:18
California [5] - 51:6, 12; 52:3; 76:11; 89:12
cameras [1] - 35:13
capacity [1] - 65:19
career [1] - 66:5
case [32] - 6:16; 13:21; 15:12; 17:23, 25; 19:6;

20:4, 16; 39:16; 44:18; 47:1, 13; 48:13, 21; 56:1; 66:14; 76:13; 81:19; 82:18; 83:10, 19; 84:8; 85:12; 87:12, 16; 93:18; 94:4; 95:3, 16, 24; 96:2; 104:17
cases [2] - 22:14; 101:24
cast [2] - 68:2, 5
catastrophic [1] - 98:25
categorize [1] - 49:18
caused [9] - 20:1; 46:15; 62:7; 68:10, 18; 86:18; 88:15; 89:18; 106:3
cautioned [1] - 5:2
CDs [1] - 15:13
cells [1] - 35:15
Cengiz [1] - 17:7
certain [4] - 35:11; 57:14; 73:14; 98:24
certainly [2] - 65:23; 94:1
certified [1] - 5:3
challenge [1] - 20:14
chance [3] - 6:15; 89:10; 91:11
change [2] - 80:9; 83:6
changed [2] - 36:9; 43:15; 83:6
changes [1] - 83:3
changing [1] - 99:5
channel [2] - 72:6; 74:25
charge [1] - 80:12
chasing [1] - 41:10
chemical [3] - 11:14; 12:5; 88:19
chemistry [3] - 10:2; 43:23
chosen [1] - 103:17
chronology [1] - 42:23
chunk [1] - 52:3
circumferential [1] - 29:7
class [1] - 40:16
classes [3] - 11:15; 13:8, 12
clean [1] - 92:14
cleaner [1] - 59:15
cleanly [4] - 11:10; 62:21; 78:23; 88:24
clear [2] - 51:23; 59:13
close [7] - 17:7; 21:22; 32:14; 67:3; 80:20; 83:7; 106:22
closest [1] - 71:7
closing [1] - 32:7
clumps [1] - 52:7
cluster [4] - 48:7, 17; 91:12, 23
coat [1] - 61:18
coating [1] - 62:10
coincident [1] - 47:5
COLEMAN [1] - 5:1
Coleman [3] - 5:10; 81:17

collected [1] - 15:22
college [1] - 13:8
combination [1] - 59:21
comfortable [3] - 38:21, 24; 39:1
coming [4] - 8:11; 13:18; 19:17, 23
comment [1] - 61:22
common [2] - 55:18; 66:10
communicate [1] - 7:3
companies [3] - 7:16; 101:11; 102:2
company [7] - 7:21; 8:22; 10:13; 11:20, 22; 12:3; 38:22
company's [1] - 19:16
compiled [1] - 13:20
complete [1] - 6:16
completely [5] - 49:16; 53:21; 66:12; 67:15, 19
complicated [1] - 92:10
component [6] - 66:10; 67:14, 18; 88:3; 89:5; 102:9
components [14] - 25:24; 26:6, 21; 27:9, 22; 28:8; 32:9; 35:21; 36:7; 37:24; 42:12; 58:19; 86:15
composite [4] - 13:7, 10; 19:2; 67:24
composites [6] - 12:25; 17:13; 18:1; 65:10; 92:3; 98:23
compound [2] - 44:5; 89:24
concealed [2] - 18:9; 91:16
concentrated [2] - 67:5; 68:4; 88:12
concerned [1] - 44:2
concerning [1] - 96:2
concerns [1] - 44:12
concluded [1] - 107:25
concluding [1] - 57:13
conclusion [5] - 37:3; 59:4; 63:2; 77:17; 90:24
conclusions [19] - 17:20; 26:22; 27:6; 42:22; 53:3; 57:14; 58:2, 4, 13, 22; 76:2; 78:17, 19; 79:24; 86:13; 90:1; 94:3, 13; 107:11
condition [11] - 27:4, 19; 28:8, 12; 30:11; 41:25; 64:25; 79:18; 99:5
conditions [1] - 63:9
cones [1] - 25:16
connection [3] - 5:16; 84:7; 105:15
consequence [2] - 49:7; 89:23
consequently [1] - 99:7

consider [1] - 107:17
consideration [1] - 75:21
considered [2] - 61:19;
74:24
consistent [1] - 97:17
consult [3] - 17:1; 18:15;
19:5
consultant [1] - 20:12
consulted [4] - 16:4; 18:17,
20; 20:8
consulting [2] - 12:13; 83:13
contact [4] - 17:14; 30:4, 8;
39:11
contacted [2] - 20:17, 22
contain [2] - 24:11; 97:1
contained [4] - 15:19; 31:3;
37:8; 38:8
containing [1] - 59:10
contains [1] - 15:6
continued [1] - 10:4
continuing [1] - 61:24
contribute [1] - 65:22
contributed [2] - 68:10;
89:18
control [3] - 33:3; 64:15;
91:1
controlled [1] - 73:17
controls [1] - 70:5
conversation [7] - 21:3;
31:24; 32:1, 8; 42:10;
85:22; 86:10
conversations [1] - 85:11
copies [2] - 15:8, 11
coppers [1] - 13:4
copy [2] - 77:9; 78:12
core [1] - 12:6
corner [1] - 88:3
corners [1] - 107:19
cornerstone [1] - 76:15
correct [32] - 5:17; 6:15;
8:17; 18:23; 56:6; 69:12;
73:23; 74:6; 76:4, 14, 17;
81:5, 12; 85:6; 87:4; 90:4,
17; 92:1, 13; 93:16, 20;
94:5, 11, 15, 19; 95:8, 20;
96:8; 99:13; 100:22;
104:11
correctly [1] - 36:6
corrosion [2] - 12:8; 65:8
cosmetic [1] - 30:11
couple [10] - 13:8; 17:2;
19:19; 30:22; 84:24; 85:1,
5; 102:24; 103:5
course [5] - 26:23; 43:21;
84:6; 105:12; 107:7
courses [3] - 12:6; 13:15
court [3] - 14:16, 20; 69:7
covered [1] - 59:2
covering [1] - 25:17

covers [1] - 58:23
crack [10] - 29:13; 52:24;
62:5; 65:7, 13; 67:5; 88:21;
97:16, 22
cracked [1] - 92:22
cracking [5] - 64:23; 65:1,
20; 93:7; 99:6
cracks [3] - 52:23; 59:22;
98:17
cradled [2] - 29:4, 6
crazing [3] - 29:7, 10, 12
create [6] - 53:13; 64:5, 12;
74:19; 99:16; 104:1
created [1] - 98:5
credit [2] - 13:16; 76:22
criteria [1] - 77:24
critical [6] - 45:18; 49:24;
54:20; 77:12; 78:15; 93:25
criticisms [2] - 96:12; 97:12
CROSS [1] - 81:15
cross [16] - 43:25; 50:24;
52:20, 24; 53:1, 18-19;
54:1; 59:16, 18; 61:18;
64:19, 25; 65:12; 77:1;
88:5
CROSS-EXAMINATION [1] -
81:15
cross-section [12] - 43:25;
53:1, 18-19; 54:1; 59:16,
18; 61:18; 64:19, 25;
65:12; 88:5
cross-sections [4] - 50:24;
52:20, 24; 77:1
crossing [1] - 87:8
cured [7] - 59:8, 21; 60:16;
63:5; 66:12; 67:16, 21
curing [2] - 88:18; 89:24
current [2] - 7:6; 81:22
curves [1] - 107:9
customer's [1] - 92:9
cut [8] - 9:6; 34:5; 50:24;
52:5, 8, 16, 20; 93:20
cuts [2] - 30:13; 43:8
cutting [1] - 45:11

## D

D-ring [2] - 55:20; 56:15
daily [1] - 64:10
damage [4] - 29:21; 36:7;
68:19; 97:16
damaged [1] - 29:23
data [2] - 17:19; 40:8
date [1] - 84:9
dated [2] - 75:24; 81:20
Daubert [1] - 20:14
daughter [1] - 10:5
Dawson [17] - 23:10; 24:21;
27:23; 31:13, 23; 32:21;
33:2, 17; 34:8; 57:1, 11;

79:11; 83:10, 16; 94:10;
102:8, 12
day-to-day [1] - 12:17
days [1] - 21:23
deadly [1] - 81:6
deal [4] - 11:18; 12:23; 40:1
dean [1] - 24:20
Dean [1] - 31:24
decedent [1] - 68:9
decide [1] - 76:19
deer [1] - 81:10
defaced [1] - 29:22
defect [20] - 47:5; 48:7, 16,
19; 49:2, 5-6, 14, 16, 25;
53:4; 60:20; 65:2; 66:4, 15;
67:2, 4; 97:9
defective [3] - 79:19; 88:11;
97:1
defects [46] - 17:12; 18:8;
24:11; 37:9; 48:8; 54:19;
56:8; 59:5, 7; 60:1, 15, 24;
61:6, 13; 62:14, 22; 63:3,
10, 25; 64:14; 67:10; 68:4,
18, 21; 78:21; 79:3; 86:3,
7; 90:3, 24; 91:9, 15, 23;
92:11, 15; 93:1, 23; 95:20;
97:1; 98:5, 12, 20, 23;
99:2, 8
defense [1] - 102:5
deficient [1] - 95:4
defining [1] - 105:24
deformation [3] - 72:5, 12,
18
degree [7] - 9:25; 10:8; 11:8,
13; 12:21; 36:25
delaminated [1] - 52:23
delaminations [2] - 79:1;
96:24
demonstrate [1] - 78:23
demonstrative [1] - 30:14
denote [1] - 48:8
dense [1] - 62:23
dent [1] - 74:25
deny [1] - 68:17
department [2] - 11:14; 12:5
depict [1] - 69:13
deployed [1] - 70:4
deposition [3] - 15:20;
81:18; 107:25
depositions [8] - 15:9; 55:1;
80:1, 3, 6; 95:23; 96:2, 7
describe [2] - 30:12; 52:11
described [1] - 79:19
description [1] - 12:15
design [6] - 78:8; 91:5, 8;
103:15; 104:7, 20
designed [6] - 56:1; 62:18;
63:8; 65:25; 103:25; 104:1
designer [1] - 90:12
detached [2] - 71:15; 72:1

detail [2] - 32:14; 77:15
detailed [1] - 32:23
details [3] - 41:10; 42:9; 57:1
detectable [1] - 93:10
detected [2] - 91:24; 94:1
deteriorated [1] - 92:22
deteriorating [1] - 92:18
deterioration [1] - 99:6
determinations [1] - 24:2
determine [28] - 24:5; 36:5,
10, 13, 21; 37:7; 43:22, 25;
45:2, 7; 46:1, 15; 47:8;
48:2, 18; 53:12; 54:4; 60:5,
19; 62:13; 63:7, 11; 71:15;
74:15; 75:19; 104:9; 106:3
determined [4] - 38:14;
106:7, 11
determining [3] - 43:19;
47:19; 58:25
develop [1] - 55:7
device [3] - 48:9; 56:22; 62:9
devoted [2] - 8:20, 25
diagram [1] - 71:24
die [1] - 68:6
dielectric [1] - 30:16
difference [1] - 47:23
different [19] - 6:7; 7:15;
8:13; 19:11, 22; 31:20;
36:8; 38:17, 20; 43:2, 15;
47:17; 54:2; 58:18; 66:7;
87:8; 88:16; 97:11
difficult [2] - 15:4; 92:7
dimensions [1] - 45:4
dinged [1] - 25:18
dinnerware [1] - 29:13
DIRECT [1] - 5:6
direct [1] - 40:5
directions [1] - 97:22
directly [1] - 59:10
director [1] - 16:10
disagree [8] - 78:17, 24;
97:14, 25; 98:2, 13
disagreed [1] - 86:20
disagreement [1] - 86:22
disagreements [3] - 96:12;
97:13; 99:10
disallowed [1] - 20:13
disassembled [2] - 25:12, 14
disassembly [1] - 28:13
disassociate [1] - 66:3
discoloration [2] - 44:13;
52:25
discontinuity [1] - 53:6
discovered [3] - 59:5; 60:15;
67:10
discovery [2] - 15:6, 14
discredit [1] - 107:5
discuss [2] - 23:23; 57:3
discussed [6] - 43:1; 54:23;

80:8; 85:25; 86:14
**discussing** [1] - 102:18
**discussion** [2] - 42:6; 69:3
**distance** [2] - 70:12, 25
**distorted** [1] - 29:22
**distributed** [1] - 105:7
**document** [2] - 28:7, 15
**documented** [2] - 28:11; 37:16
**documents** [2] - 58:11, 19
**Doherty** [2] - 16:14; 18:18
**Doherty's** [1] - 16:21
**done** [42] - 5:23; 12:16; 20:5; 25:15; 32:8; 35:17; 42:13; 43:7, 9-10; 44:19; 45:5, 12; 48:12; 50:20; 51:6, 11; 52:3, 17; 54:15, 24-25; 55:2, 7; 63:6; 76:13, 17, 24; 77:18; 80:10; 83:9; 85:13; 90:17, 19-21; 94:10; 103:10, 14; 105:25; 106:2
**down** [16] - 22:9; 28:24; 29:6; 35:21; 41:21; 43:11; 44:9, 18; 45:1; 61:12; 65:13; 69:25; 73:22; 92:21; 96:18; 99:25
**Dr** [2] - 78:13; 99:18
**draw** [1] - 53:3
**drawing** [1] - 70:20
**Drive** [1] - 7:8
**duces** [2] - 13:19
**duck** [1] - 81:4
**duly** [1] - 5:2
**during** [13] - 13:17; 30:2; 31:23; 32:21; 49:23; 59:23, 25; 65:3, 13; 89:1; 91:14; 101:5; 104:3
**duties** [1] - 10:10

**E**

**early** [6] - 12:4; 19:9; 20:4; 59:25; 68:21; 70:20
**economically** [1] - 39:7
**education** [4] - 12:17; 58:12, 20; 107:11
**educational** [1] - 5:21; 9:20
**effect** [5] - 49:5; 60:20, 23, 25; 91:5
**efforts** [2] - 74:16; 86:23
**Eihusen** [6] - 42:15; 76:6; 84:25; 85:5, 8, 12, 16; 104:23
**either** [14] - 6:13, 15; 18:8; 23:14; 28:21; 32:15; 34:9; 40:10; 54:8; 64:6; 75:17; 98:4; 102:20; 103:2
**electrical** [1] - 40:3
**electrocutions** [1] - 101:25
**Element** [1] - 103:20

**element** [3] - 103:21; 104:15; 106:5
**emission** [1] - 93:24
**employed** [3] - 11:13; 100:25; 101:1
**employee** [3] - 10:16, 19; 24:21
**employees** [1] - 16:5
**end** [8] - 9:1; 12:2; 32:4, 6; 41:13; 45:15; 51:3; 64:20
**ended** [4] - 19:17; 57:25; 71:16; 72:22
**ends** [2] - 12:23; 27:17
**energy** [4] - 73:14; 74:19, 22; 75:8
**engineer** [2] - 9:19; 16:24
**Engineering** [5] - 7:11, 22; 8:10; 10:12; 35:1
**engineering** [9] - 9:23; 10:1; 11:14; 12:6; 15:9; 16:11; 31:5; 84:4; 103:9
**engineers** [1] - 7:24
**enhanced** [1] - 80:9
**entails** [1] - 36:17
**entire** [3] - 13:20; 14:5; 53:17
**entity** [1] - 18:1
**entrapped** [1] - 89:21
**equal** [1] - 13:3
**equipment** [14] - 22:3; 25:15, 25; 26:24; 27:21; 35:12-14, 16; 38:18; 56:23; 82:19; 102:19
**equipmentwise** [1] - 23:19
**equipped** [1] - 35:5
**erupt** [1] - 98:24
**essence** [1] - 62:25
**established** [1] - 73:5
**estimate** [2] - 8:19; 79:8
**evaluating** [1] - 104:20
**evaluation** [1] - 45:14
**events** [1] - 42:24
**eventually** [2] - 12:24; 37:18
**everyday** [1] - 19:1
**evidence** [6] - 37:8; 43:7; 45:10; 58:10; 68:14; 98:16
**exact** [1] - 103:18
**exactly** [7] - 21:14; 54:1, 3, 5; 60:4; 65:14; 104:2
**EXAMINATION** [3] - 5:6; 81:15; 103:3
**examination** [7] - 45:13; 46:9; 51:5, 17; 58:9, 17
**examine** [3] - 37:6; 38:18; 52:21
**examined** [2] - 5:3; 51:14
**examining** [1] - 37:15
**example** [2] - 82:5; 95:4
**exams** [1] - 49:22
**excessive** [1] - 97:24

**excruciating** [1] - 77:15
**excuse** [2] - 56:17; 67:17
**exercises** [1] - 89:11
**Exhibit** [4] - 14:18, 22; 69:4, 7
**exhibit** [1] - 14:21
**existed** [2] - 68:15; 69:19
**existence** [1] - 8:10
**existing** [2] - 30:15; 84:18
**expect** [7] - 6:25; 71:5; 80:4, 8-9; 104:22
**expectancy** [1] - 91:17
**expenses** [1] - 92:6
**experience** [3] - 58:12, 20, 24
**experiment** [1] - 45:14
**experiments** [4] - 45:5, 9, 25; 53:12
**expert** [2] - 95:10; 101:12
**expertise** [2] - 22:11; 95:8
**experts** [4] - 15:12; 60:9; 80:3; 87:15
**explanation** [4] - 72:12, 23; 73:9; 75:8
**explanations** [1] - 88:17
**explode** [2] - 67:2; 92:16
**Exponent** [1] - 52:17
**exposed** [2] - 52:20; 98:6
**exposure** [1] - 89:4
**extent** [2] - 62:22; 98:17
**eye** [6] - 18:9; 38:1; 53:16; 54:9; 61:20; 92:13
**eyes** [1] - 97:7

**F**

**fabricated** [1] - 90:22
**fabricating** [1] - 44:11
**fabrication** [4] - 37:9; 48:9; 61:6, 13
**fabricator** [1] - 90:13
**face** [1] - 63:2
**facet** [1] - 16:6
**facilitate** [1] - 65:19
**facility** [1] - 23:11
**fact** [6] - 25:8; 39:14; 49:15; 73:5; 87:24; 98:16
**factory** [1] - 94:2
**facts** [3] - 25:6; 73:25; 74:6
**faculty** [1] - 39:25
**fail** [10] - 53:23; 54:1, 6; 67:6; 68:21; 79:10, 13; 97:25
**failed** [11] - 5:17; 24:6; 26:7; 28:8; 48:4; 50:4; 54:18; 61:4; 70:10; 79:7, 9
**fails** [4] - 56:2, 6, 11; 73:19
**failure** [66] - 11:23; 12:8; 19:14; 20:1; 23:18; 24:10; 28:16; 33:8; 34:4, 10; 36:11, 16, 21; 37:4; 45:2,

7; 46:2, 15; 47:4, 22; 49:7, 12; 50:22, 25; 52:6; 53:9, 13, 21; 60:2; 61:8, 11, 14; 62:1, 4, 8; 63:18; 66:3; 67:11; 68:11, 16, 23; 71:14; 75:20; 76:16; 79:5; 86:15, 18; 89:3, 6, 18; 91:6; 92:17; 94:21; 96:20; 97:4; 98:1, 10, 18, 21, 25; 100:19, 22; 106:3, 7
**failures** [7] - 7:14, 17; 8:14; 12:23; 13:10; 101:25; 102:3
**fair** [7] - 12:19; 35:7; 53:24; 64:19; 99:23
**fairly** [1] - 34:23
**fall** [5] - 55:11; 56:2, 15, 22; 100:14
**fallen** [2] - 21:9; 30:25; 56:14
**falling** [1] - 56:5
**familiar** [3] - 44:10; 55:11; 103:23
**family** [1] - 10:9
**far** [6] - 20:3; 37:22; 42:17; 47:19; 69:24; 80:18
**fashion** [2] - 67:2; 20:9
**fatigue** [1] - 65:7
**FEA** [1] - 103:22
**February** [3] - 8:11; 11:2; 94:7
**fee** [2] - 82:20; 83:4
**feet** [13] - 71:1, 21; 72:2, 17, 24; 73:3, 10, 14; 74:1, 5, 23; 75:9
**fell** [2] - 22:2; 55:22
**felt** [3] - 31:21; 39:1; 43:9
**few** [7] - 5:12; 15:9; 25:23; 78:25; 79:8; 81:3; 100:9
**fiber** [4] - 67:18; 87:7; 89:9; 97:21
**fiberglass** [13] - 16:18, 20; 19:2, 14; 29:24; 58:10; 61:8, 15; 62:1; 66:6, 11; 67:15, 20
**fibers** [3] - 43:25; 97:15, 22
**field** [5] - 15:18; 49:20; 55:19; 82:19; 92:8
**figure** [1] - 80:20
**file** [13] - 13:20; 14:5, 7, 23; 15:6, 25; 16:4; 21:13; 27:18; 31:4; 41:8; 50:12; 99:13
**final** [1] - 70:9
**findings** [1] - 31:12
**fine** [1] - 7:3
**fingers** [1] - 50:11
**finish** [1] - 10:9
**finite** [2] - 104:15; 106:4
**finite..** [1] - 103:19
**fires** [1] - 101:25

firm [3] - 22:5; 83:19, 21
first [26] - 5:2, 20; 11:1; 17:10; 20:17; 23:17, 23; 25:8; 36:1; 37:5; 40:14; 43:18; 46:17; 48:10; 51:22; 59:3; 61:23; 63:1; 83:24; 85:15, 17, 22; 86:5; 88:7; 99:22; 103:8
five [2] - 7:23; 57:22
five-minute [1] - 57:22
flange [1] - 60:13
flap [4] - 26:15, 17; 52:9, 11
flaw [7] - 47:9; 53:16; 62:11; 66:17; 78:5; 88:22
flaws [7] - 52:25; 59:11; 61:17; 62:8; 64:17; 78:22; 93:25
flies [1] - 81:14
floor [1] - 105:8
fly [1] - 13:11
focus [1] - 12:17
focused [2] - 36:10; 86:23
foggy [1] - 85:24
fold [2] - 11:17; 66:25
folds [1] - 66:23
folks [1] - 103:15
followed [1] - 55:15
follows [1] - 5:3
force [2] - 48:3; 49:11
foreign [12] - 44:3, 8; 48:12; 59:7; 60:2, 16; 63:4; 68:5; 88:2; 89:7, 9, 17
forensic [2] - 11:23; 83:13
forensics [1] - 8:16
foreseeable [4] - 63:21; 64:13; 78:3; 98:7
forgot [1] - 103:6
forgotten [1] - 57:7
form [4] - 61:19; 68:1; 73:1
formed [6] - 11:1, 21; 59:23; 66:21
forming [1] - 65:13
formulate [5] - 27:6; 36:22, 24; 58:21; 79:24
formulated [1] - 37:2
forward [1] - 6:24
foundation [1] - 56:18
four [4] - 52:18; 80:25; 95:23; 96:8
fraction [1] - 12:8
Fracture [1] - 61:9
fracture [29] - 37:7, 15; 42:19; 44:4, 13, 22; 45:13, 19, 24; 46:16; 47:1, 11; 48:1, 4, 8; 52:6, 19; 59:9, 20; 60:23; 61:7, 23, 25; 62:10; 64:22; 74:15; 76:16; 78:23
fractured [2] - 21:9; 23:21
fractures [3] - 12:25; 37:17;

58:25
fragment [1] - 52:15
fragments [2] - 26:13; 31:19
free [1] - 49:16
front [4] - 14:13, 22; 36:23; 49:6
FTRI [1] - 35:18
full [4] - 5:8; 7:24; 8:1; 12:12
fully [1] - 35:5
functions [2] - 32:22; 80:5
fuzzy [1] - 18:22

G

G-a-r-d-e [1] - 8:7
Gahn [1] - 16:13
game [3] - 41:14, 20; 42:6
gaping [1] - 53:18
Garde [1] - 8:7
gather [1] - 47:3
gauge [1] - 46:8
gel [1] - 61:18
general [4] - 27:3; 34:21; 35:24; 99:6
generally [2] - 54:4; 105:8
generated [4] - 14:10; 15:21; 19:20; 47:9
gentleman [1] - 16:17
gentlemen [2] - 24:24; 87:18
ghastly [1] - 92:6
given [5] - 6:12; 77:9; 81:20; 90:2; 102:8
glad [1] - 96:22
glasses [1] - 13:1
goal [1] - 36:17
grad [1] - 13:17
graduate [4] - 11:13, 16; 13:15
graduation [1] - 11:12
graphic [1] - 30:14
gravity [1] - 73:23
great [2] - 12:24; 85:2
greater [2] - 65:18, 20
ground [4] - 21:10; 56:6, 10, 14
group [1] - 82:17
grows [1] - 67:5
GUENZEL [1] - 103:1
Guenzel [12] - 18:23; 20:23; 21:2, 24; 23:6, 22; 32:9, 16; 37:21; 41:18; 54:18; 85:18
Guenzel's [1] - 83:18
guess [5] - 13:11; 62:25; 63:5; 75:12; 97:19
guy [1] - 16:14

H

half [1] - 8:24

hammer [1] - 45:21
hand [4] - 14:16; 52:4; 69:25; 99:25
handle [2] - 62:19; 63:10, 22; 77:23, 25; 78:2
handwritten [1] - 99:13
happy [2] - 6:6, 14
hard [1] - 92:8
hardness [1] - 35:14
harness [2] - 55:19, 23
healthy [1] - 66:1
heard [2] - 100:20; 103:19
hearing [1] - 80:6
heavily [1] - 67:6
heavy [1] - 105:5
height [1] - 55:16
Heinz [1] - 24:25
help [5] - 18:13; 37:2; 39:6; 54:4; 56:1
hereinafter [1] - 5:3
heterogeneous [1] - 88:9
hidden [2] - 91:10; 92:15
high [5] - 53:5; 106:14; 107:7, 12, 17
higher [1] - 107:7
highest [1] - 105:18
highlighted [1] - 100:9
highly [1] - 91:12
himself [1] - 87:7
hinge [1] - 107:4
hire [3] - 8:8; 35:17
history [1] - 47:9
hit [7] - 72:2, 17, 21; 74:23; 75:10
hitting [2] - 56:10; 75:2
hold [3] - 42:22; 52:4; 105:13
hope [1] - 6:25
hot [1] - 66:22
hour [1] - 80:13
hourly [1] - 80:15
house [1] - 97:18
hung [2] - 64:5; 75:14
hunt [2] - 81:10, 14
hunter [1] - 81:4

I

idea [6] - 20:7; 24:5; 34:21; 36:22; 38:16; 92:24
identification [2] - 14:19; 69:5
identified [4] - 28:25; 53:14; 88:24; 93:1
identify [1] - 89:8
identifying [1] - 39:20
immediate [1] - 59:20
immediately [1] - 64:24
imminent [1] - 62:4
impact [2] - 29:21; 75:3
impending [1] - 61:11

importance [1] - 44:23
important [6] - 26:20; 27:5; 71:18; 75:18; 99:1; 104:17
impractical [1] - 93:13
impressions [2] - 19:25; 53:2
improve [1] - 8:22
improvement [1] - 7:18
improving [1] - 8:15
impurity [1] - 88:12
in-house [1] - 97:18
inaccurate [1] - 6:13
Inc [4] - 7:22; 8:10; 10:12; 35:1
inception [1] - 10:22
incident [7] - 21:12; 22:8, 20; 25:3; 34:10; 50:21; 55:9
inclined [1] - 43:4
include [5] - 15:1; 58:15; 59:7; 66:7; 94:4
included [3] - 15:3; 28:9; 65:10
includes [1] - 58:2
incoming [1] - 28:8
incomplete [2] - 6:13; 67:20
incompletely [5] - 59:8, 21; 60:16; 63:5; 67:16
inconclusive [1] - 89:12
inconsistencies [1] - 88:20
inconsistent [1] - 88:4
incorporated [1] - 17:19
increased [1] - 65:3
indicate [5] - 15:15; 41:11; 48:25; 49:1; 95:23
indicated [4] - 8:12; 13:12; 34:12; 49:13
indicates [3] - 29:19; 39:20; 58:8
indication [4] - 29:11; 62:3, 5; 94:7
indicative [1] - 97:20
individual [2] - 18:16; 41:2
Industries [1] - 5:13
industry [1] - 93:15
infer [1] - 84:15
information [19] - 17:19, 22; 18:7; 22:24; 24:4; 25:2, 20; 28:24; 37:19; 38:14; 39:13, 17, 21; 40:8; 41:12; 42:1; 47:2, 18
inherent [1] - 59:4
inherent [4] - 64:17; 68:21; 89:5; 90:3
inhomogeneities [1] - 59:17
inhomogeneous [1] - 89:20
initial [2] - 23:14; 41:14
injecting [1] - 89:24
input [1] - 38:19
inside [8] - 44:1, 4, 8; 61:19;

