**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **JULIE KEASCHALL, Personal Representative of the Estate of Kurtis Keaschall, deceased and DAWSON PUBLIC POWER DISTRICT,** | ) ) ) ) | **CIVIL ACTION NO.: 4:14-CV-03070** |
| **Plaintiffs,** | ) ) ) ) | **DEFENDANTS OSBORNE INDUSTRIES, INC. AND ALTEC INDUSTRIES, INC. BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY (_Daubert_ Motion)** |
| **vs.** | ) ) ) | |
| **ALTEC INDUSTRIES, INC. and OSBORNE INDUSTRIES, INC.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## INTRODUCTION

Defendants Altec Industries, Inc. ("Altec") and Osborne Industries, Inc. ("Osborne"), collectively "Defendants," file this Brief opposing Plaintiff's Motion to Exclude (_Daubert_ Motion). (ECF No. 110). The Court should deny Plaintiff's Motion because it seeks to exclude expert testimony that is relevant, reliable and admissible.

Specifically, Plaintiff seeks to exclude all testimony from Defendants' experts regarding Mr. Keaschall's failure to use a safety-feature built into the aerial lift he was operating at the time of the accident at issue in this lawsuit—a D-Ring meant to secure an operator's personal fall-arrest equipment (hereafter "fall-arrest testimony"). Both Osborne's expert, Ben T. Railsback, M.S., P.E, and Altec's expert, Anand R. Shah, M.S., M.B.A., P.E., will offer fall-arrest testimony that is relevant, reliable, and, accordingly, admissible.

Plaintiff's argument to the contrary rests on a misinterpretation of evidence regarding this D-Ring. In particular, Plaintiff argues that Mr. Railsback and Mr. Shah's fall-arrest testimony fails to account for the "fact" that the D-Ring only provides

protection when an operator <u>falls out</u> of an aerial boom bucket, and not in cases (like this one) where an aerial boom bucket separates from its boom. But this "fact" that Plaintiff relies on is not a fact at all. Instead, it is a misstatement of the testimony of Altec's corporate representative, Joshua Chard. Contrary to Plaintiff's mischaracterization, Mr. Chard's testimony confirms that the D-Ring, if used properly, <u>would</u> have prevented Mr. Keaschall's fall to the ground in this case. Accordingly, Mr. Chard's testimony does <u>not</u> undermine—but rather is properly relied on in support of—the relevant and reliable fall-arrest testimony of Defendants' experts.

Plaintiff also argues that the fall-arrest testimony is unreliable because Mr. Railsback and Mr. Shah did not use appropriate methodologies to reach their conclusions. This argument lacks merit. The fall-arrest opinions of Mr. Railsback and Mr. Shah are grounded in, and consistent with, (1) Defendants' extensive testing of the D-Ring; and (2) applicable industry standards. This contrasts, sharply, with the unsupported and speculative testimony proffered by Plaintiff's designated experts John A. Eihusen and William R. Coleman. (*See* Def. Mot. to Exclude Eihusen, ECF No. 101, and Def. Mot. to Exclude Coleman, ECF No. 108).

The Court should deny Plaintiff's Motion to Exclude because the fall-arrest testimony of Defendants' experts is based on "good grounds." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

## <u>RELEVANT FACTS</u>

Kurtis Keaschall was operating an aerial boom truck, manufactured by Altec, and was inside the insulated boom bucket, manufactured by Osborne when the bucket

separated from the truck and dropped to the ground, injuring Mr. Keaschall and causing his death. (ECF No. 1).

It is undisputed that Mr. Keaschall was not properly using the fall-arrest equipment available to him at the time of the accident; although Mr. Keaschall was wearing a harness, he had not attached it to the anchor, known as a D-Ring, attached to the rib of the bucket on the aerial boom. (Coleman Depo. 55:1-25; Eihusen Depo. 149:13-17). If an operator has properly connected his fall-arrest equipment to the anchor, it will prevent the operator from reaching the ground. (Chard Depo. 61:22-25). Having the harness on without having it attached is like not having the harness on at all. (Coleman Depo. 55:23-25).

Nor do the parties dispute that OSHA, ANSI, and the regulations of Mr. Keaschall's employer made such fall-arrest equipment mandatory. (Coleman Depo. 57:10-12). The parties do not dispute that the available fall-arrest equipment met industry standards. (Eihusen Depo. 78:16-79:17, 149:8-12, 163:18-21). Moreover, Defendants warned users about the dangers of failing to properly use fall-arrest equipment; Altec provided all purchasers with a copy of the Operator's Manual, a training video, and a copy of a Manual of Responsibilities for ANSI 92.2, which included warnings regarding the requirement that operators use fall-arrest equipment. (Chard Depo. 58:21-23; Altec Industries, Inc. Operator's Manual for AA755L at 14, 26).

