IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JULIE KEASCHALL, Personal Representative of the Estate of Kurtis Keaschall, deceased, and DAWSON PUBLIC POWER DISTRICT, | ) ) ) ) ) | 4:14CV3070 |
| Plaintiffs, | ) ) | MEMORANDUM AND ORDER |
| v. | ) ) | |
| ALTEC INDUSTRIES, INC., and OSBORNE INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) ) | |

This is a products liability action, which currently is scheduled to be tried to a jury commencing on August 28, 2017. Motions in limine to exclude expert testimony and motions for summary judgment have been filed by both sides (Filing Nos. 101, 105, 107, 110, 114). For the reasons discussed below, all motions will be denied.

### I. Background

Plaintiff's decedent, Kurtis Keaschall, suffered fatal injuries while working as lineman for Dawson Public Power District on June 6, 2012.[1] At the time of the accident, Keaschall was in the process of unbolting a transformer from near the top of a utility pole. He was operating an articulated boom mounted on a truck from an insulated bucket that was attached to the end of the boom. The bucket, which was

---

[1] The action is brought by Julie Keaschall, as personal representative of Kurtis Keaschall's estate. Dawson Public Power District is also named as a plaintiff because it has made worker's compensation payments, *see* Neb. Rev. Stat. § 48-118, but it has not joined in the pending motions.

made of fiberglass, broke off from the boom and fell to the ground, along with Keaschall. The bucket was manufactured by Osborne Industries, Inc., and supplied to Altec Industries, Inc., which assembled and sold the boom truck to Dawson. Osborne and Altec are both named as Defendants.

In general, it is Plaintiff's contention that the bucket was defectively designed and manufactured and suffered catastrophic failure after seven years in service simply because it could no longer support Keaschall's body weight. Defendants, on the other hand, contend the bucket failed because of an external force, such as being pushed against the utility pole; they dispute that the bucket would have landed where it did had there not been an external force applied. Defendants also claim Keaschall would have avoided serious injury if, as instructed, he had attached a safety lanyard to a D-ring that was located on a portion of the bucket that remain attached to the boom.

## II. Defendants' Motions

Defendants "move this Court for an Order *in limine* excluding from trial the opinion testimony and report of Plaintiff's designated expert[s], John Eihusen, P.E.," (Filing No. 101) and "William Coleman, P.E., M.S." (Filing No. 107). As to each expert, "Defendants state that [his] testimony is inadmissible under Federal Rule of Evidence 702 and the principles outlined in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157, 119 S. Ct. 1167, 1179 (1999) because it goes beyond the scope of his qualifications and does not meet the test of reliability and relevance" (Filing Nos. 101, 107). Defendants also cite Federal Rule of Evidence 403 (*Id.*).

### A. Rule 702

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact

to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The standards in Rule 702 are flexible." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016). "Rule 702 stresses 'scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission.'" *Id.* (quoting *Daubert*, 509 U.S. at 594-95). "'[P]rinciples and methodology, not . . . the conclusions that they generate' should be the focus of the analysis." *Id.* (quoting *Daubert,* 509 U.S. at 595).[2] "The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.,* 644 F.3d 604, 613 (8th Cir. 2011)).

Eight Circuit "cases are legion that, correctly, under *Daubert,* call for the liberal admission of expert testimony. *See, e.g., United States v. Finch,* 630 F.3d 1057, 1062 (8th Cir.2011) (holding that we resolve doubts about the usefulness of expert testimony in favor of admissibility); *Robinson v. GEICO Gen. Ins. Co.,* 447 F.3d 1096, 1100 (8th Cir.2006) (holding that expert testimony should be admitted if it 'advances the trier of fact's understanding to any degree' (quotation omitted)); *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001) (Rule 702 'clearly is one of admissibility rather than exclusion' (internal quotation omitted)); *Wood v. Minn. Mining & Mfg. Co.,* 112 F.3d 306, 309 (8th Cir.1997) (holding that exclusion of expert's opinion is proper 'only if it is so fundamentally unsupported that it can offer

---

[2] However, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). "Accordingly, a district court's focus on principles and methodology need not completely pretermit judicial consideration of an expert's conclusions." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (internal quotation marks and citations omitted). "Expert evidence may be excluded if the court determines 'that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *Joiner,* 522 U.S. at 146).

no assistance to the jury.' (internal quotation omitted))." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "Further, district courts are admonished not to weigh or assess the correctness of competing expert opinions." *Id.* (citing *Kuhn v. Wyeth,* 686 F.3d 618, 624 (8th Cir. 2012)). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset. *Id.* (quoting *Daubert,* 509 U.S. at 590, 596). The court's "gatekeeper" role should not invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence. *See United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003).