62:8; 66:2; 92:12, 19
insofar [1] - 73:2
inspect [1] - 25:24
inspected [3] - 23:11; 25:9; 92:21
inspection [9] - 28:13; 31:8, 10; 42:24; 86:25; 92:4; 93:9; 94:7, 10
inspections [1] - 94:5
inspectors' [1] - 91:11
instance [7] - 28:23; 29:14, 21; 64:7; 65:9; 93:23
instantaneous [3] - 61:9; 64:22; 65:8
instruction [1] - 102:15
instructions [2] - 102:7, 12
insulating [1] - 30:17
insurer [1] - 83:15
integrity [1] - 49:18
intend [1] - 79:23
intended [1] - 66:19
intentionally [1] - 89:21
interaction [1] - 19:1
interactions [1] - 92:19
interior [1] - 62:7
intern [5] - 7:25; 8:5; 39:10; 40:23; 41:4
internal [4] - 52:23; 54:19; 93:7
internet [1] - 19:3
interns [2] - 40:17, 19
interrogatories [1] - 15:7
interrupt [1] - 50:16
introduced [1] - 5:12
intuitions [1] - 71:9
intuitively [1] - 71:8
invasive [3] - 43:7; 45:11; 80:10
investigating [1] - 36:16
investigation [10] - 5:16, 24; 16:7; 31:23; 33:8; 41:16; 62:12; 70:21; 76:16; 106:2
investigative [1] - 96:10
involve [2] - 38:17; 42:3
involved [15] - 8:16; 20:4; 23:19; 28:16; 39:16; 40:14; 42:25; 46:3; 48:13; 58:24; 76:7; 87:2; 95:13; 101:24
involvement [3] - 42:7; 43:11; 90:10
involves [1] - 102:3
involving [1] - 82:10
isolate [1] - 47:7
isolated [1] - 66:17
issue [2] - 77:20
issues [4] - 24:10; 42:1; 88:18
item [1] - 64:21
items [3] - 27:19; 34:4; 66:8

itself [5] - 25:3; 45:20; 66:23; 77:22; 91:2

**J**

Jeremy [1] - 24:25
July [1] - 20:21
junction [1] - 96:20
June [2] - 21:22; 50:18
justify [1] - 35:19

**K**

Kaiser [1] - 24:25
Kansas [1] - 90:9
Keaschall [7] - 55:12, 17; 56:13; 68:10; 69:20; 100:18; 105:1
keep [4] - 33:10; 56:5, 10; 102:17
keeps [1] - 21:17
killed [1] - 21:10
kind [14] - 11:3, 17; 15:2; 18:10; 19:1; 22:15; 23:18; 32:3; 41:13; 43:3, 9; 49:17, 21; 101:3
kinds [6] - 18:10; 35:12; 37:20; 40:1; 92:4; 93:7
knife [1] - 68:20
knowledge [2] - 87:10; 100:17
Kunkee [5] - 24:20; 25:7; 31:25; 33:7, 19
Kurtis [1] - 68:10

**L**

lab [4] - 11:15; 55:2; 80:5; 92:9
labeled [2] - 52:2; 60:7
laboratory [11] - 7:14; 15:19; 35:3; 37:13; 43:20; 45:1, 10; 52:17; 58:9, 17; 76:25
labs [1] - 11:16
lack [3] - 52:10; 56:18; 61:2
laid [1] - 73:25
laminations [1] - 88:20
lanyard [1] - 56:15
lap [1] - 66:25
last [5] - 79:7; 80:25; 82:6; 85:19; 99:24
late [4] - 12:4, 11; 40:16
laterally [10] - 71:21; 72:2, 17, 24; 73:10, 15; 74:5, 19, 23; 75:9
lawful [1] - 5:2
lawsuit [1] - 5:13
lawsuits [2] - 8:21; 9:10
laymen's [1] - 59:11
lays [1] - 67:4
learn [1] - 13:11

learning [1] - 11:18
least [4] - 17:17; 23:22; 43:18; 85:4
leave [1] - 49:19
lectures [1] - 82:13
left [7] - 12:2; 14:22; 25:14; 26:15; 64:15; 90:25; 93:9
legal [2] - 9:3
length [1] - 53:17
less [1] - 80:24
level [4] - 13:14; 53:22; 62:18; 98:17
Lexington [5] - 22:4; 23:11; 24:13, 16; 36:8
library [1] - 84:19
life [2] - 65:4; 91:17
lifetime [3] - 29:25; 59:24; 65:2
lift [17] - 5:17; 19:15; 55:16; 58:10; 59:6; 60:4; 61:8, 15; 62:1; 68:11; 90:3, 6, 11; 91:2; 100:25; 103:11
lights [4] - 37:13; 38:1; 42:20
likelihood [1] - 65:12
likely [2] - 67:22; 70:3
limited [2] - 44:19; 92:4
limits [1] - 78:9
line [4] - 92:21; 99:4; 101:24; 102:2
lineman [1] - 22:2
lines [1] - 102:5
list [4] - 57:14; 84:12, 14, 22
listed [1] - 18:16
listening [1] - 12:15
literature [3] - 15:10; 17:11; 84:4
litigation [3] - 8:16, 25; 83:13
live [2] - 68:5; 98:20
lived [1] - 87:6
load [32] - 35:15; 47:9; 49:12, 20; 53:7, 12, 22, 25; 54:5; 59:18; 61:3; 62:18; 63:9; 64:3, 5, 12; 65:8, 20; 66:1, 3; 67:7, 11; 68:16, 22; 74:18; 75:13, 19; 77:25; 78:1, 3; 98:12; 105:7
loaded [6] - 62:11; 63:18; 65:17; 67:2, 6; 103:13
loading [12] - 59:19; 62:20; 63:20, 25; 65:23; 77:20, 23-24; 97:17, 20, 24; 105:5
loads [5] - 38:19; 49:22; 98:2; 107:6
localized [2] - 47:9; 66:16
located [4] - 7:10; 73:10; 98:24; 105:3
location [21] - 21:9; 49:13; 53:9; 60:6, 21; 70:6; 96:21; 97:16; 106:9, 12; 107:12
locations [1] - 30:23

look [21] - 12:23; 21:13, 16; 24:3; 25:10; 27:15; 30:11; 31:15; 33:10; 43:24; 47:1, 7; 48:1; 58:1; 74:14; 76:25; 94:17; 97:8; 100:1; 102:16
looked [19] - 31:17-19; 37:11, 25; 42:19, 24-25; 50:23; 60:9; 66:6; 67:14; 74:25; 78:25; 84:17; 86:4; 97:4
looking [22] - 7:17; 8:14; 18:7; 19:18; 30:10; 45:19; 46:15; 47:6, 11; 48:4; 53:1; 58:24; 62:3; 64:20; 76:1, 16; 91:20; 97:6; 102:2, 4
lookout [1] - 32:10
low [2] - 98:11; 106:12
lower [1] - 67:6

**M**

M.S [1] - 5:1
machining [2] - 90:16, 19
macroscopic [2] - 58:9; 88:22
macroscopically [2] - 58:17; 76:9
main [1] - 12:17
maintain [1] - 33:3
major [1] - 11:21
man [13] - 8:6; 19:15; 21:10; 55:16; 58:10; 59:6; 61:8, 15; 62:1; 64:15; 68:11; 90:3, 25
mandrel [1] - 66:21
manufacture [3] - 42:11; 91:14; 93:3
manufactured [2] - 90:6; 91:2
manufacturer [7] - 22:6; 28:25; 37:19; 38:15; 41:13; 64:16; 91:1
manufacturing [14] - 37:9; 49:3; 59:5, 25; 63:4; 66:15; 86:1, 8; 89:1; 90:3, 11; 92:11; 95:19; 97:9
mark [2] - 14:17; 72:13
marked [4] - 14:18, 21; 69:4, 7
marks [1] - 29:21
master's [1] - 9:25
match [1] - 49:20
material [29] - 7:14; 18:2; 19:2; 24:9; 37:16; 44:3; 47:5; 48:1, 12; 49:25; 52:8, 12; 53:10; 59:7, 17; 60:16; 61:1; 63:4; 68:5, 16; 76:10; 78:6; 88:3, 9; 89:17; 92:18, 22; 99:3
Materials [5] - 7:11, 22; 8:9;

10:12; 35:1
**materials** [32] - 7:15, 20; 11:14; 12:7, 24; 13:7, 10; 14:21; 15:6; 18:10; 22:19; 23:7; 24:8; 25:23; 29:12; 40:2; 43:23; 58:11; 65:9; 66:7; 68:2; 70:18; 84:12, 15; 89:8; 92:3; 93:7; 95:11; 98:20; 103:17
**matter** [7] - 14:2; 20:10; 58:6; 64:1; 75:17; 79:3; 97:2
**mean** [14] - 9:6; 15:17; 19:10; 30:6; 34:2; 56:21; 63:20; 74:13; 87:5; 89:2; 92:7; 107:3
**meaning** [3] - 29:4; 66:20; 91:13
**meaningful** [3] - 19:7, 10; 46:9
**means** [5] - 29:6; 56:4; 64:23; 74:3; 88:10
**meant** [1] - 94:20
**measurement** [3] - 70:14, 22
**measurements** [1] - 37:17
**mechanical** [3] - 16:11, 23; 40:2
**mechanics** [4] - 12:9; 13:9; 44:11; 87:6
**meet** [2] - 24:16; 41:21
**melt** [1] - 91:15
**mention** [1] - 87:20
**met** [7] - 17:10; 24:23; 81:18; 85:9; 87:17
**metal** [5] - 13:1; 66:21; 67:25
**metallurgical** [8] - 7:13; 9:19, 23, 25; 12:18, 22; 35:11, 14
**Metallurgists** [3] - 11:20, 23; 12:1
**metallurgy** [1] - 12:8
**metals** [5] - 47:7; 65:9; 68:3; 95:11; 98:21
**meter** [1] - 46:8
**method** [1] - 74:21
**methodology** [1] - 85:13
**methods** [2] - 92:4; 93:24
**microscope** [2] - 42:20; 52:21
**microscopes** [2] - 35:11; 37:14
**microscopic** [2] - 51:16; 88:22
**microscopically** [5] - 38:1; 50:24; 51:14; 54:9; 76:9
**mid** [1] - 12:11
**middle** [2] - 64:21; 93:6
**might** [7] - 18:25; 28:14; 42:2; 48:19; 65:22; 88:14; 94:17
**mildly** [1] - 53:1

**mill** [1] - 66:19
**mine** [2] - 15:22; 86:24
**minors** [1] - 10:2
**minute** [2] - 57:18, 22
**minutes** [1] - 5:12
**missed** [1] - 46:17
**missing** [1] - 81:25
**misused** [1] - 98:8
**mixture** [1] - 12:13
**mode** [1] - 86:15
**mold** [3] - 17:12; 89:22, 24
**molded** [1] - 18:1
**molding** [1] - 86:2
**moment** [1] - 99:3
**month** [2] - 20:20; 34:22
**most** [10] - 13:1; 30:7; 43:19; 54:20; 70:3; 84:18; 85:3; 96:6; 97:2; 101:24
**mostly** [1] - 82:18
**move** [6] - 46:11; 72:1; 73:14, 17; 74:19; 75:9
**moved** [6] - 62:7; 68:1; 70:5; 72:17, 23; 73:3, 9; 74:23
**moves** [2] - 73:16; 74:4
**movie** [1] - 81:7
**MR** [24] - 5:7; 21:19; 46:18; 56:17; 57:20; 67:17, 19; 68:25; 73:1; 81:1, 5, 7, 11, 14, 16; 102:21, 23, 25; 103:1, 4; 107:20, 22, 24
**must** [1] - 98:12
**myriad** [1] - 52:22

# N

**naked** [4] - 38:1; 53:16; 61:20; 92:12
**name** [14] - 5:8, 11; 11:22; 12:22; 16:11, 13; 17:7; 20:25; 22:5; 24:20, 24; 41:1; 103:18
**named** [2] - 8:6; 16:14
**names** [1] - 22:4
**nasty** [1] - 53:1
**nature** [1] - 20:1
**near** [1] - 106:24
**nearly** [2] - 53:17; 54:21
**Nebraska** [9] - 5:14; 9:11; 22:4, 25; 23:25; 24:14; 50:7, 20; 76:8
**necessarily** [6] - 40:2; 49:23; 89:23; 93:4; 97:20; 99:3
**necessary** [1] - 46:25
**need** [18] - 7:18; 21:13, 19; 23:24; 35:6, 17; 42:2, 10; 48:9; 49:9, 11, 14; 54:7; 57:3; 60:22; 80:23; 92:14; 107:23
**needed** [8] - 26:25; 32:8; 37:18; 41:12; 42:1; 47:3,

12, 14
**network** [1] - 67:5
**networks** [1] - 65:13
**never** [5] - 19:8; 20:15; 39:15; 60:1; 87:17
**new** [6] - 8:8; 42:6; 76:2; 82:9, 14; 91:25
**next** [11] - 23:5; 34:22; 41:16; 42:7, 21; 60:12; 73:7; 74:2; 96:4
**nicks** [1] - 30:13
**night** [1] - 99:24
**nobody** [3] - 25:14; 35:10
**nondestructive** [2] - 28:13; 43:6
**nonmetallic** [1] - 92:3
**normal** [1] - 98:1
**normally** [1] - 37:15
**Norman** [5] - 7:8; 9:24; 19:18, 23; 41:19
**notations** [1] - 31:20
**note** [1] - 31:8
**notebook** [5] - 15:5, 15-16; 17:3; 51:17
**noted** [2] - 30:1; 31:17
**notes** [12] - 15:18; 22:1; 27:24; 28:17; 29:3; 30:21; 31:1, 11; 99:13, 16; 100:8
**nothing** [8] - 19:19; 30:14, 19; 41:8; 82:9, 13; 98:3
**notice** [5] - 13:19, 25; 14:4; 15:21; 84:11
**noting** [1] - 28:20
**number** [5] - 61:6; 64:14; 68:8; 71:25; 75:4
**numbers** [2] - 29:1; 49:17

# O

**oath** [1] - 5:5
**object** [3] - 56:17; 73:1; 104:2
**observation** [1] - 45:23
**observations** [11] - 19:24; 27:8, 20; 30:2; 31:17; 37:10; 38:4; 45:16; 53:3; 65:6; 76:9
**observe** [1] - 26:21
**observed** [1] - 28:21
**observing** [1] - 54:8
**obviously** [1] - 69:20
**occasion** [2] - 38:10; 85:21
**occasions** [1] - 91:21
**occupation** [1] - 9:17
**occur** [5] - 47:4; 58:25; 98:1, 11; 105:23
**occurred** [11] - 23:18; 34:15; 36:11, 21; 37:4; 53:21; 55:4, 9; 60:23; 89:3; 94:8
**occurrence** [1] - 78:23

**occurs** [2] - 29:12; 89:6
**odd** [1] - 88:10
**off-the-record** [1] - 69:2
**offer** [1] - 91:8
**offering** [6] - 91:4; 94:13, 20; 95:3, 5, 19
**office** [2] - 20:23; 21:2
**oil** [1] - 82:18
**Oklahoma** [4] - 7:8; 9:24; 39:12, 21
**old** [1] - 29:13
**once** [2] - 15:25; 85:20
**one** [42] - 7:24; 8:1; 12:21; 13:15; 15:5; 16:10; 17:14; 24:23; 25:10; 32:2; 39:1, 10; 43:20; 47:2; 49:16, 23; 52:16; 53:25; 62:23; 64:2; 65:5; 69:10; 70:5; 75:21; 79:11, 22; 83:4, 24-25; 85:20; 88:18; 89:12; 91:21; 92:2; 96:19; 103:10; 104:2, 9, 13; 105:1; 107:14
**one's** [1] - 24:24
**ones** [1] - 40:19
**ongoing** [2] - 7:18; 99:5
**onset** [2] - 20:5; 65:3
**open** [1] - 59:22
**operating** [1] - 98:1
**operation** [1] - 104:3
**operators** [1] - 64:4
**opinion** [9] - 37:3; 59:4; 63:1; 68:9, 13; 88:14; 89:17; 90:2, 24
**opinions** [27] - 17:20; 19:21, 25; 26:22; 27:6; 42:21; 57:15; 58:2, 5, 13, 16, 21; 76:2, 21; 79:24; 80:8; 85:12; 86:13; 90:2; 91:4; 94:3, 14, 20; 95:3, 18; 100:8; 107:11
**opposed** [2] - 8:21; 105:19
**opposing** [1] - 67:25
**ordinarily** [1] - 43:3
**orientation** [3] - 62:23; 66:4; 69:23
**origin** [15] - 37:7; 44:4, 22; 47:6, 8; 48:7; 52:5, 7; 60:2; 88:2; 89:13; 96:20
**original** [2] - 38:13; 76:3
**originally** [1] - 77:8
**Osborne** [7] - 5:13; 39:11, 19; 67:9; 79:15; 90:8; 93:10
**OSHA** [2] - 56:24; 57:10
**otherwise** [4] - 18:9; 39:15; 78:24; 92:23
**OU** [10] - 10:1; 11:15, 22; 16:11, 24; 17:13; 40:9, 16-17, 19
**outline** [1] - 15:2

outriggers [1] - 70:4
outside [1] - 48:3
overdesigned [3] - 65:25; 78:5; 98:9
overlapping [1] - 11:9
overload [3] - 48:2; 68:15; 78:10
overloaded [1] - 97:6
overwhelming [1] - 98:12
own [3] - 10:14; 12:3; 16:6
owner [1] - 10:23
owns [1] - 10:18
oxidation [2] - 29:11; 89:6
oxidized [1] - 92:23

## P

P.E [1] - 5:1
package [2] - 32:11; 104:1
packaged [1] - 36:6
packaging [1] - 32:12
page [3] - 46:11; 57:13; 58:1
pages [3] - 99:14; 100:9
paid [1] - 20:6
paint [3] - 72:7; 75:2, 4
palm [1] - 52:13
paper [4] - 17:11; 18:5; 49:19; 91:8
papers [2] - 82:10; 85:3
parallel [2] - 97:16, 22
paramount [1] - 99:8
paraphrased [2] - 99:15; 100:7
part [8] - 15:25; 26:3, 17; 27:8; 30:5; 33:8; 36:18; 45:12, 14, 16, 19; 46:3, 9, 17; 48:11, 20; 49:15; 51:8; 62:9; 71:3; 73:18; 79:25; 87:7; 89:5, 11; 92:19; 94:14; 106:2
participate [1] - 44:20
participated [1] - 74:16
particular [6] - 5:25; 24:2; 31:6; 50:21; 104:10, 25
particularly [1] - 86:1
parts [8] - 38:20; 50:20; 51:3, 10; 52:19; 102:9; 105:23
party [1] - 39:16
pass [1] - 49:21
passes [1] - 49:21
past [3] - 12:16; 19:8, 19
path [1] - 39:17
pattern [3] - 29:10, 13; 97:18
patterns [1] - 30:23
pay [1] - 82:3
pending [1] - 5:14
people [17] - 16:10; 22:4; 24:22; 33:9; 39:25; 47:17; 72:4; 78:9; 80:7; 91:16; 94:2; 96:6; 97:4; 102:4, 8,

16; 104:24
per [2] - 13:16; 29:23
percentage [1] - 8:20
perfect [2] - 67:23; 92:7
perform [2] - 44:16; 63:8
performance [1] - 99:8
performed [5] - 45:6, 9; 62:18; 63:8; 80:19
performing [1] - 32:22
perhaps [1] - 61:10
period [3] - 12:12; 48:13; 92:1
peripheral [1] - 47:18
Perkins [1] - 8:4
Perkins' [1] - 83:5
permit [1] - 93:22
person [6] - 24:8; 39:4; 42:3; 75:21; 87:6; 97:4
perspective [1] - 73:15
Ph.D [2] - 10:4, 8
phase [1] - 45:15
Phil [1] - 83:5
Phillip [1] - 8:4
phone [2] - 19:19; 23:14
photograph [6] - 27:1, 9, 21; 69:1, 8, 13
photographed [3] - 31:20; 37:24; 52:22
photographing [4] - 27:18; 28:22; 37:6; 54:9
photographs [11] - 15:11, 19; 22:22; 27:11, 14; 31:2; 38:7, 9; 43:1; 55:3; 77:2
photography [1] - 31:10
phrase [1] - 54:12
physical [1] - 12:7
physically [1] - 26:21
physics [2] - 10:2
pic [1] - 71:23
pick [1] - 9:17
picture [1] - 70:7
piece [6] - 45:10; 52:4; 56:23; 66:18, 25; 89:21
pieces [9] - 15:23; 27:19, 21; 36:23; 37:25; 52:16, 18, 22; 67:24
pipe [1] - 66:18
pirated [1] - 21:17
place [4] - 72:22, 24; 75:10; 90:21
placed [2] - 65:21; 74:18
plan [9] - 36:19, 22, 24; 37:23; 38:13; 41:14, 20; 42:6; 43:2
planes [1] - 59:9
plastic [2] - 92:20; 97:15
plastics [4] - 12:25; 65:9, 12; 68:3
platform [9] - 26:13; 31:19;

35:20; 63:7; 65:17; 74:4; 87:20; 89:9; 103:10
platforms [2] - 79:15; 104:9
pleadings [1] - 15:8
point [21] - 22:16; 23:14; 33:10; 37:18, 20, 23; 38:13; 41:12, 24; 42:24; 43:9; 54:15, 23; 65:1; 80:7; 95:17; 106:7, 13, 15, 20, 24
points [2] - 105:6, 15
pole [22] - 23:12; 26:9, 16; 55:5; 64:6; 69:24; 70:13, 23-24; 71:7, 20; 72:24; 73:3, 8, 10; 74:1; 75:10, 14; 102:13, 15
polymers [2] - 98:22; 99:5
poor [1] - 94:17
poorly [1] - 91:22
populated [1] - 91:12
population [2] - 53:5; 65:2; 66:4; 79:10
portion [1] - 46:20
position [5] - 9:21; 10:11; 20:12; 70:3; 98:13
positions [1] - 98:24
possible [4] - 88:25; 98:21
potentially [3] - 9:1; 39:16; 75:19
Power [2] - 23:10; 83:10
power [3] - 101:10, 24; 102:2
pre [1] - 30:15
pre-existing [1] - 30:15
precedence [1] - 30:15
precipitated [5] - 24:11; 61:7, 14, 25; 62:6
precision [1] - 85:2
premature [3] - 61:8, 14, 25
presence [3] - 49:24; 53:7; 93:25
present [17] - 27:22; 31:22; 44:5; 59:18; 62:11, 15; 64:15; 74:22; 78:21; 79:3; 86:3; 90:25; 96:24; 98:18; 99:3; 104:22
presentations [2] - 82:13, 16
presently [1] - 5:14
preserve [1] - 33:11
preserved [1] - 25:13
pretty [5] - 53:1; 59:13; 66:1; 83:7; 97:7
previous [1] - 6:12
primarily [3] - 61:7, 13; 105:2
primary [1] - 52:6
principal [1] - 90:21
problem [10] - 40:1; 47:20; 48:8; 54:22; 66:2; 77:22; 78:7; 91:9; 94:9
problems [8] - 7:16; 30:15; 40:1; 66:2; 68:3; 85:25;

91:15; 92:2
process [14] - 7:18; 8:22; 44:10; 46:1; 49:3; 63:4; 66:15; 67:23; 86:8; 89:1; 103:23, 25; 104:8; 106:2
processes [1] - 8:14
product [10] - 8:22; 37:19; 39:13, 22; 49:18; 59:24; 67:4; 78:10; 91:25; 99:4
product's [1] - 78:7
products [4] - 8:15; 37:20; 44:7; 68:2
profession [1] - 9:18
professor [2] - 11:21; 12:5
proffer - 68:9
program [2] - 10:4; 11:17
programs [1] - 11:16
progressive [3] - 61:10; 64:23; 65:11
project [2] - 14:11; 40:14
prone [2] - 65:1; 92:18
pronounce [1] - 16:12
propensity [1] - 93:6
properties [1] - 12:7
protect [1] - 56:4
protection [2] - 55:11; 56:16, 22
proven [1] - 71:9
provide [6] - 5:15; 17:18, 22; 25:1; 38:19; 88:21
provided [12] - 5:24; 15:13; 22:19; 25:20; 51:11; 61:11; 69:10; 70:21; 76:10; 77:7; 78:12; 96:7
Public [2] - 23:10; 83:10
publication [1] - 82:6
publications [6] - 9:3; 82:5, 16; 84:5, 18, 21
pull [1] - 16:13
pulled [2] - 52:12; 56:3
purpose [5] - 23:16; 74:14; 104:6
pursue [1] - 18:14
pushing [1] - 64:7
put [6] - 37:13; 46:8; 53:1; 63:15; 66:20; 67:24
putting [1] - 50:11

## Q

qualified [1] - 39:2
quarantine [1] - 102:17
quarantined [1] - 25:16
questioning [1] - 83:23
questions [13] - 5:19; 20:2; 44:12, 14; 47:16; 81:2; 86:5; 102:22; 103:1, 6; 107:21
quickly [1] - 39:8
quite [1] - 43:12

quote [1] - 45:15

**R**

rail [3] - 72:12, 18; 73:11
Railsback [1] - 99:17
Railsback's [2] - 77:10; 100:5
raised [1] - 82:24
Rakow [1] - 99:18
Rakow's [2] - 78:13; 100:4
rate [4] - 65:18; 80:15; 82:23; 83:5
rated [2] - 65:19
ray [2] - 35:16
rayed [1] - 93:16
raying [1] - 93:12
reactions [1] - 89:25
read [7] - 46:18; 55:1; 87:15; 99:25; 100:6; 107:23
reading [1] - 12:19
real [1] - 41:21
really [19] - 7:23; 12:20; 13:9; 18:7; 19:7, 20; 29:22; 41:20; 45:13; 57:3; 64:1, 23; 66:22; 80:8, 10; 83:7; 87:1; 96:18
reason [11] - 6:4, 13; 18:5; 53:19; 61:22; 72:5, 7; 98:9; 105:17
reasons [1] - 78:18
rebond [1] - 66:23
receipt [1] - 34:19
received [8] - 9:23; 38:9; 43:7; 51:3, 10, 23; 52:1; 83:24
receiving [1] - 44:25
recent [1] - 82:9
recess [1] - 57:23
reckless [2] - 79:4; 97:3
recollection [3] - 18:22, 24; 85:24
reconstructing [2] - 75:22; 77:17
reconstruction [2] - 55:8; 74:16
record [6] - 5:9; 39:19; 46:20; 50:10, 12; 69:2
recorded [1] - 38:3
records [2] - 41:9; 42:25
red [4] - 72:8; 75:2, 4
REDIRECT [1] - 103:3
refer [1] - 84:4
referenced [1] - 15:16
referred [2] - 86:7; 89:7
referring [6] - 28:1; 70:20; 91:1; 99:12; 103:11; 106:9
reflect [1] - 22:2
regard [25] - 5:13, 24; 20:9; 23:2, 15; 34:4; 45:7; 50:21;

58:5; 80:19; 82:5, 12; 83:12; 85:8; 90:1, 23; 91:5; 94:4, 14; 95:3; 99:16; 102:9, 13; 103:10; 104:13
regarding [1] - 22:20
regardless [1] - 78:1
regions [2] - 59:10, 15
related [1] - 32:2
relation [2] - 56:7; 104:10
relevant [1] - 27:2
rely [1] - 6:23
remain [2] - 87:3; 91:15
remainder [1] - 88:5
remained [1] - 30:25
remember [16] - 13:23; 16:12; 17:16; 19:4, 20; 20:17; 23:13; 25:22; 32:13; 85:1, 23; 102:10, 14-15; 103:18; 106:4
removed [3] - 15:24; 43:21; 69:21
repeated [1] - 46:21
reply [1] - 25:13
report [26] - 15:20; 57:14, 17; 58:1; 75:23; 76:1, 3; 77:7, 10; 78:13; 81:20; 84:3, 13-14, 16, 22; 86:14; 87:19; 95:22; 96:10, 12; 99:10, 12; 100:4
reporter [3] - 14:17, 20; 69:7
reports [6] - 15:11; 83:24; 87:15; 99:17, 25
represent [3] - 5:13; 59:17; 81:19
represented [1] - 100:14
requested [1] - 46:20
require [1] - 49:23
required [3] - 56:24; 57:2, 4
requirement [1] - 55:15
research [1] - 12:10
residual [1] - 91:15
resin [9] - 17:12, 25; 59:8; 60:17; 63:5; 66:12; 67:16, 21; 86:2
resins [1] - 66:7
respect [1] - 82:18
response [2] - 5:5; 59:19
responsible [1] - 11:15
rest [4] - 70:10; 72:22; 77:6; 105:20
resting [1] - 29:5
result [7] - 10:7; 19:23; 20:13; 75:1; 89:4; 98:20; 101:25
resulting [1] - 59:8
results [1] - 51:16
retained [3] - 5:15; 22:17; 87:15
retired [2] - 91:19; 92:24
review [5] - 80:4; 84:4, 7, 12;

99:17
reviewed [7] - 58:11, 19; 84:15; 95:23; 96:2, 10, 13
reviewing [2] - 80:1, 6
revised [1] - 81:22
rib [4] - 54:21; 60:12; 62:7; 96:21
ribs [3] - 105:16, 18; 106:22
Rick [2] - 16:14; 18:18
right-hand [1] - 69:25
rim [7] - 44:1; 52:7, 11-12; 96:21; 105:19; 106:22
ring [3] - 55:20; 56:15; 61:19
road [1] - 29:6
roughly [1] - 20:20
routine [1] - 65:14
routinely [1] - 16:19
rubs [1] - 30:9
rule [1] - 18:1
rules [2] - 57:8, 10
run [2] - 97:22; 101:17
runs [1] - 53:17