Plaintiff alleges that Mr. Railsback and Mr. Shah's fall-arrest testimony is irrelevant and unreliable because these experts fail to account for the fact that this case involves a bucket separation instead of an operator falling out of a bucket. (ECF No.

111 at 5). Plaintiff relies on her interpretation of Mr. Chard's testimony to suggest that the fall-arrest equipment available to Mr. Keaschall would have played no role in the event of a bucket separation like the one that occurred here. (*Id.*). According to Plaintiff, this renders the fall-arrest testimony inadmissible.

At his deposition, Mr. Chard actually testified that the D-Ring would have kept Mr. Keaschall from falling to the ground if he had properly fastened his personal fall-arrest equipment to the D-Ring. (Chard Depo. 65:10-19).

Plaintiff's contrary framing is based on testimony Mr. Chard gave about a 2010 modification Altec made to its fall-arrest system, which changed the operation of the system in cases where the platform rib, which contains the D-Ring, separates from the boom. During his deposition, Mr. Chard explained that in 2005, at the time the Keaschall bucket was manufactured, Defendants used a D-Ring on the platform rib as an anchor point for an operator's fall-arrest equipment (referred to hereafter as "the Original D-Ring"). (Chard Depo. 51: 3-5).

Mr. Chard also explained that in 2010, Altec sent out a letter notifying customers (including Mr. Keaschall's employer, Dawson Public Power District) that Altec was adding a secondary retention strap to rib-mounted anchors (referred to, hereafter, as "the 2010 Modification"). (Chard Depo. 64:9-11). The D-Ring would remain mounted to the platform rib, but a secondary strap was added; Altec made this part available to all previous customers free of charge. (*See* July 22, 2010 Letter from Altec).

The purpose of the 2010 Modification was limited: to keep the Original D-Ring mounted to the boom tip if the rib (where the D-Ring is located) were to separate from

4

the aerial boom. (Chard Depo. 64:19-22). The 2010 Modification came about because of an event where a falling power line knocked the rib off of the boom, removing the D-Ring along with it. (Chard Depo. 64:23-65:3). While previous incidents had involved only bucket but not rib separation, for which the Original D-Ring was sufficient, the power-line incident led Altec to design a secondary retention strap specifically to prevent against previously unanticipated cases of rib separation. (Chard Depo. 65:4-66:4).

The retention strap has no effect when the rib does not separate from the boom: Mr. Chard clearly testified that it "doesn't do anything normally. So the only time that ever holds anything in place is if the rib comes off." (Chard Depo. 67:16-22) (emphasis added). "In this case the anchor point remained on the boom tip." (Chard Depo. 64:10-11). Plaintiff's experts acknowledge that there are pictures of the D-Ring remaining on the boom, calling this "an objective fact." (Eihusen Depo. 149:21-22).

Mr. Chard clarified that when a bucket separates but the rib remains attached to the aerial boom, the Original D-Ring retains the operator in the same manner it would in the event of an operator fall out of the bucket. (Chard Depo. 65:10-19). Plaintiff's expert testified that the Original D-Ring would have prevented Mr. Keaschall from falling to the ground if his personal fall-arrest equipment had been properly secured. (Coleman Depo. 56: 10-12). Neither of Plaintiff's experts offered any opinion that the Original D-Ring would not have prevented Mr. Keaschall from falling.

## ARGUMENT

**I.  PLAINTIFF MISCHARACTERIZES THE EVIDENCE REGARDING THE IMPACT OF THE FALL PROTECTION EQUIPMENT; THE 2010 MODIFICATION HAS NO BEARING ON ANY ISSUE IN THIS CASE**

5

Plaintiff's Motion to Exclude relies on a mischaracterization of select excerpts from Mr. Chard's deposition, arguing that the Court should exclude the opinions of Mr. Railsback and Mr. Shah because they are irrelevant and unreliable in light of (Plaintiff's interpretation of) Mr. Chard's testimony. In particular, Plaintiff relies on a series of partial quotes in which Mr. Chard discussed the 2010 Modification to Altec's fall-protection equipment. (ECF No. 111 at 4-5).

But Plaintiff's out-of-context presentation of these quotes blurs a fundamental distinction— (1) cases of bucket separation (like this one) where the rib containing the D-Ring stays intact, and the Original D-Ring continues to function appropriately; versus (2) cases of "catastrophic failure of the platform" where the rib containing the D-Ring separates from the boom. Only the <u>latter</u> case, not present here, would make Mr. Chard's testimony regarding the 2010 Modification relevant.

Mr. Chard did not testify that the Original D-Ring would not function in the event of a bucket separation, nor did he imply that bucket separation would impair the effectiveness of the Original D-Ring. To the contrary, Mr. Chard specifically testified that in the event of a bucket failure leaving the rib in place, the Original D-Ring <u>would</u> serve to hold the operator in place:

> 10 In this case the anchor point remained
> 11 on the boom tip. That was the way it was
> 12 originally designed and intended is that the
> 13 rib is the main structural component, the
> 14 anchor is attached to it. And if we have seen
> 15 platform failures, it is consistent with
> 16 Exhibit 12 where you see the platform section
> 17 between the ribs retained at the boom tip. And
> 18 if the operators attached to that anchor, he

6

19 would be retained at the boom tip.