"When assessing whether expert testimony is based on scientific knowledge, trial courts may consider various factors including: (1) whether the expert's technique can be tested, (2) whether the technique has been subjected to peer review and publication, (3) whether there is a known or potential rate of error, and (4) whether the technique is generally accepted within the relevant scientific community. These same factors may also be relevant in assessing the admissibility of an expert's testimony on the basis of technical, or other specialized knowledge. " *United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016) (internal quotation marks and citation omitted). "*Daubert*'s progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001).

"This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Russell,* 702 F.3d at 456-57 (quoting *Unrein v. Timesavers, Inc.,* 394 F.3d 1008, 1011 (8th Cir. 2005)). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.* (quoting *Unrein,* 394 F.3d at 1011).

### *1. John Eihusen*

John Eihusen has been a registered Professional Engineer in Nebraska since approximately 1982. He received his Bachelor of Science in Mechanical Engineering in 1981 and his Masters of Science in Mechanical Engineering in 1998. Both degrees were obtained from the University of Nebraska, Lincoln. Eihusen began working for Brunswick Defense in 1983, where he specialized in product design and stress analysis of advanced composite structures. At Brunswick Eihusen served as the lead design engineer on fuel tanks for the F-18 Super Hornet fighter aircraft. He also worked on failure and stress analysis of composite components for the NASA space shuttle fleet. After working as a design and development engineer for three companies between 1988 and 1994, Eihusen began working for Lincoln Composites, which later became General Dynamics and is now Hexagon Composites. Eihusen has worked twenty-three years for Hexagon as a designer and analyst on advanced composite structures. Eihusen has examined thousands of failed composite parts in the regular scope of his job. Eihusen estimates that he has personally reviewed and visually inspected hundreds of composite failure tests in his career. He is an accredited ANSI composite expert and has published multiple scholarly articles on composite materials. The material involved in the bucket at issue in this case is a composite laminate.

In a report prepared on September 26, 2015, Eihusen expressed the following opinions regarding the bucket:

1) A delamination flaw (or structural defect) was created at the time of manufacture at the "A" Location (see Figure 6).

2) The defect was near or adjacent to the top of the pre-formed insert used to form the right side vertical rib of section 2.

3) Secondary machining operations transforming the raw molded part described in ALTEC drawing 704-00065 to the external profile on drawing 704-00350 caused external edge defects or in-plane delamination at the 18 inch rib to rib cut opening. The

    defects could have been facilitated by physical damage of the cutting tool or by exposing existing internal defects to the environment.

4)      The internal delaminations and external machining damage was facilitated by dry fiber from incomplete resin flow and wet out of the reinforcement mat at the time of molding.

5)      The incomplete resin flow resulted from improper reinforcement layup and mold closure as identified by Osborne on the units Aerial Platform Inspection Report.

6)      The external flaws caused by the machining operation grew in service extending the delamination surface between plies and reducing the structural capacity of the laminate as it was used in-service until it reached the failure load condition.

7)      At time of the failure the compromised composite resolving Mr. Keaschall's body weight into vertical rib failed in shear at or near the vertical rib insert which triggered the catastrophic failure of the bucket.

8)      Mr. Keaschall would not have had any visual warning of the impending failure.

9)      None of the inspection methods used for safety assessment "as described" in the user operating instructions would have indicated this failure mode to Mr. Keaschall.

10)      The primary structure was not resistant to a single point failure mode and as such failed totally and completely in a manner inconsistent with life-critical applications.

11 )      The primary reinforcement used in the design and identified as short fiber, random mat has little capacity to resist flaw propagation and was improperly applied in the design without suitable long fiber reinforcement to provide fracture toughness and control of cycling tensile strains in the laminate.