**S**

saddle [1] - 29:7
safely [1] - 36:6
safety [2] - 55:14; 95:10
samples [1] - 76:10
saw [14] - 27:1; 29:20; 30:14; 31:21; 36:8; 44:3; 51:20; 52:8; 59:20; 61:17; 72:9; 100:14; 102:18
scenario [3] - 61:10; 64:1; 75:5
scene [5] - 25:14; 55:4; 69:16, 19
schedule [2] - 82:20; 83:4
school [1] - 13:17
science [2] - 9:22; 11:15
sciences [1] - 88:10
scientific [3] - 45:25; 97:8; 103:9
scope [3] - 23:15; 36:9; 94:15
se [1] - 29:23
seam [2] - 66:24
seamless [1] - 66:19
Seattle [2] - 16:15, 19
second [8] - 17:3; 23:18; 24:9; 48:11; 75:23; 83:25; 86:10; 94:23
secondly [1] - 99:2
section [15] - 43:21, 25; 53:1, 6, 18-19; 54:1; 59:16, 18; 61:18; 64:19, 25; 65:12; 88:5
sections [4] - 50:24; 52:20, 24; 77:1
see [27] - 12:21; 23:17, 19,

24; 26:12, 25; 29:13, 21, 25; 36:3, 20; 37:8; 41:21; 45:21; 48:6; 49:20; 53:7, 16, 19; 68:11; 70:1, 13; 72:18; 76:2; 96:22; 97:9
seeing [2] - 13:24; 106:4
seem [1] - 33:14
segment [2] - 30:24
semantic [1] - 47:23
semantics [1] - 98:15
senior [1] - 13:16
sense [4] - 6:3; 56:12; 88:1; 97:10
sent [1] - 84:25
sentence [2] - 61:23; 64:21
separate [2] - 11:10; 15:22
separated [3] - 23:3; 26:14; 72:16
separates [3] - 73:19; 74:3
September [7] - 51:4; 81:20, 23; 83:25; 84:13, 16; 87:19
sequence [1] - 73:18
serial [1] - 28:25
series [1] - 8:13
served [1] - 13:18
serves [1] - 30:16
service [10] - 50:1; 65:14; 78:4; 79:7; 91:14, 19; 92:25; 98:25; 99:7; 102:20
services [3] - 5:16, 24; 80:13
setting [1] - 9:5
seven [1] - 50:3
Shah [4] - 96:11, 13; 97:5, 10
Shah's [2] - 99:12, 22
shape [1] - 103:16
shaped [1] - 68:1
share [1] - 86:17
shared [1] - 41:19
shear [1] - 97:16
sheriff [1] - 22:22
ship [1] - 33:24
shipped [8] - 32:10; 34:13, 25; 35:21; 36:18; 50:6, 14; 76:7
shipping [2] - 34:19; 50:19
Shively [2] - 81:3, 17
SHIVELY [8] - 21:19; 57:20; 81:7, 11, 14, 16; 102:21; 107:22
shocked [2] - 56:3; 93:17
shoot [1] - 102:5
shop [1] - 24:23
shortly [3] - 22:20; 43:10
shotguns [1] - 102:5
show [3] - 41:23; 64:24; 69:6
showed [2] - 41:25; 54:22
shows [5] - 29:24; 41:9; 69:14, 23; 71:24
side [17] - 30:3; 52:10; 69:25;

71:6; 72:6; 73:11; 75:13;
    77:20, 23-25; 78:3; 97:17,
    20, 24; 107:3, 5
**sidewalls** [1] - 29:14
**sign** [1] - 107:23
**significance** [10] - 28:21;
    29:2, 16; 30:2, 21; 33:4;
    48:19; 49:2; 51:20; 87:23
**significant** [3] - 31:11, 21;
    88:1
**similar** [2] - 42:12; 99:16
**simply** [4] - 46:15; 47:25;
    48:4; 56:14
**single** [1] - 93:15
**sit** [1] - 96:1
**site** [1] - 100:21
**sites** [4] - 42:20; 59:21;
    105:25
**sits** [1] - 67:1
**sitting** [3] - 14:13; 29:6; 30:8
**size** [2] - 52:13; 103:16
**sketch** [1] - 11:4
**sketched** [1] - 30:24
**sketches** [1] - 30:22
**sketchy** [1] - 22:1
**skills** [1] - 38:17
**sky** [1] - 100:15
**slash** [1] - 64:18
**slowed** [1] - 43:11
**small** [4] - 52:4, 15; 82:17;
    107:8
**smaller** [1] - 107:9
**so..** [1] - 100:12
**sole** [1] - 95:18
**solemnly** [1] - 5:2
**solvents** [1] - 88:19
**someone** [4] - 38:17; 39:2;
    40:5; 44:9
**sometime** [1] - 85:20
**sometimes** [2] - 64:4; 71:8
**somewhat** [2] - 11:9; 42:8
**somewhere** [1] - 50:10
**soon** [1] - 34:23
**sorry** [5] - 9:6; 10:3; 34:5;
    46:17; 50:16
**sort** [6] - 15:8; 19:17; 27:17;
    30:11; 38:19; 43:11, 25;
    44:4; 47:10
**sorts** [3] - 29:1; 35:15; 87:1
**sound** [3] - 54:11, 13; 101:6
**source** [1] - 88:21
**speaking** [1] - 22:13
**specialize** [1] - 7:13
**specials** [1] - 83:7
**specific** [6] - 13:6; 59:9;
    63:12; 84:9; 100:22;
    105:24
**specifically** [7] - 20:16; 54:5;
    82:4; 84:21; 89:8; 100:17;

102:14
**specimens** [1] - 52:1
**speculate** [2] - 56:19
**speculative** [1] - 42:9
**spend** [2] - 12:24; 32:20
**spent** [1] - 52:18
**splices** [2] - 102:2, 4
**spoken** [3] - 87:10, 14;
    100:13
**spot** [1] - 30:7
**spots** [1] - 104:2
**spring** [1] - 8:8
**stages** [1] - 19:9
**stand** [1] - 86:20
**standards** [2] - 15:9; 49:22
**standing** [1] - 105:13
**standpoint** [1] - 40:3
**start** [4] - 11:7; 12:2, 22;
    16:23
**started** [3] - 11:24; 57:22;
    91:13
**starting** [3] - 11:4; 58:1;
    106:7
**starts** [1] - 47:20
**state** [3] - 5:8; 29:19; 90:24
**statement** [4] - 53:24; 58:15;
    97:14; 98:15
**stayed** [1] - 48:13
**steels** [1] - 13:4
**steps** [1] - 43:20
**stereomicroscopic** [1] -
    35:12
**Steve** [1] - 5:11
**sticking** [1] - 68:20
**still** [6] - 26:17; 36:10; 62:17;
    63:7; 70:4; 77:3
**stop** [3] - 6:5, 13; 9:15
**storage** [1] - 22:3
**straight** [1] - 66:24
**straps** [1] - 30:23
**strength** [3] - 60:21, 25; 61:2
**stress** [4] - 106:13; 107:12,
    17
**stresses** [11] - 38:19; 103:12;
    104:3, 10, 18, 21; 105:2, 4,
    17, 21, 23
**strict** [1] - 56:12
**strictly** [1] - 28:15
**striking** [1] - 74:5
**strong** [1] - 98:11
**struc** [1] - 106:23
**struck** [1] - 72:25
**structural** [12] - 16:18; 30:19;
    38:18; 42:11; 48:18; 49:2,
    5-6; 62:9; 86:14; 87:6
**structure** [5] - 44:1; 54:19;
    77:22; 78:21; 86:25
**structures** [1] - 12:7
**stuck** [1] - 64:6

**students** [2] - 11:18; 39:10
**stuff** [2] - 23:24; 82:3
**sub** [2] - 61:7; 66:23
**sub-surface** [1] - 61:7
**subject** [1] - 59:6
**subpoena** [2] - 13:19, 24
**substance** [3] - 44:22; 60:3;
    88:13
**substantive** [3] - 34:2, 9;
    86:12
**subsurface** [2] - 61:13, 20
**success** [1] - 44:19
**suddenly** [1] - 68:6
**sufficient** [2] - 54:17; 98:18
**suggested** [1] - 72:4
**summer** [2] - 8:8; 51:3
**summery** [1] - 99:23
**support** [1] - 98:16
**suppose** [2] - 33:15; 39:8
**supposed** [2] - 89:14; 98:11
**surface** [8] - 45:24; 48:5;
    52:25; 61:7, 17; 62:6, 9
**surfaces** [7] - 37:7, 16;
    44:13; 45:19; 46:16; 47:1;
    48:1
**surprised** [1] - 64:9
**survive** [1] - 78:4
**suspect** [1] - 28:20
**sworn** [1] - 5:2
**symptoms** [1] - 68:15

### T

**tab** [1] - 31:6
**table** [1] - 21:18
**tail** [1] - 12:2
**tarnish** [1] - 17:6
**tarps** [1] - 25:17
**taught** [2] - 12:6; 40:16
**teaching** [3] - 11:16; 12:9
**technical** [3] - 15:10; 17:11;
    84:5
**techniques** [2] - 86:25; 93:23
**tecum** [1] - 13:19
**templates** [1] - 28:24
**ten** [13] - 71:1, 20; 72:2, 17,
    24; 73:3, 10, 14; 74:1, 5,
    23; 75:9
**termed** [1] - 66:14
**terms** [5] - 42:6; 45:1; 59:11;
    67:8; 68:17
**test** [9] - 44:16; 45:20; 46:10;
    49:22; 63:13; 97:7, 18;
    103:19
**testified** [3] - 5:3; 9:10; 82:25
**testifying** [1] - 99:11
**testimony** [2] - 20:13; 70:9;
    73:3; 101:5
**testing** [5] - 7:14; 28:4, 12;
    43:6, 8; 45:6, 15, 17, 24;

48:18, 24; 51:6; 62:12;
    93:21; 103:9
**testings** [1] - 53:12
**tests** [3] - 44:21; 46:6; 49:24
**that'll** [1] - 56:4
**THE** [5] - 21:21; 81:4, 9, 13;
    107:23
**themselves** [1] - 39:20
**theoretical** [1] - 13:9
**theory** [2] - 56:21; 65:25
**there'd** [1] - 21:8
**there'll** [1] - 8:7
**thereafter** [4] - 22:20; 37:21;
    43:10
**thickened** [1] - 105:19
**thicker** [1] - 16:2
**thinks** [3] - 10:18; 96:16;
    97:11
**third** [1] - 90:23
**thirds** [1] - 69:25
**three** [4] - 7:24; 24:22; 25:1;
    87:17
**throughout** [1] - 66:5
**thumbnail** [1] - 11:4
**time-out** [1] - 50:16
**tired** [1] - 82:2
**tires** [1] - 29:14
**today** [8] - 13:18, 22; 14:7,
    24; 81:2; 87:4; 95:19; 96:1
**together** [1] - 66:20
**took** [6] - 13:8, 15-16; 22:23;
    27:12; 28:23
**tool** [1] - 104:6
**tools** [2] - 28:14; 105:14
**top** [4] - 15:5; 29:5; 30:3, 5
**topic** [1] - 24:9
**touched** [1] - 25:12
**traced** [1] - 59:10
**training** [2] - 13:6; 107:11
**transfer** [4] - 17:12; 18:1;
    72:8; 86:2
**transformers** [1] - 102:19
**transit** [1] - 36:4
**transmitted** [1] - 105:15
**tried** [3] - 10:21; 27:1; 28:23
**trivial** [5] - 54:11; 14; 76:15,
    18
**trivializing** [1] - 76:12
**truck** [43] - 19:15; 21:8; 22:3,
    14; 23:12; 25:2; 26:2, 12,
    14-15; 27:4; 28:10; 29:5;
    30:9; 31:18; 33:3; 42:25;
    55:4; 69:23; 70:2, 13,
    23-24; 71:4, 6, 21; 72:2, 6,
    8, 18, 25; 73:4, 7, 11; 74:1,
    5, 23, 25; 75:11; 105:16;
    106:23
**truck's** [1] - 75:3
**trucks** [1] - 101:15

**true** [11] - 10:22; 46:6; 55:25; 65:16; 72:15; 81:11; 82:12; 92:2; 96:9; 106:10; 107:13
**truthful** [1] - 7:1
**truthfully** [1] - 6:22
**try** [6] - 6:17; 7:4; 11:10; 37:2; 39:12; 59:14
**trying** [11] - 8:22; 27:5; 36:10, 13; 38:25; 45:1, 7; 47:3, 7; 75:19; 106:2
**tub** [1] - 56:8
**tubing** [1] - 66:25
**two** [15] - 7:24; 11:25; 15:9; 16:10; 17:17; 21:23; 24:24; 52:7, 19; 69:25; 83:23; 97:11; 99:14; 100:3
**two-thirds** [1] - 69:25
**Tyler** [1] - 8:6
**type** [11] - 7:12; 35:6; 43:13, 15; 44:8; 45:20; 48:3; 55:8; 64:11; 68:15; 86:1
**types** [5] - 7:15; 8:13; 18:7; 35:11; 86:2
**typical** [3] - 30:4; 44:7; 63:20
**typically** [1] - 18:8

## U

**ultimate** [1] - 27:6
**ultimately** [9] - 10:7; 26:22; 38:3; 42:13, 15, 22; 43:15; 50:7; 72:22
**ultrasound** [1] - 93:24
**unable** [2] - 20:2; 91:24
**unattached** [1] - 57:7
**unbonded** [1] - 64:18
**uncertain** [1] - 42:23
**uncover** [1] - 49:24
**uncovered** [1] - 18:8
**uncrate** [1] - 36:1
**uncrated** [1] - 36:3
**uncured** [2] - 59:21; 64:18
**undamaged** [1] - 36:4
**under** [7] - 31:6; 37:13; 38:1; 42:20; 52:21; 63:8
**undergraduate** [1] - 13:13
**understood** [2] - 6:21; 44:10
**undetected** [1] - 91:22; 92:20
**unit** [4] - 28:11; 35:18; 92:9; 94:9
**University** [3] - 9:24; 39:12, 21
**unknown** [1] - 66:4
**unless** [1] - 33:23
**unpublished** [1] - 82:13
**unquote** [1] - 45:15
**unusual** [1] - 29:25
**unwarned** [1] - 92:17
**up** [24] - 9:1, 17; 12:23;

13:21; 16:13; 19:17; 22:25; 23:25; 25:18; 27:17; 28:6; 38:13; 45:11; 57:25; 64:5, 24; 71:16; 72:22; 75:14; 92:15; 100:20, 25; 102:3; 105:5
**updated** [2] - 81:22; 82:21
**useful** [2] - 43:20; 65:4
**users'** [1] - 91:10

## V

**value** [1] - 63:2
**various** [6] - 25:24; 27:9, 21; 37:25; 60:9; 80:3
**vehicle** [1] - 58:10
**vicinity** [1] - 106:10
**view** [3] - 68:14; 91:10
**viewing** [1] - 58:18
**violation** [1] - 57:10
**visible** [5] - 18:9; 61:20; 92:12; 93:2; 94:9
**visit** [2] - 32:21; 85:15
**visually** [1] - 91:20
**vitae** [3] - 81:21; 82:5, 14
**voids** [1] - 88:20

## W

**wait** [1] - 67:4
**walked** [1] - 24:23
**wall** [1] - 62:7
**wants** [1] - 7:19
**warn** [1] - 63:23
**warning** [3] - 30:23; 61:11; 68:7
**warnings** [4] - 94:14, 21; 95:4, 6
**watch** [1] - 81:5
**ways** [3] - 75:5; 93:21
**weaken** [1] - 53:6
**weakened** [1] - 91:14
**weakening** [2] - 65:11; 92:18
**weakness** [3] - 59:9, 16; 88:11
**wear** [4] - 29:12; 30:4, 13, 22
**weathering** [1] - 89:5
**weight** [1] - 105:13
**welding** [1] - 66:20
**what'd** [2] - 21:7; 23:9
**whole** [2] - 49:15; 75:3
**wife** [1] - 10:18
**WILLIAM** [1] - 5:1
**William** [1] - 5:10
**withstand** [1] - 64:2
**witness** [1] - 56:19
**WITNESS** [5] - 21:21; 81:4, 9, 13; 107:23
**Witness's** [1] - 5:5
**wondering** [2] - 63:6; 75:7

**world** [2] - 76:23; 87:7
**worn** [1] - 55:13
**worse** [1] - 94:22
**worst** [1] - 92:16
**would've** [1] - 10:6
**wound** [1] - 53:18
**write** [2] - 22:9; 79:2
**wrote** [1] - 99:24

## X

**x-ray** [2] - 35:16
**x-rayed** [1] - 93:16
**x-raying** [1] - 93:12

## Y

**year** [1] - 85:19
**years** [8] - 8:11; 13:3; 17:2, 17; 50:3; 79:7; 80:25; 82:9
**yellow** [3] - 44:5; 88:7, 23
**yellowed** [4] - 87:20, 24; 88:15
**yesterday** [3] - 69:1; 85:10, 13
**young** [1] - 8:6
**yourself** [3] - 5:21; 44:15; 101:19

## Z

**ZIP** [1] - 7:9
**zone** [5] - 30:4; 88:10
**zones** [5] - 52:24; 59:8, 15; 60:16; 63:5

# ANALYTICAL & MATERIALS ENGINEERING, INC.

**1906 Atchison Drive**
**Norman, Oklahoma 73069**
Voice (405) 447 - 2234   Facsimile (405) 447 - 2254

September 30, 2015

## EVALUATION

### OF A

## FRACTURED AERIAL LIFT BUCKET

In the mater of:
*Julie Keaschall and Dawson Public Power District*
*vs*
*Altec Industries, Inc. and Osborne Industries, Inc.*

Submitted to:

Mr. Steven E. Guenzel
Johnson, Flodman,
Guenzel & Widger
1227 Lincoln Mall
PO Box 81686
Lincoln, NE 68501-1686

Mr. Larry W. Beucke
Parker, Grossart, Bahensky,
Beucke & Bowman
1416 First Avenue
PO Box 1600
Kearney, NE 68848-1600

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**
**CIVIL ACTION NO.: 4:14-CV-03070**

As prescribed by:
Federal Rule 26(a)(2)

*www.analyticalmaterials.com*



Mr. Steven E. Guenzel                                        Page 2
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.:  4:14-CV-03070
September 30, 2015


# INTRODUCTION

An employee of Dawson Public Power District, Mr. Kurtis Keaschall, was fatally injured as a result of a lift bucket failure on vehicle number #3505. According to reports compiled by Mr. Jeremy Kaiser and Mr. Dean Kunkee of Dawson Public Power, Mr. Keaschall was in the process of retiring hardware from a pole and was working the line de-energized.  The set-up of Truck #3505 at the scene is described in their report of the June 6, 2012 incident.  Two hand-drawn schematics of the accident locale provided a general layout around the pole.   Another statement (approximately ½ page typewritten - author unconfirmed) by the co-worker who initially found Mr. Keaschall, indicated that the bucket was no longer attached to the truck.  The accident reportedly occurred near Ravenna, Nebraska.   The truck and associated equipment was subsequently taken to the Dawson Public Power District facility in Lexington, Nebraska.

Mr. Steve Guenzel of the Johnson, Flodman, Guenzel & Widger law firm in Lincoln, Nebraska, contacted my office by telephone on June 8, 2012, two days after the accident.   We were engaged by Mr. Guenzel's firm shortly thereafter to examine (in Lexington) the truck and aerial lift assembly, and to determine the cause of the bucket failure.


# EXAMINATION

The initial examination was conducted on July 13, 2012, a little more than one-month post-failure.   Mr. Dean Kunkee, Mr. Jeremy Kaiser and Mr. Bob Heinz directed me to the vehicle. Dawson Public Power truck #3505 had been quarantined indoors at the Lexington facility since immediately after the accident.  As a part of the inspection I examined the Model 7300 International truck and documented its condition photographically.  The boom had been previously lowered from the bed controls and had reportedly remained untouched since the accident. The turret and bucket, including the detached segment on the ground nearby, were covered with a blue tarp.  Additionally, the pole that Mr. Keaschall had been working next to was lying on the ground parallel to the truck. (Figures 1 through 20)

A template found on the boom base identified the lift assembly as a Model AA755L carrying the Serial No. 0405 BZ 3559.  Altec Industries was noted as being the manufacturer or seller of the unit.  On the left rear under rail an Altec Serial No. 37-3830626  07/05, was noted.  Osborne Industries was also shown on the bar

Mr. Steven E. Guenzel                                                    Page 3
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.: 4:14-CV-03070
September 30, 2015

coded sticker. "Initial Inspection Photographs of the Aerial Bucket" was submitted to
Mr. Guenzel on May 6, 2013. The bound volume contained the 234 photographs
(Figure 1 through 234) taken during the first examination.   These included
numerous photographs of the failed fiberglass bucket.

The portion of the bucket that had fallen to the ground is shown at the rear of
the vehicle in Figures 3 and 4.   Figures 26 through 31 reveal the flap of fiberglass
remaining attached to the lift assembly, while Figures 48 and 49 exhibit side views of
the flap of material. Additional perspectives of the fractured fiberglass are presented
as Figure 56, and Figures 58 through 62. A partial overhead view of the area is
shown in Figure 66, with additional views provided as Figures 67 through 72.
Overall views of the large bucket segment, plus a series of close range photographs,
are shown in Figures 73 through 89. Close up images of the fiberglass flap are
exhibited in Figure 90 through Figure 110.

Macro-photographs displaying the upper portions of the fractured flap are
provided in Figures 112 through 141.   These are taken of the area around the
perimeter of the bucket nearest the control panel, the thickest section and the area
containing the vertical platform ribs. In Figure 147, slightly below the center of the
image, a yellowish fractured region stands in obvious contrast to the adjacent whiter
fiberglass. Close up views of this area are disclosed in Figure 148 through Figure
152.

Another view of the failed bucket is shown in Figure 154, followed by an
overhead view in Figure 155. The roughly triangular-shaped white piece near the
upper end of the photograph is a small piece of the fractured bucket. An oblique
view revealing one side of the fractured perimeter appears as Figure 156 (in Figure
154, the area is about one-third of the way along the edge from the right corner).
Figures 157 through 163 offer extreme close up images of the fractured bucket rim,
with Figures 159, 162 and 163 demonstrating the most unobstructed views of the
fracture.   Un-bonded (yellowed) areas are visible, as are horizontal dark streaks of
contaminated laminate. These are primary fracture origin sites. Figures 170 and
172 illustrate the fracture on the facing segment of the bucket perimeter.

Figures 190 through 196 are overall and mid-range views of the bucket liner.
Additional overall and close range views of the failed fiberglass bucket are presented
as Figures 197 through 207.   Views of the pole are provided in Figures 208 through
221.   Dawson personnel removed the fiberglass flap, with the fractured piece
exhibited in Figures 222 through 226, and Figures 228 and 229.

Mr. Steven E. Guenzel                                                    Page 4
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.:  4:14-CV-03070
September 30, 2015

## LABORATORY EXAMINATION

The entire bucket, including all fragments and the liner, Altec was shipped from Dawson Public Power to our laboratory in early August 2012. Laboratory examinations of the fractured bucket and its fragments were conducted shortly thereafter and periodically over the next few months. Macro-photographs documenting the condition of the bucket were taken, and submitted on May 14, 2013 to Mr. Guenzel and Mr. Larry W. Beucke, co-counsel for the plaintiff. Both sets of examination photographs are folded into this report in their entirety. The second volume of photographs contains 23 additional images (Figures 235 through 258). Figures 239 and 253 provide additional views of an area exhibiting a fracture origin.

Only non-destructive examination and study of the fiberglass bucket was conducted while the evidence was in our possession. The entire bucket and fragments were shipped via FedEx Freight to Mr. Guenzel's on June 25, 2015.

## QUALIFICATIONS

I have a Bachelor of Science and Master of Science degrees majoring in Metallurgical Engineering from the University of Oklahoma. I completed a substantial additional post-graduate work toward the Doctor of Philosophy degree, majoring in Metallurgical Engineering and designating Analytical Chemistry as a minor field of study.

During the traditional academic calendar beginning in August 1989 and continuing through May 1996 I served as an Adjunct Professor in the Department of Chemical Engineering & Materials Science at the University of Oklahoma. My primary responsibilities included teaching courses in metallurgical engineering and the materials sciences, in addition to advising undergraduate students. Among the courses I taught during that time were: (1) Structures and Properties of Materials, (2) Physical Metallurgy (ferrous and non-ferrous alloys), and (3) the companion Physical Metallurgy Laboratories, plus (4) Failure Analysis & Materials Selection. The first course listed was an undergraduate core course required for the majority of the engineering disciplines within the College of Engineering. The latter courses were departmental and offered to undergraduate and graduate students majoring in engineering.

Mr. Steven E. Guenzel                                                    Page 5
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.: 4:14-CV-03070
September 30, 2015


    Throughout the years I have also taught courses to industrial interests and at
the Oklahoma Center for Continuing Education.  The recurring topics presented have
been:  (1) the principles of engineering, (2) basic metallurgy, (3) the theory of the
heat treatment of steels and non-ferrous alloys, (4) corrosion engineering and (5)
engineering failure analysis.

    Analytical & Materials Engineering currently specializes in the analysis of
engineering failures.  Primarily our work involves evaluating the in-service behavior
and overall performance of many different engineering materials, devices and
equipment.  For example, on- and off-road heavy-duty automotive equipment such as
tractor/trailer suspension members, braking components, frame rails, cranes and
man lifts are often examined as phases of particular projects.  Routinely we examine
scores of different steels and non-ferrous alloys (i.e., aluminum, copper, and alloys of
each).  Polymers (plastics), ceramics and composite materials are among the other
engineering materials that are evaluated.

    Frequently the work may also include assessment of the materials, methods
of manufacture and workmanship associated with fabrication of the product.
Assessment of the design criteria and how those elements have been incorporated
into the development, production, and inspection of a device may also be conducted.
The analysis of previous field failures, re-testing and/or recertification of existing
design and fabrication techniques may be performed as well.

    Significant portions of our projects involve analyzing material failures
associated with the oil and gas industry.  On nearly a daily basis we are immersed in
the investigations of drill pipe, casing and tubing, tubular connections and numerous
downhole devices.  Included also are rig assembly, disassembly and relocation.  The
steady diet of working on such products has resulted in extensive expertise in
various oil field operations.

    Our clientele consists of various local and regional industrial concerns,
insurance companies and claims adjusting groups, private businesses, attorneys and
law firms.  Attorneys representing both plaintiffs and defendants frequently retain
our services as consultants, and we favor neither litigating party.

    My education and professional experience are itemized in the attached
curriculum vita.  A list of the cases in which I have testified by either deposition or
trial appears in a spreadsheet, which is attached along with a fee schedule for
Analytical & Materials Engineering.  Currently the hourly rate for all phases of

*www.analyticalmaterials.com*

Mr. Steven E. Guenzel                                                  Page 6
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.: 4:14-CV-03070
September 30, 2015

engineering services is $265.00.  No surcharges or variable rate structures exist for
appearance at deposition or trial.  My qualifications as an expert witness regarding
metallurgical or materials issues, engineering principles, mechanical design and
engineering failure analysis have been recognized in State and Federal Courts in
Oklahoma and Texas, among other jurisdictions across the United States.  I have not
authored publications in the last ten years.

**MATERIALS REVIEWED**

     As a part of the evaluation in this matter, I have been provided a number of
documents for review and consideration.  I have also consulted other publications,
textbooks, and technical literature.

Dawson Public Power – misc. notes, sketches, scene photographs
Consolidated Fleet Services – Report of Inspection: 02/15/2012
Universal Inspections, Ltd., 8-17-11
Universal Inspections Ltd., 2-16-11
Universal Inspections, Ltd., 8-10-11
Universal Inspections, Ltd., 8-10-10
Universal Inspections, Ltd., 2-17-10
Altec Maintenance and Parts Manual
Altec Operator's Manual, AA755L
"American National Standard for Vehicle-Mounted Elevating and Rotating Aerial
Devices", ANSI/SIA A92.2 – 2009
"American National Standard for Boom-Supported Elevating Work Platforms",
ANSI/SIA A92.5 - 2006
Interrogatories to Plaintiff Julie Keaschall
Altec Fiberglass Platform Construction - Procedure Number:  EN-241-P (Origin Date:
05-22-86; Revision Date:  01-28-14)                              O100003 - O100098
Altec Correspondence 16 December 2002
Altec Test Report TR-00141, Platform Test, 12-13-02
Altec Test Report TR-00741, Platform Test MYR, 05-01-09
Altec Test Report TR-00741, Altec Composites Platform Test MYR, Revised 04-01-09
Altec Test Report TR-00822
Altec Test Report TR-00835
Altec Test Report TR-00848, West Platform Rib Issue, 03-08-10
Altec Test Report TR-01075
Osborne Line Resin Mix QC Test Record (1 p)
Osborne Purchase Order Status Report (22 pp)

Mr. Steven E. Guenzel                                    Page 7
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.: 4:14-CV-03070
September 30, 2015


AEM Aerial Devices Safety Manual
Altec Self Directed Sentry Operator Safety
Altec Build Records
Drawing 704-00065
Drawing 704-0350
PUN 201A, Secondary Lanyard Attachment
Altec Service Records
Osborne Discovery Responses to Request Nos. 2, 3, 7, 13, 21, 30, 31, 35, 37, 39

## CONCLUSIONS and OPINIONS

Based upon macroscopic and laboratory examination of the evidence vehicle, lift assembly, fiberglass man lift bucket, the materials and documents reviewed, my education and work experience, I have developed the following opinions and formed the following conclusions to a reasonable degree of engineering certainty.