(Chard Depo. 65:10-19).

Mr. Chard clarified that the original D-Ring did not anticipate a situation of catastrophic platform failure—meaning a situation where, in addition to the bucket, the rib (where the D-Ring is attached) also separated from the boom. The 2010 modification arose in response to an incident where a utility pole fell, tearing off an entire platform including the anchor and rib from the boom tip. (Chard Depo. 64:24-65:3).

Mr. Chard testified that the 2010 modification would have no impact unless the rib separated from the boom:

> 12    Q. The safety harness is attached to what?
> 13    A. The lanyard anchor, the D-Ring itself.
> 14
> 15    Q. And the secondary retention lanyard simply
> 16    holds the D ring in place?
> 17    A. **It doesn't do anything normally. So the only**
> 18    **time that ever holds anything in place is if**
> 19    **the rib comes off.**

(Chard Depo. 67: 12-18) (emphasis added).

In this case, the anchor point remained on the boom tip. Accordingly, if Mr. Keaschall had been attached to that anchor, he would have been "retained at the boom tip." (Chard Depo. 65:7-19).

Plaintiff errs by using Mr. Chard's testimony to suggest that Mr. Keaschall's failure to use the Original D-Ring was not relevant to the cause of Mr. Keaschall's fall and resulting injuries. To the contrary, Mr. Chard's analysis supports the fall-protection testimony. Mr. Chard's testimony and the 2010 Modification Letter confirm Defendants'

7

position that fall-arrest equipment <u>does</u> function in the event of a bucket failure, with the only question being whether the nature of the failure requires the use of a device that would keep the D-Ring on the rib. (*See* July 22, 2010 Letter from Altec). Mr. Chard's testimony also establishes that the Original D-Ring would function in precisely the same way with or without the 2010 Modification in this case because <u>there was no rib separation</u>.

Plaintiff's attempt to frame Mr. Chard's testimony to her advantage is <u>not</u> a basis for a *Daubert* Motion. Plaintiff's argument is <u>not</u> supported by testimony from Plaintiff's experts, nor is it a fair reading of Mr. Chard's testimony as a whole. The Court should reject Plaintiff's attempt to use an artful framing of Mr. Chard's testimony as a basis for excluding Mr. Shah and Mr. Railsback's testimony.

Because Plaintiff's motion hinges on this mischaracterization of Mr. Chard's testimony, Plaintiff's Motion to Exclude should be denied in its entirety. To the extent the Court looks past this specious argument, the testimony of Mr. Railsback and Mr. Shah is relevant and reliable for the reasons discussed below.

## II.   MR. RAILSBACK'S TESTIMONY IS RELEVANT AND RELIABLE

Mr. Railsback's fall-arrest testimony is admissible. Contrary to Plaintiff's argument, Mr. Railsback does not fail to account for critical information. Moreover, he offers testimony that is relevant and reliable to (1) establish Mr. Keaschall's misuse; (2) to rebut Plaintiff's product-defect theory; and (3) to challenge Plaintiff's showing of proximate causation.

### A.   <u>Mr. Railsback Did Not Fail to Account For Relevant Information</u>

8

Plaintiff's primary argument for excluding Mr. Railsback's fall-arrest testimony is her allegation that Mr. Railsback failed to account for critical information when forming his opinions. This argument lacks merit.

Specifically, Plaintiff asserts that Mr. Railsback failed to account for the "fact" that the Original D-Ring was not intended to protect against catastrophic bucket failure. The Court should reject this argument for two reasons.

First, this "fact" that Mr. Railsback allegedly failed to account for is not a fact at all. Plaintiff's contrary suggestion is based on her misinterpretation of Mr. Chard's testimony, which is addressed above. Mr. Chard's testimony <u>actually</u> provides evidence <u>supporting</u> an opinion that if Mr. Keaschall had used the Original D-Ring, the equipment would have operated properly.

Second, Plaintiff mischaracterizes Mr. Railsback's testimony. Contrary to Plaintiff's suggestion, Mr. Railsback <u>did</u> consider the 2010 Modification when forming his opinions regarding the fall-protection equipment. (June 23, 2016, Knott Laboratory Engineering Report at 30). In support of her contrary argument, Plaintiff cites to the following exchange:

> Q Okay. The lanyard is not designed to
> prevent injury in the -- in the event of a bucket
> failure? Would you agree with that?
>
> A I don't know whether I agree or disagree
> with that statement. I mean, it's -- it's certainly
> meant to prevent a fall.

(Railsback Depo. 88:23-89:1-3).