(Filing No. 104-1 at CM/ECF p. 6).

Eihusen also responded to five "questions of interest" in the report: (1) "Did defendants use reasonable care in the manufacture of the bucket?" Eihusen answered "No," stating, in part, "My determination is based on lack of disclosures that indicate that the requirements of ISO 9000 were not being followed and best practices for risk management were not being applied." (2) "Did defendants use reasonable care in the design of the bucket?" Eihusen again answered "No," stating, in part, "The design documentation did not provide or apparently consider a material evaluation plan to develop acceptable allowable stresses for the bucket over the design lifetime." (3) "Did defendants adequately warn of the dangers of the use of the bucket and the need for periodic inspection?" Again, Eihusen answered "No," stating, in part, "An extensive review of the documents provided by Altec never disclosed the potential for catastrophic structural failure of the composite parts." (4) "Was the bucket defective and unreasonably dangerous for its intended use (or for any use defendants could reasonably foresee)?" Eihusen answered "Yes," stating, in part, "By Osborne manufacturing records the bucket was subjected to known folds and visual indications at the time of manufacture. These were judged to be superficial and passed on without further inspection." (5) "Were items 1-4 a cause of the collapse of the bucket?" Eihusen answered "Yes." (Filing No. 104-1 at CM/ECF pp. 4, 7-8).

Defendants argue Eihusen's opinions are not reliable because he did not perform any tests or make any calculations. Eihusen testified, however, that visual inspection is the primary technique for examining composite materials (Filing No. 123-5 at CM/ECF p. 178) and that "[o]ne accepted technique for visually inspecting composite structural failures is tracing fracture paths, visually determining failure initiation patterns, and determining mechanical loads placed across the failure surface/planes of composite structures" (Filing No. 123-7 at CM/ECF p. 2, ¶6), which is the substance of his September 26, 2015 report. Defendants have not refuted this testimony. Furthermore, Eihusen did x-ray the bucket on or about March 3, 2016, the results of which allegedly corroborated his earlier findings (Filing No. 123-10). He

also participated in a joint laboratory test with Defendants' experts in California on April 27, 2016. During that testing, a Scanning Electron Microscope (SEM) was used to inspect various parts of the failed bucket and samples were analyzed using Fourier Transform Infrared Spectroscopy (FTIR). Eihusen concluded that, in his opinion, the results from these tests supported his previous conclusions regarding the origin and cause of the bucket failure. (Filing No. 123-8 at CM/ECF pp. 12-14, 18; Filing No. 123-5 at CM/ECF pp. 177-78).

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner,* 259 F.3d at 929 (quoting *Hose v. Chicago Northwestern Transp. Co.,* 70 F.3d 968, 974 (8th Cir.1995) (internal citations and quotations omitted)). In this case, Eihusen's testimony is "not so fundamentally unsupported that it could offer no assistance to the jury." *Synergetics, Inc. v. Hurst,* 477 F.3d 949, 956 (8th Cir. 2007). Although Defendants have identified potential weaknesses in Eihusen's methodology and conclusions, it may address these weaknesses through cross-examination and its own experts. *Id .; see also Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants' *Daubert* motion to exclude Eihusen's opinion testimony and report will be denied without prejudice to reassertion at trial.

### *2. William Coleman*

William Coleman is a registered Professional Engineer in the State of Oklahoma. He holds a Bachelor and Master of Science degree in Metallurgical Engineering. His post-graduate work toward a Ph.D. included a minor in Analytical Chemistry. He was a graduate assistant in the department of chemical engineering and materials science at the University of Oklahoma. From 1989 to 1996, Coleman taught

courses in Structures and Properties of Materials and Failure Analysis & Materials at that institution. Coleman also has taught continuing education courses in the principles of engineering and engineering failure analysis. Coleman has been involved in failure analysis since 1978 and estimates that he has made over 2,000 failure analyses. Although his main focus has been metals, Coleman testified he has looked many fiberglass structures and resins in his career.