(1)     Inherent manufacturing defects have been discovered in the subject Altec/Osborne man lift bucket. These defects include foreign material and zones of incompletely cured resin, resulting in specific planes of weakness. Fracture of the bucket can be traced directly to the region(s) containing these flaws.

(2)     The fabrication defects, which are primarily sub-surface, precipitated fracture and premature failure of the fiberglass man lift bucket. Fracture could have been instantaneous or progressive, perhaps both. Neither scenario would have provided a warning of impending failure.

(3)     The defects were present at the time the man bucket left the control of the manufacturer. In all likelihood, the defective condition would have been (a) undetectable during customary periodic (maintenance) inspections and (b) completely concealed to the end-user.

(4)     No indications of pre-existing damage that could have adversely affected performance of the man lift bucket, were observed.

(5)     The decedent, Kurtis Keaschall, neither caused nor contributed to failure of the man lift bucket.

*www.analyticalmaterials.com*

Mr. Steven E. Guenzel                                            Page 8
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.:  4:14-CV-03070
September 30, 2015

     It is highly likely that I will be asked to review additional reports, deposition transcripts and other discovery materials.  To the extent that any information should affect my conclusions and opinions, I reserve the right to make appropriate amendments in a timely fashion with a supplemental report.

     Respectfully submitted,

     William R. Coleman, M.S., P.E.
     Consulting Metallurgical Engineer

GUENZEL_keaschall.rep

# ANALYTICAL & MATERIALS ENGINEERING, INC.

**1906 Atchison Drive**
**Norman, Oklahoma 73069**
Voice (405) 447 - 2234   Facsimile (405) 447 - 2254

August 29, 2016

Mr. Steven E. Guenzel
Johnson, Flodman,
Guenzel & Widger
1227 Lincoln Mall
PO Box 81686
Lincoln, NE 68501-1686

Mr. Larry W. Beucke
Parker, Grossart, Bahensky,
 Beucke & Bowman
1416 First Avenue
PO Box 1600
Kearney, NE 68848-1600

RE:   ***Julie Keaschall v Altec Industries, Inc. and Osborne Industries, Inc.***
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**
**CIVIL ACTION NO.: 4:14-CV-03070**

Gentlemen:

I have conducted additional evaluations of the design, manufacture and performance of the man-lift bucket associated with the above referenced matter. This supplement is to be incorporated entirely into my earlier report, published September 30, 2015.   As a part of the work, I have reviewed the following engineering reports and deposition transcripts:

| | |
|---|---|
| Expert Report, Joseph F. Rakow, Phd, PE | June 2016 |
| Investigative Report, Anand R. Shah, M.S., M.B.A. P.E. | June 27, 2016 |
| Engineering Report, Ben T. Railsback, M.S., P.E. | June 23, 2016 |
| Failure Investigation Summary, John A. Eihusen, PE | Sept 26, 2015 |
| Deposition: George Eakin    (Osborne) | Feb 17, 2015 |
| Deposition: Amy Conrad    (Osborne) | Feb 17, 2015 |
| Deposition: Michael David Moore  (Altec) | Apr 2, 2015 |
| Deposition: Ryan McKinney        (Altec) | Apr 2, 2015 |

Specimens removed from the subject bucket during inspections and testing conducted by other parties have been examined in the laboratory.   Macro- and microphotographs have been taken of the pieces made available and will be provided under separate cover.    I anticipate conducting additional examinations of the

*www.analyticalmaterials.com*


EXHIBIT
E

Mr. Steven E. Guenzel                                                                   Page 2
Mr. Larry W. Beucke
Keaschall v Altec & Osborne
CIVIL ACTION NO.: 4:14-CV-03070
August 29, 2016

remaining members and fragments of the failed bucket.   Photographs acquired during such examinations will be distributed accordingly.

Finally, I have reviewed and studied engineering literature and technical publications related to the materials, mechanical properties and behavior of the fiberglass bucket involved in this case.  Some of the publications are listed below.

> Chui, WK, Glimm, J. and Tangerman, F.M., Modeling of Resign Transfer Molding, (unk)
> Bunsell, A.R. and Renard, J., Fundamentals of Fibre Reinforced Composite Materials, Briston:  Inst. Physics Pub, 2005
> Hamidi, Y.K., Aktas, L. and Cengiz Altan, M., Formation of Microscopic Voids in Resin Transfer Molded Composites, Trans ASME, 126, Oct 2004, 420-426
> Sutherland, H.J. and Mandell, J.F., Updated Goodman Diagrams for Fiberglass Composite Materials Using the DOE/MSU Fatigue Database, Contract DE-AC04-94AL85000
> Steckel, G.L., and Hawkins, G.F, The Application of Qualification Testing, Field Testing, and Accelerated Testing for Estimating Long-Term Durability of Composite Materials for Caltrans Applications, 25 Feb 2005, CA DOT Contract 59A0188
> Jollivet, T., Peyrac, C., and Lefebvre, F., Damage of Composite Materials, 5[th], Fatigue Design Conference, Fatigue Design 3013

Additional examination and review of the evidence components, reports and technical materials have not resulted in significant modifications to my original conclusions and opinions.

It is my understanding that a number of depositions will be taken as discovery nears completion. To the extent that any information uncovered upon review of those documents should affect my conclusions and opinions, I reserve the right to make appropriate amendments.

Respectfully submitted,

William R. Coleman, M.S., P.E.
Consulting Metallurgical Engineer

# Keaschall Failure Investigation

## Consolidated Response to:

Ben T. Railsback, Knott Laboratory, LLC

Anand R. Shah, Engineering Systems, Inc

Joseph F. Rakow, Exponent Failure Analysis Associates, Inc

August 1, 2016



MECHANICAL

EXHIBIT

**F**

John A. Eihusen, PE

1

# 1  Scope of Work

The scope of work (SOW) for this report is to provide expert review of the following reports as it relates to the physical evidence relevant to the Keaschall Failure Investigation.

    a)  Ben T. Railsback Knott Laboratory, LLC, June 23, 2016
    b)  Anand R. Shah, Engineering Systems, Inc
    c)  Joseph F. Rakow, Exponent Failure Analysis Associates, Inc

# 2  Standard Reference Datums and Identification

For consistency in this report a standardized reference datum is defined as an observer would view the assembly standing at the point of connection with the lift boom; facing outward and bucket open upwards.



**Figure 1 Reference View**



**Figure 2 Failure Locations**

# 3  Commentary on Knott Laboratory Reports

Commentary and interpretive discussion of key evidence is provided as follows:

## 3.1  External Condition of Bucket Flange

In Figure 6(page 10) indentations on the bucket liner and bucket are noted as "old" and not part of the direct cause of the accident.  This can be positively evidenced by the dark oiling, staining, and dirt that show an aged condition.  The damage noted was not caused at the time of the bucket failure.  It is also to note that Mr. Railsbeck indicated no positive identification of mating contact by direct comparison of the impacting surfaces using witness marks.

The bucket liner was fabricated from a low durometer insulative material and was doing its job exactly as designed, which was to protect the surface electrical characteristics of the bucket.  Being a low durometer material (soft plastic) blunt edged tackle, tools, materials and even boots could register that class of damage.  In fact this type of damage would be the reason to use a bucket liner because of this type of normal wear.  As expected for tools and other dunage hauled into the bucket by human ergonomics it would be unreasonable to expect that any "man-rated" and "life critical" structure could be rendered unsafe by normal use.

As stated in other reports there was no published visual inspection criteria that would have warranted removal of this particular bucket from service.  This is recorded by several independent inspection agencies in the disclosures.

## 3.2  Bent Wrench

In Figure 7 and 8 (page 11) the discussion was focused on a "bent" wrench.  I find it highly unlikely that the axial misalignment highlighted was causative to any recorded evidence in the failure investigation.  The standard drive spindles are purposely-fitted with an engineered class of free running, clearance fit between the drive pintle and tool receiver.  That is what makes them useful as the end effector (driven tool) can be easily changed from the power drive.  With normal use of impact drivers, the interface between the drive pintle and mating tool is peened open further widening the clearance gap.

The picture is simply a power tool with a large socket hanging off the end.

This fact can be evidenced that no tool was retired or replaced after the accident.

## 3.3  Paint indication – Pole

In Figure 12 (page 15) Mr. Railsbeck makes note of 2 alleged marks on the pole.  Again, physical inspection of the pole as provided in Coleman's photographs Figures 208 through 221 do not show any associated paint transfer or indentation.  It is important to note that no expert on-site at the time of the accident or since has indicated a paint transfer to the pole.  The surface indications again seem normal to the expected transportation, storage and handling of a rough timber power poll.  The indications if involved in the accident would be clearly denoted by a paint transfer if the high impact loads contemplated by Mr. Railsbeck were truly imparted.

## 3.4  Failure Kinematics

In Figure 18 (page 20) and the following discussions Mr. Railsbeck failed to consider the evidence contained in the failure surfaces of the composite laminate and in no case did he incorporate the physical evidence of the failed laminate in his conjecture of the failure sequence.  This is first evidenced in his discussion suggesting the failure of the laminate occurred simultaneously dropping the bucket straight down therefore ruling out the rotation of the bucket as insufficient to strike the truck railing.

4

My evaluation of the bucket rotation was not based on the kinematics of a free falling body, but on the fracture paths and the physical evidence retained in the composite laminate.  I clearly indicated in my opinion the progressive nature of the failure from the primary point, the initial high-speed propagation of the fracture, and the hesitation and final failure events.  The composite clearly demonstrates a rotational axis or hinge axis as shown in Figure 3 and Figure 4.  This was the final coupling point between the boom and bucket as it failed.  The laminate at this point was the last to separate; this hesitation in the speed of the failure (or fracture) is what imparted a rotational velocity to the bucket before the separation from the boom.  The effect would be similar to cutting the string of a pendulum in mid swing.  In that simple case the pendulum weight does not fall straight down but moves tangentially to the rotational path.  Given the rotational momentum imparted to the bucket at the final release both Mr. Keaschall and the bucket would continue a tangential path at the time of separation and remain rotating as two free bodies in the same inertial reference frame.

If attention is drawn to Mr. Railsbeck Figure 16 (as shown below in Figure 5) in which he locates the bucket in relation to the impact point on the truck rail, the nominal axis of rotation can be mapped from the evidence recorded in the laminate.  The nominal projected rotation axis shows good agreement to his presentation.  As used here the term "nominal" rotation axis is used because the release of energy from the boom as the bucket and Mr. Keaschall's weight is shed will cause relative motion and generate minor errors in the actual placement of the separation axis.



**Figure 3 Location Hinge Axis in the Laminate-Outside View**

5



**Figure 4 Location Hinge Axis in the Laminate-Inside View**



**Figure 5 Nominal Location Hinge Axis Relative to Rail Impact Point**

## 3.5    Pole Misalignment

Mr. Railsbeck makes a conjecture that the boom pushed on the pole resulting in a 10 inch lean away from the truck. Movement of the pole would have certainly involved displacement of the dirt at the base of the pole and been well observed by operational and safety experts on scene at the time of the accident.  The condition of the dirt can be satisfactorily observed as shown below in Figure 7.  There are no indications of disturbed soil or plant placement.

It is more reasonable to consider that the pole was leaning because it was simply old and located in a bad position in the side of an embankment.

It is also reasonable to consider that Mr. Keaschall expertly placed his equipment in the best possible position to manage any risk from a potentially unstable pole, such as one with a noticeable lean with the support cables cut.



**Figure 6 Utility Pole at Site**



**Figure 7 Utility Pole Base**

## 3.6    Comment on Damage at Failure Location A

It is clear from the inspection of the laminate at Figure 8, the composite laminate was pulled rearward and outward from the center of the bucket as would be expected for the structure supporting Mr. Keaschall's weight.  For an impact forward of the mounting bolts, this location would show material pushed or sheared forward into the bucket.  The composite direction of failure suggests that the impact would have to have occurred behind the mounting bolts or between the lift boom and bucket structure.  This is not a reasonable scenario based on the evidence.



**Figure 8 Utility Pole Base**

## 3.7    Comment on Bucket Location

In Mr. Railsbeck's Figure 16 the projected location of the bucket on the boom shows it clear of the pole.  It is reasonable to conclude that the boom stopped moving at the time of an alleged impact if nothing more than Mr. Keaschall would not be able to operate the controls.  It is highly probable that the boom recorded the placement of the bucket at the time of failure.  Providing the positioning as described by Mr. Railsbeck an impact could not have caused the root cause of the composite failure sequence.

9

## 3.8    Test Data and Load Estimations

Again in using data supplied by Dr. Rakow, Mr. Railsbeck did not personally examine the laminate of the bucket or he would have recognized that the exemplar bucket used by Mr. Rakow is a different design and all of the testing supplied has absolutely no bearing to the failure of the Keaschall bucket assembly.  As clearly evidenced by X-ray imaging on the Keaschall bucket the internal structure of the rib and its load transfer between the vertical mounting ribs and horizontal flange are different than the exemplars provided for his analysis so any finding relating to that data is by definition in error.  Having no baseline of the actual strength of the configuration used in the Keaschall bucket he is not able to state that the rated load was exceeded or predict any reasonable failure sequence.

# 4    Commentary on ESI Report

Commentary and interpretive discussion of key evidence is provided as follows:

## 4.1    Inspection of Subject Platform

In Photo 10 (page12), the comment that the parallel separation line at location A is caused by shear load is inconsistent with the evidence.

The first principle to be applied for composite laminates is that load orientation and fiber direction must be explicitly related.  In the photographs the location and orientation reinforcement direction are not identified.  In this case if the shear plane was parallel to the fiber direction the fibers would be in the direction of the load much like 45 degree fiber is used in drive shafts to react to the torque load.  This would place the fibers directly in the load path and the failure mode would be fiber breakage.

As taught by Mohr circle of stress transformation any combination of a tensile and shear stress can be represented in a differential element.  In the case of composites the weakest failure plane needs to be considered and that is not always aligned with the direction of the applied loads.  In this case the picture indicates to me a transverse separation of the fiber bundles due to poor impregnation and compaction of the laminate at the time of manufacture.  This would be consistent with the global delamination at the mid-plane of the horizontal flange indicating poor control of the manufacturing process for a RTM laminate as shown in Figure 9.



**Figure 9 Flange Cross Section View**

10

## 4.2    Inspection of Exemplar Platforms

Inspection of the x-ray images for the OSB 78768 and OSB 62187 show that they are not the same configuration as the Keaschall bucket.  The internal fiber distribution between the vertical rib and horizontal flange have almost nothing in common with the Keashall configuration and are not relevant to understanding the failure mode of the Keaschall accident.

The data will be useful for a follow up industry survey of the existing fleet but cannot be considered relevant to the engineering in this case.

As relating to the Keaschall bucket no data at the time of manufacture have been provided to show that the Altec drawing requirements were properly checked or validated.

## 4.3    Inspection of Prior Platforms

The testing referenced in TR-0041 performed in 2002 is also not relevant to the Keaschall configuration.  As provided in Altec drawing 704-00350 Rev D, by JLL with ECO 03-0855 on 9/16/03 the depth relief cut was increased 0.5 inches removing key reinforcement material from the failure location highlighted in red in Figure 10.  The removal of that reinforcement would be key to the actual ultimate failure load of the structure and its continued safe use in service.  The release of Rev D effectively created a new and untested configuration of the platform from that point in time moving forward.  The Keaschall bucket was fabricated in 2005.



**Figure 10 Key Drawing Revision**

In addition, during the manufacturing time line, the internal configuration of the lamination was radically changed.  This too is completely undocumented with respect to the engineering documents that should be in positive control of the configuration.

It is important to note that Altec has not turned over any document that identifies that the competent design authority did review and authorize the drawing or manufacturing changes or review the changes against structural calculation or product test data.  This is not in compliance with the risk management required of an ISO 9000 organization.

## 4.4    Review of Mr. Shah Reports

The assertion that wide spread delamination in the horizontal flange is not a manufacturing defect but is nothing more than a random discontinuity having no effect on safety is a theory to be considered by a broader panel of experts evaluating the safety of the national vehicle fleet for the configuration of the platform which Mr. Shah tested.  For the configuration of the Keaschall platform, it is not valid or reasonable to accept as factual.

In the general case of delaminations, it is usually recognized in the industry that a delamination that is larger than the thickness of the base laminate significantly impacts the design intent of the laminate.  The intent of the laminate would have been clearly identified by properly drafted DFMEA and

Mr. Shah makes reference that the damage to the platform should have been sufficient for removal from service.  It is important to note that several independent inspection bodies using Altec published documents did not interpret the indications in a similar manner.

The actual true failure load of the Keaschall platform in the virgin, as-manufactured condition is unknown.  This means that Altec as the design authority fielded a design for which they did not explicitly know the actual performance data.  This is inconsistent with good practice for life critical, man-rated hardware.

## 4.5    Comments on Micrographs

The SEM micrographs of the laminate are informative in evaluating the resin to fiber interaction within the laminate.  In Figure 11 the general condition of the laminate is shown with poor infusion of the resin around the fibers and high void content typical of a manufacturing process not providing the proper consolidation during molding.  This is reflected in the macro-scale with the large visible delaminations as shown in Figure 9.  This condition is indicative of an underperforming laminate structure with reduced load capacity.



**Figure 11 General Matrix Condition**

This lack of infiltration of the resin in the fiber layers is also reflected in the poor adhesion of resin to the fibers as in Figure 12 where long lengths of glass fibrils are pulled free of the resin matrix.  This is also displayed on the macro scale with the visible fiber pulled free at the failure points.



**Figure 12 Fibril Extraction**

These views can be followed down to the single filament scale in Figure 13 where the lack of resin flow and wetting of the surface is apparent.   This probably indicates a fiber surface chemistry (sizing) that is either incompatible with the base resin system or fiber sizing that is past its shelf life.  With a manufacturing process that does not track raw material selection or appropriate storage conditions these conditions can manifest itself as under performing laminate in the structure.



**Figure 13 Fibril / Resin Interface**

14

# 5   Commentary on Exponent Report

Commentary and interpretive discussion of key evidence is provided as follows:

## 5.1   Altec Industries Aerial Lift Devices

The key point is that the bucket was inspected by competent third party inspectors using the best available published information provided by Altec, and the equipment was within its normal inspection interval.

## 5.2   Osborne Industries Two-person Platform

The point of clarification is that Figure 4 is not a picture of the Keaschall installation.  The figure is for a single person bucket.  This distorts the position of Mr. Keaschall in reference to the mounting ribs.

The manufacturing description is generally appropriate for the Keaschall assembly but does not adequately describe the exemplar buckets following in this report or the ones described by Mr. Railsback or Mr. Shah.  The internal morphology as provided by x-ray images on prior reports clearly shows a change in the manufacturing technique.

The manufacturing documentation listed is not inclusive to the documentation that is required by a functional ISO 9000 quality control system.  There should be extensive documentation of design input, validation, and supplier controls for the 2005 time frame.

The manufacturing build documentation indicated a recordable defect in the Keaschall bucket of folded material in the flange. As part of an ISO 9000 quality control system the competent design authority in charge of the bucket should have recorded concurrence for its use or provided detailed criteria for non-conforming hardware to receiving inspection and acceptance.  In this case, consideration should have been given to the folded material's ability to increase the localized fiber volume fraction, which in an RTM part can disrupt resin flow in the mold causing dry spots with low transverse tensile strengths.

A non-inclusive sample list of missing documents

   a.) Material specifications
            a.   Validation of fiber sizing appropriate for the resin
            b.   Appropriate storage methods
            c.   Control of shelf life
   b.) Material test program for as manufactured laminate
            a.   Tensile data
            b.   Aged test data
   c.) Weight controls with error limits, engineering evaluation of go/no go of weights to control resin content and fiber volume factions within accepted industry practice
   d.) Validation of production parameters through the use of PFMEA
   e.) An active Control Plan for all production variables
            a.   Validation of in-process acceptance of manufacturing variances by the competent design authority as noted by the variance accepted by the tracking documentation of the Keaschall bucket
   f.) An active DFMEA listing the critical failure modes and listing the relevant preventions and controls that are used.
   g.) Manufacturing and inspection documents under positive control within the required document management system

15

The ability to perform post accident calculations is based on disclosure of all manufacturing materials and full disclosure of the manufacturing process. Because of the sparse detail disclosed or recorded the only meaningful source of factual information is carried within the laminate of the failed bucket. The progression of the damage and linkage of the internal defects is clear to an experienced composite engineer through internal shape of the planar delamination and the distribution of internal contamination. Mr. Rakow makes the statement that these defects are common for thick molded sections. I disagree with that assessment in general and specifically for man-rated, life-critical structures. Defects of this nature would be cause for rejection in all military and commercial applications even without the critical man-rated classification. The extensive nature of the defects would be recognized as a production process that lacked sufficient systematic design and manufacturing controls.

The void content of this laminate is well outside standard good practice.

One easily understood cause of rejection would be the internal exposure to external corrosion such as mid acidic water found in acid rain. Acid rain can attack E-glass fibers and cause early stress rupture of loaded fibers. The close out of machined edges and management of contaminant migration is a design consideration to ensure a composite structure meets its intended performance through its rated design life. In addition, it is hard to imagine that a flaw length that approaches the thicknesses of the composite section that it is imbedded in, is not detrimental to the original design intent. In this specific case the delamination reduced the shear transfer internally in the laminate causing a large reduction in the torsional resistance of the cross-section. This along with the effect of concentrating the shearing stress from the molded insert were major factors in the failure.

## 5.3   Platform Flange and In-service Population

In Mr. Rakow's discussion of the surveyed population of buckets he has failed to show that they represent the Keaschall configuration. The exemplars provided by Mr. Shah, and the bucket inspected by me with a later build date, clearly show a different morphology of internal configuration of the mounting rib. The Keaschall configuration does show a rib insert that was fabricated from a balanced cross ply cloth with visually a high fiber volume fraction. The exemplar buckets show an insert of a different design or likely a configuration where the random cloth mat is tucked and wrapped around the corner of the rib. It is this tuck and wrap around the corner rib and into the bucket shell which is partly responsible for different resolution of internal stresses in the laminate.

Mr. Rakow seeks to understand the performance of the Keaschall bucket in relation to the existing field population. This first step would be to investigate the number of replacement buckets that Altec has supplied to exiting trucks. In my field investigation it was made known to me that a bucket on a different truck was removed from service at the Dawson facility by the Altec personal when they first inspected the Keaschall failure. As told to me the reason was "cracking around the rib mounting holes". If that bucket was similar to the exemplars then the rationale would be easy to explain. As shown in Figure 16 in my report[1] a significant de-bond manifests itself at the mid-plane of the vertical rib.

Given the location of the through mounting holes in the rib, this laminate construction would not be able to support the high compressive load caused by the torque of the bolts. In time the laminate would creep reducing the thickness of the vertical rib. This would cause a loss of pretension in the bolt but it would also cause a circumferential stress at the edge of the bolt hole. Given the light reinforcement of the scrim cloth in that area, the resulting reduction of the rib thickness would cause exceptional high tangential hole strains, which would open cracks radially from the centerline of the hole.

---

[1] Keaschall Failure Investigation, Appendix A – NDE Review, February 20, 2016

This visual indication would be enough (as already described) to remove a bucket from service.  As noted in my discussions the Keaschall configuration does not suffer from this particular design defect.  The internal configuration of the rib was able to resist the bolt installation torque and so did not display a visual clue that the bucket was near failure.  Another consideration is that the Keaschall bucket is years older than any of the buckets examined and its age-based position in the installed population is unknown.  As a fleet leader this accident event is indicating a much larger future problem.

In this case, the Keaschall configuration is unique and not represented by the exemplars provided.  The extent of the subject defects within the Altec fleet and its effect on safety or acceptable practice is a topic for a detailed review by risk management experts for the design shown by the exemplars.

## 5.4   Platform Performance Tests

In these tests the configuration of the exemplars has not been tied to the configuration of the Keaschall configuration and are not suited for projecting the modes of the Keashall failure.

The Finite Element Analysis (FEA) of the bucket is provided by Mr. Rakow with no explanation of the type of elements, material properties, or associated boundary conditions used in the analysis.  As shown in the Figure 11 Mr. Rakow makes use of Von Mises stresses which are only suited for isotropic materials.  Apportionment of the load equally between the ribs is not a valid assumption as the "rotator" arm which positions the bucket would transfer the load unequally due to its own compliance.   A composite FEA model needs to be constructed with 3D layered bricks to maintain accuracy. The use of automatic volume meshing which reduces 3D element volumes to tetrahedral configurations is explicitly invalid as it destroys the element's ability to correctly resolve the internal shear stresses necessary for anisotropic material input.  In addition the element's material directions must be tracked and recorded in the global reference frame because the global strains must be resolved with the element material directions to accurately calculate the laminate stresses in the direction of interest.

Specifically in this case the internal structure of the vertical rib must be explicitly known so that element stiffness can be queried to resolve the local strain into stresses in the lamina directions.  Since the vertical rib is prefabricated with extensive de-bonds between it and the flange, to adequately model the structure, the rib section would have to be installed into the shell membrane with contact elements to correctly capture the resolution of forces and stresses at the point of the mortised connection within the horizontal flange.  In addition, contact elements or de-bonds would need to be modeled in the flange geometry.

As provided the FEA model has not been shown to be adequate for composite design, determination of failure modes or representative of the Keaschall configuration.

## 5.5   Platform Fracture Surface Inspection

Mr. Rakow's review of the facture surface is inconsistent in that he would have the failure start in the most compliant point of the structure.  Given the visually verifiable de-bond and gap between the surface material and the rib structure, and the lack of local material stiffness and thickness, it is not reasonable to believe that this point was more highly loaded than the horizontal flange.

The polishing of cracked surfaces with relative motion cited Mr. Rakow is only appropriate for metallic components and not fiber-reinforced composites.  In this case with the large internal defects shown Figure 9 a sizable separation distance between the adjoining layers existed in the laminate at the time of manufacture which prevents recording of fracture extension.  Rather in this case with such large internal defects the fracture simply linked the defects in a common delamination plane until the critical condition was reached.

In fact it is clearly stated in Altec publications that the horizontal flange is the primary structural element and that the surface scrim / cloth is used only to provide support for the heavily pigmented surface "gel coat" which is the primary environmental protection for the main structure.

17

As stated in my previous reports for the Keaschall configuration, the horizontal flange at the mortised joint in Figure 2 (location A) first failed in shear, allowing the flange to rotate off the top of the rib then failing in transverse tension. The resulting loss of stiffness rotated the shell of the bucket body down and outward.  The underlying scrim support for the "gel coat" and the nominal bucket shell was insufficient to carry the load so the material separated easily propagating the facture to a location of high geometry stiffness (the curved section at location C).  During this time the horizontal flange continued to internally resolve the load as a torsional moment at location B.  The load accumulated at location B until it failed by transverse tension normal to the flange thickness from the applied moment.  At the time of location B separation, a facture propagated out of location B and headed to meet the point where the fracture from location A entered the curved section of the corner.  At this time the bucket resumed its movement rotating around the temporary hinge point at location C.  This is evidenced by the rotation of the fracture separation plane normal to the surface of the shell.  The shell laminate failed in bending, as the bucket shell continued its rotation down and under the last point of separation.

Mr. Rakow makes note that the mid-plane delaminations were insignificant to the overall structure.  But, the evidence in the laminate is that the fracture speed had slowed, and the flange even though crippled was very close to carrying the load of the failure at location A.  If the flange was better consolidated, with better through resin impregnation with fewer voids it might have survived the event.  Certainly when a structure is designed without redundant load paths it should be fabricated to the highest standards.

From my inspection of the FTIR results of the destructive investigation, the fabricated laminate had a recordable amount of low molecular volatile compounds that might indicate the base resin was solvent reduced.  Base resins are normally thinned because they can be ill suited for the RTM process.  Solvent reduction was a typical process methodology in 2005 based on the commercial resin selections at the time.  Resins solvent thinned and injected require special handling in a closed mold processes to vent volatiles that do not participate in the resin cure and cross linking process.  This would include specific venting ports or a mid-process step to burp the mold.  If not done properly these solvents will cause voids at the point that it is hardest to escape the laminate.  In this case the mid-plane of the flange.  Detection of such volatile materials in an aged structure would indicate a high initial concentration in either the base resin or blended in before injection to the mold.  The effect of solvent locked into the laminate could interfere with the cure process by separating reactants; leaching of the fiber sizing preventing bonding of the fiber to the resin and numerous other detrimental effects.  The yellowing displayed in the failure locations can be likely attributed to aged unreacted base resin.  Unreacted resin, by definition does not participate in the structure so the discoloration indicates localized areas of low strength laminate.