According to Plaintiff, this exchange establishes that Mr. Railsback did not

consider whether the Original D-Ring would operate in the event of a bucket failure (as opposed to a situation where an operator fell out of a bucket). This is not the appropriate interpretation of this exchange. Read fairly, and in its context, this exchange is not a concession that Mr. Railsback failed to consider whether the Original D-Ring would protect an operator in the event of a bucket separation. Instead, Mr. Railsback was answering a question about <u>design intent</u> and making a distinction that while he <u>knew</u> design intent was about preventing a fall (in the event of a bucket failure), he did not <u>know</u> whether <u>design intent</u> was about preventing <u>injury</u> (in the case of a bucket failure). This is question about the specific purpose behind design intent of the lanyard is <u>not</u> relevant to the opinions that Mr. Railsback seeks to offer.

Moreover, Plaintiff's attempt to frame this exchange as if it shows that Mr. Railsback ignored the difference between the pre-2010 fall-arrest equipment and the post-2010 fall-arrest equipment is undermined by the fact that Plaintiff asked Mr. Railsback about the function of the <u>lanyard</u>, which was not altered by the 2010 Modification, and which would play a critical role in <u>any</u> fall, regardless of whether the 2010 Modification was involved. (Chard Depo. 67:12-13).

### B.   Mr. Railsback Offers Reliable Opinions Relevant to Misuse and To Rebut Mr. Eihusen's Speculative Defect Testimony

The first category of fall-arrest opinions that Mr. Railsback proposes concern (1) the compliance of the available fall-arrest equipment with relevant industry standards; and (2) how Mr. Keaschall's failure to use the available fall-arrest equipment departed from industry standards and from clear warnings in the Operator's Manual. These opinions are both relevant and reliable.

First, these opinions are relevant for at least three purposes. They support Defendants' misuse defense[1], rebut Plaintiff's design-defect theory,[2] and undermine Plaintiff's attempt to show that any defect was a proximate cause of Plaintiff's injury.[3]

Second, Mr. Railsback's reliance on industry standards and on the warnings in Altec's Operator's Manual renders his testimony reliable and admissible. *See Sappington v. Skyjack, Inc.,* 512 F.3d 440, 449 (8th Cir. 2007) (describing relevant factors). Mr. Railsback has sufficient experience and education to qualify him to testify regarding industry safety standards. He has a background in safety engineering and has experience with the safety engineering aspects of ANSI standards. (*See* CV of Ben Railsback). Mr. Railsback's Report demonstrates that he properly reviewed and considered relevant industries standards and warnings issued by Defendants. (June 23, 2016, Knott Laboratory Engineering Report at 27-28).

Mr. Railsback's reliance on tested and objective industry standard provides a

---

[1] Although Plaintiff moves for partial summary judgment on Defendants' affirmative defense of misuse, there is a question of material fact on misuse. Defendants will file a Brief in Opposition to that Motion discussing this issue.

[2] Testimony regarding a Plaintiff's alleged violation of instructions may be relevant to show the absence of a product defect. *Shelton v. Young's Welding & Mach. Shop, LLC*, No. 8:14CV165, 2016 U.S. Dist. LEXIS 48470, at *5 (D. Neb. Apr. 11, 2016). Testimony regarding the safety features a product has and whether those comply with industry standards is relevant to rebut allegations that a product has a defect that makes it unreasonably dangerous. *See, e.g., Wagner v. Clark Equip. Co.*, 243 Conn. 168, 189, 700 A.2d 38, 49 (1997) ("Evidence that a product complies with an OSHA regulation that addresses the safety of the product may be probative of whether the product meets consumer expectations regarding its safety."); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985) (compliance with OSHA standards "constitutes strong and substantial evidence that a product is not defective").

[3] *See Shelton v. Young's Welding & Mach. Shop, LLC*, No. 8:14CV165, 2016 U.S. Dist. LEXIS 48470, at *5 (D. Neb. Apr. 11, 2016).

concrete basis for his testimony, on which he is subject to cross-examination and any challenge from qualified experts. This is in sharp contrast to the testimony of Plaintiff's designated expert, John A. Eihusen, who testifies about the available fall-arrest equipment underline without a methodology and underline in contravention of the written warnings and industry standards. (*See* ECF No. 102 at 20-22).

### C.   Mr. Railsback Offers Reliable Opinions Regarding Proximate Causation

The second category of fall-arrest testimony Mr. Railsback proposes is causation testimony. Specifically, Mr. Railsback will opine that Mr. Keaschall's failure to use the available fall-protection equipment was a proximate cause of his injury. This testimony is both relevant and reliable.