On July 13, 2012, Coleman traveled to Lexington, Nebraska, to Dawson Public Power District's office, where he examined the subject truck, boom, bucket parts, and the utility pole. Coleman also photographed all of these components, including taking macro-photographs (i.e., extreme close-ups). The failed bucket parts were then shipped to Coleman's laboratory in Norman, Oklahoma, where they were examined periodically over the next few months, including under a microscope.

In a report dated September 30, 2015, Coleman formulated the following opinions:

(1) Inherent manufacturing defects have been discovered in the subject Altec/Osborne man lift bucket. These defects include foreign material and zones of incompletely cured resin, resulting in specific planes of weakness. Fracture of the bucket can be traced directly to the region(s) containing these flaws.

(2) The fabrication defects, which are primarily sub-surface, precipitated fracture and premature failure of the fiberglass man lift bucket. Fracture could have been instantaneous or progressive, perhaps both. Neither scenario would have provided a warning of impending failure.

(3) The defects were present at the time the man bucket left the control of the manufacturer. In all likelihood, the defective condition would have been (a) undetectable during customary periodic (maintenance) inspections and (b) completely concealed to the end-user.

> (4) No indications of pre-existing damage that could have adversely affected performance of the man lift bucket, were observed.
>
> (5) The decedent, Kurtis Keaschall, neither caused nor contributed to failure of the man lift bucket.

(Filing No. 112-1 at CM/ECF p. 9).

Defendants' principal criticism of Coleman's report is that his opinions are based solely on visual inspections of the bucket. But, as discussed above, this is a generally accepted methodology for analyzing composite failures. While certain of Coleman's opinions may be challenged for lack of a sufficient factual basis, this is a matter that can best be resolved at trial. Some evidence "cannot be evaluated accurately or sufficiently by the trial judge" in the procedural environment of a ruling on a motion *in limine*. *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 439 (8th Cir.1997); *see also United States v. Dico, Inc.,* 266 F.3d 864, 871 (8th Cir. 2001) (holding "the sufficiency of the factual basis of ... [an expert's] theory was open to any challenge [the defendant] . . . desired to mount on cross-examination, but that sufficiency was not a basis for excluding [the expert's] testimony altogether").

Defendants' *Daubert* motion to exclude Coleman's opinion testimony and report will be denied without prejudice to reassertion at trial.

### B. Rule 403

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[Rule 403] does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial." *United States v. McCourt,* 468 F.3d 1088, 1092 (8th Cir. 2006) (quoting *United States v. Johnson,* 463

F.3d 803 (8th Cir. 2006)). "Generally, the balance of Rule 403 weighing should be struck in favor of admission." *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 885 (8th Cir. 2006). Whether the probative value of challenged evidence is substantially outweighed by unfair prejudice "is a fact-intensive question that [oftentimes] must be answered by the district court in the course of trial." *Bennett v. Nucor Corp.*, 656 F.3d 802, 813 (8th Cir. 2011).

Because Defendants have not demonstrated that Eihusen's and Coleman's proposed testimony and reports are unfairly prejudicial, confusing, misleading, or otherwise objectionable, their Rule 403 motions to exclude such evidence will be denied without prejudice to reassertion at trial.

### *C. Motion for Summary Judgment*

Defendants have moved for summary judgment on all claims, and argue there is no competent evidence to establish their products were defective or a proximate cause of Plaintiff's decedent's fatal injuries. The motion will be denied because the expert testimony of Eihusen and Coleman is admissible at this point and is sufficient to create a question of material fact on these issues. *See* Fed. R. Civ. P. 56(a).

### **III. Plaintiff's Motions**

Plaintiff "moves for partial summary judgment . . . on Defendants' affirmative defense of misuse at it relates to Decedent's use of a lanyard" (Filing No. 105)[3] and "for an Order barring each of the experts for the Defendants, Ben T. Railsback, Joseph F. Rakow, and Anand R. Shah from testifying about or offering any expert opinion regarding Kurtis Keaschall's failure to connect a safety lanyard to a D-ring located on

---

[3] Defendants allege that "[t]he bucket described by the plaintiffs in their Complaint was abused and not used in the manner for which it was designed or intended" (Filing No. 9 at CM/ECF p. 3, ¶ 20).

the bucket which failed and the effect, if any, of such failure" (Filing No. 110). Plaintiff contends "[s]uch testimony fails to meet the relevance and reliability requirements because none of the experts conducted any testing or examination of the D-ring on the failed bucket, and the testimony of Altec itself confirms that the D-ring was not designed to protect an individual in the event of a catastrophic failure of a bucket" (Filing No. 110).