# Engineering Report

Prepared for:

Stephen L. Ahl, Esquire
Wolfe, Snowden, Hurd, Luers & Ahl, LLP
1248 O Street, Ste. 800
Lincoln, NE 68508

## Keaschall vs. Osborne Industries
Date of Accident:  June 6, 2012

Prepared by:
**Ben T. Railsback, M.S., P.E.**
Date of Report:  June 23, 2016



EXHIBIT
G

**Table of Contents**

1.0   Purpose: .................................................................................................... 3

2.0   Procedure: ................................................................................................. 3

3.0   Background ................................................................................................ 3

4.0   Accident Scene Evidence ......................................................................... 4

   4.1   Aerial lift truck and bucket evidence ................................................. 6

   4.2   Utility pole evidence ....................................................................... 12

   4.3   Ground debris ................................................................................. 15

5.0   General bucket kinematics (motion) of separation ............................. 17

   5.1   Mr. Eihusen's failure mode and bucket kinematics: ........................ 18

6.0   Reconstruction of events ....................................................................... 20

   6.1   Wind effects ................................................................................... 20

   6.2   Bucket pushed against pole ........................................................... 21

   6.3   Bucket contact with transformer bolt ............................................. 23

   6.4   Bucket forces and testing .............................................................. 25

7.0   Contributing factors ............................................................................... 26

   7.1   Altec AA755L Operators Manual .................................................... 26

   7.2   OSHA regulations .......................................................................... 27

   7.3   ANSI A92.2-2001 standard ............................................................ 27

8.0   Conclusions ............................................................................................ 28

Appendix A:  Additional Provided Materials Reviewed By Knott Laboratory ................. 30

Appendix B:  Additional Material Obtained and Reviewed By Knott Laboratory ........... 32

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 3 of 32

As you requested, Knott Laboratory, LLC, has investigated an aerial lift bucket separation incident involving an Altec Model AA755L aerial lift truck and a bucket manufactured by Osborne Industries that occurred on June 6, 2012.  On the morning of the incident, Dawson Public Power District employee, Mr. Kurtis Keaschall, was using the aerial lift truck while retiring hardware from an electrical pole.  As Mr. Keaschall was working within the aerial lift bucket, the bucket separated from the aerial lift boom, and subsequently both the bucket and Mr. Keaschall fell to the ground.  As a result of the incident, Mr. Keaschall sustained fatal injuries.

## 1.0 <u>Purpose:</u>

The purpose of this investigation was to reconstruct the incident, determine the probable cause of the incident, and to respond to conclusions offered by Mr. John Eihusen on September 26, 2015.

## 2.0 <u>Procedure:</u>

Knott Laboratory reviewed the provided materials listed in Appendix A; reviewed additional materials obtained by Knott Laboratory listed in Appendix B; inspected the bucket and dielectric bucket liner on July 13, 2015;  visited Osborne Industries manufacturing facility on August 10, 2015 to view the manufacturing process; performed photogrammetry of scene photographs to establish locations of evidence; conducted a kinematic analysis of the bucket falling;  analyzed wind data and determined the drag effects of wind on the bucket falling;  studied the kinematics of the boom hydraulic system; tested failure mode hypotheses;  simulated the kinematics of the bucket falling;  and finally established contributing factors and the probable cause of the incident.

## 3.0 <u>Background</u>

Mr. Kurtis Keaschall, a lineman employed by Dawson Public Power District ("Dawson"), was contacted by a landowner who requested the removal of an electrical line from the landowner's property a day before the incident (June 5, 2012).[1]  On the morning of the incident, Mr. Keaschall took the Dawson aerial lift truck #3505 to the landowner's property near Ravenna, Nebraska to start removing the line.

At around 10:30 am on the morning of the incident, Mr. Jerry Hobelman, a consumer accounts manager for Dawson arrived at the site to create a staking sheet for the job. Upon arrival, Mr. Hobelman saw Mr. Keaschall in the bucket removing hardware from the pole.  Mr. Hobelman was working inside his truck near a meter pole 140 feet from where Mr. Keaschall was working.  Mr. Hobelman looked up from his computer and noticed the hydraulic wrench hanging from the lift truck's boom.

---

[1] Deposition transcript of Mr. Jerry Hobelman taken on September 9, 2015, p. 23.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 4 of 32

Mr. Hobelman drove towards the accident scene and noticed Mr. Keaschall lying face down and unconscious. Mr. Hobelman also observed the detached bucket on the ground.

Mr. Hobelman described in his accident report that Mr. Keaschall "was breathing, but there was blood coming from his nose and possibly his mouth." Mr. Keaschall was also observed wearing a safety harness, however, the was no lanyard connecting the safety harness to the boom arm lanyard anchor.

Mr. Hobelman went back to his truck and issued a mayday call over the radio around 11:15 am to the Kearney outpost of Dawson Public Power. After issuing the mayday call, Mr. Hobelman checked on Mr. Keaschall, who had started to regain consciousness, but was unable to speak.

The ambulance arrived and transported Mr. Keaschall to Good Samaritan hospital. Police investigators photographed the incident scene. Dawson employees, Carl Kyle, Trent Trampe, Dean Kunkee, and Jeremy Kaiser arrived at the scene while the police were still there. Mr. Kunkee and Mr. Trampe took scene measurements, and Mr. Kaiser drew a scene diagram.

Additional photographs were taken by Dawson employees at the scene. According to Mr. Kaiser, the bucket and tools had not been moved prior to photographing the scene.

None of the Dawson employees involved in the investigation were able to reconstruct the incident based on the evidence, nor were any of the employees able to offer any personal opinion as to why the bucket separation occurred.

Three days after the incident (June 8, 2012), Mr. Mike Moore P.E., Altec's Manager of Product Engineering, traveled to the Dawson garage in Lexington, NE to inspect the Altec truck and the separated bucket.

Mr. Moore concluded after his inspection, "The ultimate failure of the platform involved in the accident is consistent with an external force applied to the platform."

## 4.0 Accident Scene Evidence

Knott Laboratory relied on scene photographs, Mr. Moore's June 8, 2012 inspection photographs of the bucket, Altec truck, and utility pole, Knott Laboratory's inspection photographs of the bucket, and high definition 3-D laser scans of the bucket to analyze the physical evidence associated with the bucket, the aerial lift truck, the utility pole, and debris scattered near the pole.

Knott Laboratory applied photogrammetry, the process of positioning objects shown in photographs in virtual space, to the photographs taken by police and by Dawson employees using photogrammetry software PhotoModeler. A 3-dimensional scaled

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 5 of 32

diagram was created showing the positions of the aerial lift truck, boom, and the bucket at the accident scene (Figure 1).

From the 3-dimensional scaled model, Knott Laboratory was able to determine the orientation of the boom at the accident scene.



**Figure 1:**  Photogrammetry of accident scene conducted by Knott Laboratory.

The accident occurred at the approximate coordinates 41 degrees, 5 minutes, 7 seconds North and 99 degrees, 0 minutes, 42 seconds West in central Nebraska.  The location and the pole and location and orientation of the Altec truck are shown in Figure 2.  The Altec truck was oriented north, and the pole was located to the west of the truck.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 6 of 32



**Figure 2:** Aerial photograph of accident scene.  Altec truck in yellow box, base of pole shown by yellow arrow.  Graphic by Knott Laboratory.

## 4.1   Aerial lift truck and bucket evidence

The Altec truck was built on a 2005 International 7300 chassis with a vehicle identification number of 1HTWAAAR55J172992.  According to the Altec specifications, the truck has a wheelbase of 205 inches.

Knott Laboratory reviewed photographs to determine physical damage to the truck consistent with the incident.  A large bend was observed in the Altec truck's left rear railing (Figure 3).  Based on photogrammetry analysis, the depth of the railing bend is approximately 4 inches.  A significant external force was required to plastically, or permanently, deform the railing.

White paint transfer consistent with the color of the fiberglass bucket was observed below the bottom railing (Figure 3).  Corresponding red paint transfer consistent with the color of the Altec truck's body color was observed on the left front bottom corner[2] of the fiberglass bucket (Figure 4).  The presence of corresponding paint transfer between the fiberglass bucket and the Altec truck's railing is consistent with the left front bottom corner of the bucket contacting and bending the railing of the Altec truck.

---

[2] Through the report the north edge of the bucket (when attached to the boom) will be referenced as the front of the bucket.  Similarly, the south edge will be referenced as the rear, the west edge as left, and the east edge as right.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 7 of 32



**Figure 3:** Bend on left rear railing on Altec truck.
Photograph taken by Dawson employee at accident scene.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 8 of 32



**Figure 4:** Red paint transfer on the bottom front left corner of the fiberglass bucket.
Photograph taken by Dawson employee at accident scene.

Knott Laboratory analyzed whether or not the bucket could have bent the railing while still attached to the boom (Figure 5). As shown in Figure 5, the boom cannot be oriented in such a manner that the bottom left corner of the fiberglass bucket contacts the railing while the bucket is still attached to the boom. Therefore, the bucket impacted the railing <u>after</u> it had separated from the boom.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 9 of 32



**Figure 5:** Graphic showing the bucket could not have bent the railing while still
attached to boom.  Graphic by Knott Laboratory.

Knott Laboratory reviewed the provided photographs of the bucket and inspected the
bucket on July 13, 2015.  Several sharp chops and relatively wide indentations were
observed along the left upper rim of both the bucket and the bucket liner (Figure 6).  The
chops and indentations on the bucket and bucket liner are consistent with repeated
external forces applied downwards on the bucket and bucket liner.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 10 of 32



**Figure 6:**  Photograph of the bucket and bucket liner with several indentations.
Photograph taken by Mr. Mike Moore, P.E. on June 8, 2012.

Further, the wrench socket shown in Figure 7 and Figure 8 appears to be bent downwards, which is consistent with significant external bending loads applied to the socket in excess of normal handheld operation. Therefore, both the bucket, bucket liner, and hydraulic wrench socket experienced significant external loading.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 11 of 32



**Figure 7:** Bent hydraulic wrench socket consistent with external loading applied to the socket.  Accident scene photograph.



**Figure 8:**  Bent hydraulic wrench socket consistent with external loading applied to the socket.  Accident scene photograph.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 12 of 32

4.2   Utility pole evidence

The photogrammetry analysis was used to determine the dimensions of the pole above ground (Figure 9).  The pole's height was 341.3 inches.  The base diameter of the pole was approximately 8.9 inches and tapered down to a diameter of approximately 6.7 inches at the top of the pole.

The lower half of the pole leans to 55 degrees east of north (Figure 10).  The direction of the lean is consistent with the direction of the electrical cables to the northeast.

Knott Laboratory reviewed scene photographs taken by police and Dawson employees to analyze the pole's hardware.  The guy-wires had been cut, the electric cables were removed from the pole, and several hardware components were removed prior to the incident.



**Figure 9:** Dimensions of the utility pole from Knott Laboratory photogrammetry.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 13 of 32



**Figure 10:**  Angle of pole leaning.  Graphic by Knott Laboratory.

Further, a photograph taken by a Dawson employee shows a loose spring washer on the lower transformer bolt, which is consistent with a loosened nut on the lower transformer bolt (Figure 11).  The loosened transformer nut is evidence that Mr. Keaschall had been working on the nut prior to the bucket separation incident.

An accident scene photograph shows white paint marks under both the upper and lower transformer bolts perpendicular to the pole (Figure 12).  The white paint marks are consistent with the white color of the bucket.  Therefore, it is possible the white paint marks were deposited by the bucket pressed against the pole

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 14 of 32



**Figure 11:**  Partially unfastened nut on lower transformer bolt.
Photograph taken by Dawson employee.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 15 of 32



**Figure 12:**  Perpendicular white marks below both upper and lower transformer bolts consistent with white color of the bucket.  Accident scene photograph.

4.3   <u>Ground debris</u>

After the bucket separated from the boom, struck the Altec truck railing, Mr. Keaschall was deposited between the base of the pole and left side of the truck as evidenced by the fall-protection harness removed from his body. (Figure 13)

The bucket also had a tool board that had separated from the left edge of the bucket after the bucket fell that came to rest west of the truck.  The bucket itself also came to rest to the west of the truck (Figure 14 and Figure 15).

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 16 of 32



**Figure 13:** Area Mr. Keaschall was deposited.  Accident scene photograph.



**Figure 14:** Area Mr. Keaschall was deposited, tool board, and bucket.
Accident scene photograph.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 17 of 32



**Figure 15:** Scaled diagram showing rest position bucket.  Graphic by Knott Laboratory.

### 5.0  General bucket kinematics (motion) of separation

After identifying the locations of key physical evidence through photogrammetry, Knott Laboratory analyzed the general kinematics or motion of the bucket as it separated from the boom, and determined whether the general kinematics outlined in Mr. Eihusen's engineering report was physically possible using engineering simulation software, PC-Crash 10.0.

First, Knott Laboratory aligned the virtual model of the bucket into the virtual photogrammetry scene with the broken rib section of the bucket still attached to the boom representing where the bucket would have been had it still been attached to the boom at the accident scene.  The location of the red contact mark on the bucket was determined to be 9 feet 2 inches horizontally to the southeast from the corresponding contact dent on the Altec truck's railing (Figure 16).  Therefore, the bucket had to travel rearwards after separation from the boom.

In order for the bucket to travel rearwards 9 feet 2 inches towards the Altec truck railing, the bucket would have required an initial velocity towards the rear at separation.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 18 of 32



**Figure 16:** Horizontal distance from bucket contact mark to dent in rail based on Knott Laboratory's photogrammetry.

5.1   Mr. Eihusen's failure mode and bucket kinematics:

Mr. John Eihusen, P.E. offered an explanation of the failure mechanism and rearward movement of the bucket towards the dent in the railing after separation,

> *"At time of failure the compromised composite resolving Mr. Keaschall's body weight into vertical rib failed in shear at or near the vertical rib insert which triggered the catastrophic failure of the bucket."*

Therefore, Mr. Eihusen apparently concluded that the primary external loading on the bucket at the time of failure was Mr. Keaschall's body weight.  Mr. Eihusen also described how Mr. Keaschall's body weight, alone, contributed to the rearward motion of the bucket after separation:

> *"In effect Mr. Keaschall was dumped head first out of the bucket.  The mechanics of the separation would have also imparted an angular momentum on the bucket as it fell free from the boom.  This would have caused it to travel backward under the boom into the truck box resulting in the bent frame railing."*

While Knott Laboratory agrees that the mechanics of the separation would have imparted an angular momentum on the bucket as it fell free from the boom, Knott Laboratory does

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 19 of 32

not agree that Mr. Keaschall's body weight alone would have resulted in any significant rearward, translational, movement of the bucket after separation from the boom.

Knott Laboratory conducted simulations showing the separation of the bucket as explained by Mr. Eihusen.[3] The hypothetical simulation shows that as the bucket separation occurred, the bucket began rotating, consistent with Mr. Eihusen's statement.

However, contrary to Mr. Eihusen's statement, the simulation shows negligible translational rearwards movement of the bucket after separation towards the dent on the railing (Figure 17 and Figure 18).



**Figure 17:** Visualization of the simulated drop position of the bucket after separation and free-fall from boom as opined by Mr. Eihusen.  Graphic by Knott Laboratory.

---

[3] Simulation assumed Mr. Keaschall initially near the left side of the bucket with the bucket failing near the right rear corner of the bucket. This assumption imparts maximum rotational motion.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 20 of 32



**Figure 18:** Distance of bucket from dent in railing during simulation of Mr. Eihusen's failure scenario. Graphic by Knott Laboratory.

Therefore, Mr. Eihusen's conclusion that Mr. Keaschall's weight alone imparted enough rearwards momentum to cause the left front bottom corner of the bucket to strike the railing is not consistent with physics based on analysis of the event.

## 6.0 Reconstruction of events

Knott Laboratory investigated three external force application scenarios to determine whether or not the scenarios were consistent with both the physical evidence and with the bucket kinematic and dynamics.

### 6.1 Wind effects

The only external environmental force that could have acted on the bucket <u>after</u> the bucket separated from the boom was wind.

Knott Laboratory obtained the weather history for Kearney Regional Airport, approximately 25 miles south of the incident site. The reported weather at 10:55 am, near the time of the incident, was clear skies, temperature of 75.2 degrees Fahrenheit, and wind speeds of 13.8 mph directed to the south to southeast. The maximum reported wind gust speed on the day of the incident was 23 mph.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 21 of 32

The approximate wind speed and direction at the time of the incident relative to the bucket and truck are depicted in Figure 19.



**Figure 19:**  Wind speed and direction relative to truck at time of incident.
Graphic created by Knott Laboratory.

Under the maximum possible wind force, the bucket would have only traveled to the south southeast approximately 2 feet, significantly shorter than the distance of 9 feet 2 inches traveled by the bucket after separation.  Therefore, an additional external force was needed beyond wind.

Knott Laboratory analyzed two additional external rearward forces acting on the bucket prior to separation. The first scenario involves the bucket pushed frontwards against the pole, and the second scenario involves the bucket pushed upwards against the pole hardware, specifically the upper or lower transformer bolt.  Both scenarios were compared with the physical evidence to determine which, if either, physically resulted in the required rearward force needed for the bucket to contact the railing and matched with the physical evidence.

## 6.2   Bucket pushed against pole

The first additional hypothetical external force examined involved the bucket pressed frontwards horizontally against the pole creating an equal and opposite rearward force in the direction the bucket traveled.  In this scenario, the bottom boom was raised such that the left front corner of the bucket made contact with and pressed against the utility pole.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 22 of 32

The amount of force required to cause the bucket to separate from the boom would have bent the pole at least 10 inches away from the truck.  (Figure 20).



**Figure 20:**  Bucket pushed into the pole deflecting pole a minimum of 10 inches.  Knott Laboratory still frame from visualization.

As a result of exceeding the materials strength of the bucket, the bucket would have separated and traveled rearwards towards the railing of the truck, which is consistent with the post-separation movement of the bucket.  However, in this hypothetical scenario, the tip of the boom would have come to rest at least frontwards of where the boom tip came to rest during the incident. (Figure 21).  Therefore, the hypothetical scenario of the bucket pushing frontwards into the pole creating a large equal and opposite external force is not consistent with the physical evidence.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 23 of 32



**Figure 21:** Hypothetical boom tip (left) comes to rest forwards of the actual rest position (right). Still frame from Knott Laboratory visualization and accident scene photograph.

### 6.3   Bucket contact with transformer bolt

The second scenario involved interaction between the bucket and the pole hardware, specifically the upper or lower bolts used to secure the transformer (see Figure 11), to create the required rearward external force.

In this scenario, the left-side of the bucket is laterally pressed up against the pole and upwards against the upper transformer bolt, as evidenced by the white paint deposits shown in Figure 12.

Mr. Keaschall raises both the upper and lower booms thus resulting in loading on the bucket liner (Figure 22). As the booms are raised, the booms begin to deflect, creating hazardous stored energy, while the bucket remains fixed against the bolt. As the stored energy increases, more force is transferred to the ribs of the bucket securing the bucket to the boom arm.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 24 of 32



**Figure 22:** Initial force acting downwards on the bucket from transformer bolt. Graphic by Knott Laboratory.

Eventually, the force exceeds the strength of the bucket ribs securing the bucket to the boom arm, and the bucket begins to separate from the boom. As the bucket beings to separate, the force on the bucket begins to change from purely downward loading to both downward and rearward loading (Figure 23), which is consistent with the bucket traveling rearwards towards the dent in the railing.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 25 of 32



**Figure 23:**  Bucket caught on upper transformer bolt.  Still frame from Knott Laboratory visualization.

After the bucket separates, the boom arm springs upward, rearward, and laterally to the right to its final rest position consistent with the rest position of the boom arm depicted in accident scene photographs.

The scenario of the bucket pressed against the transformer bolt is consistent with the physical evidence and provides the external rearward force needed for the bucket to hit the railing. Therefore, the bucket was pressed against the transformer bolt during the incident.

## 6.4   Bucket forces and testing

After determining the bucket was pressed against a transformer bolt, Knott Laboratory analyzed the forces acting on the bucket during the incident.  Knott Laboratory first simulated the separation motion of the bucket and Mr. Keaschall using PC-Crash 10.0 in order to determine the speed and direction the bucket separated from the boom arm.

Using Altec failure test data and bucket separation velocity determined through simulations, Knott Laboratory was able to determine that a peak external force of approximately 1,600 pounds was applied to the bucket by the transformer bolt.  For comparison, the rated load capacity of the bucket is only 700 pounds.  Therefore, Mr.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 26 of 32

Keaschall had exceeded the rated load capacity of the bucket by pushing the bucket up against the transformer bolt.

Additionally, Dr. Joseph Rakow conducted a test using an exemplar bucket and completely removed material from the flange and rib of the bucket to simulate the delamination reportedly observed on the subject bucket.  During the test, Dr. Rakow applied a vertical load of 700 pounds to the approximate position of the bucket that would have come into contact with the transformer bolt.  Bucket separation and/or failure did not occur during the test, nor were there any reported cracking or tearing sounds coming from the bucket.  Therefore, Knott Laboratory's analysis showing Mr. Keaschall exceeded the vertical load capacity is consistent with Dr. Rakow's testing.

## 7.0 Contributing factors

Knott Laboratory reviewed the AA755L Operator's Manual and OSHA regulations to determine contributing factors to the incident.

## 7.1   Altec AA755L Operators Manual

Within section 5, "Operation" on page 26 of the operator's manual, it is stated

>**"Warning Death or serious injury can result from improper use of the boom(s) or platform(s).  Do not use the boom(s) or platform(s) surfaces to push or support objects such as poles, conductors, etc."**

Also within section 5, "Operation" on page 26 it is stated:

>**"Warning Death or serious injury can result from overloading the unit.  Do not exceed the capacity values."**

Mr. Keaschall failed to follow the aforementioned warnings by pushing the bucket into the pole and against the transformer bolt and then overloading the bucket beyond capacity.  Failure to follow the warnings directly resulted in the bucket separating from the boom and Mr. Keaschall's subsequent fatal injuries.  Had Mr. Keaschall followed the warnings and not externally loaded the bucket beyond capacity, the accident would have been prevented.

Within section 4, "Before You Operate…" on page 19 it is stated,

>**"Danger The lanyard connected between the OSHA approved fall protection system and the boom tip lanyard anchor must always be used and kept in good condition.  It should never be replaced with a lanyard of different length.  It should never be replaced with any material that is conductive."**

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 27 of 32

Mr. Keaschall failed to follow the operator's manual by not properly attaching a lanyard between his safety harness and the boom tip lanyard anchor. The failure resulted in Mr. Keaschall falling 22 feet after the bucket separated from the boom.

## 7.2   OSHA regulations

The Occupational Safety and Health Administration (OSHA) specifies safety and health regulations for usage of aerial lift platforms such as the Altec boom lift under standard number 1926.453, titled, "Aerial lifts."

OSHA regulations require operators working from boom lift platforms to wear a body belt with a lanyard attached to the boom under 1926.453(b)(2):

> *"A body belt shall be worn and a lanyard attached to the boom or basket when working from an aerial lift."*

Mr. Keaschall was not wearing a lanyard attached to the boom at the time of the incident and therefore failed to comply with OSHA regulation 1926.453(b)(2) and the operator's manual. Mr. Keaschall's failure to comply with OSHA 1926.453(b)(2) and the operator's manual directly resulted in him falling approximately 22 feet after the bucket separated from the boom.

OSHA regulations also require operators work from boom lift platforms to not exceed manufacturer specified load limits under OSHA 1926.453(b)(2)(vi)"

> *"Boom and basket load limits specified by the manufacturer shall not be exceeded."*

The rated load limit for the platform was 700 pounds, significantly less than the approximately 1,600 pounds[4] of external force applied to the platform. Therefore Mr. *Keaschall* failed to comply with OSHA regulation 1926.453(b)(2)(vi) and the operator's manual. Mr. Keaschall's failure to comply with OSHA 1926.453(b)(2)(vi) and the operator's manual directly resulted in the bucket separating from the boom. Had Mr. Keaschall complied with OSHA 1926.453(b)(2)(vi) and the operator's manual, the accident would have been prevented.

## 7.3   ANSI A92.2-2001 standard

The American National Standard Institute (ANSI) has developed a standard for "Vehicle-Mounted Elevated and Rotating Aerial Devices", such as the boom lift.

---

[4] The calculated external force applied to the platform does not include additional weight of the operator and materials.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 28 of 32

Section 10 of the ANSI A92.2-2001 standard outlines the "Responsibilities of Operators." Section 10.2, titled "Operation", states:

> *"During operation of the aerial device all occupants shall use appropriate fall protection connected to the aerial devise at the platform position."*

Mr. Keaschall was not wearing a lanyard attached to the boom at the time of the incident and therefore failed to comply with the ANSI A92.2 standard, OSHA 1926.453(b)(2) and the operator's manual. His failure to comply with the ANSI standard, OSHA regulations, and operator's manual directly resulted in him falling approximately 22 feet after the bucket separated from the boom. Had Mr. Keaschall complied with the ANSI standard, OSHA regulations, and operator's manual, he would not have fallen 22 feet after the bucket separated from the boom.

Section 10.5 of the ANSI standard titled, "Loading" states:

> *"Any loading which includes a horizontal load shall be avoided unless the mobile unit is designed for that application."*

The bucket was not designed to be loaded beyond its rated capacity. Therefore Mr. Keaschall failed to comply with ANSI A92.2, OSHA regulation 1926.453(b)(2)(vi) and the operator's manual. Mr. Keaschall's failure to comply with ANSI standard, OSHA regulations and the operator's manual directly resulted in the bucket overloading and separating from the boom. Had Mr. Keaschall complied with the ANSI standard, OSHA regulations and the operator's manual, the bucket would not have separated, and the accident would have been prevented.

## 8.0 <u>Conclusions</u>

Based on available evidence, scientific research literature, published test data, and the engineers' training, education, and experience, the following conclusions were reached:

1. Mr. Keaschall applied external loading to the bucket, which exceeded the rated load capacity of the bucket.

2. Mr. Keaschall's failure to follow the warnings stated in the operator's manual, OSHA regulations, and ANSI standard regarding external loading of the bucket and attaching a lanyard to the boom, directly resulted in the bucket separating from the boom and directly resulted in Mr. Keaschall falling 22 feet to the ground. The failure to follow the operator manual warnings, OSHA regulations, and ANSI standard is the probable cause of the accident.

3. Had Mr. Keaschall complied with OSHA regulations, ANSI standards and the operator's manual, the accident would have been prevented.

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 29 of 32

4. Mr. Eihusen's conclusion that Mr. Keaschall's weight alone imparted enough rearwards momentum to cause the left front bottom corner of the bucket to strike the railing is not consistent with physics based on analysis of the event.

The opinions and conclusions expressed in this report are based on the information available to the engineer as of the date of this report.  As discovery continues, additional information may become available that will affect his opinions and conclusions.

Respectfully,

KNOTT LABORATORY, LLC

_____
Ben T. Railsback, M.S., P.E.
Director of Mechanical Engineering

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 30 of 32

## Appendix A:  Additional Provided Materials Reviewed By Knott Laboratory

1. Declaration Page General Liability Policy
2. AEM Aerial Devices Safety Manual
3. Altec Self Directed Sentry Operator Safety Training Workbook
4. Build Records
5. Conrad Email
6. Complaint and Demand for Jury Trial
7. Amended Progression Order
8. Affidavit of Joseph Rakow
9. Altec Drawing Platform, Mold, Ribbed
10. Altec Drawing Platform, Fiberglass, Rectangular
11. Fiberglass Platform Construction – Procedure No. EN-241-P
12. Maintenance and Parts Manual
13. Moore Memo – Summary Report of Inspection
14. Operator's Manual
15. PUN 2010A, Secondary Lanyard Attachment
16. Service Records
17. Universal Inspections 2-16-11
18. DPPD Photos
19. Dawson Photos
20. Altec Bucket Photos SN OSB39386
21. Altec Bucket Photos SN OSB62811
22. Sherman County Sheriff Department Photos
23. Deposition of Jeremy Kaiser
24. Deposition of Jerry Hobelman
25. Deposition of Dean Kunkee
26. Binder 1
27. Exhibits 21-44
28. Exhibits 100-112
29. NES Platform Photos
30. Somat Data
31. Test A
32. Test A2
33. Test A3
34. Test B
35. Test C
36. Test F
37. Test G
38. Test H
39. NES Meeting Notes
40. 121602 MC Kent
41. Tr00141 Test Report
42. Tr00141 Test Summary

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 31 of 32

43. Unit Platform Cross Reference
44. TR00741 Photos and Video
45. Platform Hole Locations
46. TR00471 Summary
47. TR00741 Test Log Platform Performance
48. TR00741 Test Report
49. TR00822 Photos
50. Platform Performance Test Log
51. Testing Matrix
52. TR00822 Test Summary
53. TR00822 Test Report
54. TR00835 Pictures
55. Reference Items
56. Template Test Report
57. Template Test Summary
58. TR00835 Test Log
59. TR00848 Photos
60. Program & PCL
61. Quality Inspection Report
62. TR00848 Procedure and Test Log
63. TR00848 Summary
64. TR00848 Summary Test
65. TR00848 Test Log and Procedure
66. TR00848 Test Plan
67. TR00848 Test Report
68. TR00848 Test Report 2
69. Westar Platform
70. TR01075 Data
71. TR01075 Fixture Setup
72. TR01075 Pictures and Video
73. Accelerometer Map For Collecting Roading Data
74. Accelerometer Map For Collecting Roading Data PowerPoint
75. Test Log Uplander Platform Roading
76. TR001075 Test Plan
77. TR01075 Road Data Correlation end hung
78. TR01075 Road Data Correlation
79. TR01075 Roading Accelerometer Parameters
80. TR01075 Summary
81. TR01075 Test Report
82. Uplander Parts Decal
83. Uplander Test Decal
84. Analytical & Materials Engineering, Inc. Report dated 10/30/15
85. EiCon Services Summary Findings dated 10/26/15

Stephen Ahl, Esquire
Ahl.14442-0115
June 23, 2016
Page 32 of 32

## Appendix B:  Additional Material Obtained and Reviewed By Knott Laboratory

1. Weather Underground historical data for Kearney, NE regional airport.
2. Google Earth imagery of accident site.
3. OSHA regulations.
4. Drag properties of various shapes.
5. ANSI/SIA A92.2-2001 "Vehicle-Mounted Elevating and Rotating Aerial Devices."
6. (839) Eight hundred thirty nine photographs taken of bucket and bucket liner taken 07/13/15
7. (14) High definition laser scans of the bucket
8. (348) Three hundred forty eight photographs of Osborne Industries manufacturing facility taken 08/10/15
9. Human Factors Design Handbook Second Edition by W. Woodson, B. Tillman, and P. Tillman
10. Materials Science and Engineering An Introduction Seventh Edition by W.D. Callister, Jr.
11. Introduction to Fluid Mechanics Sixth Edition by R. Fox, A. McDonald, and P. Pritchard.
12. Gates VIN Decoder
13. Diesel Truck Index
14. Mechanical Properties of Wood by D. Green, J. Winnandy, and D. Kretschmann.