First, this testimony is underline relevant in two respects: it supports Defendants' efforts to (1) establish the affirmative defense of misuse;[4] and (2) defend against Plaintiff's attempt to establish proximate causation.[5]

Second, Mr. Railsback's fall-arrest causation testimony is sufficiently underline reliable to satisfy the *Daubert* standard. Plaintiff's erroneous argument to the contrary is based primarily on her allegation that Mr. Railsback failed to conduct any testing relevant to

---

[4] Defendants will discuss this issue in their opposition to Plaintiff's partial Motion for Summary Judgment.

[5] *Shelton v. Young's Welding & Mach. Shop, LLC*, No. 8:14CV165, 2016 U.S. Dist. LEXIS 48470, at *5 (D. Neb. Apr. 11, 2016) (allegations regarding Plaintiff's conduct admissible for purpose of contesting whether "any defect in the Machine was the cause of [Plaintiff's] injuries.") Moreover, it is also appropriate for Mr. Railsback to opine that Mr. Keaschall's failure to use the available fall-protection equipment combined with another alleged misuse (i.e. overloading the aerial boom) to proximately cause Mr. Keaschall's injuries. *See, e.g., Leistra v. Bucyrus-Erie Co.*, 443 F.2d 157, 163 (8th Cir. 1971) (acts of the plaintiff in prying cable with a crow bar and crane operator in swinging drum superseded liability of manufacturer).

this opinion.

Plaintiff's claim that Mr. Railsback did not rely on testing when forming this causation opinion is factually incorrect. Mr. Railsback did extensive analysis reconstructing Mr. Keaschall's accident. He used reliable methods, including a kinematic analysis involving kinematic simulation. (June 23, 2016 Knott Laboratory Engineering Report at 3). Mr. Railsback's opinion about how an absent variable (proper use of fall-protection equipment) would have impacted Mr. Keaschall's fall was reliable. It was based on his application of his knowledge of fall-arrest systems and basic principles of physics (i.e. gravity) to his multi-body analysis. (Railsback Depo. 87:18-88:15).

Moreover, it was also grounded in well-established principles regarding the operation of fall-arrest systems. Mr. Railsback's opinion specifically relied on the fact that the available fall-arrest system was OSHA/ANSI compliant, something that every expert in this case agrees on. Mr. Railsback opined:

> Mr. Keaschall's failure to follow the warnings stated in the operator's manual, OSHA regulations, and ANSI standard regarding external loading of the bucket and attaching a lanyard to the boom, directly resulted in the bucket separating from the boom and directly resulted in Mr. Keaschall falling 22 feet to the ground. The failure to follow the operator manual warnings, OSHA regulations, and ANSI standard is the probable cause of the accident.

(June 23, 2016 Knott Laboratory Engineering Report at 28). Also supporting Mr. Railsback's opinion was his review of "published test data", including product testing conducted by Defendants. (*Id.* at 28, 30-32). This included a lanyard-hang test of the Original D-Ring, which Altec had performed. (Chard Depo. 62:10-13).

13

Mr. Railsback's proper reliance on manufacturer testing and OSHA/ANSI compliance makes his opinion reliable. Under Federal Rule of Evidence 703, it is appropriate for an expert to base his opinions on testing done by others so long as experts in the field would reasonably rely on the testing. Opinions based on industry standards or on a manufacturer's records related to product testing are reliable. *See, e.g., Sappington v. Skyjack, Inc.,* 512 F.3d 440, 451 (8th Cir. 2008) ("[I]t was unnecessary for Skyjack's expert to testify about the conditions under which its testing was performed, i.e., platform height, workload, slope, etc., because those testing conditions are dictated by the **ANSI** standard.") *Colt Indus. Operating Corp. v. Frank W. Murphy Mfr.,* 822 P.2d 925, 934 (Alaska 1991) (reversible error for court to exclude testimony of defendant's expert based on the product records of the defendant manufacturer); *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2004 U.S. Dist. LEXIS 2359, at *13 (E.D. La. Feb. 17, 2004) (tests consistent with OSHA/ANSI standards reliable because those standards are the product of testing*); McCoy v. Whirlpool Corp.*, 258 F. App'x 189, 195 (10th Cir. 2007) ("no question" that test results provided by manufacturer were sufficient basis for expert testimony).

One of the central purposes of *Daubert* is to ensure that experts are using the same level of rigor in the courtroom that is used in the relevant field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999). There is no doubt that manufacturer testing and industry standards are regularly used for non-litigation purposes in the relevant field to make safety-critical decisions. This supports the reliability of testimony based on the same under this Court's analysis.

Plaintiff's argument that Defendants' experts needed to examine and test the particular D-Ring at issue here is misguided. There is nothing beyond Plaintiff's <u>mere speculation</u> and <u>misinterpretation of testimony</u> to suggest that the available fall-arrest equipment would not have functioned consistent with the previous testing.   Plaintiff did not allege any defect in the D-Ring. There is not a <u>single</u> shred of evidence that the D-Ring is defective. Even Plaintiff's expert concedes that if Mr. Keaschall had been wearing the fall-protection equipment, it would have prevented him from hitting the ground in the event of a bucket failure. (Coleman Depo. 56: 10-12).