### A. Motion for Partial Summary Judgment

Plaintiff argues that Defendants cannot prevail on an affirmative defense of product misuse "because (1) failure to attach the lanyard was not a supervening cause of the bucket separating from the boom and (2) failure to attach the lanyard was a foreseeable misuse as a matter of law" (Filing No. 106 at CM/ECF p. 1). Defendants respond that "[t]he evidence creates a question of material fact regarding whether Mr. Keaschall's failure to use the D-Ring, either on its own or in combination with other alleged misuses, was a proximate cause of Mr. Keaschall's injury" and "there is, at a minimum, a jury question regarding whether Mr. Keaschall's failure to use the D-Ring was reasonably foreseeable, in the light of Defendants' clear warnings, the applicable industry regulations, the policies of [Dawson] and the training Mr. Keaschall received" (Filing No. 127 at CM/ECF pp. 1-2 (underlining omitted)).

Under Nebraska law, to recover on a claim of strict liability, a plaintiff must prove by a preponderance of the evidence: "(1) The defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect is the proximate or a proximately contributing cause of plaintiff's injury sustained while the product was being used in the way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and (5) plaintiff's damages were a direct and proximate result of the alleged defect." *Kudlacek*

*v. Fiat S.p.A.,* 509 N.W.2d 603, 610 (Neb. 1994) (quoting syllabus of the court in *Rahmig v. Mosley Mach. Co.*, 412 N.W.2d 56, 58-59 (Neb. 1987)); *see also* NJI2d Civ. 11.20. This theory of recovery was adopted by the Nebraska Supreme Court from Restatement (Second) of Torts § 402A (1965). *See Stahlecker v. Ford Motor Co.,* 667 N.W.2d 244, 258 (Neb. 2003).

Misuse of the product is a defense to a strict liability theory of recovery. *Jay v. Moog Auto., Inc.*, 652 N.W.2d 872, 882 (Neb. 2002). To prevail on this affirmative defense, the burden is on the defendant to prove by the greater weight of the evidence that: (1) The plaintiff used the product in one or more of the ways claimed by the defendant; (2) the defendant could not reasonably have foreseen such a use of the product; and (3) this misuse by the plaintiff was a proximate cause of his or her own injury. *See* NJI2d Civ. 11.25; *Meisner v. Patton Elec. Co.*, 781 F. Supp. 1432, 1441 (D. Neb. 1990).

Plaintiff allows that "Defendants can present evidence that Decedent misused the boom and bucket in such a way that caused the bucket to separate from the boom," but states that "[a]ny such alleged misuse purported to cause the bucket to separate from the boom would be distinct from the issue of Decedent's alleged misuse by not connecting the lanyard" (Filing No. 106 at CM/ECF p. 8). Plaintiff contends the misuse defense regarding the lanyard fails as a matter of law because "[t]he failure to connect the lanyard to the bucket did not cause the bucket to separate and fall" (Filing No. 106 at CM/ECF p. 7).

According to Plaintiff, "[t]o prevail on a misuse defense, Defendants must establish the alleged misuse was a superseding cause of the injury-causing event" (Filing No. 106 at CM/ECF p. 5). Among other authorities, Plaintiff cites *Carlson v. Freightliner LLC*, 226 F.R.D. 343 (D. Neb. 2004), in support of this proposition of law. In *Carlson*, Magistrate Judge David L. Piester ruled that a truck manufacturer was judicially estopped from amending its amended answer in products liability action to assert an affirmative defense of misuse to the plaintiffs' strict liability claim

because the manufacturer's prior admission of at least partial liability "defeats any argument that [the plaintiff's] alleged 'misuse' of the truck was *the* cause of the accident." Id. at 358 (emphasis in original). Magistrate Judge Piester stated that "'misuse' is an available defense to a product liability case when a plaintiffs' [*sic*] or third party's misuse of the product is the sole cause of an accident." Id. at 359. This statement of law, however, is not in accord with Nebraska Civil Jury Instruction 11.25, which only requires proof that the plaintiff's misuse was "a" proximate cause of his or her injury (as opposed to being "the" proximate cause of the injury-causing accident).