*Failure Analysis Associates*

# E*x*ponent®

**Keaschall v. Osborne Industries, et al.**

**Expert Report**

**Joseph F. Rakow, PhD, PE**

EXHIBIT
E

$Ex$ponent®

*Failure Analysis Associates®*

**Keaschall v. Osborne Industries, et al.**

**Expert Report**

Prepared for

Stephen Ahl, Esq.
Wolfe, Snowden, Hurd, Luers & Ahl, LLP
Wells Fargo Center
1248 O Street, Suite 800
Lincoln, NE 68508

Prepared by

Exponent Failure Analysis Associates, Inc.
149 Commonwealth Drive
Menlo Park, CA 94025

Joseph F. Rakow, PhD, PE

June 2016

© Exponent

Doc. no.  1502730.000 - 7382

# Contents

| | Page |
|---|---|
| **List of Figures** | iii |
| **Limitations** | iv |
| **Personal Background** | 1 |
| **Opinions** | 2 |
| **Basis for Opinions** | 3 |
| Altec Industries Aerial Lift Device | 5 |
| Osborne Industries Two-person Platform | 5 |
| Opinion of Plaintiff's Expert John Eihusen | 6 |
| -541 Platform Flange and In-service Population | 7 |
| Platform Performance Tests | 10 |
| Platform Fracture Surface Inspection | 15 |
| **Discussion** | 22 |
| **Documents Received** | 23 |

| | |
|---|---|
| Appendix A | Compositional Analysis of Extracted Samples |
| Appendix B | Résumé of Joseph F. Rakow, Ph.D., P.E. |
| Appendix C | Deposition and Trial Testimony |
| Appendix D | Compensation |
| Appendix E | Exhibits |

## List of Figures

Page

Figure 1.    Post-incident scene.                                                                                    3

Figure 2.    Subject platform with liner after incident.                                            4

Figure 3.    Subject platform portion attached to the boom after the incident.      4

Figure 4.    Schematic of the -541 platform.                                                             6

Figure 5.    Portion of failed subject platform with locations identified.               7

Figure 6.    Unlaminated areas (marked with red arrows) in exemplar platform flanges.    9

Figure 7.    Unlaminated areas (marked with red arrows) in exemplar platform flanges.    10

Figure 8.    Damage imparted to location A in first test.                                         11

Figure 9.    Intentionally damaged platform tested under 3,500 pounds of dead weight, which is five times the rated capacity of the platform.    12

Figure 10.   Damage imparted to location A in second and third tests.               13

Figure 11.   Stress contours of the -541 platform loaded with 700 pounds on its floor. The highest stress locations are at the bottom of the ribs (colored in red). Units are in psi.    14

Figure 12.   Platform tested under 700 pounds of dead weight on the front right corner of the flange.    15

Figure 13.   Subject platform.                                                                                 16

Figure 14.   Subject platform back wall.                                                                16

Figure 15.   Fracture propagation on right-side rib.                                              17

Figure 16.   Fracture at location A, back wall portion.                                          19

Figure 17.   Fracture at location A, main platform portion.                                 20

Figure 18.   Location B fracture.                                                                            21

Figure 19.   Location C fracture.                                                                            21

## Limitations

Exponent investigated specific issues relevant to the subject incident, as requested by Wolfe, Snowden, Hurd, Luers & Ahl, LLP. The scope of services performed during this investigation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations is at the sole risk of the user. The opinions and comments formulated during this investigation are based on observations and information available at the time of the investigation.

The findings presented herein are made to a reasonable degree of engineering certainty. We have endeavored to be accurate and complete in our assignment. If new data become available or there are perceived omissions or misstatements in this report, we ask that they be brought to our attention as soon as possible so we have the opportunity to address them.

# Personal Background

I am a Principal Engineer in Exponent's Mechanical Engineering practice. I have expertise in the areas of mechanical, structural, and aerospace engineering, with particular expertise in composite materials. I am routinely hired by clients to analyze failures in composite components, and to assist in composite product development and stewardship. These matters have involved composite aircraft and spacecraft, as well as aerial lift devices, automobiles, sporting equipment, pipelines, medical devices, and building products, among other products. On a number of occasions, I have been invited by professional organizations to speak and train their membership on composite materials and composite failure analysis.

I hold a Ph.D. and an M.S. in aerospace engineering from the University of Michigan, as well as a B.S. in physics from the University of California, Davis. I am a licensed professional mechanical engineer in the state of California. Prior to joining Exponent, I held teaching and research positions at the University of Michigan and Sandia National Laboratories.

I have published a number of scientific articles and frequently present at national and international technical conferences. I am a contributing author to the International Civil Aviation Organization (ICAO) *Manual of Aircraft Accident and Incident Investigation*, having authored the chapter addressing failure analysis of composite structures. In addition, I am a Visiting Lecturer in the Aeronautics and Astronautics Department at Stanford University, and I teach an introductory composites course to professional engineers and the Department of Defense through the American Society of Materials.

# Opinions

Based on review of information and documentation provided to me and listed in this report, my inspection of the available physical evidence, and my analysis, I have formed the following opinions in this matter:

1.  The subject platform did not fail due to a manufacturing or design defect.

    a.  No evidence of a manufacturing or design defect has been identified in the subject platform. Plaintiff's expert claims a pre-existing delamination caused the subject failure, but similar delaminations appear to be present throughout the population of nearly 12,000 platforms of this model, and reportedly none of those platforms have failed.

    b.  The subject platform model can withstand loads well beyond its rated capacity even in the presence of significantly more extensive damage than the delamination identified by plaintiff's expert.

2.  The subject platform failed likely due to misuse involving loading conditions above its rated capacity. The fracture surfaces are rough and fibrous, consistent with overload failure.

# Basis for Opinions

On June 6, 2012, around 11:00 am, Kurt Keaschall, lineman for Dawson Public Power, was working in an aerial lift near Ravenna, Nebraska. He was working to remove a transformer when the lift platform (i.e., bucket) fractured and detached from the boom. The majority of the platform and its liner fell to the ground, while the back wall of the platform remained attached to the boom. Figure 1 shows the scene after the incident occurred. Figure 2 and Figure 3 show the portions of the platform on the ground and on the boom, respectively.

Exponent was retained to provide engineering analysis related to this incident. Our activities have included a review of available documents, examination of physical evidence, and engineering analysis.



Figure 1.      Post-incident scene.



Figure 2.       Subject platform with liner after incident.



Figure 3.       Subject platform portion attached to the boom
                after the incident.

## Altec Industries Aerial Lift Device

The subject aerial lift consists of a truck, an articulated boom, and a two-person platform attached to the end of the boom. The subject Altec unit was model AA755L, serial number 040BZ3559, and was delivered to Dawson Public Power on April 2005, where it was designated as truck 3505.

According to Dawson Power employees, the linemen are required to visually inspect the various components of the unit, including the platform, before use and to report any concerns to the mechanics.[1] Third-party inspections are performed twice per year. During these inspections, dielectric is measured and the linemen look for cracks and other signs of damage. The last third-party inspection prior to the subject incident was performed in February 2012, approximately four months before the subject incident.[2] The platform reportedly passed the inspection with no reported issues at that time.

## Osborne Industries Two-person Platform

The subject platform (serial number OSB39386) was manufactured by Osborne Industries (Osborne, KS) in March 2005, approximately seven years before the subject incident. Referred to as model 704-00541, the platform is designed to hold two individuals and has a rated capacity of 700 pounds. The platform is made of fiberglass, which in this case is vinylester resin reinforced with glass fiber. Figure 4 shows a schematic of the -541 model platform and the various components, such as the ribs, flange, and step. The platform is attached to the boom via a set of fasteners in each rib.

Osborne manufactures the platform by resin transfer molding (RTM), a common manufacturing technique used for many composite products and applications. RTM consists of a male and female mold pair in which dry glass fiber preforms and fabric are placed, the mold is closed, and then resin is injected into the closed mold. For the subject platform model, the ribs, which are also fiberglass, are precured prior to being inserted into the mold. The ribs are attached to the main platform body and flange by overwrapped fiberglass fabric, and are then cured altogether to consolidate into one structure.

Exponent visited Osborne's manufacturing facility and observed the platform production process. Osborne's manufacturing process includes a number of quality control processes:

- Raw materials quality control, such as testing resin on receipt and checking certificates of compliance for glass products.
- Weighing glass fiber preforms prior to placing them in the mold.
- Utilizing glass product kits.
- Tracking resin injection and molding parameters.

---

[1]   Deposition of Jeremy Kaiser.

[2]   Deposition of Dean Kunkee.

- Visually inspecting the platform throughout the manufacturing process, such as after removing it from the mold, after machining operations, and prior to packaging for shipment.
- Measuring barcol hardness on the bottom of the platform.
- Weighing the platform.
- Testing the mechanical strength of the lanyard anchor and the platform step
- Documenting quality parameters throughout the production process for each individual platform, from raw materials preparation to shipping. A document entitled *Aerial Platform Inspection Report* accompanies each platform throughout the manufacturing process.



Figure 4.      Schematic of the -541 platform.[3]

## Opinion of Plaintiff's Expert John Eihusen

Exponent has reviewed reports written by plaintiff's expert, John Eihusen. Mr. Eihusen opines that since the time it was manufactured, the subject platform flange contained a delamination (unlaminated area) in location A.[4] Location A is marked in Figure 5 and is described by Mr. Eihusen as being near or adjacent to the top of the preformed vertical rib on the right-hand side of the platform. Mr. Eihusen hypothesizes that the delamination grew in service and caused

---

[3]   PUN 2010A, Secondary Lanyard Attachment (00081563xA37B1).PDF, Altec 749-50080, July 23, 2010, p. 2.

[4]   Although Mr. Eihusen refers to this feature as a delamination, we refer to it as an unlaminated area because the area was not laminated at the completion of manufacturing. Delamination implies an area was laminated during manufacturing and then became delaminated at a later time.

the platform to fail. Interestingly and unfortunately, Mr. Eihusen performs no calculations and conducts no tests to support his opinion.



Figure 5.      Portion of failed subject platform with locations identified.

## -541 Platform Flange and In-service Population

Mr. Eihusen's root cause conclusion is flawed because he fails to realize that unlaminated areas are common in the -541 platform flange. Exponent has examined the flanges of nine platforms to date, and all nine platforms contain unlaminated areas in the flange, adjacent to the ribs. These platforms include the subject platform (OSB39386), seven exemplar platforms provided to Exponent by Osborne (OSB883782, OSBXXXXX, OSB8385X,[5] OSB82845, OSB82685, OSB84104, OSB84510), and a ninth platform that Mr. Eihusen pulled out of service (OSB62811). Mr. Eihusen analyzed the ninth platform with x-ray and confirmed the presence of unlaminated areas. Unlaminated areas in all seven exemplar platforms are shown in Figure 6 and Figure 7.

It is not surprising to find unlaminated areas in these flanges, given the thickness of that portion of the platform. Thick molded composite parts are susceptible to entrapped air and potentially unlaminated locations.

---

[5]   Complete serial number not available on two samples.

The unanimous result of nine-for-nine flanges containing unlaminated areas near the ribs indicates that these features are commonly present throughout the population of -541 platforms. Osborne has manufactured and sold nearly 12,000 platforms of the -541 model between 1999 and July of 2015, and the subject incident is the only in-service catastrophic failure that has ever been reported to Osborne. Moreover, Osborne has sold nearly 28,000 two-person platforms and more than 64,000 total platforms during this time period, all of which have thick flanges molded by Osborne's RTM process, yet the subject incident is the only in-service catastrophic failure that has ever been reported to Osborne.

With the common presence of unlaminated areas and the lack of catastrophic failures, Mr. Eihusen's conclusion that the subject platform failed due to an unlaminated area is in contrast to the demonstrated performance of this product in service, including its unlaminated areas. In other words, Mr. Eihusen has failed to identify the factor in this incident that caused the subject platform to fail while others in service have not.





Figure 6.    Unlaminated areas (marked with red arrows) in exemplar platform flanges.



Figure 7.      Unlaminated areas (marked with red arrows) in exemplar platform flanges.

## Platform Performance Tests

Having presented no calculations or experiments, Mr. Eihusen failed to evaluate the structural significance of the unlaminated area in the subject platform. Exponent evaluated the structural significance of the unlaminated areas by performing load tests on an exemplar platform (OSB75752) that contained severe damage intentionally imparted in location A. Three tests were performed, at Osborne's facility and with Osborne's assistance.

In the first test, Exponent and Osborne made two cuts in the platform at location A, as shown in Figure 8. The cuts penetrate the thickness of the platform wall, rib, and flange. The cuts are much larger than any unlaminated area identified to date in this investigation. Exponent and Osborne mounted the platform on Osborne's test fixture, which replicates the platform mounting on the boom. We then hung 3,500 pounds of dead weight from the bottom of the platform (Figure 9). This applied load is five times the rated capacity of the platform and is approximately the weight of a typical midsize automobile. The load remained on the platform for several minutes, and the platform did not fail. The platform exhibited no sounds of cracking and no signs of impending failure.



Figure 8.        Damage imparted to location A in first test.

 

Figure 9.    Intentionally damaged platform tested under 3,500 pounds of dead weight, which is five times the rated capacity of the platform.

In the second test, Exponent and Osborne removed all of the material between the two cuts, completely removing all material strength in the area in which Mr. Eihusen identifies the unlaminated area to be on the subject platform. This damage is shown in Figure 10. We then loaded the platform again with 3,500 pounds of dead weight and allowed the weight to remain on the platform for several minutes. Again, the platform did not fail and did not exhibit any sounds of cracking or signs of impending failure.





Figure 10.    Damage imparted to location A in second and third tests.

These results show that there is no manufacturing feature at location A that is the cause of this incident. Mr. Eihusen claims that the unlaminated area at location A grew until failure. Yet our tests show that even if the feature grew to the point of completely removing all material strength at that location, the platform can still support not only its rated capacity but at least five times its rated capacity without failure.

The reason the platform can withstand such significant damage at location A without failure is that the stresses at that location are low relative to the rest of the platform, when the platform carries load on its floor.  The primary load path is between the floor and the bolts that mount the platform to the boom, whereas location A is above this load path. To demonstrate this, Exponent performed finite element analysis of a -541 platform with 700 pounds distributed evenly across

the platform floor (using ABAQUS software). As shown in Figure 11, the high stresses are located between the platform floor and the mounting bolts, with the highest stresses located at the bottom of the ribs. Importantly, location A contains relatively low stress.[6]



Figure 11.    Stress contours of the -541 platform loaded with 700 pounds on its floor. The highest stress locations are at the bottom of the ribs (colored in red). Units are in psi.

Exponent performed a third test with the same platform that was involved in the first two tests, still containing the hole damage shown in Figure 10. In this third test, the platform was loaded with 700 pounds of dead weight hanging from the front right corner of the platform, as shown in Figure 12. This arrangement was selected to match the failure scenario tpresented by Mr. Ben Railsback, an expert accident reconstructionist retained in this matter by Wolfe, Snowden, Hurd, Luers & Ahl on behalf of Osborne Industries.[7]

The load was applied for several minutes, and the platform again completed the test without failing or generating any cracking noises or signs of impending failure. This result shows that the

---

[6]    The purpose of this model is to demonstrate stress distribution on a relative basis, not to calculate absolute stress values.  For this demonstration, linear elastic homogeneous material properties were assumed, using the Altec specified modulus of 1.39e6 psi.

[7]    Knott Laboratory Engineering Report, Keaschall vs Osborne Industries, Ben T. Railsback, June 23, 2016.

presence of unlaminated areas at location A could not have contributed to the failure of the subject bucket in Mr. Railsback's calculated scenario.



Figure 12.    Platform tested under 700 pounds of dead weight on the front right corner of the flange.

## Platform Fracture Surface Inspection

As shown previously, the majority of the platform separated from the truck, leaving the back wall of the platform attached to the boom. These two pieces are shown in Figure 13 and Figure 14. The flange fractured at two locations marked as A and B in Figure 13. Location A is where the flange and the right-side rib meet, and location B is at the back left corner of the platform. Location C is assigned to the corner between the front and left walls, where the fracture bifurcates.

1502730.000 - 7382                                                15



Figure 13.    Subject platform.



Figure 14.    Subject platform back wall.

The fracture at location A is shown in Figure 16 and Figure 17. The flange exhibits fibers protruding out of the fracture, indicating that this area failed in tensile overload. Near the bottom edge of the flange and at the intersection with the rib insert, the fracture surface changes to yellow and shiny. This zone is consistent with a pre-existing unlaminated location from manufacturing. The shiny appearance suggests that these surfaces were free, with limited or no contact with other surfaces.

When a delamination grows with repeated service loads, the newly created surfaces often rub against each other, becoming smooth and worn. The surroundings to the subject delaminated areas at location A are rough and fibrous, consistent with overload, and not growth with service loads.

Furthermore, inspection of the platform revealed evidence of one fracture origin located at the bottom of the right rib. This is consistent with the high stress location identified with FEA (Figure 11). Originating at the bottom of the rib, this fracture grew up toward location A, as shown in Figure 15. This evidence is inconsistent with Mr. Eihusen's illustration that the failure originated and is caused by features at location A.



Figure 15.      Fracture propagation on right-side rib.

Figure 18 and Figure 19 show the fracture surfaces at locations B and C, respectively. These surfaces are also rough and fibrous, consistent with overload failure.

The yellow area at location A, noted during the fracture surface inspection, was analyzed by gas chromatography–mass spectroscopy (GC-MS), Fourier transform infrared spectroscopy (FTIR), and differential scanning calorimetry (DSC). Based on these results, it appears that the yellow discoloration is likely the result of diphenylpropenone present in this location. This compound and its derivatives are characterized by a bright yellow color and are found as pigments in many types of yellow plants. The details of this analysis are found in Appendix A. We have not determined the exact mechanism by which this compound formed within the vinyl ester resin, but Exponent does not consider the compound to be relevant to the subject failure, as the platform performance tests show that the platform can support loads well beyond its rated capacity even with significantly damaged or missing material in location A, where this yellow compound was found.





Figure 16.    Fracture at location A, back wall portion.





Figure 17.       Fracture at location A, main platform portion.

1502730.000 - 7382



Figure 18.    Location B fracture.



Figure 19.    Location C fracture.

## Discussion

Mr. Eihusen opines that the unlaminated area at location A is the root cause of the subject platform failure, but he fails to acknowledge that unlaminated areas are not unique to the subject platform. Rather, they are a common feature to the population of -541 platforms, as evidenced by nine out of nine inspected flanges containing this feature. Approximately 12,000 units were sold from 1999 to 2015, but only the subject platform failed catastrophically, indicating that the subject platform failed for a reason that Mr. Eihusen failed to identify.

In addition, Mr. Eihusen's theory is flawed because the -541 platform can carry load well over its rated capacity even with significantly more damage at location A than the unlaminated areas. Stress analysis of the platform under rated loading shows that the high stresses are located at the bottom of the ribs, and that the flange experiences relatively low stress.

The subject platform likely failed due to misuse involving loads beyond its rated capacity. This is supported by the fracture surfaces, which exhibit features consistent with overload failure.

## Documents Received

Lexington Insurance Company Commercial General Liability Policy Declarations Page 2013-14

AEM Aerial Devices Safety Manual for Operating and Maintenance Personnel

Altec Self-Directed Sentry Operator Safety Training Workbook

Build Records (00070559)

Conrad Email

Dawson photos

Document 1: Complaint and Demand for Jury Trial, Filed 03/31/14

Altec Drawing 704-00065

Altec Drawing 704-0350

Altec Fiberglass Platform Construction, Procedure No. EN-241-P

Altec Maintenance and Parts Manual

Memo from Mr. Scott Fagot (Dawson Public Power) to Mike Moore (Altec Industries), June 12, 2012

Altec AA755L Operator's Manual

Plaintiff's Answers to Interrogatories of Osborne Industries, Inc., 1/27/15

PUN 201 2010A, Secondary Lanyard Attachment

Altec InstallBase Service Request Details

Sherman County Sheriff Department Photographs

Universal Inspections test report, 2/16/11

Deposition of Dean Kunkee

Deposition of Jeremy Kaiser

Deposition of Jerry Hobelman

Deposition of Joshua Chard

Deposition of Michael Moore

Deposition of Ryan McKinney

Deposition of G. Eakin

Deposition Index Template

Deposition Summary, Joshua Chard

Deposition Summary, George Eakin

Deposition Summary, Ryan McKinney

Deposition Summary, Michael Moore

Deposition Summary, Dean Kunkee

Deposition Summary, Jeremy Kaiser

Deposition Summary, Jerry Hobelman

Altec Bucket SN OSB39386 photos

Altec Bucket SNOSB62811 photos

Binder photos 2948 to 3032

Knott Lab Scans Ahl000–Ahl013

TR00141: NES Meeting Notes, 9/19/02

TR00141: Letter from Roger Burgoon (Altec) to M.C. Kent (Nashville Electric Service), 12/16/2002

Test Report TR00141

Test Summary TR00141

Summary Chart for TR00141 Test Report, Summary Chart for M.C. Kent Letter 021602 (Unit Platform Cross Ref)

TR00141: Test Setup

TR00141: NES Platform Photos

TR00141: Somat Data: Ultimate Test Data (Platforms A, A2, B, C, H, G, F)

TR00141: Test A Photos and Video

TR00141: Test A2 Photos and Video

TR00141: Test A3 Photos

TR00141: Test B Photos and Video

TR00141: Test C Photos and Video

TR00141: Test F Photos and Video

TR00141: Test G Photos and Video

TR00741 Photos and Video

TR00741 Summary

TR00741 Test Log Platform Performance

TR00741 Test Report

Drawing 9970047832jdo Platform Hole Locations

TR00822 Photos and Video

TR00822 Platform Performance Test Log

TR00822 Testing Matrix

TR00822 Test Summary

TR00822 Test Report

TR00835 Photos 6654–6668

Drawing 070412530-A

Drawing 970093702-A

Drawing 970174165-B

TR00835 Figure 24D-2

TR00835 Load Case 1, 2, 3 Photos

TR00835 Template Test Report

TR00835 Template Test Summary

TR00835 Test Log

TR00848 Photos

TR00848 Test Control Logic, Platform Load Test

Osborne Quality Notification Summary

TR00848 Procedure and Test Log

TR00848 Summary

TR00848 Summary Test 2

TR00848 Test Log and Procedure, Test 2

TR00848 Test Plan

TR00848 Test Report

TR00848 Test Report, Test 2

Drawing 704-00541 (Westar Platform)

TR01075 Accelerometer Installation Location Map (Uplander Platform Package Roading Test), pdf and PowerPoint files

TR01075 Test Log Uplander Platform Roading

TR01075 Test Plan

TR01075 Road Data Correlation End Hung

TR01075 Road Data Correlation

TR01075 Roading Accelerometer Parameters

TR01075 Summary

TR01075 Test Report

TR01075 Uplander Parts Decal

TR01075 Uplander Test Decal

TR01075 raw data, road data correlation template, and Uplander road data correlation

TR01075 Bad Data

TR01075 Run 1 and Run 2

TR01075 End Hung Files

TR01075: 220 Test images

TR01075 Photos and Videos (including for 217 Platform, 219 Platform, 220 Platform, and Setup)

TR01075 Beck Bounce Test Notes

TR01075, 217 Platform, Drilling and Mounting Boom Tips photos

DPPD photos

Affidavit (Motion to Compel) of Dr. Joseph Rakow in support of defendant Osborne Industries, Inc.

Knott Laboratory Engineering Report, Keaschall vs Osborne Industries, Ben T. Railsback, June 23, 2016

Coleman Evaluation Report

Doc 55 - Pltf's Brief In Opp to Def's Mtn to Compel-111115

Doc 56-2 - Affidavit of John Eihusen-111115

Eihusen draft report (Appendix A 3.3.16)

Eihusen Findings 092615

Exhibits 1-20

Exhibits 21-44

Exhibits 100-112

Unit Sales-Platforms

Keaschall Destructive Testing Protocol 10-2-15

Keaschall Inspection Protocol 7-8-15

Pltf Keaschall's Supplemental Expert Witness Disclosures

Pltf's ATI to Osborne 1.27.15

Sample Collection Recommendations and EDS Description

VIDEO_TS

AUDIO_TS

ANSI A92.2

## Appendix A

## Compositional Analysis of Extracted Samples

During inspection of the subject platform, areas of localized yellowing were observed on the platform at location A. To investigate potential compositional differences in the composite resin near the fracture surface and in the yellowing areas, four samples were extracted from the device for material and chemical analysis. Three samples (labeled Sample A-01 to A-03) were taken from the fractured region at location A and were chosen based on the yellow color intensity of the resin. Sample A-01 showed the most extensive yellowing, and Sample A-03 showed the least yellowing of the three samples. Sample C was taken in a non-yellowed region at location C and was used as a control for compositional comparison. Table A1 provides a list of samples, and Figure A1 shows photographs that identify the location of sample removal.

**Table A1. Samples analyzed from the lift device.**

| Sample | Information |
|---|---|
| Sample A-01 | Yellowed resin from fracture area (most yellow) at location A |
| Sample A-02 | Resin sample taken near yellowed area at location A |
| Sample A-03 | Non-yellow resin sample taken from fracture area at location A |
| Sample C | Control resin sample (taken at location C) |



Figure A1.    Sample locations at location A (Samples A-01 to A-03) and the control (Sample C).

Fourier transform infrared (FTIR) spectroscopy[1] was used to attempt to identify compositional differences among the three samples taken from the fracture surface and the control sample. Figure A2 shows the FTIR spectra for all of the four samples stacked for comparison. All four spectra are consistent with a vinyl ester resin composed of unsaturated polyester with phthalate groups as determined by absorbances at 1720, 1250, 1100 and 730 cm[-1]. The FTIR is also consistent with added styrene in the formulation based on absorbances at 1490, 750, and 700 cm[-1]. In general, few obvious material chemistry differences are observed among the four resin samples. In Sample A-02, absorbances associated with the vinyl ester are diminished and absorbances associated with talc are observed at ~3700 and 1000 cm-1.

Differential scanning calorimetry (DSC)[2] was also used to investigate possible differences in thermal transitions of location A and location C, which might be indicative of compositional variation in the resin. DSC analysis of Samples A and C showed few differences in both the first and second heating scans, and the glass transition temperature (recorded during the second heating scan) was nearly identical (67 and 68 °C for Samples A and C, respectively), indicating similar material composition, and curing. Decomposition profiles were also shown to be similar by thermogravimetric analysis (TGA),[3] further suggesting few material composition differences between samples taken at the fracture surface and the control sample.[4]

[1] FTIR is a spectroscopic technique that identifies compounds based on absorbance of IR radiation by groups of atoms. FTIR can assist in the identification of materials and can provide a comparative assessment of chemical differences among samples. In this case, attenuated total reflectance (ATR)–FTIR was performed, so spectral data are collected a few microns into the sample surface.

[2] DSC analyzes thermal transitions in a polymeric material and uses comparative measurements of heat flow to probe molecular events, including glass transition, crystallization, and melting.

[3] TGA is a thermal analysis technique that measures changes in material mass loss as a function of increasing temperature. It can provide physical and chemical information relating to solvent/water loss and material decomposition.

[4] It should be noted that TGA was performed for the purpose of identifying compositional differences of resin. It was not performed for the purpose of identifying glass content in the platform. The samples were small, localized, and intentionally resin-focused; they are not intended to be representative of the glass content throughout the platform.



Figure A2.    FTIR spectra collected from Samples A-01, A-02, A-03, and Sample C (control).

Exponent performed an organic extraction to dissolve and identify small molecule compounds within the vinyl ester resin that might be responsible for the yellow color. Sample A-01 (most yellow), Sample A-02 (less yellow), and the Sample C (control) were extracted with hexane: acetone (1:1 v/v) with sonication for 10 minutes. Each extract solution was analyzed by direct injection using gas chromatography–mass spectrometry (GC-MS).

The most abundant compound found in Sample C and Sample A-02 was 2,2,4-trimethyl-1,3-pentanediol diisobutanoate, the solvent carrier for MEKP. In fact, the compound was abundant in all three samples tested, which suggests that peroxide initiator was present in all of the areas sampled for GC-MS analysis. Five compounds that are unique to Samples A-01 and A-02, the samples that exhibit yellow discoloration, are listed in Table A2. Of these compounds, diphenylpropenone (also known as chalcone) was present in the highest abundance in both samples and is likely responsible for the yellow color. Diphenylpropenone and its derivatives are characterized by a bright yellow color and are found as pigments in many types of yellow plants.[5] We have not determined the exact mechanism by which this compound formed within the vinyl ester resin.

---

[5]   Davies, K.M., Bloor, S.J., Spiller, G.B., Deroles, S.C. "Production of yellow color in flowers: redirection of flavonoid biosynthesis in Petunia," *The Plant Journal* (1998) **13**(2), 259–266.

**Table A2. Unique compounds identified in yellow samples A-01 and A-02.**

| GC Retention Time (min) | Component ID (NIST Library Match) |
|---|---|
| 8 | Diphenylbutenone |
| 8.16 | Diphenylpropenone |
| 8.32 | Hydroxyphenethyl benzoate |
| 8.4 | Acetyloxyphenyl Ethanone |
| 8.86 | Dibenzoylethane |

## Appendix B

## Résumé of Joseph F. Rakow, Ph.D., P.E.

**E**$^x$**ponent**®

*Failure Analysis Associates*®

Exponent
149 Commonwealth Drive
Menlo Park, CA 94025

telephone 650-326-9400
facsimile 650-326-8072
www.exponent.com

### Joseph F. Rakow, Ph.D., P.E.
**Principal Engineer**

### Professional Profile

Dr. Joseph Rakow is a Principal Engineer in Exponent's Mechanical Engineering practice. Dr. Rakow advises clients on complex engineering problems from design, manufacturing, and qualification, to field use and field failures, with particular expertise in failure analysis. He leads diverse multi-disciplinary investigations to deliver scientific answers to clients' technical problems. Dr. Rakow has expertise in the areas of mechanical, structural, and aerospace engineering, with extensive experience involving a wide variety of devices and components: gas, steam, and wind turbines; aircraft and spacecraft; pumps, tanks, and pipelines; cars and trucks; cranes and lifts; consumer products; sporting equipment; and a variety of civil structures. Dr. Rakow employs laboratory experimental methods supplemented with theoretical and numerical analysis to identify and illustrate scientific solutions for clients.

Dr. Rakow has published a number of scientific articles and is frequently invited to present at national and international technical conferences, where he is well known for the failure analysis of composite structures. He is a contributing author to the International Civil Aviation Organization (ICAO) *Manual of Accident and Incident Investigation*, having contributed the chapter on composites. He teaches introductory composites courses to professional engineers through the American Society of Materials. He is also a Visiting Lecturer in the Aeronautics and Astronautics Department at Stanford University. Prior to joining Exponent, Dr. Rakow held teaching and research positions at the University of Michigan and Sandia National Laboratories. As a volunteer, Dr. Rakow is a structural specialist with FEMA Urban Search & Rescue.

### Academic Credentials and Professional Honors

Ph.D., Aerospace Engineering, University of Michigan, 2004
M.S., Aerospace Engineering, University of Michigan, 2000
B.S., Physics, University of California, Davis, 1999

Top Conference Paper, International Society of Air Safety Investigators, 2006
Best Student Paper Award, American Institute of Aeronautics and Astronautics, 2004
Rollin M. Gerstacker Graduate Research Fellowship, University of Michigan, 1999
Citation of Excellence in Physics, University of California, Davis, 1999

Tau Beta Pi Engineering Honor Society; Sigma Pi Sigma Physics Honor Society

### Licenses, Certifications, and Training

Registered Professional Mechanical Engineer, California, #M33403
Registered Professional Civil Engineer, California, #C76562

Class A California commercial driver's license with doubles/triples and air brake ratings (expired)
NAUI certified SCUBA diver
University of Southern California Aircraft Accident Investigation Course
FEMA Urban Search and Rescue Program, Structure Specialist

## Patents

Patent No. 7814597: Method and Apparatus For Determining Cloth And Fluid Motion In A Washing Machine, October 2010 (with J.M. Fife and A. Starkie).

Patent No. 8080498: Elastic Hollow Particles for Annular Pressure Buildup Mitigation, October 2009 (with P.D. Pattillo and J.E. Shepherd).

Patent Application No. 60/791,279: Convectively Cooled Sandwich Panel for Structural and Heat Exchange Applications, April 2006 (with A.M. Waas).

## Publications

Rakow AS, Edmonds JS, Rakow JF, Brody RD. Root cause failure analysis of a 373 megawatt steam turbine generator exhibiting both reversible and irreversible thermal sensitivity. Proceedings, ASME 2011 Power Conference, July 2011.

Rakow AS, Caflisch ML, Rakow JF. The role and process of machinery root cause failure analysis. Proceedings, Machinery Failure Prevention Technology Conference, April 2010.

Rakow JF, Pettinger AM. Failure analysis of composites: Sandwich structures. Adv Mater Processes 2009; 167(8):24-26, August.

Rakow JF, Pettinger AM. Failure analysis of composites: Laminate behavior. Adv Mater Processes 2009; 167(7):16-18, July.

Rakow JF, Pettinger AM. The emergence of composite aircraft: An introduction for aviation attorneys. Proceedings, SMU Air Law Symposium, February 2009.

Rakow JF, Pettinger AM. Failure analysis of composite structures in aircraft accidents. ISASI Forum, January-March 2007, p.17-23.

Rakow JF, Pettinger AM. Failure analysis of composites: A manual for aircraft accident investigators. First Edition, International Society of Air Safety Investigators, 2007.

Rakow JF, Waas AM. Response of actively cooled metal foam sandwich panels exposed to thermal loading. AIAA Journal 2007; 45(2):329-336.

Rakow JF, Waas AM. Thermal buckling of metal foam sandwich panels for convective thermal protection systems. J Spacecraft Rockets 2005; 42(5):832-844.



Rakow JF, Waas AM. Size effects and the shear response of aluminum foam. Mech Mater 2005; 37(1):69-82.

Rakow JF, Waas AM. Thermomechanical response of actively cooled metal foam sandwich panels for thermal protection systems. Paper #2005-1953, AIAA Structures, Structural Dynamics, and Materials Conference, Austin, TX, April 2005.

Rakow JF, Waas AM. The response of actively cooled metal foam sandwich panels to thermal loads. Symposium on Materials and Structural Systems for Hypersonic Vehicles, ASME International Mechanical Engineering Conference, Anaheim, CA, November 2004.

Rakow JF. Thermomechanical response of metal foam sandwich panels in structural thermal protection systems for hypersonic vehicles. Ph.D. Dissertation, University of Michigan, Department of Aerospace Engineering, 2004.

Rakow JF, Waas AM. Thermal buckling of metal foam sandwich panels for actively cooled thermal protection systems. Paper #2004-1710, AIAA Structures, Structural Dynamics, and Materials Conference, Palm Springs, CA, April 2004.

Rakow JF, Waas AM. Size effects in metal foam cores for sandwich structures. AIAA Journal 2004; 42(7):1331-1337.

Rakow JF, Waas AM. The effective isotropic moduli of random fibrous composites, platelet composites, and foamed solids. Mech Adv Mater Struct 2004; 11(2):151-173.

Rakow JF, Waas AM. Size effects in metal foam cores for sandwich structures. Paper#2003-1946, AIAA Structures, Structural Dynamics, and Materials Conference, Norfolk, VA, April 2003.

Rakow JF, Waas AM. Shear deformation of aluminum foam produced by the melt route. Paper#P033, EuroFoam, Manchester, U.K., July 2002.

**Selected Presentations**

Rakow JF. An interactive case study on composite failure analysis. MS&T, Columbus, OH, October 2011.

Rakow JF. The role of manufacturing in solving composite product failures. Composites, Las Vegas, NV, February 2010.

Mitchell EA, Schwall ML, Rakow JF. Bicycle failure analysis and product liability. Interbike, Las Vegas, NV, November 2009.

Caflisch ML, Rakow JF. Failure analysis and reliability of wind turbines. Windpower, Chicago, IL, May 2009.



Rakow JF. Thermostructural failure in aviation-related accidents and incidents. Annual Conference of the International Society of Air Safety Investigators, Fort Worth, TX, September 2005.

Rakow JF, Waas AM. Thermomechanical response of metal foam core sandwich structures for hypersonic vehicles. Symposium on Materials and Structural Systems for Hypersonic Vehicles, ASME International Mechanical Engineering Conference, Washington, D.C., November 2003.

Rakow JF, Waas AM. Shear response of metal foams. Annual Meeting of the Society of Engineering Science, Ann Arbor, MI, October 2003.

Rakow JF, Waas AM. Metal foam sandwich structures for crashworthy applications. Automotive Composites Consortium, Ann Arbor, MI, November 2002.

Rakow JF. Bounds on elastic moduli for composite materials and metal foams. Sandia Summer Seminar Series, Livermore, CA, August 2001.

Rakow JF, Dike JJ. A comparison of inter-element continuity of stress-based quantities in hex and the finite element schemes in DOE in-house codes. Sandia Summer Seminar Series, Livermore, CA, August 2000.

**Invited Presentations**

Rakow JF. Tutorial: Investigating composite structures. International Society of Air Safety Investigators, Vancouver, Canada, August 2013.

Rakow JF, et al. Failure analysis: The science of what went wrong. ASME Professional Development Seminar, Santa Clara, CA, March 2013.

Rakow JF. Resolving marine claims with engineering and science. International Union of Marine Insurance, Paris, France, September 2011.

Rakow JF. Failure analysis of satellite components. Space Systems/Loral Bob Dodd Seminar, Palo Alto, CA, February 2009.

Rakow JF. Failure analysis of composite structures in aircraft accidents. Symposium on International Challenges in the Investigation of Air Accidents under Safety Management Systems, Santiago, Chile, November 2007.

Rakow JF. MRO and NDT: Managing damage and failure in composite aircraft structures. Swiss Re Center for Global Dialogue, Zurich, Switzerland, January 2007.

Rakow JF, Pettinger AM. Failure analysis of composites in aircraft accidents. New York City Bar Association, Aeronautics Committee, January 2007.



Rakow JF. Structural instabilities in advanced aerospace structures-Experimental and analytical techniques. Invited Speaker, NextGen Aeronautics, Torrance, CA, August 2004.

Rakow JF. Development of an advanced structural thermal protection system for aerospace vehicles. Invited Speaker, Aerospace Corporation, El Segundo, CA, April 2004.

## Book Chapters

Rakow JF, Pettinger AM. Chapter 9. Structures Investigation: Composite Materials. Manual of Aircraft Accident and Incident Investigation, Part III, International Civil Aviation Organization, Doc 9756-AN/965.

## Television

"Hijack," Surviving Disaster, Freemantle Media, October 2009.

"Plastic Planes," Dan Rather Reports, HDNet, September 2007.

"MythBusters: Shredded Airplane," Discovery Channel, September 2005.

"Coming Home: The Science of Re-entry," Discovery Channel, May 2003.

## Editorships and Editorial Review Boards

- Working Group Chair, Composite Materials Handbook CMH-17
- Reviewer, Journal of Composite Structures
- Reviewer, Fatigue and Fracture Technical Committee, Society of Experimental Mechanics

## Professional Affiliations

- American Society of Mechanical Engineers
- American Institute of Aeronautics and Astronautics
- American Society of Materials
- International Society of Air Safety Investigators



## Appendix C

## Deposition and Trial Testimony

# Deposition and Trial Testimony, Past Four Years

## Trials and Arbitrations

1. *Hilltop Ranch Inc. v. Buhler Barth GmbH,* International Chamber of Commerce, International Court of Arbitration, Paris, France, ICC Cases No. 20774/RD, April 2016.

2. *Rick Pratt v. Easton Technical Products, et al.,* Court of Common Pleas, Stark County, Ohio, Case No. 2011CV02511, June 2013.

## Depositions

1. *Woody Contracting, Inc. v. Kaman Corporation, et al.,* United States District County for the District of Connecticut, Case No. 3:12-CV-01010-AVC, October 2014.

2. *Rick Pratt v. Easton Technical Products, et al.,* Court of Common Pleas, Stark County, Ohio, Case No. 2011CV02511, May 2013.

3. *David Aguado v. Time Manufacturing, et al.,* Superior Court of New Jersey, Law Division – Atlantic County, Docket No. ATL-L-8778-11, May 2013.

4. *Bronco Professional Park v. Tina Dhillon, Clovis Valley Plumbing, et al.,* Superior Court of California, County of Madera, Case No. MCV050582 with MCV054745, January 2013.

5. *Shrodric McGee v. Anheuser-Busch; Seaworld; Bolliger & Mabillard; et al.,* District Court of Bexar County, Texas, Cause No. 2009-CI 12376, September 2012.

## Appendix D

## Compensation

## Compensation

My hourly billing rate for 2016 is $430, as set by my employer, Exponent, Inc.

## Appendix E

## Exhibits

## Exhibits

I have not yet prepared exhibits for trial.



# Investigative Report

Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A



EXHIBIT

I



4215 Campus Drive
Aurora, IL 60504

# Investigative Report

Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A

**Report Prepared for:**

Mr. Robert W. Shively
Shively & Lannin, PC, L.L.O
4400 S. 86th Street, Suite 100
Lincoln, NE 68526

**Submitted by:**

June 27, 2016
Date

Anand R. Shah, M.S., M.B.A. P.E.
Senior Managing Consultant
IL P.E. | Expires:  November 30, 2017

**Technical Review by:**

June 27, 2016
Date

Pierce D. Umberger, Ph.D.
Senior Staff Consultant

This report and its contents are the Work Product of Engineering Systems Inc. (ESI).  This report should only be duplicated or distributed in its entirety.  This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESI at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESI © 2016 – All Rights Reserved

## Introduction

Engineering Systems, Inc. (ESI) has been retained by Robert W. Shively, of Shively & Lannin, P.C, L.L.O. to provide materials engineering consulting related to a litigation matter in the United States District Court, District of Nebraska, titled Keaschall v. ALTEC Industries, Inc. (Altec) and Osborne Industries, Inc. (Osborne), Case No. 4:14-cv-03070. The matter arises from a failure of a fiberglass platform that occurred on June 6, 2012.

ESI is a professional engineering and consulting firm and a laboratory headquartered in Aurora, Illinois. ESI is a multi-disciplinary company, which provides professional engineering services to industrial, legal and insurance firms, government agencies and trade organizations, and provides consulting to other engineering firms. The laboratory capabilities are supplemented by cooperative agreements with other recognized facilities to provide a wide range of technical support capabilities, including metallurgical, materials, mechanical, aeronautical, structural, civil, electrical, safety, automotive and audio/visual services. Projects ranging from simple failure investigations to complex engineering studies are undertaken.

ESI's investigation focused on the root cause for the failure of a fiberglass platform on a Dawson Public Power District (Dawson Power) truck. ESI's investigation included review of the incident scene photos, examination of the subject fiberglass platform, testing of the subject fiberglass platform, as well as examination and testing of other exemplar fiberglass platforms, a review of technical reports authored by Plaintiffs' experts, a review of discovery documents, and review of other relevant technical literature.

This report details the findings and opinions expressed by Anand R. Shah, M.S., M.B.A, P.E., pertaining to the engagement described above. This report summarizes the opinions reached and the basis for those findings. ESI reserves the right to clarify or supplement this report, if warranted, as new information becomes available. Attached hereto are the curricula vitae of Anand R. Shah, M.S., M.B.A., P.E., which set forth pertinent qualifications and experience, and list the technical presentations and publications authored (Appendix A). Also attached is a listing of depositions and trials wherein expert testimony has been given over the last four years (Appendix B). ESI currently bills Mr. Shah's time at $325 per hour for research and analysis in this matter.

Report figures, photographs, video, excerpts from literature and other materials reviewed may be utilized at the time of trial as demonstrative exhibits.



Keaschall (Julie), et al. V. Altec Industries, et al.                                    Page 3 of 26
ESI Project: 47413A                                                                      June 27, 2016

## Background

The subject truck, Dawson Power vehicle number 3505 was a 2005 model year International 7300, VIN 1G2HX54KXY4195606, fitted with an Altec AA-755 aerial lift device and fiberglass two-man side-hung 700 lb capacity platform, serial number OSB39386.[1,2,3] The at-issue vehicle was ordered by the Dawson Public Power District on or about November 16, 2004.

Witnesses indicate that the decedent, Kurtis Keaschall, was in the platform bucket decommissioning a utility pole on June 6, 2012, when the platform separated from the boom.[4]  Mr. Keaschall was wearing a fall protection device, but the device lanyard had not been attached to the anchor point on the lift boom.  Both ends of the lanyard appeared to be intact and attached to the D-ring at the back of the fall protection harness.[5]

The exact mileage of the vehicle at the time of the incident is not known, however, upon return to the Dawson County storage facility, the vehicle odometer indicated 93,975 miles.  Precise maintenance history for the vehicle and equipment is not known, but the truck bears an inspection sticker from Consolidated Fleet Services, Inc., with a date of February 15, 2012.

---

[1] Sherman County Sheriff Incident Report I1206-03-0

[2] Altec purchase order 5549, dated November 16, 2004

[3] Altec specification sheet for PO 5549, undated

[4] Sherman County Sheriff Incident Narrative I206-03

[5] Sherman County Sherriff Photos, dated June 6, 2012



Keaschall (Julie), et al. V. Altec Industries, et al.                                      Page 4 of 26
ESI Project: 47413A                                                                           June 27, 2016

## Basis for this Report

This report is based on a review of the documents listed below, and on the inspections conducted as indicated below. The education and experience of the author also served as a basis for this report.

### Received Documents

- Affidavit of Joseph Rakow in Support of Osborne Industries' Motion to Compel Discovery;
- Affidavit of John Eihusen (Plaintiff Expert) in Response to Osborne Industries' Motion to Compel and attached Exhibit A;
- Memorandum and Order filed December 21, 2015;
- John A. Eihusen's draft report dated March 3, 2016;
- Protocol for Destructive Testing of the Subject Platform dated February 19, 2016;
- Deposition of Amy Conrad dated February 17, 2015, with Exhibits;
- Deposition of Michael David Moore dated April 2, 2015;
- Deposition of George Eakin dated February 17, 2015, with Exhibits;
- Deposition of Joshua Chard dated April 2, 2015;
- Deposition of Ryan McKinney dated April 2, 2015;
- Black light photos of bucket received from the Attorney for Dawson Public Power District;
- X-ray imagery of failed bucket received January 20, 2016;
- FARO scans taken by Ben Railsback, Knott Laboratory, July 13, 2015;
- Altec test reports received July 6, 2015;
- Inspection photographs taken July 22, 2014 (unknown source);
- Photographs taken at site by Dawson Public Power District (DPPD) June 12, 2012;
- Inspection photographs taken by Mike Moore June 8, 2012 (Deposition Exhibit);
- Photographs taken at site by Sherman County Sheriff June 6, 2012;
- Any and all photos taken and information gathered on the inspections that took place July 13, 2015, April 27, 2016, and June 17, 2016;
- Altec Protective Order dated December 5, 2014;
- Altec Responses to RFP dated October 13, 2014;
- Altec Supplemental Responses to RFP dated December 31, 2014;
- DPPD Responses to RFP dated May 19, 2015;
- Affidavit of John Eihusen dated November 11, 2015;
- Osborne Responses to RFP dated January 14, 2015;
- Affidavit of Joseph Rakow dated November 17, 2015;
- Complaint filed March 31, 2014;
- Altec Service Records;
- Sherman County Sheriff Report dated June 11, 2012;
- Ravenna Fire Rescue Records dated June 6, 2012;
- Protocol for Destructive Testing of the Subject Platform dated July 8, 2015;
- John Eihusen report dated September 26, 2015;
- William Coleman report dated September 30, 2015;
- AEM (Assn of Equip Mfrs) Aerial Devices Safety Manual (1998);
- Altec Operator's Manual (2004);
- Altec Maintenance and Parts Manual (2004);
- Altec Self-Directed Sentry Operator Safety Training Workbook (2012);
- EN-241-P Altec Fiberglass Platform Construction Procedure rev. 2014-01-28;



4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 258 of 288 - Page ID # 2726

Keaschall (Julie), et al. V. Altec Industries, et al.                    Page 5 of 26
ESI Project: 47413A                                                      June 27, 2016

- Drawing 704-00065 (Mold) 1986-08-16 (rev G 2006-09-29);
- Drawing 704-0350 (Fiberglass) 1993-08-03 (rev F 2008-11-19);
- PUN 2010A, Secondary Lanyard Attachment (2010-07-23);
- Altec Build Records;
- Medical Records from Good Samaritan (2012-06-06)
- Summary Report from Mike Moore dated June 12, 2012
- Altec Document Production
- Osborne Document Production
- Plaintiffs Document Production
- Supplemental Protocol for Destructive Testing of the Subject Platform dated October 2, 2015
- MAI Sample Collection Recommendations and EDS Description
- Plaintiffs' Expert Witness Disclosures dated September 30, 2015



Keaschall (Julie), et al. V. Altec Industries, et al.                                   Page 6 of 26
ESI Project: 47413A                                                                      June 27, 2016

## Review of Scene Photos

ESI reviewed the scene photos taken on June 6, 2012 by Sherman County Sheriff's department.  Select photos are discussed here to provide relative orientation information of the objects and details of the incident.  Photos 1 and 2 show the incident scene from two different positions. The Dawson truck was found positioned parallel and in close proximity to the pole as shown in Photo 1.  The truck outriggers are extended stabilizing the truck and the boom was extended.  The bottom and top boom are oriented and extended such that the platform front (away from the rib attachment) would have been facing away from the front of the truck. In the lower right corner of Photo 1, the final rest location of the subject platform can also be observed.

Photo 2 shows the subject platform completely in view as well as the orientation of the truck, and the pole. Additionally, the damaged railing above the rear tire on the driver side of the Dawson Power truck can also be observed. Prior to landing on the ground, the platform impacted a horizontal rail located above the rear tire on the driver side of the truck causing it to bend as shown in Photos 3 and 4. Based on red paint markings on the exterior surface of the platform, the location of the impact on the platform was at the right-hand side front corner, if one was in the platform and facing towards the front of the platform (away from rib attachment side). In Photo 5, the side of the platform that remained attached to the aerial lift is shown from two vantage points.



Photo 1: Incident scene photo taken by Sherman County Sheriff's department.





Photo 2: Incident scene photo taken by Sherman County Sheriff department.



Photo 3: Incident scene photo taken by Sherman County Sheriff's department.  The damage to the horizontal railing from impact of the falling platform is shown.  The railing is located on the driver side of the truck above the rear tire of the truck.





Photo 4:  Incident scene photo taken by Sherman County Sheriff's department.  A close up of the damage to the horizontal railing.



Photo 5: Incident scene photos taken by Sherman County Sheriff's department.  The portion of the platform that remained attached to the aerial lift and relative orientation of the aerial lift to the pole and truck is shown.



4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 262 of 288 - Page ID # 2730

Keaschall (Julie), et al. V. Altec Industries, et al.                                    Page 9 of 26
ESI Project: 47413A                                                                        June 27, 2016

Based on the review of the scene photos, it is concluded that the fiberglass platform fractured and separated from the rib side and travelled in the direction of the truck at a velocity that resulted in sufficient impact force to bend the railing before reaching the ground.

## Inspection of Subject Platform

The subject platform was inspected by ESI on July 13, 2015 at a storage facility in Lincoln, Nebraska, and again on April 27, 2016 at the Exponent Laboratory in Menlo Park, California. All parties were present at both of the inspections. As shown in Photo 6 and apparent from the scene photos, the platform exhibited a separation of the mounting rib side from the platform. The imprint on the rib side of the platform indicated that the Platform serial number was OSB39386. The fracture initiated in the area of the rim, adjacent to the mounting rib, shown in Photo 7. Although a number of surface cracks exist in this area, it is clear that the fracture occurred relatively close to the bottom of the rim. The surface cracks appear to have existed at the time of the incident and the crack opening displacement appears not to have changed in the accident. A paper label adhering to outer surface of the fractured rib side provided the following product information:

Altec Part Number 070400541          Container#B21505
Quantity 1                           Supplier Part: FC-135410
Supplier: Osborne Industries         Ship To:
PO Number 31712                      Altec Industries, Inc. 093- Midwest Aerial Mfg.
Release 244                          2106D S. Riverside Road
                                     St. Joseph, MO 64507

On April 27, 2016, a joint inspection was held in a laboratory to examine the fracture morphology at three locations and perform material analysis on the fiberglass reinforced plastic material of the platform. All parties agreed to cut out smaller samples to facilitate examination and testing at locations identified as "A", "B", and "C" in Photo 8. A small piece from area marked as "A" was cut during the inspection on April 27, 2016 and examined both in optical and scanning electron microscope. It was observed during cutting of a small sample at this location that the surface micro-cracks visible in Photo 7 do extend several inches along the rim of the platform, as shown in Photo 9.

A Scanning Electron Microscope (SEM) was used to obtain images of the fracture locations identified as "A" and "B". SEM images shown in Photos 10 and 11 of the fracture from location "A" and location "B" reveal a fracture surface morphology that is indicative of overload failure of the platform. Photo 11 shows number of glass fiber ends that fractured in the cracking of the platform. The fracture surface morphology is consistent with tensile overload failure at location "B". There is proper adhesion between the fiber and matrix material. There is no evidence of fiber pull out. At location "A" the fracture morphology shows fibers that run mostly parallel to the crack surface indicating fracture occurred in shear. As will be discussed later in this report, the location of the failure and the observed damage on the subject platform is consistent with the location of failure observed in a side-load testing of similar platform conducted by Altec in 2002.



4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 263 of 288 - Page ID # 2731

Keaschall (Julie), et al. V. Altec Industries, et al.                    Page 10 of 26
ESI Project: 47413A                                                      June 27, 2016



Photo 6. Subject platform without the fractured rib section (left) and with the fractured rib section (right).



Photo 7. Fracture initiation region at rim in vicinity of mounting rib. (Side view (left). Bottom view (Right))



Keaschall (Julie), et al. V. Altec Industries, et al.          Page 11 of 26
ESI Project: 47413A                                                June 27, 2016



Photo 8:  Locations of interest marked as "A", "B", and "C".



Photo 9: Cut location and polished cross-section few inches from the fracture at location "A".



Keaschall (Julie), et al. V. Altec Industries, et al.                                   Page 12 of 26
ESI Project: 47413A                                                                      June 27, 2016



Photo 10:  Fracture at location "A" shows cracking developed along fibers due to shear loading.



Photo 11: Fracture at location "B" shows fractured ends of glass-fiber reinforcement.

The fiberglass material from the subject platform was subjected to Fourier transform infrared spectroscopy (FTIR), differential scanning calorimetry (DSC), and thermogravimetric analysis (TGA).  The resin used in the subject platform was listed as "CORESYN" [sic] in the platform inspection report.[6]  It is possible that this refers to CoREZYN, a commercially available line of resins commonly used for composite manufacturing.  The material characterization in FTIR is consistent with an ester resin such as CoREZYN.  FTIR analysis was also performed on yellow debris present at location "A".  FTIR analysis suggested that the yellow debris is similar in its chemical composition to the clear white resin material tested at location "C".

The weight percentage of glass fiber was measured at the fracture location "A" and "C" by heating a sample in TGA up to 600 C. The weight percentage of glass fiber at location "A" and "C" was 16.1% and 13.7% respectively. Significant experimental error of the weight percentage of glass fiber is expected using this test method, as only milligrams of sample is tested and the test sample is taken from a fractured area that has been exposed to

---

[6] OI00033, Osborne Industries Aerial Platform Inspection Report, dated March 29, 2005



4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 266 of 288 - Page ID # 2734

Keaschall (Julie), et al. V. Altec Industries, et al.                                    Page 13 of 26
ESI Project: 47413A                                                                        June 27, 2016

environment.  For accurate determination of the weight percentage of glass fiber a representative sample of full cross-section would have to be tested. The examination of the platform, the laboratory material testing, and the high-magnification documentation of the fracture surface morphology provided evidence to conclude that composite material failed from overloading experienced by the platform.

## Inspection of Exemplar Platforms

On June 17, 2016 ESI traveled to Altec Nueco in Ft. Wayne, Indiana for examination and testing of exemplar platforms. ESI examined and tested platforms from two trucks equipped with AA755 type aerial lift. The platforms were identified as Altec Part #07040054. Altec's records indicated that the platforms had been in service for approximately 1.5 and 4 years.

The platforms were closely inspected for any signs of cracking near the rim and at rib connections. One truck with ID# 95-37164530 had a platform with serial # OSB78768. Altec records indicated that although the truck was a 2007 model International 43000 DT466, the platform had an approximately 1.5 year service history. A second truck with ID#95-39175735 had a platform with serial # OSB62187. Altec records indicated that although the truck was a 2007 model International 4300DT 466, the platform had an approximately 4 year service history.

Photos 12 and 13 show that similar to the subject platform both of these exemplar platforms had small surface cracks at the rim in the vicinity of the rib connection.  This observation indicates that surface cracking observed on the subject platform is a common occurrence for platforms as a result of service.

After a visual examination, both exemplar platforms were tested with 1050 lbs of vertical load.  A vertical force of 1.5x the load capacity of the platform was applied to the platforms as shown in Photos 14 and 15. Based on review of the documents this is one of the requirements in the ANSI 92.2 standard and performed on all Altec trucks.  The 1050 lbs of force, which is 1.5x the 700 lbs. rating of the platform, is significantly higher than that would be expected under normal use conditions.  Prior to loading the platforms, a Dillon Dynamometer with 10,000 lbs capacity with 50 lbs increments was used to verify that the weight in the test was 1050 lbs.  The two platforms tested resisted 1050 lbs of force for up to 5 minutes of loading without any signs of failure.  The platforms were inspected after the vertical load test and there was no visible crack opening of the surface cracks present, nor any gel coat damage or cracking of any kind observed.

Subsequently, the platform side with the ribs was cut from the platform and X-ray images were obtained of the rim section above the mounting ribs.  The X-ray images of these two exemplar buckets are provided in Photos 16-19.  The X-ray images revealed the presence of the same features in the rim of these two platforms that the Plaintiffs have documented in the subject and in another exemplar platform removed from service by Dawson Power.  As discussed below, the accurate description of these features is discontinuities or flaws and not manufacturing defect since their presence has no direct effect on the ability of the platform to carry loads well in excess of its design load.



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A



Photo 12: A view of the top rim of the bucket just above the mounting ribs that exhibited surface micro-cracking in platform marked as OSB62187.



Photo 13: A view of the top rim of the bucket just above the mounting ribs that exhibited surface micro-cracking in platform marked as OSB78768.



Keaschall (Julie), et al. V. Altec Industries, et al.

ESI Project: 47413A



Photo 14: Vertical static load test of 1050 lbs applied for 5 minutes on exemplar OSB 62187 fiberglass platform.



Photo 15: Vertical static load test of 1050 lbs applied for 5 minutes on exemplar OSB 62187 fiberglass platform.





Photo 16: OSB 78768 Platform X-ray image.



Photo 17: OSB 78768 Platform X-ray image.



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A

Page 17 of 26
June 27, 2016



Photo 18: OSB 62187 Platform X-ray image.



Photo 19: OSB 62187A Platform X-ray image.



Keaschall (Julie), et al. V. Altec Industries, et al.                                Page 18 of 26
ESI Project: 47413A                                                                  June 27, 2016

The Plaintiffs' experts allege that similar features which are present in the subject platform are manufacturing defects that contributed to the failure of the subject platform. However, as demonstrated by the current testing, these features are present on other Osborne manufactured platforms that are in service and with them present the platform is able to carry at least 1.5x the load capacity.

According to ASM Materials Engineering Dictionary[7], a defect is defined as a (1) discontinuity whose size, shape, orientation, or location makes it detrimental to the useful service of the part in which it occurs. It further explains (2) that a discontinuity or discontinuities which by nature or accumulated effect (for example, total crack length) render a part or product unable to meet minimum applicable acceptance standards or specifications.

A discontinuity is defined as (1) any interruption in the normal physical structure or configuration of a part, such as a cracks, lap seams, inclusions, or porosity. A discontinuity may or may not affect the utility of the part. It further states that a discontinuity is not necessarily a defect.

Thus, the observed surface cracking and subsurface delamination are not defects but discontinuity and its presence does not affect the utility of the part.

## Discussion

## 1) Platform Requirements

The Fiberglass reinforced plastic material and platform specification are provided by Altec in Altec document titled "Fiberglass Platform Construction"[8]. The origin date of this document is May 22, 1986. Altec specified the fiberglass reinforced plastic material for the platform to meet the following properties:

| | |
|---|---|
| Barcol Hardness using 934 scale | 45 to 55 |
| Flexural Strength | 17500 PSI |
| Flexural Modulus | .74 x 10 E6 |
| Tensile Strength | 6350 PSI |
| Tensile Modulus | $1.39 \times 10^6$ PSI |
| 24 hour water absorption rate | .129% (By Weight) |
| Glass to resin ratio | 26% |

The tensile strength, flexural strength, and modulus, as well as other constitutive properties that are specified are typical and in line with fiberglass composite materials frequently used in industry.[9] In terms of composite

---

[7] ASM Materials Engineering Dictionary edited by J. R. Davis, Copyright 1992

[8] Altec Fiberglass Platform Construction Specification EN-241-P

[9] MFG Companies Technical Design Guide for FRP Composite Products and Parts, p. 22



4:14-cv-03070-RGK-CRZ   Doc # 117-1   Filed: 05/10/17   Page 272 of 288 - Page ID # 2740

Keaschall (Julie), et al. V. Altec Industries, et al.                                    Page 19 of 26
ESI Project: 47413A                                                                      June 27, 2016

homogeneity and finish requirements, Altec specifies that the platform must be constructed without voids, dry spots, or resin rich regions.[10]

Altec also specifies that platforms meet or exceed an ultimate strength test of 12 times their load capacity (8,400 pounds in the case of the at-issue platform) before final failure of the platform.[11]  This requirement is well in excess of the regulatory requirements set forth in ANSI A92.2, which requires stresses in the platform remain at 20% or less of their ultimate strength value[12], effectively a load factor of 5 as opposed to Altec's specification of 12.  A side load strength of minimum of 500 pounds are also required, with damage to the gel coat allowed, but other structural damage forbidden.[13]  As discussed later, the designed platform exceeds the side load strength requirement by significant margin.

Altec practices testing of 100% of completed units in compliance with ANSI A92.2 and conducts a stability test with the platform loaded to 150% (1.5X load capacity) of its design rated load.[14]  Individual platforms are received from Osborne and installed after passing a visual inspection.[15]

## 2)  Prior Platform Testing by Altec

Review of testing data provided by Altec showed that a number of tests in various loading directions on a platform identified as TR-00141 was performed in 2002.  The TR-00141 type platform (model 704-00541)[16] is similar to the subject platform. The platforms tested by Altec in 2002 passed all the qualification testing requirements.[17]  The data is summarized in Table 1 below.

| Platform | Ultimate (lbs.) | Safety Factor | Test Description |
|---|---|---|---|
| A | 6,900 | 8.6 | Loaded downward at center of platform. |
| A2 | 11,700 | 14.6 | Loaded downward at center of platform. |
| B | 4,400 | Na | Loaded upward at center of platform. |
| C | 11,500 | 14.4 | Loaded downward at center of platform. |
| H | 2,300 | Na | Loaded horizontally at lip of platform. |
| G | 2,200 | Na | Loaded horizontally at lip of platform. |
| F | 3,900 | Na | Loaded downward at outside lip of platform. |

Table 1:  Results of Altec Testing of Platforms TR-00141 in 2002.

---

[10] Altec Fiberglass Platform Construction Specification EN-241-P, sections 2.4.3 – 2.4.4

[11] Altec Fiberglass Platform Construction Specification EN-241-P, section 2.2.3

[12] ANSI A92.2-2001, *American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices*, Section 4.2

[13] Altec Fiberglass Platform Construction Specification EN-241-P, section 2.2.2

[14] Deposition of Joshua Chard, dated April 2, 2015, pp. 29-30

[15] Deposition of Ryan McKinney, dated April 2, 2015, p. 24

[16] Altec Test Report Summary Sheet for Test Report TR-00141, dated December 13, 2002

[17] Tr00141 Test Report NES 705-00541 Platform Test 12-13-02



4:14-cv-03070-RGK-CRZ Doc # 117-1 Filed: 05/10/17 Page 273 of 288 - Page ID # 2741

Keaschall (Julie), et al. V. Altec Industries, et al.                    Page 20 of 26
ESI Project: 47413A                                                     June 27, 2016

Additionally, Altec specifies a non-destructive quality assurance test for platform strength, prescribing a load of 3 times the rated load (2,100 pounds total in the case of the at-issue platform) be placed within the platform. Absolutely no damage, including gel coat cracking is allowed.[18,19] Long-term durability testing in which repeated loading is applied was also conducted by Altec on similar platform as the subject platform. It was found that no damage or cracking resulted from repeated loading of 100,000 cycles at twice the platform's rated load capacity.[20]

## 3)  Side loading of Exemplar Platform

In side loading test described as Test G in Table 1 above, the fracture occurred in the same location as that in the subject platform. The fracture in side loading test is shown in Photo 20.[21] The plot of the force required for this failure is shown in Photo 21 and indicates that force in excess of 2000 lbs is required for the failure.

A side load applied to the platform can generate substantial bending moments in regions of the platform rim and rib, depending on the location and magnitude of the applied side load. A moment, generated when an applied force is reacted over a distance, known as a "moment arm" generates bending in the structure, illustrated schematically in Photo 22. In the case of the at-issue platform, a moment arm of up to 24 inches can generate bending moments of 2 ft-lb for every 1 lb of applied load. The fixed point of the ribs mounted to the boom assembly reacts both the sideways load, as well as the bending moment at a fixed point. This same bending moment is also present in the corners of the platform rib, and is consistent with gel coat cracking observed in the corners of both subject and side-loaded exemplar platforms. (Photos 23 and 24) While not inspected by ESI, the subject vehicle was inspected by Michael Moore of Altec. Spiral cracking was noted on the fiberglass boom, which – while not a structural issue in and of itself – can be an indicator of previous overloading of the boom and/or platform.[22]

Based on the information reviewed Altec Part #07040054 platform manufactured by Osborne Industries has been tested to ensure that failure does not result from normal loading of the platform in service. The platform is rated for a load capacity of 700 lbs and testing of similar platforms has shown ultimate strength well in excess of the specified ultimate strength requirement of 8400 lbs. which is 12x the load capacity.[23] Reportedly, Altec is not aware of any platform failures due to material defects, but is aware of a multitude of failures due to overloading of the platform.[24] Additionally, the extent of fracture which resulted in complete separation of the rib side, the platform has to have experienced excessive side loading and did not fail from normal operating loads. The county sheriff's report notes that the boom was approximately 3 feet from the utility pole at the time of the accident, "with the bucket present it would have been closer."[25].

---

[18] Altec Fiberglass Platform Construction Specification EN-241-P, section 2.3.2

[19] Deposition of Joshua Chard, dated April 2, 2015, pp. 36-37

[20] Deposition of Joshua Chard, dated April 2, 2015, pp. 110-111

[21] Altec Platform Test TR00141, Test G

[22] Deposition of Michael Moore, dated April 2, 2015, pp. 33-34

[23] Summary for Test Report TR-00141 NES 704-00541 Platform Test

[24] Deposition of Ryan McKinney dated April 2, 2015 p. 16.

[25] Sherman County Sheriff Incident Narrative I206-03



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A

Page 21 of 26
June 27, 2016



Photo 20. Platform test TR00141, Test G after side load failure.



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A

Page 22 of 26
June 27, 2016



Photo 21:  Graph of the force in lbs. required for ultimate strength test when platform is side loaded



Photo 22: Schematic illustration of moment generated at platform corner and rib due to side loading.



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A



Photo 23: Corner cracking of subject platform consistent with non-vertical loading. Similar cracking was observed at other corners.



Photo 24: Side load damage during test of Altec Platform 1928.[26]

---

[26] Altec Test Report for Platform 1928, TR00822



Keaschall (Julie), et al. V. Altec Industries, et al.
ESI Project: 47413A

Page 24 of 26
June 27, 2016

## Review of Expert Reports

1) Review of William R. Coleman, M.S., P.E Analytical & Materials Engineering, Inc. reported dated September 30, 2015

   ESI has reviewed a report authored by William R. Coleman of Analytical & Materials Engineering Inc., and ESI does not agree with the 5 opinions offered by Mr. Coleman as discussed below.

   In regards to Mr. Coleman's opinion #1 there is no evidence to support that "inherent manufacturing defects have been discovered in the subject Altec/Osborne lift bucket." The "defect" that Mr. Coleman is referring to are discontinuity and a feature that is common to other exemplars examined in this case. Testing has shown that their presence is not detrimental to the useful service of the part thus by definition these features and not defects.

   In regards to Mr. Coleman's opinion #2, Mr. Coleman again references the surface cracks as "fabrication defects which precipitated fracture and premature failure of the fiberglass man lift bucket." Mr. Coleman has no evidence to support that the extent and level at which the surface cracks are present in the subject platform are sufficient to cause failure under the loading of one operator and accompanying tools.

   In regards to Mr. Coleman's opinion #3, he has no engineering and scientific basis from having conducted only a non-destructive visual examination of the platform to opine that what he believes to be defect was "present at the time the man bucket left control of the manufacturer."

   In regards to Mr. Coleman's opinion #4, he is simply ignoring the condition of the subject platform that showed evidence of significant gel coat cracking, chipping, gauging, as well as spiral cracks on the boom and proceeds to offer a false opinion that "no indication of pre-existing damage that could have adversely affected performance of the man lift bucket, were observed."

   ESI does not agree with Mr. Coleman's opinion #5 and further claims the opposite that failure was caused by excessive side loading caused by the operator, Kurtis Keaschall. Mr. Coleman neglects to note that the decedent was wearing a fall protection device, and violated safety procedure by not attaching a lanyard present on the D-ring of the primary lift structure.

2) Review of John A. Eihusen, P.E., EiCon Services report, *Keaschall Failure Investigation*, dated September 26, 2015.

   ESI has reviewed a report authored by John A. Eihusen of EiCon Services, and ESI does not agree with opinions 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 offered by Mr. Eihusen as discussed below.

   In opinions 1, 2, and 3, Mr. Eihusen similar to Mr. Coleman references "flaws" and "defects" in the composite laminate. As previously discussed, this notion is not consistent with the ASM Materials Engineering Dictionary definition of a defect, as discontinuities are present in composite parts, and if accounted for in the design process, are not detrimental to a safe service life. Testing has shown that the at-issue platform model exhibits strength well in excess of its working load and, in fact, well in excess of its designed safety factor of 12 times the working load.



Mr. Eihusen does not provided an engineering or scientific basis for his opinions 4 and 5 regarding the source of the discontinuities in the subject platform. As previously discussed, discontinuities and voids are present in composite products as a matter of course (as they are in virtually all materials), and do not inherently constitute a defect or detriment to the strength and life of the component, given adequate design provisions.

Eihusen opinion 6 does not take into account the evidence observed in the at-issue platform that is consistent with an applied side overload. Eihusen opinion 7 attempts to suggest that the composite platform was compromised as opposed to the catastrophic failure of the bucket being triggered by excessive side loading.

Eihusen opinions 8 and 9 do not take into account the substantial damage and cracking observed in both the subject boom and platform. The extent of this damage is sufficient cause for evaluation and repair of the primary structure.

Opinion 10 neglects to note that there is a redundant structural component in the form of a D-ring provided to directly attach the operator to the primary boom structure to protect the user in the event of a platform incident. This D-ring was not in use by the operator at the time of the incident and would have restrained the operator and prevented the fall to the ground.

Opinion 11 does not address the fact that both single event and fatigue testing has been conducted by Altec, showing that overloads well in excess of the design working load, as well as 100,000 cycles of fatigue loading at twice the rated platform capacity did not produce failure of the platform. The material of construction was appropriate given the design and validation performed by Altec.

In addition, Mr. Eihusen claims Altec did not adequately warn of the dangers of the use of the bucket and the need for periodic inspection. Mr. Eihusen's claim has no merit as the Altec Operator's manual (2004) provides warnings related to the dangers of the use of the platform and instructs occupant to use appropriate OSHA approved personal fall protection system. Statements related to warnings can be found on page 17, page 19 and page 26.

## Conclusions

Based on our investigation, education, training and experience, ESI has reached the following conclusions to a reasonable degree of engineering certainty:

1. The root cause for the failure of the fiberglass platform on the Dawson Power truck is overloading from the side of the platform causing the catastrophic failure.

    a. The fracture occurred at the same location as an exemplar bucket that was tested in side loading.

    b. There is damage in the form of gel coat cracks at the corners of the bucket that is consistent with side loading.



Keaschall (Julie), et al. V. Altec Industries, et al.                    Page 26 of 26
ESI Project: 47413A                                                       June 27, 2016

  c. There is damage observed on the boom in the form of spiral cracks indicating excessive loading.

2. The fiberglass platform involved in this accident Altec Part # 07040054 is not defective in its design, manufacturing, or material.  The platform is not unreasonably dangerous for its intended use.

  a. Altec performed testing to relevant industry standards.  Altec tests 100% of the platforms in conformance with applicable ANSI standards.
  b. The test data on similar platforms show that the platform has a safety factor in excess of the 12x the rated capacity of 700 lbs in the direction of normal loading.
  c. The composite material properties requirement of Altec are common of materials for this application.

3. The presence of subsurface discontinuity and or surface micro-cracking in the rim should not be considered a defect as it is a manufacturing discontinuity that appears to be present in platforms manufactured by Osborne Industries.

  a. As shown by the testing conducted on exemplars with this discontinuity the platforms passed the stability test conducted at 1050 lbs or 1.5X the 700 lbs load capacity.

  b. The cracking and subsurface discontinuity was present in every platform examined by cutting and/or x-ray imaging.

4. The fall of Mr. Keaschall could have been prevented had Mr. Keaschall properly attached a lanyard securing himself to the D-ring intended for this purpose, which remained attached to the section on the upper boom.

The above represents ESI's opinions as of the date of this report.  ESI reserves the right to modify our opinions in this matter as new information becomes available.

✎ End of Report Text ✎

<u>Attachments</u>
Appendix A — CV of Author
Appendix B — Rule 26 of Author



# Appendix A

**CV of Anand R. Shah, M.S., M.B.A., P.E.**



4215 Campus Drive
Aurora, IL 60504

**ANAND (ANDY) R. SHAH, M.S., M.B.A., P.E.**
**SENIOR MANAGING CONSULTANT**
arshah@engsys.com

As a Senior Managing Consultant and a Director of the Polymer practice, Mr. Shah oversees materials and analysis personnel and related work across offices of Engineering Systems Inc.

Mr. Shah conducts and leads investigations on the performance of products made from plastics, composites, and elastomeric materials for use in diverse applications. He specializes in product failure analysis, material characterization testing, investigations on the appropriateness of the choice of materials for their intended application, evaluating the influence of processing parameters on product performance, and in evaluating product design. He has published his work in numerous technical journals and is a co-author of Fractography in Failure Analysis of Polymers book.

In his 20 years of experience, he has evaluated incidents related to product, systems, and component failures in plumbing, transportation, construction, electrical, oil and gas, chemical processing, medical, and consumer industry. His experience also includes investigating formulations of polymers in paints, coatings, adhesives, and in lubricants. He utilizes the study of interpretation of fracture surface features (Fractography) and principals of structure property relationship in polymers to provide solutions to plastic product performance and service life issues. Mr. Shah has provided testimony in matters pending before both state and federal courts.

## Areas of Specialization

| | |
|---|---|
| Plastic Failure Analysis | Environmental Stress Cracking in Plastics |
| Material Selection Consulting | Fatigue and Fracture Mechanics |
| Product Design Evaluation | Creep and Stress Rupture of Plastics |
| Chemical Compatibility Testing | Service Life Prediction |
| Analytical Testing | Non-Destructive Testing and Inspection |
| Mechanical Testing | |

## Education

B.S., Biomedical Engineering, Case Western Reserve University, Cleveland, Ohio, 1995
M.S., Macromolecular Science, Case Western Reserve University, Cleveland, Ohio, 1997
M.B.A., Business Administration, DeVry University, Chicago, Illinois, 2003

## Licensed Professional Engineer (P.E.)

IL (062.058788)

January 2016

*www.esi-website.com*

Phone: (630) 851-4566   v   Fax: (630) 851-4870

*Andy R. Shah M.S., M.B.A., P.E.* *Page 2 of 4*
*January 2016*

## Professional Affiliations

- Society of Plastics Engineers (SPE) Member
- American Society of Testing and Materials (ASTM) International Member
- Society for Biomaterials Member
- Society for Advancement of Materials and Processing Engineering (SAMPE) Member

## Honors and Awards

Chairman for Failure Analysis and Prevention Special Interest Group of Society of Plastics Engineers for Annual Technical Meeting in Orlando, Florida, 2014-2015

Technical Program Chair (TPC) for Failure Analysis and Prevention Special Interest Group of Society of Plastics Engineers for Annual Technical Meeting in Orlando, Florida, 2012-2013

Moderator of Failure Analysis and Prevention session at Society of Plastics Engineers (SPE) ANTEC meetings – 2000, 2009, 2010

Reviewed papers for <u>Journal of Applied Polymer Science</u>, <u>Journal of Material Science</u>, <u>Society of Plastics Engineers</u> and <u>Society for Biomaterials</u> conferences

## Positions Held

- Engineering Systems Inc., Aurora, Illinois
  Senior Managing Consultant, 2015 to Present
  Senior Consultant, 2010 to 2015

- Illinois Institute of Technology, Chicago, Illinois
  Adjunct Faculty, MMAE Department, 2014 – Current

- Packer Engineering, Inc., Naperville, Illinois
  Director, Materials Engineering, 2005 - 2010

- Bodycote Polymer Broutman Lab, Melrose Park, Illinois
  Manager, Materials Testing, 2000 – 2005

- Broutman and Associates, Chicago, Illinois
  Senior Research Engineer, 1997 - 2000

## Publications

"Computed Tomography X-Ray Imaging – A Technique for Non-Destructive Examination of Plastic Products," <u>Society of Plastics Engineers Annual Technical Conference</u>, Orlando, Florida, March 2015, with J. G. Jordan and Dr. A. Richards



*Andy R. Shah M.S., M.B.A., P.E.*                                                                          *Page 3 of 4*
*January 2016*

"Determination of Environmental Stress Cracking Failure Mode in Investigation of CPVC Fire-Suppression Sprinkler Pipe Failures," <u>Proceedings of the Society of Plastics Engineers Annual Technical Conference</u>, Orlando, Florida, April 1-4, 2012, with D. B. Edwards

"Failure Analysis of Plastic Crimp Fitting Assemblies," <u>Proceedings of the Society of Plastics Engineers Annual Technical Conference</u>, Boston, Massachusetts, May 1-5, 2011, with D. E. Duvall and D. B. Edwards

"A Discussion on Prevention of Plastic Product Failures," <u>Society of Plastics Engineers Annual Technical Conference</u>, Orlando, Florida, May 2010

"The Effect of Marking Paint on Walking Surface Slip Resistance," <u>International Conference on Slips, Trips and Falls 2007: From Research to Practice</u>, August 2007, with D. G. Curry, R. Reinke and J. Kidd

"Role of Finite Element Analysis – A Computer Aided Engineering Technique in Failure Analysis of Plastic Products," <u>Proceedings of the 12th Annual International Conference on Industrial Engineering Theory, Applications, and Practice (IJIE'07)</u>, Cancún, Mexico, November 2007, with K. Nakamoto and B. Agarwal

"Characterization of Continuous Fiber Reinforced Chemically Bonded Ceramic Composites," <u>Materials Science & Technology 2006: Ceramic Matrix Composites</u>, Cincinnati, Ohio, October 2006, with M. Pareek, J. Rigsby and B. Agarwahl

"Significance of Creep Rupture and Stress Relaxation Data in Product Design and Material Suitability Evaluation," <u>Annual Technical Conference of Society of Plastics Engineers</u>, May 2005

"Prediction of Service Life in a Chemically Active Environment Using Stress Rupture Data," <u>Journal of Applied Medical Polymers, Autumn 2000, Vol. 4, No. 2</u>, pp. 88-93, with Dr. P. K. So and L. J. Broutman

"Mechanical Strength Properties of Silicone Gel Filled Breast Prosthesis after Explantation," <u>Sixth World of Biomaterials Congress Meeting</u>, Kamuela, Hawaii, May 2000

"An Alternative Method for Determining the Hydrostatic Design Basis for Plastic Pipe Materials," <u>Proceedings of the International Plastic Pipe Symposium</u>, Goteborg, Sweden, September 14-17, 1998, with L. J. Broutman, E. F. Palermo, and D. B. Edwards

"Stepwise Fatigue Crack Propagation in Polyethylene Resins of Different Molecular Structure," <u>Journal of Polymer Science: Part B: Polymer Physics, Vol 36</u>, pp. 2355-2369 (1998), with Dr. A. Hiltner and Dr. E. Baer

"Fatigue Acceleration of Slow Stepwise Crack Growth in Polyethylene Pipe Materials," <u>International Symposium on Plastic Piping Systems for Gas Distribution</u>, October 1997, with Dr. A. Hiltner and Dr. E. Baer

"Study of Polyethylene Pipe Resins by a Fatigue Test that Simulates Crack Propagation in Real Pipe," <u>Journal of Materials Science</u>, April 1997, with Dr. A. Hiltner and Dr. E. Baer



"Correlation of Fatigue Crack Propagation in Polyethylene Pipe Specimens of Different Geometries," International Journal of Fracture, September 1996, with Dr. A. Hiltner and Dr. E. Baer

"Correlation of Fatigue Crack Propagation between Compact Tension and Real-Pipe Geometry," Society of Plastics Engineers Annual Technical Conference, May 1996, with Dr. A. Hiltner and Dr. E. Baer

## Book Contribution

"Fractography in Failure Analysis of Polymers," Elsevier ISBN 978-0-323-24272-1with Dr. Michael D. Hayes and Dale B. Edwards.

"Strength of the PC-SAN Interface as Determined by Delamination of Polymer Microlayers," a chapter in Interfacial Aspects of Multicomponent Polymer Materials, with Dr. A. Hiltner and Dr. E. Baer

## Technical Presentations

Instructor for Failure Analysis and Prevention Annual Seminar Course offered by Society of Plastics Engineers and Bodycote Materials Testing, 2000-2004

"Introduction to Fiber-Reinforced Plastic Composites" The Lewis University, Romeoville, Illinois Adjunct Professor, 2010 to 2013

"Failure Analysis of Plastic Gas Piping"
U.S. Department of Transportation, Transportation Safety Institute/PHMSA Seminars on Pipeline Failure Investigation Techniques, 2014 – 2015

Instructor for Failure Analysis and Prevention Annual Seminar Course offered by ESI, June 2015



# Appendix B

**Anand R. Shah, M.S., M.B.A., P.E. Testimony List**

# ANAND R. SHAH, M.S., M.B.A., P.E.

## TESTIMONY LIST
Mr. Shah's 2016 billing rate is $325/hour

**October 20, 2011**
Ann L. Ballenger, individually and as administrator of the Estate of Thomas Ballenger
deceased v. Sikorsky, Bell, Aeronautical Associates and Edwards Aircraft Corporation
a Foreign Corporation
In the United States District Court for the Middle District of Alabama Northern Division
Case No. 2:09-CV-72-MHT
Representing:  Aeronautical
Deposition Testimony

**December 19, 2011**
Dairyland Power Cooperative v. Merrill Iron & Steel, Inc., Wausau Business Insurance
v. Papco Industries, Inc., The Boldt Company, et al.
State of Wisconsin Circuit Court, Marathon County, Branch 5
Case No. 09-CV-1030
Representing:  The Boldt Company
Deposition Testimony

**September 21, 2012**
Davide Della Valentina, et al. v. Product Partners, LLC, d/b/a Beachbody and B-Lines
and Chubb Insurance Company
United States District Court, Eastern District of Louisiana
Case No. 2:11-CV -02135-ILRL-DEK
Representing:  Lifeline USA, LLC
Deposition Testimony

**October 1, 2012**
Linda DeJana, et al. v. Marine Technology, Inc., et al.
United States District Court, Eastern District of Missouri
Case No. 4:11-CV-1690-JAR
Representing:  Estate of Kevin Graff and Philip DeJana
Deposition Testimony

**December 18, 2012**
American Polymers Corporation v. Polystar Products, Inc. v. Mervis Industries, et al.
Superior Court of New Jersey, Law Division: Mercer County
Docket No: Mer-L-2149-08 **Consolidated** with Mer-L-617-09; Mid-L-7457-09;
and Bur-L-3854-09
Representing:  American Polymers Corporation
Deposition Testimony

# ANAND R. SHAH, M.S., M.B.A., P.E.

## TESTIMONY LIST
Mr. Shah's 2016 billing rate is $325/hour

**January 14, 2013**
American Polymers Corporation v. Polystar Products, Inc. v. Mervis Industries, et al.
Superior Court of New Jersey, Law Division: Mercer County
Docket No: Mer-L-2149-08 **Consolidated** with Mer-L-617-09; Mid-L-7457-09;
and Bur-L-3854-09
Representing:  American Polymers Corporation
Deposition Testimony

**March 15, 2013**
Donna Reed v. City of Georgetown, Kentucky, et al
Commonwealth of Kentucky, Scott Circuit Court, Division 1
Civil Action No: 07-CI-814
Representing:  Buckhorn Inc.
Deposition Testimony

**April 30, 2013**
Meyer Chatfield Aviation Services LLC v. Cessna Aircraft Company
In the United States District Court, for the Eastern District of Pennsylvania
Civil Action No: 12-cv-03266-TJS
Representing:  Cessna
Trial Testimony

**December 19, 2013**
Dan Wilson v. E&B Giftware LLC & Sports and Leisure Tech, et al.
In the Circuit Court of Cook County, Illinois, County Department, Law Division
Civil Action No: 10-L-3286
Representing:  E&B Giftware
Deposition Testimony

**January 29, 2014**
Linda DeJana, et al. v. Marine Technology, Inc., et al.
United States District Court, Eastern District of Missouri
Case No. 4:11-CV-1690-JAR
Representing:  Estate of Kevin Graff and Philip DeJana
Trial Testimony

**2015**
No Testimony

# ANAND R. SHAH, M.S., M.B.A., P.E.

### TESTIMONY LIST
Mr. Shah's 2016 billing rate is $325/hour


**March 23, 2016**
Christianson Air Conditioning and Plumbing LLC v. Continental Homes of Texas, L.P.
v.NIBCO, Inc., et al.
In the District Court of Travis County, Texas, 261st Judicial District
Case No. D-1-GN-14-000962
Representing: NIBCO, Inc.
Deposition Testimony