Moreover, Plaintiff's argument that Mr. Railsback's testimony is unreliable because he failed to inspect the aerial lift truck is meritless. Mr. Railsback relied on the testimony and photographs taken by Mike Moore, P.E., Altec's Manager of Product Engineering, who examined the boom immediately after the incident. (June 23, 2016 Knott Laboratory Engineering Report at 3).

To the extent Plaintiff attempts to rely on Mr. Chard's testimony to support her argument that specific testing was necessary, her argument fails for the same reasons discussed above. Mr. Chard's testimony establishes that the 2010 Modification has no impact except when the rib holding the D-Ring comes off of the fiberglass boom. (Chard Depo. 67: 12-18). Despite Plaintiff's best attempt to frame it as such, the 2010 Modification has <u>nothing</u> to do with whether the Original D-Ring would live up to its testing expectations in the future. Accordingly, the testing supporting Mr. Railsback's testimony is a sufficiently close fit to render it squarely admissible under *Daubert*.

Mr. Railsback's testimony is based on a concrete methodology that is verifiable.

15

He specifically invokes manufacturer testing and compliance with industry standards that set requirements for fall-arrest equipment. This provides a basis for challenging his opinions on cross-examination. If Plaintiff wishes to raise questions regarding whether there are differences between the testing conditions and the operative conditions, those can be raised on cross-examination. But the fit is clearly close enough to render Mr. Railsback's testimony relevant and admissible.

In this respect, Mr. Railsback's testimony presents a sharp contrast to the case law Plaintiff cites. The cases that Plaintiff cite, and the cases that Defendants rely on in support of their motion to exclude the testimony of Plaintiff's experts Mr. Eihusen and Mr. Coleman, involve situations where an expert sought to opine regarding causation when a product deviated from prior manufacturer and industry tests without doing any testing of the expert's own. It is absolutely true that testing is required in those cases because there is nothing concrete or verifiable for the expert to rely on. That is why the testimony of Plaintiff's experts is unreliable and inadmissible. *See Smith v. Cangieter,* 462 F.3d 920 (8th Cir. 2006) (expert who sought to testify about effects of loss traction relied on no tests by himself or by anyone and no calculations); *Pro Service Automotive, L.L.C. v. Lenan Corp.*, 269 F.3d 1210 (8th Cir. 2006) (expert who sought to opine about cause of fire cited no test, no data, no calculation, and no objective standard grounding his conclusion).

Although Plaintiff calls them strikingly similar, these cases do not stand for the proposition that an expert may not derive conclusions based on manufacturer tests and/or compliance with the test-proven industry standards, so long as the testifying

expert possess sufficient qualifications to render those opinions. This distinction is consistent with the principle that the kind of testing needed differs based on how well-accepted the subject matter of the opinion is. A more exacting "testing" requirement will be imposed when a proposed opinion is "novel in that it **contradict[s] the outcome of standard industry tests**." *Heer v. Costco Wholesale Corp.*, 589 F. App'x 854, 862 (10th Cir. 2014) (unpublished) (emphasis added).

It is also instructive to contrast Mr. Railsback's fall-protection testimony with Mr. Eihusen's unreliable fall-protection testimony. While Mr. Railsback's testimony is grounded in recognized and tested OSHA and ANSI standards, Mr. Eihusen ultimately admitted he could not give an opinion about whether the fall-arrest equipment counted as a redundancy. While he acknowledged that the fall-protection device was consistent with relevant industry standards, he did not consider it in his analysis based on facts that he ultimately admitted were subjective in nature. (Eihusen Depo. 166:7-18).

Courts recognize that expert testimony given <u>in opposition</u> to industry standards and manufacturer testing has a higher burden to overcome in order to be deemed reliable. *Cf. See Howard v. Omni Hotels Mgmt. Corp.,* 203 Cal. App. 4th 403, 428, 136 Cal. Rptr. 3d 739, 758 (2012) (excluding testimony of Plaintiff's expert and granting defendant's motion for summary judgment where "Once Howard's expert admitted that the industry standards were met, his further views that higher safety standards were needed, under these circumstances, were not supported by anything other than his own opinion. Although industry standards alone would not be dispositive, other evidence was presented about Kohler's testing processes, quality control through factory audits, and

17

consumer preferences."); *Heer*, 589 F. App'x at 862 ("Federal courts have consistently held that compliance with industry standards is relevant to a reliability determination under Rule 702.").

### III. MR. SHAH'S TESTIMONY IS RELIABLE AND ADMISSIBLE

Mr. Shah's fall-arrest testimony is admissible. Contrary to Plaintiff's argument, Mr. Shah does not fail to account for critical information. Moreover, he offers testimony that is relevant and reliable to (1) rebut the product-defect testimony of Plaintiff's designated expert, Mr. Eihusen; and (2) show that Mr. Keaschall's failure to use the available fall-arrest equipment was a proximate cause of his injury.

### A. <u>Mr. Shah Did Not Fail To Account For Information</u>

Plaintiff's primary argument with respect to Mr. Shah, too, is that he failed to account for critical information, rendering his opinion unreliable and irrelevant. But this argument is based on the same erroneous interpretation of Mr. Chard's testimony discussed above.

While Plaintiff suggests that Mr. Shah did not consider the limitations of the Original D-Ring when forming this opinion, this is inaccurate. Mr. Shah <u>did</u> review documentation of the 2010 Modification; he also reviewed Mr. Chard's deposition, which contained the full discussion of the impact of the 2010 Modification. (Shah Report at 4; Shah Depo. 94:10-21).

Plaintiff's argument is, effectively, that Mr. Shah's testimony is unreliable because it does not account for <u>Plaintiff's</u> interpretation of Mr. Chard's testimony about the 2010 Modification. However, this argument lacks merit. As discussed above,

18

evidence shows that the 2010 Modification pertains to situations where the <u>rib</u> came off the boom, which is <u>not</u> what happened here. Mr. Shah specifically based his opinion on the fact that the D-Ring remained attached to the upper boom. (Shah Report at 26).

**B.  <u>Mr. Shah Gives Relevant And Reliable Testimony Rebutting the Testimony of Mr. Eihusen</u>**

The first category of fall-arrest testimony Mr. Shah offers is testimony rebutting the proposed testimony of Plaintiff's expert Mr. Eihusen. As discussed in Defendants' pending Motion to Exclude Opinions of John Eihusen (*see* ECF Nos. 101-104), Mr. Eihusen's testimony is unreliable and inadmissible. However, to the extent that Mr. Eihusen is permitted to testify, Mr. Shah's rebuttal testimony is relevant, reliable and admissible.

Of course, use of an expert to comment on or rebut other testimony presented at trial is allowable and expected. Specifically, Mr. Shah seeks to rebut Mr. Eihusen's opinion that the aerial boom bucket had a design defect rendering it unreasonably dangerous because it was a "mission critical" device that had no built-in redundancies. (Eihusen Depo. 78:1-5). This lack of "redundancies" is the <u>only</u> design defect Mr. Eihusen identifies. To rebut this opinion, Mr. Shah opines that Mr. Eihusen's opinion fails to account for a built-in safety feature—the available fall-protection equipment that Mr. Keaschall failed to use. (Shah Report at 25).

The existence of a built-in safety feature is undoubtedly relevant to whether a product is unreasonably dangerous. This is particularly true when a built-in safety feature complies with relevant industry standards. *Cf. Rexrode v. Am. Laundry Press Co.*, 674 F.2d 826, 831 n.18 (10th Cir. 1982) (OSHA standards relevant to determining

19

whether the product has a design defect). Expert testimony about whether a product complied with industry standards is relevant to a determination of a product-defect claim. *Howard*, 203 Cal. App. 4th at 426 (2012) ("When the plaintiff alleges strict product liability/design defect, any evidence of compliance with industry standards, while not a complete defense, is not "irrelevant," **but instead properly should be taken into account through expert testimony as part of the design defect balancing process**.").

Mr. Shah's testimony on this point is also reliable. Mr. Shah's background and experience qualify him to opine regarding the applicable industry standards. (*See* Shah Report at Appendix "A", CV of Anand R. Shah).

And Mr. Shah's method of forming this opinion is sufficiently reliable. The testimony Mr. Shah seeks to rebut (i.e. Mr. Eihusen's testimony that the aerial boom bucket was unreasonably dangerous because the available fall-arrest equipment was <u>not</u> properly considered as a redundancy and/or did not prevent the aerial boom from becoming "unreasonably dangerous") is based on nothing more than Mr. Eihusen's own speculation. (Eihusen Depo. 166:7-18). Mr. Shah's use of his experience and knowledge to apply <u>relevant industry standards</u> is a reliable method of rebutting Mr. Eihusen's speculative opinion. This Circuit does not allow the *Daubert* standard to be used as a way to shift the burden of proof to a defendant—if a defense expert offers testimony relevant and reliable for the purpose of <u>rebutting</u> a plaintiff's attempt to make a showing on a required element of the plaintiff's burden of proof, that is sufficient to render it admissible. *Cf. Allen v. Brown Clinic, P.L.L.P.,* 531 F.3d 568, 574-75 (8th Cir.

2008) (expert testimony requirement should be not be interpreted to shift the burden of proof to defendant).

### C. **Mr. Shah Gives Relevant and Reliable Testimony Regarding Proximate Causation**

Second, Mr. Shah opines that Mr. Keaschall's failure to use the fall-arrest equipment was a proximate cause of Mr. Keaschall's injuries. This testimony is relevant to Defendants' affirmative defense of misuse[6] and to rebutting Plaintiff's testimony that Mr. Keaschall's harm was proximately caused by a product defect.

Moreover, this testimony is reliable under *Daubert*. Plaintiff's argument to the contrary is based on Plaintiff's erroneous claim that Mr. Shah did not use a proper methodology. However, Mr. Shah's opinions are based on his "review of the incident scene photos, examination of the subject fiberglass platform, testing of the subject fiberglass platform, as well as review and testing of other exemplar fiberglass platforms, a review of technical reports authored by Plaintiffs' experts, a review of discovery documents, and review of other relevant technical literature." (Shah Report at 2).  He made relevant observations about the fall-protection equipment in this case. (Shah Report at 3). He also relied on analysis by Michael Moore, who was qualified to inspect the fiberglass boom. (Shah Report at 20).

And, crucially, Mr. Shah's causation testimony is based on Altec's testing of the fall-protection equipment _and_ Mr. Shah's opinion that the fall-protection equipment complied with industry standards, which themselves have been subjected to testing.

---

[6] Defendants will discuss this issue in their Brief in Opposition to Plaintiff's Motion for Summary Judgment.

(Shah Report at 20, 26). Reliance on testing and standards actually used in an industry is an indicator that an expert's testimony is reliable. *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 533 (D.N.J. 2001). Mr. Shah's experience and knowledge qualify him to give opinions grounded in Altec's previous product testing and in the relevant industry standards. (*See* Shah Report at Appendix "A", CV of Anand R. Shah).

An expert may properly rely on manufacturer and industry testing so long as the expert is qualified to opine regarding this testimony. *See* Fed. R. Evid. 703 (stating "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of"); *cf. RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 739 (4th Cir. 2015) ("Although [the expert] relied on information provided by other witnesses at trial to devise his formula, the Federal Rules of Evidence specifically authorized him to do so. See Fed. R. Evid. 703.");

And, for the same reasons discussed above with regard to Plaintiff's challenge to Mr. Railsback's causation opinion, Mr. Shah was not required to engage in any additional testing regarding this <u>particular</u> opinion. The fall-arrest equipment had been subjected to extensive testing by Altec and all experts in this case admit this equipment complied with OSHA and ANSI regulations. There is <u>no</u> indication that the fall-arrest equipment here would not have functioned properly had Mr. Keaschall used it. Mr. Shah was clearly qualified to give a reliable opinion, informed by his education, experience, and the OSHA/ANSI standards and Altec testing, regarding how the fall-arrest equipment in question works and what impact it would have had in this case. Given the lack of any indication that the fall-arrest equipment in this instance would not have

performed consistent with those previous tests, this testimony is reliable and admissible,

subject to challenge only by cross-examination.

## CONCLUSION

For the preceding reasons, Defendants respectfully request that the Court <u>deny</u>

Plaintiff's Motion to Exclude Testimony (*Daubert* Motion).


Dated this 24th day of May, 2017

                              OSBORNE INDUSTRIES, INC., and ALTEC
                              INDUSTRIES, INC. Defendants,


By:    /s/Stephen L. Ahl_____
           Stephen L. Ahl, #10036
           Elizabeth Ryan Cano, #26180
           Wolfe, Snowden, Hurd, Luers & Ahl, LLP
           Wells Fargo Center
           1248 O Street, Suite 800
           Lincoln, NE 68508
           (402) 474-1507
           sahl@wolfesnowden.com

           **Attorneys for Defendant Osborne
           Industries, Inc.**

           *Robert W. Shively*_____
           Robert W. Shively
           Shively & Lannin, P.C., L.L.O.
           4400 South 86th Street, Suite 100
           Lincoln, NE 68526
           rshively@shivelylaw.com

           **Attorneys for Defendant Altec
           Industries, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I electronically filed the foregoing ***Defendants' Brief in Opposition to Plaintiff's Motion to Exclude (Daubert Motion)*** on this 24th day of May, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Larry W. Beucke
PARKER, GROSSART LAW FIRM
P.O. Box 1600
Kearney, NE 68848-1600
lwb@pgbblaw.com

Peter C. Wegman
pwegman@remboltlawfirm.com
Mark R. Richardson
mrichardson@remboltlawfirm.com
Tim Engler
tengler@remboltlawfirm.com
Daniel Klaus
dklaus@remboltlawfirm.com
REMBOLT LUDTKE LLP
1128 Lincoln Mall, Suite 300
Lincoln, NE 68508
(402) 475-5100

***Attorney for Plaintiff Julie Keaschall***

Steven E. Guenzel
JOHNSON, FLODMAN LAW FIRM
P.O. Box 81686
Lincoln, NE 68501
sguenzel@johnsonflodman.com

***Attorney for Plaintiff Dawson Public Power District***

/s/Stephen L. Ahl
Stephen L. Ahl