In the Comments to Nebraska Civil Jury Instruction 11.25, the Nebraska Supreme Court Committee on Practice and Procedure states that although it "is not absolutely certain, it seems that in order to constitute an affirmative defense to strict liability, misuse need only be 'a' proximate cause of the plaintiff's damage, and not 'the' proximate cause." The Committee explains:

> In many ways, misuse seems to be a specialized application of assumption of risk. When, with knowledge of the danger, you voluntarily expose yourself to that danger, then you assume the risk. Failure to follow plain and unambiguous instructions is a form of voluntary exposure to whatever danger is inherent in such failure to follow instructions. And, though a user may not have specific knowledge of a particular risk, he or she bears the burden of not having discovered the risk if it was to be found in the instructions. And assumption of the risk is a defense if it was "a" proximate cause of the plaintiff's damage.

NJI2d Civ. 11.25, Committee Comments.

If the evidence warrants, the court intends to instruct the jury in accordance with Nebraska Civil Jury Instruction 11.25. Plaintiff's contention that Defendants must instead prove that Mr. Keaschall's failure to attach his safety lanyard to the D-ring was the sole proximate cause of the accident is rejected.

Plaintiff also contends Defendants cannot claim Mr. Keaschall misused the product because "[f]ailing to attach a lanyard is foreseeable as a matter of law," (Filing No. 106 at CM/ECF p. 10). Under Nebraska law, however, "[f]ailure to follow plain and unambiguous instructions is a misuse of the product." *Erickson v. Monarch Indus., Inc.*, 347 N.W.2d 99, 109 (Neb. 1984). "The seller is entitled to have his due warnings and instructions followed; and when they are disregarded, and injury results, he is not liable." *Id.* (internal quotation marks and citations omitted). "It is not reasonably foreseeable that a consumer of particular expertise would fail to follow directions." *Id.* On the evidence presented, the court finds there is a genuine issue of material fact as to whether Mr. Keaschall's failure to attach the safety lanyard to the D-ring was reasonably foreseeable.

### ***B. Motion in Limine***

Finally, Plaintiff has moved to exclude all testimony by Defendants' experts concerning the alleged product misuse associated with failing to attach the safety lanyard to the D-ring. The court has carefully reviewed the experts' reports and deposition testimony and makes a preliminary finding that the challenged evidence is both relevant and reliable.[4] Plaintiff's motion in limine therefore will be denied without prejudice to reassertion at trial.

---

[4] The court does not believe an extended discussion regarding the admissibility of this evidence issue is warranted. Essentially, Plaintiff contends the D-ring was designed to protect workers from falling out of the bucket and was not tested by Defendants' experts to determine if its use would have prevented Mr. Keaschall's fall in this instance, involving a catastrophic failure of the bucket. The evidence shows, however, that the portion of the bucket the D-ring was attached to did not break away from the boom. The opinions of Defendants' experts, which are based on their inspection of the equipment, on product testing performed by Defendants, and on applicable industry standards, appear admissible under Rule 402 and Rule 702.

## IV. CONCLUSION

At this time, the court finds no legal basis for excluding any expert testimony or for eliminating any claims or defenses. Accordingly,

IT IS ORDERED:

1. Filing No. 101, Defendants' Motion in Limine to Exclude The Testimony and Opinions of John Eihusen, is denied without prejudice;

2. Filing No. 105, Plaintiff's Motion for Partial Summary Judgment, is denied;

3. Filing No. 107, Defendants' Motion in Limine to Exclude The Testimony and Opinions of William Coleman, is denied without prejudice;

4. Filing No. 110, Plaintiff's Motion (in Limine) to Exclude Expert Testimony, is denied without prejudice; and

5. Filing No. 114, Defendants' Motion for Summary Judgment, is denied.

DATED this 19th day of July, 2017.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge